UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Cause No. |
| vs. | ) 3:23-cr-30076-SPM-1 |
| | ) East St. Louis, IL |
| NIRAV B. PATEL, | ) February 4, 2025 |
| | ) 9:04 a.m. |
| Defendant. | ) |

Before the
HONORABLE JUDGE STEPHEN P. MCGYLNN

**TRANSCRIPT OF JURY TRIAL**
**VOLUME 2**

FOR PLAINTIFF:    Mr. Peter T. Reed
                  Mr. Steven D. Weinhoeft
                  United States Attorney's Office
                  9 Executive Drive
                  Fairview Heights, Illinois   62208
                  peter.reed@usdoj.gov
                  steven.weinhoeft@usdoj.gov


FOR DEFENDANT:    Ms. Kim C. Freter
                  Federal Public Defender's Office
                  650 Missouri Avenue, Suite G10A
                  East St. Louis, Illinois   62201
                  kim_freter@fd.org


INTERPRETERS:    Nita Shah and Chetan Vyas


COURT REPORTER:    Erin M. Materkowski, RPR, CRR
                   erin_materkowski@ilsd.uscourts.gov
                   750 Missouri Avenue
                   East St. Louis, IL   62201

(Proceedings taken by machine shorthand; transcript
    produced by computer-aided transcription)

1                              **INDEX**

2                        **WITNESSES INDEX**

3     **PLAINTIFF'S WITNESSES**                          **PAGE**

4     KAREN ENDRES

5         Direct By Mr. Reed.................................... 139

6         Cross By Ms. Freter ................................. 184

7     DON SEUBERT

8         Direct By Mr. Weinhoeft............................. 205

9         Cross By Ms. Freter ................................. 260

10        Redirect By Mr. Weinhoeft........................... 270

11    ROGER SIR

12        Direct By Mr. Weinhoeft............................. 273

13        Cross By Ms. Freter ................................. 305

14        Redirect By Mr. Weinhoeft........................... 322

15    MATTHEW WAID

16        Direct By Mr. Reed.................................... 327

17        Cross By Ms. Freter ................................. 420

18

19

20

21

22

23

24

25

1

## EXHIBITS INDEX

2

**EXHIBITS**                                    **EVIDENCE**

3     Government's No. 41...................... 156

4     Government's No. 42...................... 174

5     Government's No. 43...................... 153

6     Government's No. 45...................... 144

7     Government's No. 46...................... 167

8     Government's No. 47...................... 338

9     Government's No. 49...................... 335

10    Government's No. 50...................... 158

11    Government's No. 51...................... 296

12    Government's No. 78...................... 373

13    Government's No. 80...................... 345

14    Government's No. 81...................... 353

15    Government's No. 82...................... 356

16    Government's No. 83...................... 357

17    Government's No. 84...................... 361

18    Government's No. 85...................... 362

19    Government's No. 86...................... 364

20    Government's No. 87...................... 367

21    Government's No. 88...................... 371

22    Government's No. 89...................... 381

23    Government's No. 90...................... 382

24    Government's No. 91...................... 382

25    Government's No. 92...................... 382

1

**EXHIBITS INDEX**

2

**EXHIBITS**                                    **EVIDENCE**

3   Government's No. 93..................... 382

4   Government's No. 94..................... 382

5   Government's No. 95..................... 390

6   Government's No. 96..................... 383

7   Government's No. 97..................... 392

8   Government's No. 98..................... 395

9   Government's No. 99..................... 396

10  Government's No. 100.................... 397

11  Government's No. 101.................... 397

12  Government's No. 102.................... 397

13  Government's No. 103.................... 397

14  Government's No. 104.................... 397

15  Government's No. 105.................... 397

16  Government's No. 106.................... 400

17  Government's No. 108.................... 402

18  Government's No. 109.................... 403

19  Government's No. 110.................... 403

20  Government's No. 111.................... 403

21  Government's No. 112.................... 403

22  Government's No. 113.................... 403

23  Government's No. 114.................... 410

24  Government's No. 115.................... 410

25  Government's No. 116.................... 410

**EXHIBITS INDEX**

**EXHIBITS**                                    **EVIDENCE**

Government's No. 117..................... 410

Government's No. 118..................... 410

Government's No. 119..................... 413

Government's No. 121..................... 414

Government's No. 122..................... 417

Government's No. 124..................... 415

Government's No. 125..................... 419

ENDRES - DIRECT/REED                    Vol. 2 - 139

1          (In open court.)

2          (Jury present at 9:04 a m.)

3          THE COURT:  Good morning to all.

4          Counsel, call your next witness.

5          MR. REED:  The Government calls Karen

6    Endres, E-n-d-r-e-s.

7          COURTROOM DEPUTY:  Please raise your right

8    hand.

9          (Witness sworn.)

10         COURTROOM DEPUTY:  Please state your full

11   name and state your last name for the court.

12         THE WITNESS:  Karen Endres, E-n-d-r-e-s.

13         COURTROOM DEPUTY:  Thank you so much.

14         **KAREN ENDRES, GOVERNMENT'S WITNESS,**

15                **DIRECT EXAMINATION**

16   BY MR. REED:

17   Q. Ma'am, if you wouldn't mind scooting closer, so

18   we can pick you up on that mic, if that's all

19   right.

20   A. Okay.

21   Q. All right.  Good morning, ma'am.  Can you hear

22   me okay?

23   A. Yes, I can.

24   Q. Can you tell the jury how old you are, ma'am?

25   A. I'm 70.

ENDRES - DIRECT/REED                    Vol. 2 - 140

1   Q.  And where do you live?

2   A.  I live at 312 East Sixth in Merrill, Wisconsin.

3   North central Wisconsin.

4   Q.  And where is -- is Merrill relative to Chicago?

5   You said north central?

6   A.  Yeah, north central.

7   Q.  Okay.  Do you have any children?

8   A.  I have two children.

9   Q.  Grandchildren?

10  A.  I have three grandchildren.

11  Q.  Okay.  Are you currently married?

12  A.  No.

13  Q.  Okay.  Were you married?

14  A.  Yes.

15  Q.  When did you get divorced?

16  A.  Four years ago, 2021.

17  Q.  2021, and you said you live on Sixth Street

18  now?

19  A.  Yes.

20  Q.  Was that your marital home?

21  A.  No.

22  Q.  What happened to that house?

23  A.  I sold it.

24  Q.  About how much did you have left in savings in

25  retirement after you sold it and after the

ENDRES - DIRECT/REED                    Vol. 2 - 141

1    divorce?

2    A.  I had about 250- to 300- in there, I believe.

3    Q.  Somewhere?

4    A.  Yes.

5    Q.  When did you move into the house on Sixth

6    Street?

7    A.  Three years ago, which would have been 2022.

8    Q.  Summer?  Fall?  Do you recall?

9    A.  Towards fall.

10   Q.  And why did you move into that house?

11   A.  I sold my other house.

12   Q.  Are you retired?

13   A.  Yes, I am.

14   Q.  Where did you work?

15   A.  I was self-employed toward -- I was

16   self-employed prior to retirement.

17   Q.  Okay.  What did you do when you were

18   self-employed?

19   A.  I was a faux painter and decorator type.

20   Q.  Like wallpaper and interior decorating?

21   A.  Correct.

22   Q.  How long did you do that?

23   A.  Five years.

24   Q.  And when did you retire approximately?

25   A.  Seven years ago.  I was 64, I believe.

ENDRES - DIRECT/REED                          Vol. 2 - 142

1    Q.  Around then?

2    A.  Six years ago.

3    Q.  And before you were self-employed as a paper

4    hanger, where did you work before that?

5    A.  3M Company.

6    Q.  What did you do for 3M?

7    A.  I was an inventory coordinator.

8    Q.  What does that mean?

9    A.  I ordered the chemicals to -- according to

10   production schedules.

11   Q.  And how long did you work for 3M?

12   A.  Ten years.

13   Q.  So I want to go back to November of 2022.  What

14   happened in November of 2022?

15   A.  The day before Thanksgiving, it was a holiday

16   weekend, and a day or so before that, I received a

17   call from a gentleman who said he was from the

18   Department of Justice, U.S. Treasury Department,

19   and that's --

20   Q.  Okay.  How things started?

21        So you got this call from someone claiming

22   to work for the Government.  What did he have to

23   say?

24   A.  He told me that I had a charge, that I had just

25   purchased a $1,500 computer, and the charge went

ENDRES - DIRECT/REED                          Vol. 2 - 143

1   through my bank.  They told me it was originally

2   ordered through Amazon.

3   Q.  So a charge that you didn't recognize?

4   A.  Yes.

5            MR. REED:  Can everybody hear her?  I can

6   move the mic up.

7            THE COURT:  Can you pull the microphone a

8   little closer to you, ma'am.

9            MR. REED:  Is that better?

10  BY MR. REED:

11  Q.  Okay.  Let me ask you that again.  What did he

12  say on the phone, so the jury can hear?

13  A.  He was very convincing, had a very low quality,

14  business-like voice.  He told me that he was

15  calling from the Treasury Department, that he was a

16  high-ranking official and that my account had been

17  compromised at the bank for $1,500 or so, and he

18  told me that -- he called about ten o'clock in the

19  morning and about two o'clock, I was at the bank.

20  The first day he told me to --

21  Q.  Let me stop you there, ma'am.

22  A.  Sure.

23  Q.  Let me stop you there.

24           MR. REED:  If we can put up on the screen

25  Exhibit 45 for the witness.

ENDRES - DIRECT/REED                    Vol. 2 - 144

1    BY MR. REED:

2    Q.  Ma'am, do you recognize this document?

3    A.  Yes, I do.

4    Q.  Is this a document that the guy on the phone

5    sent to you?

6    A.  Yes.

7             MR. REED:  Move to admit 45.

8             MS. FRETER:  No objection.

9             MR. REED:  Can we publish that, please.

10            THE COURT:  45 will be admitted without

11   objection.

12            (Government's Exhibit No. 45 was received

13   in evidence.)

14   BY MR. REED:

15   Q.  Okay.  Up at the very top of this letter, who

16   does this letter purport to be from?

17   A.  The Federal Trade Commission.

18   Q.  Up in the right, there's a date?

19   A.  Yes.

20   Q.  November 22nd of 2022?

21   A.  Yes.

22   Q.  Is that the day that he called you the first

23   time?

24   A.  Yes, it is.

25   Q.  Okay.  And it says, "Dear Karen Sue Endres."

ENDRES - DIRECT/REED                    Vol. 2 - 145

1    That's you?

2    A.  Yes.

3             MR. REED:  If you can zoom in on the text

4    of that main paragraph there.

5    BY MR. REED:

6    Q.  Okay, ma'am.  Do you see about four lines

7    down --

8    A.  Uh-huh.

9    Q.  -- on the right, it says, "This is case of"?

10   A.  Case of money laundering.

11   Q.  Can you read from there through the end of this

12   paragraph for the jury, please.

13   A.  "This is case of money laundering.  As per the

14   investigation, we found multiple bank accounts

15   under name Bank of America, JPMorganChase, PNC,

16   Navy Federal, Wells Fargo, and we found that there

17   was suspicious transactions from this account to

18   countries like Kenya, Africa, Pakistan, China and

19   Mexico; and as per the further investigation, we

20   found that you're already cooperating with U.S.

21   Treasury to safeguard your fund and assets, and

22   we'll soon resolve this case."

23   Q.  Signed, "Director, Bureau of Consumer

24   Protection"?

25   A.  Yes.

ENDRES - DIRECT/REED                    Vol. 2 - 146

1    Q. So he's identified this problem for you.  What

2    are you supposed to do about it?

3    A.  I have no idea.  There were no instructions

4    with it.  Just a random.

5    Q.  What did he ask you to do?

6    A.  He didn't ask me to do anything.  This came

7    after I was scammed.

8    Q.  Okay.  So that first time on that first day,

9    November 22nd --

10   A.  Yes.

11   Q.  -- did you go to -- did you go somewhere?  Did

12   he send you somewhere?

13   A.  Yes.

14   Q.  Something about Bitcoin?

15   A.  Excuse me?

16   Q.  About a Bitcoin machine?

17   A.  Yes.

18   Q.  Tell us about that.

19   A.  He -- it was about 2:30.  He asked me to grab a

20   bottle of water and get in my car, and he would

21   tell me where to go.  So he had me driving around.

22   It turned out -- I drove, like, 30 miles for him to

23   Wausau and found out that he wanted me to put the

24   money through a Bitcoin machine.  He opened an

25   account for me -- or a wallet.  I do not have the

1    password for that, so I have no access to it.

2    Q.  How did you know where to go?

3    A.  He was on my phone telling me where to go.

4    Q.  He's on the phone as you're driving?

5    A.  Yes.  He told me he was in my phone.

6    Q.  What do you mean "in your phone"?

7    A.  He said he could direct me.  I didn't have --

8    not being computer savvy really, I didn't have any

9    map section set up, so --

10   Q.  He's giving you --

11   A.  -- I don't really know how to do it, but I knew

12   the area, so I could figure out where the Mobil

13   stations were.

14   Q.  So he was telling you where to go?

15   A.  Correct.

16   Q.  And then you would go find it?

17   A.  Yes.

18   Q.  And he's on the phone with you this whole

19   time?

20   A.  He would stay on the phone with me even while I

21   was in the building.

22   Q.  And in fact, you kept notes of how often he

23   would call?

24   A.  Yes.

25   Q.  When we talked earlier, a few weeks ago, did we

ENDRES - DIRECT/REED                    Vol. 2 - 148

1    count up those calls for the first day?

2    A.  I don't believe so.

3    Q.  How often would he call?

4    A.  Started out every couple of minutes.  I just

5    let him talk after a while, and it was like a

6    Friday, and I turned my phone off for the

7    holiday --

8    Q.  For the weekend?

9    A.  For the weekend, yes.

10   Q.  Going back to that first day, where he's

11   sending you to the Mobil stations, were there some

12   calls that were longer than an hour?

13   A.  Yes, there were.

14   Q.  More than one call longer than an hour?

15   A.  Oh, yes, and he stayed on the phone with me

16   while I was in the Mobil station.

17   Q.  How many hours do you think you were on the

18   phone on that day?

19   A.  Oh boy, ten.

20   Q.  Ten hours?

21   A.  Yes, with driving and --

22   Q.  All the rest of it?

23   A.  Yes.

24   Q.  Okay.  So he sends you to, I think you said, a

25   Mobil station?

ENDRES - DIRECT/REED                    Vol. 2 - 149

1    A.  Correct.

2    Q.  For a Bitcoin machine?

3    A.  Yes.

4    Q.  How did that go?

5    A.  He told me where to find the Bitcoin machine,

6    and he helped me -- instructed me how to set up a

7    wallet.

8    Q.  Okay.

9    A.  And he gave me the password, and I started

10   writing it down, and he got upset because I was

11   writing it down.  I could not -- they would not

12   approve -- I went back and forth because I had to

13   take my picture off the driver's license, and he

14   would say, Oh, they -- you have to send a better

15   picture, so I'd run back out, take another picture,

16   bring it in, and he'd say, "Yes, that one is okay."

17   If there was a person there, at either -- any of

18   the stations, he would say, "You've been

19   compromised.  Get out of there."  And then he

20   wanted me to take the money to a Bitcoin machine at

21   a gas station that was just up the road from me.

22   Q.  Okay.  Let me stop you there.

23          You referenced "take the money."  Have you

24   been to the bank at this point?

25   A.  Yes.

ENDRES - DIRECT/REED                     Vol. 2 - 150

1    Q.  Removed some money?

2    A.  Yes.  I removed 25,000, I believe.

3    Q.  Okay.  We'll look at the records for the exact

4    amount, but you have all this cash with you?

5    A.  Yes.

6    Q.  You're taking it into the Mobil station with

7    you?

8    A.  In 50s.

9    Q.  In 50s?

10   A.  Yes.

11   Q.  And that's to feed it into the Bitcoin

12   machine?

13   A.  Correct.

14   Q.  Were you ever able to get that to work?

15   A.  No.  He called me first thing the next morning

16   and said that my account was established, and all

17   the information I provided had been --

18   Q.  Had been taken?

19   A.  Yes.

20   Q.  Okay.  And you said "the next morning."  Is

21   that Wednesday, the day before Thanksgiving?  It's

22   okay if you don't remember.

23   A.  I had to make the -- the night before the

24   pickup was the day before Thanksgiving -- the night

25   before Thanksgiving was the pickup.

ENDRES - DIRECT/REED                    Vol. 2 - 151

1    Q. Let's pause, and we'll circle back and set the

2    dates.

3              But that first day, you went around to the

4    Mobil stations --

5    A. Correct.

6    Q. -- with the cash, but you weren't able to get

7    the Bitcoin machines to work?

8    A. Correct.

9    Q. And then he calls you back the next morning?

10   A. Yes.

11   Q. What does he want you to do first thing that

12   next morning?

13   A. He wanted me -- he took me -- he wanted me to

14   go to the Mobil station that was in my

15   neighborhood.

16   Q. Okay.  Did you go?

17   A. Yes.

18   Q. What happened when you got there?  Was he still

19   on the phone with you during that trip?

20   A. He was on the phone, and I said, "Oh, okay, I

21   can get there.  The station is close to my home."

22   He said, "Do you know people there?"  And I said,

23   "Yes."  So the minute I walked in, I said hi to the

24   clerk.  He said, "You've been compromised.  Get out

25   of there."

ENDRES - DIRECT/REED                    Vol. 2 - 152

1    Q. So you left?

2    A. Yes.

3    Q. Okay.  And it sounds like, you've said this,

4    "You've been compromised," maybe more than once?

5    A. He said it about three times, I believe.

6    Q. He doesn't want you around people that you

7    know?

8    A. Around me or know what I'm doing.

9    Q. Did he tell you that?

10   A. No.

11   Q. What did he tell you about who you should tell

12   or who you shouldn't tell?

13   A. He didn't really mention that.

14   Q. Okay.

15   A. No, he didn't mention that.

16   Q. So you leave the Mobil gas station because

17   you've been compromised.  Where'd you go from

18   there?

19   A. I went back to my home.

20   Q. So did the guy on the phone, did he call you

21   again, or is he still on the phone?

22   A. He called me again.

23   Q. What did he say this time?

24   A. He was having problems picking up, wasn't sure

25   how to pick up the cash, so that he would try to

ENDRES - DIRECT/REED                    Vol. 2 - 153

1    find a courier to pick it up.

2    Q.  Okay.  What did he ask you to do while he's

3    looking for a courier?

4    A.  I just waited for him to find a courier.

5    Q.  Okay.  Were you supposed to do anything with

6    the money?

7    A.  I was supposed to put it in, like, a shoebox he

8    said would be fine and put the receipt from the

9    bank in with the box, tape it well, and I believe I

10   had to write my name on the box.

11           MR. REED:  Okay.  If we could pull up

12   Exhibit 43 for the witness, please.

13   BY MR. REED:

14   Q.  Are these pictures of the box?

15   A.  Yes.

16           MR. REED:  Move to admit Government's

17   Exhibit 43.

18           MS. FRETER:  No objection.

19           THE COURT:  43 is admitted without

20   objection.

21           (Government's Exhibit No. 43 was received

22   in evidence.)

23           MR. REED:  Publish to the jury.

24           THE COURT:  You may.

25   BY MR. REED:

ENDRES - DIRECT/REED                    Vol. 2 - 154

1   Q. So first, ma'am, there's a date at the bottom,

2   November 23, 2022.  Would that have been when you

3   took these pictures?

4   A. Yes, it is.

5   Q. Is this the box that you put the money in?

6   A. Yes.

7           MR. REED:  Go to page 2.

8   BY MR. REED:

9   Q. It's another picture of the box?

10  A. Correct.

11          MR. REED:  If you could zoom in on that

12  Park City receipt that's in the box.

13  BY MR. REED:

14  Q. Can you see that okay?

15  A. Yes, I can.

16  Q. Okay.  On that receipt, does it list a

17  withdrawal for $24,000?

18  A. Yes.

19  Q. And another withdrawal for $5,000?

20  A. Correct.

21  Q. For a total of $29,000?

22  A. Yes.

23  Q. And it's a little hard to see because it's

24  wrinkled, but is there a date in the bottom left,

25  November 22, 2022?

ENDRES - DIRECT/REED                      Vol. 2 - 155

1    A.  Correct.

2    Q.  So this is the money you took out of the bank

3    the day before and took with you to the Mobil gas

4    stations?

5    A.  Yes, it is.

6    Q.  And now you're putting it in a box?

7    A.  Yes.

8              MR. REED:  Page 3 if we could.

9    BY MR. REED:

10   Q.  This third photo has a different date, November

11   22nd?

12   A.  Uh-huh.

13   Q.  Is this in your vehicle?

14   A.  It is.

15   Q.  It's after you picked up all the cash?

16   A.  Yes.

17             MR. REED:  Just briefly, if you could put

18   41 up for the witness.

19   BY MR. REED:

20   Q.  We just saw that receipt from Park City Credit

21   Union.  Are these your statements from Park City

22   Credit Union?

23   A.  Yes, they are.

24             MR. REED:  Move to admit Exhibit 41.

25             MS. FRETER:  No objection.

ENDRES - DIRECT/REED                    Vol. 2 - 156

1          THE COURT:  41 admitted without objection.

2          (Government's Exhibit No. 41 was received

3     in evidence.)

4          MR. REED:  If we could jump down to page

5     4.

6     BY MR. REED:

7     Q.  This will say the same thing.  If you look

8     under regular savings, is there a withdrawal from

9     your savings account for 24,000 on November 22nd?

10    A.  Yes.

11    Q.  And then under checking, there's also a $5,000

12    withdrawal that same day?

13    A.  Yes, on the 22nd.

14          MR. REED:  Take that down.

15    BY MR. REED:

16    Q.  Okay.  You boxed up the 29,000.  Why did you

17    take those photos?

18    A.  I took them prior to boxing up the cash.

19    Q.  Why did you take them?

20    A.  The pictures, he instructed me to take

21    pictures.

22    Q.  Okay.  And what did you do with the pictures?

23    A.  I just kept them.

24    Q.  Did you send them to him?

25    A.  No.

ENDRES - DIRECT/REED                      Vol. 2 - 157

1   Q.  Okay.  He asked you to take them though?

2   A.  I believe so, yes.

3   Q.  Okay.

4   A.  I'm not really sure on that, but --

5   Q.  One way or the other you took them, but you're

6   not sure --

7   A.  I did, yes.

8   Q.  All right.  He told you earlier he was going to

9   try to find a courier.  Did he ever call back with

10  more information about the courier?

11  A.  He was kind of vague about that.

12  Q.  Okay.

13  A.  Yeah, it took him almost, like, from early

14  afternoon to almost five, five or six, seven before

15  he sent the courier.  It was dark already.

16  Q.  You're waiting around a while after you box up

17  the cash?

18  A.  Over half a day, yes.

19  Q.  And you said it's after dark.  Did he tell you

20  anything about the car that was expected to arrive

21  at this point?

22  A.  He did not.

23          MR. REED:  Okay.  So before we get into

24  that night, if we could pull up Exhibit 50 for the

25  witness.

ENDRES - DIRECT/REED                    Vol. 2 - 158

1    BY MR. REED:

2    Q. Do you recognize this area, ma'am?

3    A. Yes, that's the area where my home is

4    located.

5    Q. Okay.  And where on this map is your house?

6    A. It is on the corner of East Sixth and

7    Douglas.

8              MR. REED:  Okay.  Move to admit Exhibit 50

9    and publish to the jury.

10             MS. FRETER:  No objection.

11             THE COURT:  Admitted without objection.

12             (Government's Exhibit No. 50 was received

13   in evidence.)

14   BY MR. REED:

15   Q. So now that the jury can see this, your house

16   is where the red dot is in the middle of the map?

17   A. Yes, correct.

18   Q. So you're at the corner?

19   A. Yes.

20   Q. All right.  So you told us you're waiting about

21   half a day.  It's dark outside now?

22   A. Yes.

23   Q. Where are you waiting?

24   A. I'm waiting on the west side on a porch.

25   Q. Okay.

ENDRES - DIRECT/REED                    Vol. 2 - 159

1    A. On a swing, waiting, porch swing.

2    Q. Facing Sixth Street toward the railroad

3    tracks?

4    A. Yes.

5    Q. You get a call from Eric at some point that

6    night as you're sitting on the porch swing?

7    A. He told me that he had found a courier.

8    Q. Okay.

9    A. And that I should just hold on for him to call

10   me again, so -- but I had the money ready to go,

11   so --

12   Q. So you're sitting out there with your box?

13   A. Yes.

14   Q. Did he call you back?

15   A. Yes, he was -- I believe he was on the phone

16   with the courier.  I could not -- he said, "Well,

17   the porch is here," and I said, "Well, that's my

18   deck.  I'm on the porch on the west side of the

19   house."

20   Q. So is this -- the courier has arrived?

21   A. Yes.

22   Q. And he told you the courier had arrived?

23   A. Yes.

24   Q. Had you seen the courier's vehicle yet?

25   A. I had to walk off the porch and down through

ENDRES - DIRECT/REED                    Vol. 2 - 160

1   the -- catty-corner through the intersection, and

2   he said -- I couldn't find the car.

3   Q.  You couldn't find the car?

4   A.  It was kind of a dirty tan, and then they

5   flashed their lights once, and I said, "Okay, I see

6   them."

7   Q.  Okay.  So hold on a second.  You're on the

8   phone, you're walking down the driveway to the

9   street?

10  A.  Yes.

11  Q.  And you can't see the car?

12  A.  No.

13  Q.  Okay.  Do you tell the guy on the phone you

14  can't see the car?

15  A.  Yes.

16  Q.  Is that when the driver flashes his lights?

17  A.  Correct.

18  Q.  So you found the car at this point?

19  A.  Yes.

20  Q.  What do you do then?

21  A.  I walked over to the car who had flashed his

22  lights, and I was ready to knock on the window.

23  The window wasn't down.  So he rolled down the

24  window, and I said, "Well, what do I do with this?"

25  And he said, "Toss it in back."  So at that point

ENDRES - DIRECT/REED                           Vol. 2 - 161

1    he rolled the back window down.

2    Q.  And did you put it in the back?

3    A.  Yes.

4    Q.  So was he on your side of the street or on the

5    other side of the street?

6    A.  He was parked the opposite way.  There were two

7    or three cars behind him, I believe, too.

8    Q.  And when you got to the car, you said -- did

9    you say something to him?

10   A.  I said, "What do I do with this?"  I said, "I'm

11   new at this.  What do I do with this?"

12   Q.  And that's when he said, Toss it in the back or

13   something to that --

14   A.  After I knocked on the window, he rolled it

15   halfway down, and then I asked him, "What do I do

16   with this?"

17   Q.  As you approached the car, you were on the

18   driver's side?

19   A.  Yes.

20   Q.  Okay.  And you rap on the window.  He rolls it

21   down.  What direction is he looking when you do

22   that?

23   A.  He was looking toward me.

24   Q.  Okay.

25   A.  But very quickly.

1    Q.  Okay.  When he answers your question?

2    A.  Correct, and then he laid down on the car seat

3    with his head away from me, toward the front of the

4    car, and his jacket was partially covering his

5    face.

6    Q.  When you say "laid down," just kind of slouched

7    down in the chair?

8    A.  Correct -- well, he kind of went like this on

9    the seat (indicating).

10   Q.  Okay.  Leaning away from you?

11   A.  Correct.

12   Q.  So you said when he leans away from you, his

13   jacket is covering his face a little bit, did you

14   later tell officers it may have been a man or a

15   woman driving the car?

16   A.  I did.

17   Q.  Okay.  Did you get a good look at the driver?

18   A.  I got a partial of the eye area from the side

19   and the hair.

20   Q.  Okay.  And you heard his voice just for those

21   few words?

22   A.  Yes.

23   Q.  Is it dark out?

24   A.  Yes, but there were streetlights.

25   Q.  Okay.  So after you put the box in the back,

ENDRES - DIRECT/REED                    Vol. 2 - 163

1    what did you do?

2    A.  I turned around and walked back to my house.  I

3    was halfway through the intersection when he pulled

4    out toward the tracks, and I tried to get his

5    license number, but I couldn't see it, so --

6    Q.  What was the weather like in Merrill,

7    Wisconsin, at this time?

8    A.  It was snowing.  There was ice, ice on the

9    boulevards, and it was about maybe 30, 30

10   something.

11   Q.  How long do you think it would take you to walk

12   from your driveway over to where he was parked?

13   A.  Just a few minutes.

14   Q.  Okay.  And a few minutes back?

15   A.  Yes.

16   Q.  Did he wait until you got back to your driveway

17   to peel off?

18   A.  Halfway.

19            MR. REED:  If we could pull up the map.  I

20   think it's 50.

21   BY MR. REED:

22   Q.  You said he pulled towards the tracks?

23   A.  Uh-huh.

24   Q.  These tracks here?

25   A.  Yes.

ENDRES - DIRECT/REED                    Vol. 2 - 164

1    Q.  So he's going this way on Sixth?

2    A.  Correct.

3    Q.  All right.  Did the driver ever introduce

4    himself?

5    A.  No.

6    Q.  Did he ever make any eye contact with you?

7    A.  No.

8    Q.  Did he ever say anything besides -- in the back

9    line?

10   A.  No.

11   Q.  Did he give you a receipt?

12   A.  No.

13   Q.  Did he ever get out of the car?

14   A.  No.

15   Q.  Did he help you get back to your house?

16   A.  No.

17   Q.  Did he have any sign -- or have you sign

18   anything to acknowledge you had handed over all

19   that money?

20   A.  No.

21   Q.  Were there any markings on the car to indicate

22   it was a delivery service like FedEx or UPS?

23   A.  It was -- no.

24   Q.  Anything that said it was a ride service like

25   Uber?

ENDRES - DIRECT/REED                    Vol. 2 - 165

1    A.  No.

2    Q.  All right.  So that's the night of November

3    23rd?

4    A.  Yes.

5    Q.  Did Eric call back again the next day?

6    A.  Oh, yes.

7    Q.  And that would be November 24th?

8    A.  Yes.

9    Q.  Would that have been Thanksgiving Day?

10   A.  Correct.

11   Q.  Did the guy on the phone say anything about the

12   money that was picked up the night before?

13   A.  I'm blank.

14   Q.  That's okay.

15   A.  He called me the next day --

16   Q.  Oh, you're okay.

17   A.  -- Thanksgiving Day --

18   Q.  Pause for a minute.

19   A.  Okay.

20          MR. REED:  Can we go back to 43 and page

21   2.

22   BY MR. REED:

23   Q.  You pulled $29,000 out of the bank?

24   A.  Correct.

25   Q.  And that's how much you put in the box?

1  A. Yes.

2  Q. So did he call you back on Thursday asking

3  about this 29,000?

4  A. Yes.

5  Q. What did he say?

6  A. He told me I had -- in the box was only

7  $28,700.  I must have counted wrong.

8  Q. And that's the next day after the pickup?

9  A. Yes.

10  Q. Did he tell you that, "You counted wrong"?

11  A. Oh, immediately.

12  Q. What did he say?

13  A. I mentioned the 29,000.  He said, "You only had

14  twenty-eight-seven in the box."  I said, Oh.

15  Q. Was he upset about that?

16  A. He seemed a little perturbed.

17        MR. REED:  I'm going to pull up

18  Government's Exhibit 46 for the witness if we could

19  just zoom in on this.

20  BY MR. REED:

21  Q. Could you recognize this document?

22  A. Yes.

23  Q. Was it sent to you by that guy on the phone?

24  A. I believe so.  Eric Foster, yes.

25  Q. Eric Foster was the guy on the phone?

ENDRES - DIRECT/REED                    Vol. 2 - 167

1    A.  Correct.

2            MR. REED:  Move to admit Exhibit 46.

3            MS. FRETER:  No objection.

4            THE COURT:  Be admitted without objection.

5            (Government's Exhibit No. 46 was received

6    in evidence.)

7            MR. REED:  If we could publish that to the

8    jury, please.

9    BY MR. REED:

10   Q.  Can you see that okay?

11   A.  Yes, I can.

12   Q.  You mentioned that name Eric Foster.  Is his

13   name on here?

14   A.  Yes, under holder information.

15   Q.  And then at the top, who is this form

16   purportedly from?

17   A.  Minnesota Department of Commerce, Safe

18   Deposit.

19   Q.  But it really came from this Eric Foster guy

20   who's on the phone?

21   A.  Yes, it was an email.

22   Q.  Down the page, does this form have your name

23   and information -- nope.  I'm sorry.  In the box,

24   Number 2?

25   A.  Yes, it does.

1          MR. REED:  If we could just zoom in on

2     that.  There you go.  Thank you.

3     BY MR. REED:

4     Q.  Karen Sue Endres and that is your address?

5     A.  It is.

6     Q.  And there's a field that says, Date of Last

7     Activity, what is that date?

8     A.  That is Thanksgiving Day, 11-24.

9     Q.  All right.  And branch office where property

10    was held?  Treasury Department?

11    A.  Yes.

12    Q.  That's what he told you?  Eric Foster?

13    A.  Yes, he said he was an official.

14    Q.  Okay.  And in the next box, it says amount

15    verified, 28,700?

16    A.  Yes, he verified that.

17    Q.  This is when Eric Foster calls you back on

18    Thanksgiving, and this is the number he gives

19    you?

20    A.  Yes, twenty-eight-seven.

21    Q.  Okay.  Not the 29,000 that you actually put in

22    the box?

23    A.  Twenty-eight-seven.

24    Q.  Okay.  Why did he send you this?

25    A.  I don't know.  He was going back to the first

ENDRES - DIRECT/REED                        Vol. 2 - 169

1   one -- my initial thought was that my money is in a

2   safe deposit box and that the Government will help

3   me get it back, but this was all a fake.

4   Q.  Okay.  But it may have been -- at the time was

5   it reassuring?

6   A.  It was, very much so.

7   Q.  That day, Thanksgiving, did Eric Foster ask you

8   about other money?

9   A.  No, he asked me -- it was before I boxed it

10  up.

11  Q.  Okay.

12  A.  It was kind of short notice.  He asked about --

13  he wanted more cash than the 29.

14  Q.  Okay.  What did you tell him?

15  A.  I told him -- he asked me if I had -- I did not

16  have that much cash.  I said, "I don't have any

17  cash in the house, but I have a savings account."

18  So he was trying to convince me to pull the money

19  out of the savings account.

20  Q.  Did you do it that day?

21  A.  No, Lieutenant Seubert did.

22  Q.  All right.  We'll get to that in a minute.

23         How much money did you tell him you had in

24  this other savings account?

25  A.  It was 75 or 85.  I'm not certain of the exact

ENDRES - DIRECT/REED                    Vol. 2 - 170

1    amount.

2    Q.  So after you talk to him on Thanksgiving Day,

3    is he looking for more money again?

4    A.  He is, yes.

5    Q.  Okay.

6    A.  And told me about the mistake I made with

7    counting and --

8    Q.  What's going through your mind at this point as

9    he's calling back for more money?

10   A.  That's when I really got suspicious.

11   Q.  What made you suspicious about this whole

12   thing?

13   A.  I just -- the first -- when he had me running

14   around to gas stations, I stopped and I went, Okay,

15   am I going to do this or not, gut feel and that,

16   and it was kind of -- so I went with it.

17   Q.  Right.

18   A.  And what was the other part of your question,

19   please?

20   Q.  What made you suspicious later on?

21   A.  Just thinking that I made a real mistake, and

22   how do I fix it?

23   Q.  What was the mistake?

24   A.  Giving the money to a courier and taking it out

25   of my bank account.

1    Q.  Okay.  So you realize you've made a mistake.
2    What do you do next?
3    A.  I was worried he had a tracking device on my
4    car, which he said he did, and I went to the police
5    station, Merrill PD.
6    Q.  That day?
7    A.  Yes.
8    Q.  That day you went to Merrill PD?
9    A.  Yes.
10   Q.  Okay.  And reported what had happened to you?
11   A.  Yes.
12   Q.  As you sit here today, do you think Eric Foster
13   was really a federal agent?
14   A.  Oh, no, no.
15   Q.  And those documents from the FTC and the
16   Commerce Department, were those actually from the
17   FTC and Commerce Department?
18   A.  No.
19   Q.  So you went and told the police.  What did they
20   want you to do?
21   A.  The detective was there, and I had numerous
22   notes for him.  I gave him my notes on the calls
23   that Eric Foster made to me, et cetera.  I was
24   there about an hour, I was interviewed by him, and
25   he said he would -- my story and the notes would be

ENDRES - DIRECT/REED                    Vol. 2 - 172

1   referred to Lieutenant Seubert on Monday.

2   Q.  Did you end up talking with Lieutenant

3   Seubert?

4   A.  It was a few days later, I believe.

5   Q.  You mentioned earlier at some point you turned

6   your phone off so that --

7   A.  Yes.

8   Q.  -- Eric Foster would stop calling you?

9   A.  Yes.

10  Q.  Was that this weekend after Thanksgiving?

11  A.  Yes, it was.  It was before the pickup.

12  Q.  It was before the pickup?

13  A.  Yes.

14  Q.  Well, before the second -- the second one?

15  A.  It was before the first one.

16  Q.  Okay.  Did you turn your phone back on, and he

17  started calling you again?

18  A.  I'm sorry.  It was after the first one.

19  Q.  No, that's okay.  So Thursday, Thanksgiving

20  Day, was the day you went to the police?

21  A.  Yes.

22  Q.  And the first time he called you was Tuesday,

23  two days before Thanksgiving?

24  A.  Yes.

25  Q.  Okay.  And at some point after Thanksgiving, do

ENDRES - DIRECT/REED                    Vol. 2 - 173

1   you talk to Eric Foster again?

2   A.  Yes.

3   Q.  What did you talk to him about?

4   A.  I had -- I was at the PD, and he asked me where

5   I had gone, and I got really kind of scared at that

6   point.  I told him I went to the grocery store.  So

7   that was okay with him.

8   Q.  Is he still after more money?

9   A.  I don't recall.

10  Q.  Some time that week --

11  A.  Yes, oh, yes.

12  Q.  He's still bugging you about more money?

13  A.  Since I told him what I had in the bank, oh,

14  yes.

15          MR. REED:  Let's pull up Government's

16  Exhibit 42 at this point for the witness.

17  BY MR. REED:

18  Q.  Do you also bank at Nicolet Bank?

19  A.  Yes.

20  Q.  And up here in the top corner, is that your

21  name and address?

22  A.  It is.

23  Q.  Are these your account statements from

24  Nicolet?

25  A.  They are.

ENDRES - DIRECT/REED                    Vol. 2 - 174

1          MR. REED:  Move to admit 42 and publish to

2     the jury.

3          MS. FRETER:  No objection.

4          THE COURT:  Admitted without objection.

5          (Government's Exhibit No. 42 was received

6     in evidence.)

7          THE WITNESS:  This is the statement for

8     the checking account.

9     BY MR. REED:

10    Q.  Okay.  This is the one we were talking about

11    with the 75,000?

12    A.  Yes.

13         MR. REED:  If we could go down to page 16,

14    please.  Zoom in on those transactions.

15    BY MR. REED:

16    Q.  Okay.  Ma'am, do you see a couple transactions

17    on December 2nd of 2022?

18    A.  Yes.

19    Q.  There's a withdrawal of $75,000?

20    A.  Yes.

21    Q.  And a deposit of $75,000?

22    A.  Yes.

23    Q.  Okay.  As you're talking to Eric Foster about

24    picking up this 75,000, are you also talking to the

25    police?

ENDRES - DIRECT/REED                    Vol. 2 - 175

1    A.  No.

2    Q.  Okay.  Are the police communicating with you

3    during the course of this time?

4    A.  Not till the following week.  I believe it was

5    Tuesday.

6    Q.  Okay.  And what did the police say on

7    Tuesday?

8    A.  Lieutenant Seubert asked me to meet with him.

9    Q.  Okay.

10   A.  And my sister and I met him at the Walmart

11   parking lot.  It was kind of a neutral location.

12   Q.  Sure.  Did you -- did the police come up with a

13   plan to set up a second pickup?

14   A.  Yes.

15   Q.  Did you talk to Eric Foster about a second

16   pickup?

17   A.  A few days --

18   Q.  At some point?

19   A.  Yes.

20   Q.  What did he say about the second pickup?

21   A.  He said he would send a courier again.  I told

22   him I will not drive anymore at night like I did

23   the first time when I was running around for the

24   Bitcoin machine, and so he said, "I will try and

25   find a courier."

ENDRES - DIRECT/REED                    Vol. 2 - 176

1    Q.  Okay.  Did he find a courier?

2    A.  Yes.

3    Q.  Was it the same guy as before?

4    A.  Yes.

5    Q.  How did he describe the vehicle?

6    A.  It was like a dirty tan.  It wasn't a new

7    model.

8    Q.  Okay.  On these bank statements, it shows a

9    withdrawal on December 2nd and a redeposit on

10   December 2nd?

11   A.  Yes.

12   Q.  Is December 2nd the day of the second pickup?

13   A.  Yes.

14   Q.  That morning, December 2nd, did you go

15   somewhere that morning?

16   A.  I went to -- December 2nd?  Yes, I was at the

17   bank.

18   Q.  Okay.  At Nicolet Bank?

19   A.  Yes.

20   Q.  Who else was there?

21   A.  Lieutenant Seubert.  Lieutenant Seubert was

22   there.

23   Q.  Okay.  And when did you go to the bank?  In the

24   morning?

25   A.  Yes, right away.  The lieutenant and his staff

ENDRES - DIRECT/REED                    Vol. 2 - 177

1    picked me up about eight o'clock.

2    Q.  Okay.  And you went to the bank?

3    A.  Yes.

4    Q.  Did you call Eric Foster on the phone that

5    day?

6    A.  No.

7    Q.  Did he call you?

8    A.  Oh, yes.  Yes, I was on the phone with him

9    continually at the bank, yes.

10   Q.  Okay.  And what's he talking about while he's

11   on the phone with you continually at the bank?

12   A.  It was just we've got a -- they're money

13   laundering.  We have to take care of this.  We have

14   to solve this.  It was a big deal to him that a

15   federal agent had to --

16   Q.  Come get it for you?

17   A.  Correct.

18   Q.  And the money he wants is this 75,000?

19   A.  Correct.

20   Q.  Did you take pictures of it again?

21   A.  I'm sorry?

22   Q.  Did you take pictures of the money again?

23   A.  We took pictures of the money at the bank.

24   Q.  Okay.

25   A.  He was -- we made certain that the grain

ENDRES - DIRECT/REED                              Vol. 2 - 178

1   matched on the -- was close enough to my kitchen

2   table.

3   Q.  Were you waiting at the bank for a while after

4   you sent the pictures?

5   A.  I was at the bank all day almost.

6   Q.  Okay.  So you got there at 8?

7   A.  Uh-huh.

8   Q.  You're waiting there most of the day?

9   A.  Yes.

10  Q.  What was the delay?  Did Eric tell you?

11  A.  The delay for --

12  Q.  Why did it take so long?

13  A.  I told him I didn't have the money, and I would

14  have to withdraw -- you know, withdraw it.

15  Q.  Okay.  Did you withdraw it and take the

16  pictures?

17  A.  Lieutenant Seubert withdrew it, we took

18  pictures, and then he redeposited it after the

19  pictures.

20  Q.  Okay.  And then as you're waiting there after

21  Eric tells you that he'll send a courier, how long

22  do you think were you waiting at the bank?

23  A.  I think it was around four to five hours.  It

24  was getting toward four o'clock.

25  Q.  It was a long time?

ENDRES - DIRECT/REED                           Vol. 2 - 179

1    A.  Yes.

2    Q.  At some point during that time did you call

3    Eric and tell him something to get him to hurry

4    up?

5    A.  Yes.

6    Q.  What did you tell him --

7    A.  No, he phoned me.

8    Q.  He phoned you?

9    A.  Yes.

10   Q.  Okay.  And what did you tell him?

11   A.  Lieutenant -- I was -- I didn't realize they

12   were -- they had set up a sting operation until

13   that morning, earlier, so --

14   Q.  But that's what was going on?

15   A.  Yes.

16   Q.  What did you tell Eric Foster, though, when he

17   called?

18   A.  I just listened to him.

19   Q.  Okay.  Did he tell you anything about sending a

20   courier?

21   A.  Yes, he said he didn't like to do it.

22   Q.  Okay.

23   A.  I didn't ask why.  I kind of figured -- well, I

24   didn't ask why.

25   Q.  Okay.

ENDRES - DIRECT/REED                          Vol. 2 - 180

1    A.  But he said he would -- he said, I finally -- I

2    found one --

3    Q.  Okay.

4    A.  -- and I will call you when --

5    Q.  When he gets there?

6    A.  When he's there to pick up the money.

7    Q.  Okay.  And as you're waiting, did you tell him

8    something about shopping?

9    A.  Shopping?

10   Q.  Going shopping?

11   A.  Yes, where I was at the police station --

12   Q.  But when you were at --

13   A.  Police --

14   Q.  -- the bank --

15   A.  No, no.

16   Q.  Go ahead.

17   A.  He only asked me about that on the 24th,

18   Thanksgiving Day, where I had been.

19   Q.  Okay.  So let's go back to the bank then.  He

20   says he's going to send a courier.  He described it

21   the way you said earlier.  Did you tell him --

22   where did you tell him you would be?

23   A.  I told him I would be on the porch --

24   Q.  Okay.

25   A.  -- where I was the last time.

ENDRES - DIRECT/REED                    Vol. 2 - 181

1  Q.  Because you want the courier to go to the

2  house?

3  A.  Yes.

4  Q.  But you're still at the bank?

5  A.  I'm still at the bank.

6  Q.  At some point does he call you and tell you the

7  courier has arrived?

8  A.  Yes.

9  Q.  Tell us about that.

10 A.  I couldn't find him, the courier.  He told me

11 where to find him, and that's when he flashed his

12 lights.

13 Q.  That was the first time?

14 A.  Yes.

15 Q.  But this second time when you're waiting at the

16 bank --

17 A.  Yes.

18 Q.  -- does he call you and say the courier has

19 arrived?

20 A.  Yes.

21 Q.  Okay.  And what happened after that?

22 A.  I was at the bank yet.  Lieutenant Seubert was

23 on the phone, and he said, We've got the suspect in

24 custody.  There were a number of detectives who

25 were in the area of my home, and they surrounded

ENDRES - DIRECT/REED                    Vol. 2 - 182

1    him with lights and sirens.  Then the lieutenant

2    and I left to go to my home.

3    Q.  Okay.  Did you ever hear back from Eric Foster

4    on the phone after this arrest?

5    A.  No.  The last time I talked to Eric Foster was

6    as Lieutenant Seubert told me, "They've got the

7    guy."  He was still talking -- I believe he was

8    talking to me and he immediately hung up.  It was

9    like --

10   Q.  The end, okay.  And that's the last you heard

11   from him?

12   A.  Correct.

13   Q.  All right.  In all, how much did you lose?  The

14   29,000?

15   A.  Twenty-eight-seven according to Eric Foster.

16   Q.  But 29,000 according to your bank receipt?

17   A.  Yes.

18   Q.  How did this whole experience impact your

19   life?

20   A.  I had recently been divorced.  I was very

21   concerned about money.  I was -- had a rental unit.

22   I moved into a rental unit that was ready for

23   condemnation, and I had to bring it up to

24   standards, so I stuck a lot of money into it.

25   Q.  What about this experience with Eric Foster,

1    how did that impact your life?

2    A.  At first it didn't bother me; and then after

3    the PD, it really bothered me.

4    Q.  How so?

5    A.  Just that I had been scammed, and I had lost

6    all that money.  Would I ever get it back?  That

7    was what was running through my head.

8    Q.  Do you live your life differently in any way

9    now?

10   A.  Yes.

11   Q.  How is that?

12   A.  I'm more -- I'm really picky about amounts I

13   spend.  I read all statements I get.  I check them

14   all.

15   Q.  Anything else?

16   A.  Not that I can think of.

17   Q.  Okay.

18   A.  I'm just frugal now.

19   Q.  Because you lost the money?

20   A.  Correct, and I don't have much left.

21        MR. REED:  Thank you, ma'am, for your

22   time, and I pass the witness to defense counsel.

23        THE COURT:  She gets to cross-examine you.

24        THE WITNESS:  I'm sorry.

25        THE COURT:  That's all right.

**CROSS-EXAMINATION**

BY MS. FRETER:

1    Q.  Ms. Endres?

2    A.  Yes.

3    Q.  Okay.  We've never talked before; is that

4    right?  You and I have never met?

5    A.  No.

6    Q.  Okay.  And so as you were testifying, some

7    things -- I was just a little confused, so I just

8    sort of want to go back a little bit and make sure

9    that I understand.

10    A.  Okay.

11    Q.  It's your -- and this has been, what is this --

12    it's about almost two-and-a-half, three years ago

13    now, right?  It was '22?

14    A.  November of 2022.

15    Q.  It's a little while ago.  It's hard to remember

16    some of the tiny details.

17    A.  I had exclusive notes.

18    Q.  Okay.  And so your best recollection is that on

19    November 22 is that you got a phone call from this

20    guy saying he was Eric; is that right?

21    A.  Yes.

22    Q.  Okay.  And was that the first contact that you

23    had with this Eric person?

ENDRES - CROSS/FRETER                    Vol. 2 - 185

1    A.  No.

2    Q.  Okay.  What was the first contact that you

3    had?

4    A.  It was a few days before Thanksgiving.  It was

5    just a random phone call.

6    Q.  Okay.  And so this is where I get a little

7    confused.  When you talked to Mr. Reed,

8    Thanksgiving that year, on a Thursday, was on

9    November 24th?

10   A.  Uh-huh.

11   Q.  And so because the court reporter is taking it

12   down, I got to get you to say yes or no --

13   A.  Yes.

14   Q.  -- because she can't --

15   A.  Yes.

16   Q.  It's okay.

17   A.  Yes.

18   Q.  It's hard to remember, the uh-huh, it's just

19   hard.

20   A.  Yes.

21   Q.  So Thursday, November 24th of 2022 was

22   Thanksgiving?

23   A.  Yes.

24   Q.  And so your best recollection is the 23rd would

25   have been Wednesday, the 22nd would have been

ENDRES - CROSS/FRETER                    Vol. 2 - 186

1   Tuesday before Thanksgiving?

2   A.  Correct.

3   Q.  Your best recollection is, is that's the day

4   you got this phone call from this guy saying he was

5   Eric?

6   A.  Yes.

7   Q.  Okay.  And the -- that's the first contact that

8   you have with him is this phone call saying, Hey,

9   I'm from the Treasury Department.  There's been a

10  problem?

11  A.  Yes.

12  Q.  Okay.  At some point do you give him your

13  email?

14  A.  I do not.  He asked for it.  I -- no.

15  Q.  He asked for your email, but you refused to

16  give him your email?

17  A.  Yes.

18  Q.  So the -- when you were talking to the

19  Government about that --

20          MS. FRETER:  If we could have Exhibit --

21          THE COURT:  45?

22          MS. FRETER:  46, please.

23  BY MS. FRETER:

24  Q.  This is the one that says it's from the

25  Minnesota Department of Commerce?

ENDRES - CROSS/FRETER                    Vol. 2 - 187

1    A.  Yes.

2    Q.  And maybe I misheard.  Did you say this was

3    emailed to you, or did it come in the mail?

4    A.  It was texted to me.

5    Q.  Okay.  And you had, like, a smartphone that

6    could do email and text and stuff?

7    A.  I wasn't -- I had just gotten a new phone.  I

8    wasn't real handy with it yet.

9    Q.  Was it Android or --

10   A.  An Android.

11   Q.  This Minnesota Department of Commerce thing

12   gets texted to you like a picture?

13   A.  Yes.

14   Q.  Okay.

15          MS. FRETER:  And then if we can look at

16   Government's Exhibit 45.

17   BY MS. FRETER:

18   Q.  This is that letter that says it's from the

19   Federal Trade Commission.  Did that come the same

20   way through text?

21   A.  Yes, it did.

22   Q.  Okay.  And did it show up on your phone on this

23   November 22nd date?

24   A.  No.

25   Q.  When did this one come?

ENDRES - CROSS/FRETER                    Vol. 2 - 188

1   A.  I think -- it's dated the 22nd, so -- it was

2   after Thanksgiving that I received this, I

3   believe.

4   Q.  Okay.  But not in the -- not in the mail?

5   A.  No.

6   Q.  In this text?

7   A.  Yes.

8   Q.  Okay.  So there's no email communication?

9   A.  No.

10  Q.  It's just texting and phone calls?

11  A.  Correct.

12  Q.  Okay.  I got it now.

13          Okay.  So this person says he's Eric, and

14  he calls you on this Tuesday, the 22nd.  He says

15  that you've bought a computer that was worth like

16  1,500 bucks and there's some sort of problem with

17  your account; is that right?

18  A.  Yes.

19  Q.  And you hadn't bought a computer?

20  A.  No.

21  Q.  And so what is it that he tells you in order to

22  sort of fix this problem?  What does he tell you

23  that you're supposed to do?

24  A.  He told me what his -- I'm sorry.  Could you

25  repeat the question?

ENDRES - CROSS/FRETER                    Vol. 2 - 189

1    Q.  Sure.  Like, he says there's this big problem

2    with your account and this computer.  What are you

3    supposed to do to fix it?  What does he want you to

4    do?

5    A.  I drew a blank on that.  I'm sorry.

6    Q.  It's okay.  And if you don't remember, just say

7    you don't remember.

8    A.  Can you repeat the question?

9    Q.  Sure.  He tells you there's this problem with

10   the account, right?

11   A.  Yes.

12   Q.  And then what does he tell you you're supposed

13   to do to fix it?

14   A.  He told me it was to get my money, and it was

15   taken out of the bank by the -- I was being

16   scammed.  It was taken out of the bank by a scammer

17   who were laundering money, and we have to catch the

18   money launderers.

19   Q.  And what are you supposed to do to help out?

20   What are you supposed to do to fix this problem?

21   A.  I was supposed to withdraw 25,000 from my bank

22   and then drive around and deposit it into Bitcoin

23   machines as he directed the location.

24   Q.  Okay.  And so he says 25,000.  How does it turn

25   in 29,000?

ENDRES - CROSS/FRETER                    Vol. 2 - 190

1    A.  I had, I believe, four -- I had 4,000 in cash

2    at my home, so I took that, and I had -- I counted

3    it out and I counted wrong.  So the next day he

4    told me, You only sent twenty-eight-seven.

5    Q.  Well, maybe you counted right, right, and he's

6    just telling you that?  We don't know?

7    A.  He was probably right.

8    Q.  Could be, okay.  All right.  Well, how does it

9    change though -- you have 25,000 at the bank.  Does

10   he tell you, Hey, also take this extra cash that

11   you have?

12   A.  Yes.

13   Q.  He tells you that?

14   A.  Yes.

15   Q.  And is that -- you guys are having, like, a

16   bunch of conversations going back and forth with

17   each other?  Is that --

18   A.  Yes.

19   Q.  It wasn't, like, one phone call?

20   A.  Oh, no, it was continually.

21   Q.  Okay.  And that's on this day, the 22nd, on

22   this Tuesday?

23   A.  Yes.

24   Q.  And I think you maybe talked to the Government.

25   Was it maybe like a total of ten hours or something

1   on the phone?

2   A.  About eight.

3   Q.  Eight.

4   A.  Eight and a half.

5   Q.  Okay.  That's a lot of -- that's a full days'

6   worth of work?

7   A.  Right.

8   Q.  And so it's him calling you, and you just sort

9   of staying on the phone with him as you're doing

10  all this stuff?

11  A.  Yes.

12  Q.  Had you ever used Bitcoin before?

13  A.  No, I didn't even know what it was.

14  Q.  And like do you know, like, what a Bitcoin

15  machine is?  Does that even?

16  A.  No.

17  Q.  Okay.  And so he is just like giving you these

18  directions, and you're saying okay, and you're just

19  sort of doing whatever he says, right?

20  A.  Yes.

21  Q.  And when you would go to like -- is it like a

22  gas station?

23  A.  It was a Mobil station.

24  Q.  When you say "Mobil," you don't mean phone?

25  You mean like Mobil --

ENDRES - CROSS/FRETER                    Vol. 2 - 192

1    A.  Mobil gas.

2    Q.  -- gas?

3           It was a gas station.  He says, Hey,

4    there's this Bitcoin machine there, and you go in

5    and try to use it?

6    A.  Yes.

7    Q.  Okay.  And then you talked about -- something

8    about a wallet.  Do you know what that is?

9    A.  I opened -- he opened -- I opened a wallet in

10   my name for the Bitcoin organization.

11   Q.  Okay.  And then did you do that on this, like,

12   machine, or did you do that from your phone?

13   A.  It was on the machine.

14   Q.  On the machine.  And then did it take your

15   money or, like, what happened with that?

16   A.  It would not accept my identification info.  My

17   picture especially on my driver's license.  It was

18   dark outside, and I had to take a picture of it,

19   too, and I guess it didn't come through well.

20   Q.  Okay.  So he tries to get you to put this --

21   and you're walking around with $29,000 in cash,

22   right?

23   A.  Yes.

24   Q.  And do you have it in like a bag or a box or --

25   A.  It was in my purse.

ENDRES - CROSS/FRETER                    Vol. 2 - 193

1    Q.  In your purse, okay.

2            And you try to put this money into this

3    machine in the gas station, and it just won't take

4    it?

5    A.  Correct, yeah.

6    Q.  And you tell him, Hey, this isn't working; is

7    that right?

8    A.  Yes.

9    Q.  And then it's at that point, he says, Okay, I'm

10   going to go get this courier?

11   A.  No.  After the Bitcoin machine, I went back

12   home, and he waited -- he called me first thing the

13   next morning saying that the information was

14   accepted so I now had a wallet.

15   Q.  Okay.  How does it change in the conversation

16   with him to doing this Bitcoin thing to giving

17   cash?  How does that happen?

18   A.  He first asked me to go to the Bitcoin, and we

19   went to two others where I was compromised.

20   Q.  And this is on the second day?

21   A.  It was on the second day, correct.

22   Q.  So my understanding is you go to do the Bitcoin

23   and it doesn't work?

24   A.  Right.

25   Q.  And then you go back home?

ENDRES - CROSS/FRETER                    Vol. 2 - 194

1    A.  Yes.

2    Q.  Okay.  And that's on Tuesday?

3    A.  Yes.

4    Q.  And then you go to bed?

5    A.  Yes.

6    Q.  And then it's this next day, the Wednesday, so

7    the day before Thanksgiving --

8    A.  Yes.

9    Q.  -- do you go back out to do Bitcoin again?

10   A.  No.  He called me first thing in the morning

11   and said that everything had been -- hold on.

12          He called me the next morning and said

13   that everything had been processed, and that my

14   wallet was all set up --

15   Q.  Okay.

16   A.  -- and not to worry about the money.  It's all

17   taken care of.

18   Q.  Okay.  Is it on this day that you see the

19   courier and you put the cash in the car?

20   A.  No.

21   Q.  When did you do that?

22   A.  The night before Thanksgiving Day, which was

23   the 24th.  I put the money in the 23rd.

24   Q.  Right.  Okay.  I got it.

25          So the 22nd is the first day you have

1    contact with him.  The 23rd is when you put the

2    money in the car, right, and then the 24th is

3    Thanksgiving?

4    A.  Correct.

5    Q.  And then it's after Thanksgiving you go talk to

6    the police?

7    A.  It was the -- Thanksgiving Day I talked to the

8    police.

9    Q.  You talked to the police on Thanksgiving, and

10   then they got involved and set up all this sting?

11   A.  They did, yes.

12   Q.  And after you talked to them, they sort of took

13   care of you and helped you through this process?

14   A.  Yes.

15   Q.  And so in this time that you were talking to

16   this guy who said he was Eric Foster, what did his

17   voice sound like?

18   A.  He had a -- he was very well spoken.  He did

19   have a bit of an accent that it could have been --

20   it wasn't perfect English.  He had a bit of an

21   accent that I picked up on.

22   Q.  When you say -- can you tell like what kind of

23   accent or sort of hard to tell?

24   A.  I couldn't pinpoint it.

25   Q.  But you could understand -- he was speaking

ENDRES - CROSS/FRETER                    Vol. 2 - 196

1    English?

2    A.  Yes, perfect English.

3    Q.  And you didn't have any problem understanding

4    whatever --

5    A.  None, no.

6    Q.  -- you spent a lot of time on the phone with

7    him?

8    A.  No.

9    Q.  And so if he said turn right, that was clear?

10   A.  Yes.

11   Q.  And then the first -- the time with the

12   courier, you put all this cash in a shoebox, and

13   you wrap it up just like this Eric person told you

14   to do it, right?

15   A.  Is this the first pickup or the second?

16   Q.  The first time.

17   A.  Yes.

18   Q.  Okay.  And then you're on the phone.  You're on

19   your cell phone with Eric, and he gives you sort of

20   directions to where the courier is?

21   A.  Yes.

22   Q.  And the courier flashes the lights on the

23   car?

24   A.  Yes.

25   Q.  You go over and you knock on the window; is

ENDRES - CROSS/FRETER                    Vol. 2 - 197

1    that right?

2    A.  I was just about ready to knock, and then the

3    window rolled down halfway.

4    Q.  Okay.  And then I think that you said that the

5    car was a dirty tan color; is that right?

6    A.  Appeared to be, yes.

7    Q.  I'm sorry?

8    A.  Yes.

9    Q.  Yes.  And when you say tan, is it like this

10   color?  What do you mean by tan?

11   A.  Beige.

12   Q.  Okay.  So not -- what about, like, this

13   color?

14   A.  No, it was lighter than that.

15   Q.  This color?

16   A.  It wasn't white.  I guess if you do white, and

17   then it would be the next color down for the --

18   Q.  Sort of like when you go to pick paint for

19   white at your house --

20   A.  Yes.

21   Q.  -- and you've got like 900 choices?

22   A.  Yes.

23   Q.  Okay.  So -- but beigey-ish?

24   A.  Yes, and dirty.  It wasn't clean and shiny or

25   anything.

1    Q. So a beigey car, and then when you're with the

2    police the second time, it's the same beigey car?

3    A. Yes.

4    Q. Do you remember anything else about the car?

5    Just it was dirty?

6    A. Beige and dirty.

7    Q. Okay.

8    A. The second time Eric Foster told me it was a

9    brown vehicle.

10   Q. But to you it wasn't like this color brown?

11   A. No.

12   Q. It was more light beige?

13   A. Yes.

14   Q. Okay.  And so this second time, do you go to

15   the window or the police handle all that part of

16   it?

17   A. The second time I was at the bank, and that was

18   where the 75,000 was.

19   Q. With the car, though, do you go to the window

20   where the person is driving the beige car, or do

21   the police just take care of that part?

22   A. The second time the police took care of it.

23   Q. Okay.  How far away were you the second time

24   from the car?

25   A. I was just down the block.  I could see the

1    detectives and the lights from my house.  In fact,

2    I took pictures.

3    Q.  Okay.  The first time you were -- like, if this

4    podium is the car, you were, like, right up at the

5    car because you're knocking on the window, right?

6    A.  Correct.

7    Q.  And you could look into the car?

8    A.  Yes.

9    Q.  The second time you're a block or so away from

10   the car; is that right?

11   A.  The second time, before the pickup, he was

12   arrested by the detectives.

13   Q.  And so did you ever get close to the person who

14   was the driver?

15   A.  Not the second time.

16   Q.  Okay.  Just the first time?

17   A.  Correct, yes.

18   Q.  And that's the one where it may -- you didn't

19   really get a good look.  It was dark.  It could

20   have been a man or a woman maybe?

21   A.  From the shoulders he appeared to be a --

22   somewhat of a larger man.  He was wearing a green

23   Carhartt jacket.  I remember looking down, and

24   thought, Carhartt, that fits the area.  He's trying

25   to fit in, but that was my --

ENDRES - CROSS/FRETER                    Vol. 2 - 200

1    Q.  So when you say "larger," that means a whole

2    bunch of stuff to different people.  When you say

3    "larger," like if you had to put a height and

4    weight -- I mean, we're talking like football

5    offensive lineman larger or what -- what size are

6    we talking?

7    A.  I would think he wore -- in a jacket, I would

8    think he wore an XL.  I'm not sure.  An XL or --

9    you know, small, medium, large.  Large or XL.

10   Q.  Large or XL, and that is the first time?

11   A.  Yes.

12   Q.  It was a bigger person?

13   A.  Large and not very -- not thin.  He was, I

14   guess, a little heavier than your average weight.

15   Q.  You wouldn't say that the person was obese?

16   A.  Oh, no, no.

17   Q.  Okay.  Did you get a look at what color skin

18   they had the first time?

19   A.  He was -- had a little bit of darker skin,

20   not -- he wasn't dark, dark but --

21   Q.  So not like African-American?

22   A.  No.

23   Q.  Not real dark like that?

24   A.  No.

25   Q.  But lighter?

1    A.  Yes.

2    Q.  But not -- you didn't think like -- not like

3    white?

4    A.  Right.

5    Q.  Somewhere in between in the brown range?

6    A.  Yes.

7    Q.  And the first time you talked to the person,

8    did you notice anything about their voice?  What

9    did the voice sound like?

10   A.  Somewhat medium voice.  It wasn't very clear.

11   Q.  Did they have an accent?

12   A.  No.  The few words he said to me, "Toss it in

13   back," I couldn't really tell.

14   Q.  Okay.  And so your best recollection -- I know

15   it's been a little while.  Your best recollection

16   is he said, "Toss it in back"?

17   A.  Yes.

18   Q.  And your best recollection was that there was

19   no accent?

20   A.  Yes.

21   Q.  And then you didn't talk to the person the

22   second time because the police were just taking

23   care of that?

24   A.  Yes.  We're talking about the -- okay, the

25   second time.

ENDRES - CROSS/FRETER                    Vol. 2 - 202

1          MS. FRETER:  Yeah, and then if we could
2    have Government's Exhibit 42 at page 16.
3    BY MS. FRETER:
4    Q.  And this is from your bank account, right?
5    A.  It doesn't say what bank it's from, financial
6    records.
7    Q.  So if we go to the first page, this is the from
8    Nicolet Bank?
9    A.  My Bank of Nicolet, that's correct.  That's my
10   bank.
11   Q.  And this is the record you talked about with
12   the Government.  It's their exhibit.  It's the same
13   thing.  It's the Government's exhibit, the one you
14   talked about with Mr. Reed?
15   A.  Yes.
16   Q.  And so if we go to page 16, on November the
17   23rd, you see there, it says that there's a deposit
18   of $75,000?
19   A.  Yes.
20   Q.  How -- did you put that money in?  What
21   happened with that?
22   A.  I withdrew it from Park City Credit Union, and
23   I transferred it to Nicolet.
24   Q.  And why did you do that?
25   A.  I wasn't happy with PCCU in the past, and there

ENDRES - CROSS/FRETER                     Vol. 2 - 203

1    were just numerous clerical errors, and I just

2    thought this happened again, let's go to a

3    different bank.

4    Q. And so that didn't have anything to do with

5    this Eric Foster?  You just were moving money --

6    A. Yes.

7    Q. -- because you just were?

8    A. Yes.

9    Q. And then on that same day it looks like there

10   was also a withdrawal of $75,000?

11   A. Okay.  This was the -- Lieutenant Seubert

12   withdrew the 75,000 and redeposited after we had

13   caught the courier.

14   Q. Okay.  Well, Lieutenant Seubert withdrew the

15   money on the 23rd or on the 2nd of December?

16   A. The day we were at the bank, the 23rd -- no --

17   yes, it would be the 23rd.

18   Q. I know it's hard to remember.  The 24th is

19   Thanksgiving.

20   A. Yes.

21   Q. And so you didn't talk to the police until like

22   Thanksgiving, right?

23   A. Yes.

24   Q. So the lieutenant probably didn't -- he didn't

25   hang on to that money, did he, for a couple of

ENDRES - CROSS/FRETER                    Vol. 2 - 204

1   days?

2   A.  No.  This was all done at the bank prior to.

3   It was done the morning -- in the morning or

4   early -- midmorning it was done.

5   Q.  Did the lieutenant go to the bank with you on

6   one day or two different days?

7   A.  One day.

8   Q.  One day, okay.

9        Do you think that it's possible that you

10  took out $75,000 before you were with Lieutenant

11  Seubert?

12  A.  No.

13  Q.  Do you know why the bank records show two

14  $75,000 withdrawals, one on November 23rd and one

15  on December 2nd?

16  A.  The 23rd?  That was the deposit from Lieutenant

17  Seubert and that same day was a withdrawal.

18  Q.  And then, at the end of November, you just --

19  you close out this account, and you just get a

20  different one, right?

21  A.  Yes.

22        MS. FRETER:  Okay.  I don't have anything

23  further.

24        MR. REED:  No redirect, Judge.  Ma'am, you

25  may step down.  You're all done.

SEUBERT - DIRECT/WEINHOEFT                     Vol. 2 - 205

1          (Witness excused.)

2          THE COURT:  Thank you, ma'am.

3          Let's take a ten-minute recess.

4          (Recess at 10:11 a.m. until 10:23 a.m.)

5          (Jury present.)

6          THE COURT:  Counsel, call your next

7   witness.

8          MR. WEINHOEFT:  Thank you, Your Honor.

9   Government calls Lieutenant Seubert.

10          COURTROOM DEPUTY:  Please raise your right

11   hand.

12          (Witness sworn.)

13          THE WITNESS:  My name is Don Seubert.  My

14   last name is spelled S-e-u-b-e-r-t.

15          COURTROOM DEPUTY:  Thank you so much.

16   Have a seat.

17          **DON SEUBERT, GOVERNMENT'S WITNESS,**

18                 **DIRECT EXAMINATION**

19   BY MR. WEINHOEFT:

20   Q.  Lieutenant, if you would, scoot your chair

21   forward and make sure you're speaking into the

22   microphone because the acoustics in this room are

23   not exactly ideal.

24          Good morning.

25   A.  Good morning.

1    Q.  If you would, please introduce yourself to the
2    members of the jury.
3    A.  Hello.  I'm Lieutenant Detective Don Seubert.
4    I'm with the City of Merrill Police Department from
5    Merrill, Wisconsin.
6    Q.  Okay.  We've heard a little bit about Merrill,
7    Wisconsin, from our last witness.  If you would,
8    tell us just a little bit about Merrill, Wisconsin.
9    Where is it located?
10   A.  Merrill, Wisconsin, is located in central
11   Wisconsin -- actually, in north central Wisconsin,
12   north of Wausau and east of Green Bay.  It's a city
13   about the size of 10,000 -- 10,000 people and we
14   have a police department that is -- has 22 sworn
15   officers.
16   Q.  So is it fair to say that Merrill, Wisconsin,
17   is in a rural area in central Wisconsin?
18   A.  It is.
19   Q.  Okay.  And you just -- in making reference to
20   Merrill, you said you were outside of Wausau.  For
21   those of us who haven't heard of Wausau, how big is
22   Wausau?
23   A.  Wausau and its surrounding area is about 60,000
24   people.
25   Q.  So Merrill itself is a pretty small town?

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 207

1    About 10,000 people you said?

2    A.  Correct.

3    Q.  And just tell us a little bit about that area

4    and the types of issues that you see as a law

5    enforcement officer there.

6    A.  We have a heavy methamphetamine problem in our

7    county, in Lincoln County, Wisconsin.  We have

8    similar problems with other drug-related issues.

9    We have domestic violence issues as well.

10   Q.  Okay.  Safe to say that it's sort of a

11   blue-collar town.

12   A.  Yes.

13   Q.  All right.  And tell us about your current

14   employment.  You say that you are a lieutenant with

15   the police department.  How long have you been

16   there?

17   A.  So I've been employed with the City of Merrill

18   Police Department since June 5th, 1995.

19   Q.  Okay.  So more than 31 years?

20   A.  In total I have approximately 32 years in law

21   enforcement.

22   Q.  Very good.  So let's talk -- let's talk through

23   how that law enforcement career began then.  If you

24   would, kind of explain to the jury what your first

25   position was as a police officer.

SEUBERT - DIRECT/WEINHOEFT                Vol. 2 - 208

1    A.  Sure.  I started as a part-time officer in a

2    small village to the west of Wausau called Marathon

3    City.  I was there for approximately two years, and

4    then I took a position with my current department

5    as a patrol officer.

6    Q.  Tell us what a patrol officer does.

7    A.  Patrol officer handles complaints that are

8    called in to our dispatch center, a variety of

9    complaints.  Everything from vehicle lockouts to

10   taking the initial report on criminal activity that

11   had taken place.

12   Q.  So you're a first responder on calls?

13   A.  Correct.

14   Q.  Traffic enforcement?

15   A.  Traffic enforcement.  In addition to that,

16   ordinance violations, response to our schools for

17   complaints as well.

18   Q.  How long did you work as a patrol officer?

19   A.  I'm not sure exactly.  I started as a patrol

20   officer for -- so I worked approximately two years

21   in the village of Marathon as a patrol officer, and

22   then I was a patrol officer with Merrill PD for

23   about four years before I took a different

24   position.

25   Q.  What position was that?

SEUBERT - DIRECT/WEINHOEFT                Vol. 2 - 209

1    A.  It was called a temporary investigator's

2    position.  It was a one-year thing that an officer

3    could sign up for to be an investigator and to do

4    that type of work for a year.

5    Q.  How does an investigator's position differ from

6    a patrol officer's position?

7    A.  So an investigator's position is typically

8    after an officer had responded and taken an initial

9    complaint about a criminal matter, the investigator

10   would then follow up with that criminal matter and

11   follow any type of investigative leads that would

12   need to be followed up.

13   Q.  So this is an opportunity to really go more

14   in-depth in criminal investigations; is that fair

15   to say?

16   A.  That's correct.

17   Q.  What types of cases did you work on when you

18   first became an investigator?

19   A.  I handled quite a few checks cases, forgery,

20   fraud cases.  What's called uttering or the passing

21   of a fraudulent check to another person or entity.

22   I worked on sexual assaults.  I worked on child

23   abuse cases, shaken baby case, cases similar to

24   that.

25   Q.  After working as an investigator, did you move

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 210

1    into a supervisory role after that?

2    A.  Later in my career, I did, yes.

3    Q.  Okay.  Tell us about how that part of your

4    career progressed.

5    A.  So I had been promoted to a patrol lieutenant

6    position, and that position basically allowed me to

7    supervise a shift of officers that were required to

8    go out and do the initial -- take the initial

9    complaints, run traffic.  My job was to make sure

10   that they were being supervised and that the work

11   was being done properly.

12   Q.  Prior to becoming a supervisor over patrol, did

13   you also serve as a field training officer?

14   A.  I did.

15   Q.  And is a field training officer.  Sometimes

16   referred to as a FTO?

17   A.  That's correct.

18   Q.  If you would, explain to the members of the

19   jury what an FTO does and kind of what your

20   responsibilities are there.

21   A.  So my responsibilities as FTO, or field

22   training officer, were to train new officers who

23   were being hired by our police department, teach

24   them all of the policies and procedures and the

25   correct ways of doing things from a law enforcement

1    standpoint.

2    Q.  So essentially, fair to characterize that

3    position as being a mentor?

4    A.  That's correct.

5    Q.  Okay.  And so, you as a senior trusted officer,

6    is there to help a less-experienced, junior officer

7    so they learn the correct way to be a police

8    officer; is that true?

9    A.  That's accurate.

10   Q.  Did you -- how long did you serve as a patrol

11   supervisor?

12   A.  Approximately four years.

13   Q.  And then were you promoted from that

14   position?

15   A.  I was.

16   Q.  When were you promoted?

17   A.  That would have occurred at the beginning of

18   2020, so it would have been January 1 of 2020, or

19   thereabouts, I was promoted to lieutenant

20   detective.

21   Q.  What does a lieutenant detective for the

22   Merrill Police Department do?

23   A.  So the lieutenant detective for the City of

24   Merrill Police Department is a supervisory role.  I

25   supervise two additional detectives as well as the

1   school resource officer.  My job is to also take

2   cases as a detective.  Because we have a small

3   agency, we're -- the lieutenant detective, the

4   supervisor is required to pitch in and take cases

5   and investigate those matters as well.

6   Q.  Within the hierarchy of the police department,

7   where does the lieutenant detective position fall,

8   kind of, from the top to the bottom?

9   A.  So the chief of police would be the number one

10  position, followed by the captain, and then

11  lieutenant detective would be the third spot.

12  Q.  Okay.  So you're the third highest-ranking

13  member of the Merrill Police Department?  Is that

14  fair to say?

15  A.  That's correct.

16  Q.  And in that capacity and in your more than 31

17  years of law enforcement, can you even begin to

18  estimate the number of cases that you have

19  investigated?

20  A.  I can only say hundreds, many.

21  Q.  Probably quite a few more than that, huh?

22  A.  Could be.

23  Q.  So let's take your attention to this particular

24  case.  In your capacity as a lieutenant detective,

25  did you have the occasion to become involved in a

1    fraud investigation for a victim by the name of

2    Karen Endres?

3    A.  I did.

4    Q.  Tell us about how you first became involved

5    with this investigation and how you learned about

6    Karen being defrauded.

7    A.  So I first became aware of this --

8    Q.  And if I could -- I apologize for interrupting,

9    but if you just maybe move a little closer to that

10   microphone.

11   A.  So I first became aware of this on Thanksgiving

12   Day.  I was off duty, and I received a call from a

13   patrol officer -- or a canine officer who had told

14   me that he had contact with Karen Endres and that

15   she had advised him that she had been defrauded by

16   $29,000.

17   Q.  Is this getting a phone call while you're on

18   personal time, on a holiday like Thanksgiving,

19   unusual?

20   A.  No.

21   Q.  A case of a significant enough magnitude, will

22   other officers reach out to you even on your time

23   off?

24   A.  That's correct.

25   Q.  And that's what happened here, correct?

SEUBERT - DIRECT/WEINHOEFT            Vol. 2 - 214

1    A.  That's accurate.

2    Q.  So tell us about -- you had to make some

3    decisions about what follow-up investigation would

4    be done at that point; is that right?

5    A.  That's right.

6    Q.  All right.  So tell us about the information

7    you learned that helped inform your decisions about

8    next steps in this investigation.  What was your

9    understanding of the nature of the circumstances --

10          MS. FRETER:  Your Honor, compound.

11          THE COURT:  I'm sorry?

12          MS. FRETER:  It was a compound question,

13   Your Honor.

14          THE COURT:  Rephrase your question.

15          MR. WEINHOEFT:  Yep.  Hadn't gotten to a

16   question yet.

17   BY MR. WEINHOEFT:

18   Q.  You had to make decisions on further

19   investigative steps to take; is that right?

20   A.  That's correct.

21   Q.  All right.  And so to help inform those

22   decisions of what investigative steps you were

23   going to take, tell us about what you learned of

24   the initial report and just what your understanding

25   was of the case when it first came in as you were

1   trying to decide how to direct this investigation.

2   A.  Okay.  So a canine officer, McCaskill, had

3   informed me that Karen had been contacted by way of

4   both text message as well as phone by a person who

5   identified themselves as Eric and that Eric was

6   indicating that he was like a law enforcement

7   personnel for the Federal Trade Commission and that

8   he needed $29,000 to take care of some fraudulent

9   activity on some of Karen's accounts.

10  Q.  And did you learn of any -- or let's just put

11  it this way:  What investigative steps did you

12  direct to be taken immediately?

13  A.  So I had also become aware that Karen had

14  provided the money to a courier that had come to

15  the residence on the previous day, November 23rd,

16  and that I had requested that Canine Officer

17  McCaskill canvas the area for any cameras or Ring

18  doorbells that may provide photographs or video

19  from the event.

20  Q.  So Pickup No. 1 was the day before

21  Thanksgiving, the 23rd, so you're asking for

22  surveillance cameras that might be found.  What

23  else are you asking for?

24  A.  Again, photos that may be still photos from

25  cameras that are in the area is what I was looking

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 216

1   for.

2   Q. All right.  And how about witnesses?  Did you

3   make any efforts to try to find witnesses?

4   A. Not that I recall.

5   Q. Okay.  Do you know if other officers canvassed

6   or made any efforts to try to locate anyone who may

7   have seen the vehicle?

8   A. So I know that, again, Officer McCaskill was

9   asked to canvas the neighborhood for particularly

10  cameras.  I'm not aware if he actually made contact

11  with individuals.

12  Q. So this is Thanksgiving.  Did you make

13  arrangements to speak to the victim yourself the

14  following day?

15  A. I did.

16  Q. Tell us about that.

17  A. So I did speak with her.  She was going to

18  email -- email us with some photographs that came

19  from her Ring doorbell camera, and I spoke with her

20  further about her continuing to speak with the

21  person on the phone, who was now asking for an

22  additional $75,000 for him to clear up the

23  fraudulent activity that she had going on.

24  Q. So first, you said that she -- she had a Ring

25  doorbell herself?

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 217

1    A.  Yes.

2    Q.  Did you have an opportunity, or did officers

3    have the opportunity, to review any footage to see

4    if you're able to identify any vehicles or any

5    suspects?

6    A.  Yes.  Those photographs were sent to me by

7    email, and I reviewed them personally.

8    Q.  Were you able to -- tell us about the

9    orientation of the Ring doorbell and what you were

10   able to see or not see.

11   A.  So I could see the victim's porch, Karen's

12   porch, and I could see vehicles on the roadway.  I

13   could tell it was a vehicle based upon it being

14   dark and the lights being illuminated; however,

15   because of the picture quality, the pictures were

16   pixelized to the point I could not identify a

17   vehicle or a suspect vehicle in this matter.

18   Q.  And when you say it was dark, do you mean the

19   vehicle was dark or it was dark outside?

20   A.  It was dark outside.

21   Q.  Very good.  Speaking with her, did officers --

22   did your department, and have you, had the occasion

23   to see a letter that was supposedly sent from the

24   Federal Trade Commission that was in furtherance of

25   the scheme?

SEUBERT - DIRECT/WEINHOEFT                Vol. 2 - 218

1   A.  I have, yes.

2        MR. WEINHOEFT:  Your Honor, I would ask

3   for what's been previously admitted into evidence

4   as Government's Exhibit 45 to be published and

5   visible to the witness and the jury.

6        THE COURT:  You may publish.

7   BY MR. WEINHOEFT:

8   Q.  Okay.  And Lieutenant, is this the exhibit that

9   I just referenced?

10  A.  It is.

11  Q.  All right.  And as a law enforcement officer

12  with 31 years of experience, is this obviously a

13  forged document -- or a fraudulent document to

14  you?

15        MS. FRETER:  Objection, Your Honor,

16  leading.

17        THE COURT:  Overruled.

18        THE WITNESS:  Yes, it appears to be.

19  BY MR. WEINHOEFT:

20  Q.  What gave you concern?

21  A.  The numerous typos, the information that's

22  provided here that is clearly -- there's already

23  cooperating, hyphenated wording.  Just very

24  suspicious, fictitious information.

25  Q.  Okay.  And in speaking with the -- that's fine.

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 219

1          In speaking with the victim, were you also

2     able to corroborate that, in fact -- she mentioned

3     the $29,000 had been stolen.  Did you do anything

4     to try to corroborate that, or did officers do

5     anything to try to corroborate that?

6     A.  Yes.

7     Q.  What did you do?

8     A.  So we received a receipt from Nicolet Bank,

9     which is where Karen Endres banks, that showed that

10    she had withdrew, on November 22nd of 2022, $29,000

11    in cash.

12    Q.  Did you also learn that the scammer here, who

13    called himself Eric -- was there any discussion

14    about Bitcoin or trying to establish a Bitcoin

15    transaction with the victim?

16    A.  Yes.

17    Q.  All right.  Bitcoin's been referenced in this

18    case, but just to maybe help anybody that's never

19    heard of a Bitcoin before, just in very general

20    terms, can you give us a brief description of kind

21    of what Bitcoin is, and we'll start with that?

22    A.  Sure.  So Bitcoin -- typically, it's a Bitcoin

23    machine, and a person can place money into that

24    machine that is then sent to an account and then

25    that money can be forwarded from that account to a

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 220

1    different account, making it difficult to trace.

2    Q.  And is Bitcoin something that's commonly

3    referred to as cryptocurrency?

4    A.  Yes.

5    Q.  And does tracing cryptocurrency present any

6    difficulties to you as a law enforcement officer?

7    A.  It's very difficult, if not impossible.

8    Q.  Okay.  In speaking with the victim, did you

9    have the occasion to try to identify any phone

10   numbers that were used to contact her?

11   A.  Yes.  There were a number of phone numbers that

12   were used.  Various different phone numbers.

13   Q.  And as an investigator, how do you go about

14   trying to associate a phone number back to a

15   particular suspect or back to a particular

16   person?

17   A.  So I complete what's called a ZetX check.

18   Q.  If I can interrupt you right there, for the

19   court reporter, that's Z-E-T-X; is that correct?

20   A.  That's accurate.

21   Q.  All right.  And if you can continue with the

22   description of what a ZetX search is?

23   A.  So a ZetX search is -- it allows a law

24   enforcement officer to enter a phone number into

25   their database and then check that phone number for

SEUBERT - DIRECT/WEINHOEFT                Vol. 2 - 221

1    a carrier make, so like AT&T, Verizon.  It will

2    tell you that, and sometimes it will tell you who

3    the person is that that phone -- or that phone

4    comes back to.  It will also tell you whether it's

5    a mobile phone or a landline.

6    Q.  Does ZetX sometimes tell anything about the

7    location of where calls originated from?

8    A.  No, not typically.

9    Q.  Okay.  Any other information that you can find

10   from a ZetX search?

11   A.  There have been occasions where a ZetX search

12   shows fraudulent call or fraudulent phone number.

13   Q.  And, again, just so we're clear, ZetX, what

14   type of a service or process is ZetX itself?

15   A.  So it's a web-based thing that law enforcement

16   can sign up for.  It's a search mode that allows an

17   officer to place a phone number into a search field

18   and determine carrier type, the make of carrier and

19   whether or not it's a mobile phone or not as well

20   as if it's associated with fraudulent activity.

21   Q.  So this is not an open-source tool?  This is a

22   law enforcement tool?  Is that what you're

23   saying?

24   A.  That's correct.

25   Q.  And is this something that is subscription

SEUBERT - DIRECT/WEINHOEFT                Vol. 2 - 222

1   based with a private company?

2   A.  So my recollection is that I signed up for it

3   as a law enforcement officer and then just had to

4   verify my credentials.

5   Q.  Because it's a law enforcement tool?

6   A.  Correct.

7   Q.  Very good.  Were you able -- did you do

8   everything you could do to try to run down those

9   phone numbers?

10  A.  I did.

11  Q.  And were you able to identify or locate a

12  suspect, or make any associations, from any of

13  those phone numbers that were contacting the

14  victim?

15  A.  No.

16  Q.  All right.  And in your experience as a law

17  enforcement officer, what are some reasons why it's

18  difficult to trace a phone number and make those

19  kind of connections back to an individual or to a

20  subscriber?

21  A.  So many times when criminal activity is taking

22  place or fraudulent activity is taking place,

23  people have what's called burner phones.  They go

24  and get a phone.  They set up a phone number

25  quickly.  They use it for a brief period of time,

1  or they also can use a phone and do what's called

2  spoof a phone number, which means they're using a

3  phone, but the phone number itself doesn't come

4  back to that phone, so there's --

5  Q.  And if I can interrupt you there.  So when

6  you're spoofing, that means if I receive a phone

7  call, it's going to show a number, but that's not

8  the number that's really calling me?

9  A.  That's correct.

10  Q.  All right.  And that's what it means to spoof a

11  number?

12  A.  That's correct.

13  Q.  Okay.  How about other types of software, are

14  there other types of software that can mask the

15  identity of phone numbers?

16  A.  I'm not familiar with any anything else.

17  Q.  And how about Internet phone numbers like voice

18  over IP, or VoIP, are you familiar with those at

19  all?

20  A.  Very little.

21  Q.  Okay.  You know they exist but not familiar

22  with how to trace them?

23  A.  Correct.

24  Q.  Very good.  All right.  So all of these

25  conversations and all of this investigation you're

1    doing following up, this is the day after

2    Thanksgiving; is that right?  Is this all occurring

3    on Friday?

4    A.  That's correct.

5    Q.  All right.  And did you receive any photos of

6    the money at that point as well?

7    A.  Yes, I did.

8    Q.  And tell us about that.

9    A.  So the photos were -- I believe came from Karen

10   Endres.  She had to provide -- take photos of the

11   package, the box that she had placed the money in,

12   and position the money in a number of different

13   ways to then provide that -- those photos to the

14   scammer.  So she had provided us with that

15   information.

16   Q.  Did you try to determine how much money she had

17   left after the initial fraud or talk with her about

18   any other moneys that she might have in other

19   accounts?

20   A.  There were some receipts that indicated what

21   she had remaining in two accounts.

22   Q.  All right.  And did you make arrangements or

23   did Karen make arrangements to be able to continue

24   to continue -- to communicate, rather, with police

25   as the investigation moved forward?

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 225

1    A.  Yes.

2    Q.  Tell us about -- tell us about any special

3    steps Karen took to be able to communicate with

4    you.

5    A.  So she was concerned that she was being tracked

6    by the scammer, and she went and obtained what's

7    called a burner phone or a phone that was not

8    trackable by the person who she was communicating

9    with so that she could contact law enforcement.

10   Q.  When you say "a burner phone," that's what we

11   commonly refer to as like, you know, a phone you

12   might pick up with prepaid minutes on it that can

13   be purchased from all sorts of convenience marts

14   and things like that?

15   A.  That's correct.  I believe she got hers from

16   Walmart.

17   Q.  Okay.  And so she -- that way she had a clean

18   phone to be able to talk to police?  Is that

19   basically what you're saying?

20   A.  Yes.

21   Q.  Did you make any other efforts to make sure

22   that she stayed safe both personally and

23   financially over the weekend?

24   A.  Yes, I did.

25   Q.  Tell us what you did or what you told her.

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 226

1    A.  So she had indicated at one point that she

2    believed that her accounts may have been

3    compromised and that the scammer may have obtained

4    her account information.  Given that, I advised

5    Karen to cancel those accounts and then have new

6    account numbers attributed to those through the

7    banks.

8    Q.  And then, obviously, directed her not to give

9    the scammer any more money?

10   A.  That's correct.

11   Q.  So this is all on Friday, correct?

12   A.  That's accurate.

13   Q.  So that's your Black Friday?  Didn't have to go

14   shopping?

15   A.  No.

16   Q.  So you go through your holiday weekend; is that

17   right?

18   A.  Yes.

19   Q.  And then the next time you speak with Karen is

20   when?

21   A.  Would be the following Monday.

22   Q.  Okay.  Let's talk about that Monday.  That

23   would have been November the 28th; is that right?

24   A.  That's correct.

25   Q.  All right.  And so you had an opportunity to

SEUBERT - DIRECT/WEINHOEFT                Vol. 2 - 227

1    meet with Karen in person on Monday; is that

2    right?

3    A.  That's correct.

4    Q.  And did you talk with her to find out whether

5    or not that scammer was still trying to get 75,000

6    more dollars from her?

7    A.  I did, and she did indicate that that was still

8    ongoing and that the scammer was telling her that

9    she would be made -- she would be provided with a

10   check or money in the amount of $154,000.

11   Q.  Okay.  Well, let's make sure we tie that number

12   back up.  She had already given him 29,000; is that

13   right?

14          MS. FRETER:  Objection.  Leading, Your

15   Honor.

16          MR. WEINHOEFT:  It's foundation.

17          THE COURT:  Overruled.

18          THE WITNESS:  Yes.

19   BY MR. WEINHOEFT:

20   Q.  Okay.  So she had already provided him with

21   29,000.  Where was the remainder of that money to

22   come from, the 154,000?

23   A.  Her bank account -- well, she was going to be

24   provided that money.

25   Q.  Right, that she had other accounts that had

1    money in it; is that right?

2    A.  That's correct.

3    Q.  Which totaled to 154,000?

4    A.  Approximately.

5    Q.  Right, for rough numbers?

6    A.  Yes.

7    Q.  Right.

8           All right.  Let's talk more about what you

9    did on Monday to follow up on the information that

10   was provided to you by Karen.  She had indicated --

11   or you had talked to us a little bit about Bitcoin.

12   What was your understanding of efforts that were

13   made by the scammer to get Karen to purchase

14   Bitcoin and to transfer that value and that money

15   to him?

16   A.  So she had been directed at one point by the

17   scammer to go to a Bitcoin machine and transfer the

18   $29,000 into that machine, virtually making it not

19   traceable, and she was directed to do that at the

20   Marathon gas station in the city of Merrill.

21   Q.  And did she tell you that, in fact, she tried

22   to deposit money into the Bitcoin machine?

23   A.  She did go to the Marathon gas station with the

24   intention of doing that, yes.

25   Q.  Did you take investigative steps to corroborate

1    whether or not what the victim told you was true?

2    A.  I did.

3    Q.  And what did you find?

4    A.  I went to the Marathon gas station and spoke

5    with the clerks there, and they were able to tell

6    me that they did recall a female party coming into

7    the store who was looking for the Bitcoin machine.

8    The employee became aware of kind of what was

9    happening and that this money was going to be

10   placed in the Bitcoin machine, and the employee

11   told me that they told Ms. Endres that this sounded

12   like a scam, don't do this, and kind of warned her

13   not to do that.

14   Q.  So you found a witness that corroborated,

15   essentially, what the victim had told you about

16   going to the Marathon gas station?

17   A.  That's correct.

18   Q.  All right.  How about any video, were you able

19   to find any video of her being present there?

20   A.  I did request video and did obtain that, yes.

21   Q.  Very good.  All right.  So that was -- that's

22   on Monday the 28th.  Let's take your attention to

23   Tuesday -- pardon me -- the 29th.  Did you have the

24   occasion to go to any banks in furtherance of your

25   investigation on the 29th?

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 230

1    A.  I did.

2    Q.  Tell us about that.

3    A.  I went to Nicolet Bank in the city of Merrill,

4    which is where Karen Endres, the victim, does her

5    banking, and I checked with them to see if there

6    was a way for us to obtain $75,000 in cash, real

7    money, in a manner that would allow for law

8    enforcement and Karen to provide photographs of

9    that money to the scammer.

10   Q.  So backing up, beforehand, why did you go to

11   the bank in the first place?  What is your

12   investigative plan at this point?

13   A.  My plan at this point is to lure the scammer

14   into coming back for the $75,000 in cash so that we

15   can -- we could complete a traffic stop and

16   identify the suspect who is taking the money.

17   Q.  So you want to use cash as bait to conduct a

18   sting?

19   A.  That's correct.

20   Q.  All right.  So the arrangements that you made

21   at the bank, why did you think you needed to

22   actually have $75,000 in real cash?

23   A.  I was concerned about metadata and --

24   Q.  Before we get to that, why did you think you

25   needed cash?

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 231

1    A.  Because that's what he had requested in the

2    past.

3    Q.  And by that, you mean he requested photographs

4    to prove the cash was real?

5    A.  That's correct.

6    Q.  All right.  So you anticipated that would

7    happen again?

8    A.  Yes.

9    Q.  Okay.  When you spoke with Nicolet Bank, do

10   they keep that kind of cash on hand?

11   A.  No.

12   Q.  So what arrangements had to be made in order to

13   conduct your sting?

14   A.  The staff at Nicolet Bank had to order $75,000

15   in cash so that they could have it on hand for the

16   sting itself.

17   Q.  Do you remember what day it was that you

18   requested that cash or the bank ordered that

19   cash?

20   A.  I don't recall that.

21   Q.  That's okay.  But you made those arrangements

22   with the bank so that they could order it so that

23   it could be physically present; is that right?

24   A.  That's correct.

25   Q.  Tell us what happened next.

SEUBERT - DIRECT/WEINHOEFT                Vol. 2 - 232

1    A.  So after I was able to determine, through

2    speaking with the bank manager and their security,

3    that this would be something that they would be

4    willing to do and could do, we decided to put a

5    plan together to accomplish this.

6    Q.  All right.  And you made reference a moment ago

7    to metadata when we were speaking about

8    photographs.  Let's talk about that now.  You

9    anticipated having to take photographs of the

10   75,000 in cash; is that right?

11   A.  That's correct.

12   Q.  And first of all, let's tell the jury, if

13   they're not familiar with the term, what is meant

14   by metadata?

15   A.  Metadata is data that's attached to a digital

16   photograph that can tell you what kind of phone

17   took the photograph, things like GPS coordinates,

18   things that can identify a date and time, things

19   that can identify whether or not that photograph

20   was taken in the here and now, so to speak, or

21   whether or not that's a photograph that someone

22   pulled out of their camera roll and sent to someone

23   from a different time and maybe a different

24   place.

25   Q.  So if I pulled out my phone and snapped a

1    photograph of you right now and text messaged that

2    off right now, what might that person be able to

3    determine about the photograph from the metadata?

4    A.  So if location services are on, it would likely

5    provide you with GPS coordinates to where I am or

6    where the photograph is, was taken, and it will

7    tell you the date and the time.  It will also tell

8    you what kind of phone was used to take that

9    photograph.

10   Q.  Okay.  So you knew, to be believable to the

11   scammer, you needed to make -- you needed to make

12   the photo of the 75,000 as realistic as possible?

13   A.  Absolutely.

14   Q.  All right.  So Nicolet Bank agreed to order

15   that cash?

16   A.  Yes.

17   Q.  And when was it that the cash arrived and you

18   began to take those sorts of pictures and began to

19   execute this sting?

20   A.  So that would have occurred on Friday, December

21   2nd, 2022.

22   Q.  Why was Friday, December 2nd, the day that was

23   chosen to do the sting?

24   A.  So the scammer had been speaking with Karen

25   Endres and was talking about getting the $75,000

1   from her on Friday the 2nd, so we were -- because

2   that was the discussion that was taking place

3   between the scammer and Karen, we wanted to make

4   sure that that lined up for the scammer and,

5   further, was more believable.

6   Q. Did that $75,000 in cash ever leave the bank?

7   A. No.

8   Q. Was it in your -- where was it kept or where

9   was it physically located during the -- from the

10  time it was ordered through the end of your sting,

11  tell us where, if anywhere, that money ever went?

12  A. It was located on a large conference table at

13  Nicolet Bank in a box, and myself, Karen Endres and

14  for most of the time the branch manager, Dena

15  Lueck, was present with the money.

16  Q. The bank also had their own security as well?

17  A. Yes.

18  Q. So it was safeguarded the entire time?

19  A. Yes, right.

20  Q. So let's talk a little bit about planning for

21  this sting that was going to occur on December the

22  2nd.  Did you brief at the police station before

23  beginning that operation, I assume?

24  A. Yes.

25  Q. Tell us about the briefing that happened that

SEUBERT - DIRECT/WEINHOEFT                 Vol. 2 - 235

1    day.

2    A.  The briefing that happened that morning was

3    between myself, my detectives at the Merrill Police

4    Department and a number of detectives from the

5    Lincoln County Sheriff's Office; and what we had

6    set up was I was going to be going to the bank with

7    Karen to make sure the photos were taken and

8    communication with the scammer took place in the

9    correct manner; we had another detective assigned

10   to a marked patrol vehicle that was going to be the

11   takedown car for when the courier came to pick up

12   the $75,000; and then we had a series of detectives

13   assigned to various surveillance locations around

14   the house of Karen to make sure that we had -- we

15   had a visual on what was taking place around

16   Karen's residence.  Additionally, I had assigned a

17   female detective to be inside Karen's residence and

18   to act as Karen once the scammer or the courier had

19   arrived.

20   Q.  So the purpose for the people positioned that

21   you described kind of around the area, would you

22   describe that as kind of a perimeter?

23   A.  Yes, a perimeter and making sure that if we had

24   a suspect vehicle come into that area that we had

25   eyes on it.

SEUBERT - DIRECT/WEINHOEFT                 Vol. 2 - 236

1    Q.  Okay.  That would help to prevent it from

2    escaping; is that fair?

3    A.  Correct.

4    Q.  And also eyes to see it come in?

5    A.  Exactly.

6    Q.  And you mentioned Lincoln County Sheriff's

7    Department, and you work for the Merrill City.

8    Tell us about what Lincoln County is.

9    A.  So Lincoln County is the county in which the

10   city of Merrill is located, and the sheriff's

11   office handles every -- they have jurisdiction

12   anywhere outside of the city of Merrill

13   basically.

14   Q.  And is it common for the sheriff's department

15   and the city to work together?

16   A.  It is.

17   Q.  And they were providing an assist to you in

18   this situation?

19   A.  That's correct.

20   Q.  Okay.  When would you say everyone was in place

21   to begin your sting operation?

22   A.  At approximately 10:00 a.m. on the 2nd of

23   December, everyone was mostly in position.

24   Q.  Had you sent the photograph to the scammer yet

25   to let him know that the money was ready?

1    A.  So that was one of the things that we did.

2    Karen was communicating with the scammer.  I was

3    assisting her in what to say; and at one point, she

4    did take a series of photographs of the money.  The

5    money was at one point inside of the box, outside

6    of the box, and then the person on the phone, or

7    providing text messages to Karen, had a piece of

8    paper -- or asked her to tape a piece of white

9    paper to the box that contained the money and had

10   her write her name on it.  So those photographs

11   were all taken by Karen and then sent to the

12   scammer.

13   Q.  Those are really oddly specific instructions

14   for the scammer, wouldn't you agree?

15   A.  I would agree.

16   Q.  Was that significant to you?

17   A.  It was.

18   Q.  Why?

19   A.  I believe that he was checking to see if the

20   metadata was lining up and that making sure that

21   maybe Karen's phone was the same phone from the

22   $29,000 as it is for the 75 and probably checking

23   GPS location as well.

24   Q.  And taking a photo under those really specific

25   instructions also shows him that those photos are

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 238

1    being sent to him in realtime; is that right?

2                MS. FRETER:  Objection.  Leading.

3                THE COURT:  I'm sorry?

4                MS. FRETER:  It's leading, Your Honor.

5                THE COURT:  Rephrase your question.

6    BY MR. WEINHOEFT:

7    Q.  What does that suggest to you about the timing

8    of what the scammer was interested in when he tells

9    her to put the specific instructions with the white

10   paper and the name, what is he ensuring?

11   A.  He's ensuring that those photographs are being

12   taken as he directed and they're not false photos

13   or photos from Karen's camera roll.

14   Q.  You said you were present with the

15   communication between her and the scammer; is that

16   right?

17   A.  Yes.

18   Q.  And tell us a little bit about how that

19   exchange went between the two of them.

20   A.  Sure.  So a discussion ensued between Karen and

21   the scammer about what time the courier was going

22   to come to pick up the $75,000 in cash, and

23   initially that time frame was set for 4:00 p.m.

24   that afternoon.

25   Q.  And did -- is that the time that everyone

1  agreed to?

2  A.  Initially, it was the time that was agreed to;

3  however, as the day progressed, I requested that

4  Karen attempt to change that time to 3:00 p.m.  So

5  she did attempt to do that with the scammer.

6  Q.  All right.  So, and if I recall, you said you

7  started with the bank around 10:00 a.m.; is that

8  right?

9  A.  That's correct.

10  Q.  So did you spend the entire day at the bank?

11  A.  I did.

12  Q.  All right.  And who else was -- was Karen with

13  you that entire time?

14  A.  She was.

15  Q.  Why did you keep Karen at the bank the entire

16  time?

17  A.  Because I needed for Karen to continue to

18  communicate with the scammer using her phone and

19  making sure that the scammer felt like he felt

20  comfortable that this was not a police sting, that

21  this was a real -- that she was going to provide

22  the $75,000 in cash and that this was going to go

23  off without a flaw for him.

24  Q.  And did the scammer coordinate the timing?  You

25  said you tried to move that time up from -- what

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 240

1    did you say?  From 4 to 3:30?

2    A.  From 4 until 3:00.

3    Q.  Till 3:00, I see.

4          Did he accommodate that request to move it

5    up an hour?

6    A.  He said that he could do between 3:00 and 3:30

7    that afternoon.

8    Q.  Did they continue to communicate throughout the

9    course of the afternoon?

10   A.  They did.

11   Q.  And let's talk a little bit about how that

12   communication unfolded as the courier that the

13   scammer sent was getting ready to arrive.  Tell us

14   about that.

15   A.  Sure.  So the scammer had said that he would

16   contact Karen at about 2:50 to give her an update

17   on where the courier was, and so that time came and

18   went without him contacting Karen.  So at about

19   3:05 p.m., I requested that Karen reach out to the

20   scammer and find out where the courier was located,

21   and she had done that.  At about 3:31 p.m., we

22   received information from the scammer that he was

23   two to three minutes away -- that he was two to

24   three minutes away.

25   Q.  Okay.  So I want to stop right here now,

1    because the scammer is getting -- we're right into

2    it, right?  I mean, the delivery is just a couple

3    minutes away.  Was there anything unusual that

4    happened with Karen during that communication that

5    showed she was confused?

6    A.  There was.

7    Q.  Please tell us about it.

8    A.  So at the point where we received information

9    that the scammer is two to three minutes away,

10   Karen stands up and she said, "Well, we better get

11   going."  And I questioned her about where we might

12   be going, and she indicated that she was going to

13   go -- we were going to go to the house because the

14   scammer was arriving.

15   Q.  And what was she wanting to do?

16   A.  I think she wanted to provide the $75,000,

17   although that wasn't said; but she acted as if we

18   were -- we needed to go to the house to meet the

19   scammer; and clearly, that was never anything that

20   we had ever discussed.

21   Q.  Okay.  So she seemed a little confused about

22   the plan at that point?

23   A.  Yes.

24   Q.  All right.  So now you know that the scammer is

25   two to three minutes away, according to what he

SEUBERT - DIRECT/WEINHOEFT          Vol. 2 - 242

1    said.  What -- what do you do with that

2    information?

3    A.  I provided that information to our detectives,

4    our surveillance team.  I also learned that he

5    would be arriving in a brown sedan, and I provided

6    that information to our detectives who were

7    conducting surveillance there.

8    Q.  So you made sure that the other officers knew

9    what you knew?

10   A.  Exactly.

11   Q.  And what time did the suspect tell you that the

12   courier was arriving?

13   A.  So they said at 3:36 that the courier had

14   arrived.

15   Q.  Okay.  And later in the investigation, did you

16   have an occasion to see the dash cam video of when

17   the traffic stop occurred of when he was actually

18   stopped by police?

19   A.  I did.

20   Q.  And where was that in time in comparison to

21   when the scammer communicated that the courier had

22   arrived?

23   A.  At 3:37 was the time where the courier was

24   detained by our officers.

25   Q.  So at 3:36 he arrived, and at 3:37 the stop

1    happens?

2    A.  That's correct.

3    Q.  All right.  Once the traffic stop is made, your

4    sting is successful.  What happens with the

5    $75,000?

6    A.  The $75,000 goes back to the bank manager,

7    making sure that it is safe and secure.  She takes

8    care of -- takes care of holding onto and taking

9    the money back into the main bank area.

10   Q.  And what did you do with Karen?

11   A.  Karen and I got in my car, and I drove her back

12   to her residence, which was located a short

13   distance away from the traffic stop.

14   Q.  Can you give us a ballpark of how far away that

15   is?  About how long it took you from the time --

16   you know, 3:37 when he's in custody, about how long

17   do you think it took for the money to get returned

18   to the bank and for you to get back over to her

19   house?

20   A.  I would guess it would be probably after 4:00

21   sometime because initially I wasn't fully aware

22   that he was detained until like 3:48 based on

23   information from our officers.

24   Q.  Okay.  So you're fully aware of that, call it,

25   you know, 3:48, and you think it was -- what time

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 244

1    do you think you got back to her house?  Again,

2    just ballpark?

3    A.  Probably after 4:00, shortly after 4:00, 4:02,

4    4:03, somewhere in there.

5    Q.  Okay, perfect.

6              What did you see when you got back to the

7    scene?

8    A.  So I saw that our officers had a person

9    detained by a brown sedan which matched the

10   description of the information that we had of what

11   the courier would be driving.

12   Q.  And did you go to that area?

13   A.  After I dropped Karen off at her residence, I

14   did go to the traffic stop scene, yes.

15   Q.  Okay.  So you took Karen home first -- took her

16   to the house first?

17   A.  Yes.

18   Q.  All right.  And then you went over to where the

19   suspect was being detained?

20   A.  That's correct.

21   Q.  All right.  And did you have the occasion to

22   see that person who was detained?

23   A.  Yes.

24   Q.  In looking in the courtroom today, do you see

25   the individual who was detained in Wisconsin that

SEUBERT - DIRECT/WEINHOEFT              Vol. 2 - 245

1    day?

2    A.  I do.

3    Q.  Would you please point to him and identify an

4    article of clothing that he is wearing?

5    A.  He is holding his hand up at defense table.

6              MR. WEINHOEFT:  The Court record would

7    please note the identification of the defendant.

8              THE COURT:  You're supposed to identify an

9    article of clothing.  That is what you were

10   asked.

11             THE WITNESS:  He is wearing a blue suit

12   coat.

13             THE COURT:  The Court will note the

14   defendant was identified by the witness.

15   BY MR. WEINHOEFT:

16   Q.  And as he was detained there, what was going

17   on?

18   A.  At the time that I arrived, Detective Roger

19   Sir, from the Lincoln County Sheriff's Office, was

20   attempting to interview the person who was

21   identified through an Illinois driver's license as

22   Nirav Patel.

23   Q.  Did you see the beginning of that interview, or

24   did you come in while that interview was ongoing?

25   A.  I came in when it was ongoing.  The interview

1    had started prior to my arrival.

2    Q. All right.  And can you tell us about any

3    statements that you heard the defendant make?

4    A. So the information that I became aware of was

5    that Mr. Patel was telling Detective Sir that he

6    was given $250 to come up to this address to pick

7    up this box and that he didn't know what was in the

8    box was what I was aware of.

9    Q. Okay.  And did you hear him say that clearly,

10   that he did not know what was in the box?

11   A. I believe what I -- I believe I had received

12   that from Detective Sir.

13   Q. I see.

14            And how about the $250 that he was

15   receiving in payment to pick that up, did you hear

16   him say that?

17   A. I didn't hear him say that.

18   Q. Okay.

19            MS. FRETER:  I'm sorry.  I didn't hear.

20   Can you repeat your last answer?  I didn't hear

21   it.

22            THE WITNESS:  I did not hear that.

23   BY MR. WEINHOEFT:

24   Q. Okay.  What did you hear him say?

25   A. I heard Detective Sir speaking with him and

Case 3:23-cr-30076-SPM    Document 126    Filed 07/01/25    Page 114 of 309    Page ID #868

SEUBERT - DIRECT/WEINHOEFT                  Vol. 2 - 247

1    attempting to have contact with -- or attempting to
2    determine what was taking place.  At the same time
3    I was also paying attention to a cellular phone
4    that Detective Waid had and that Detective Cimino
5    were looking at.  I had become aware that they had
6    received consent from Mr. Patel to view the phone
7    itself.
8    Q.  All right.  So your attention is kind of split
9    between the interview and the cell phone?
10   A.  That's correct.
11   Q.  Tell us about what you noticed or what you
12   observed as Detective Cimino and Detective Waid --
13   and let's make sure we spell those for the court
14   reporter.  C-i-m-i-m-o for Cimino; is that
15   correct?
16   A.  That's accurate.
17   Q.  And Waid is W-a-i-d; is that correct?
18   A.  That's correct.
19   Q.  Two for two.
20          All right.  Tell us what -- so they were
21   going through the phone.  Tell us what you observed
22   and what was happening.
23   A.  They were going through what appeared to be a
24   conversation on the phone apparently between
25   Mr. Patel and someone called KKT.

SEUBERT - DIRECT/WEINHOEFT                 Vol. 2 - 248

1    Q.  Okay.  Now, this conversation, is it like a

2    text message exchange?

3    A.  It was either text message or Messenger.  I

4    don't recall.

5    Q.  Yeah, I guess I should have been a little more

6    precise in my questioning.  Was it that type of

7    exchange where it was texts back and forth on a

8    platform?

9    A.  Yes.

10   Q.  Okay.  Do you know what platform they were

11   exchanging text communications on?

12   A.  I'm not sure.

13   Q.  Okay.  That's fair.

14        And you referenced the defendant was

15   having a conversation with someone named KKT.

16   Where does the KKT come from?

17   A.  So that comes from a contact that was located

18   in the phone.

19   Q.  Okay.  So as you guys are looking at the phone,

20   you see that that's how he had saved it in his

21   phone as KKT?

22   A.  That's correct.

23   Q.  All right.  And what was the nature of the

24   exchanges that -- as you understood them?

25   A.  So the nature of the exchanges was just about

SEUBERT - DIRECT/WEINHOEFT                Vol. 2 - 249

1    him being directed to locations was my

2    understanding, was what I was hearing from the

3    officers.

4    Q.  And was the defendant asked if he knew who KKT

5    is?

6    A.  Yes.

7    Q.  What did the defendant say about who KKT is?

8    A.  He said that he just met him a couple days

9    ago.

10   Q.  Did he describe how he had met KKT just a

11   couple of days ago?

12   A.  Not to my knowledge.

13   Q.  Okay.  Was the cell phone going to be an item

14   of evidence that was important to your

15   investigation?

16   A.  It was.

17   Q.  So what next steps did you wish to take

18   directing this investigation with regard to that

19   particular phone?

20   A.  We seized the phone as evidence based upon the

21   communication that was noted to be present and

22   seized it as evidence to complete a search warrant

23   for.

24   Q.  What types of evidence would you be looking for

25   when executing a search warrant on a cell phone in

1    a fraud case of this nature?

2    A. GPS coordinates, location data, photographs,

3    videos, other communication that's taking place

4    between Mr. Patel and KKT, any and all of that.

5    Q. All right. Fair to say at this point there's

6    still plenty of questions that you were trying to

7    answer from your investigation?

8    A. That's correct.

9    Q. All right. And so tell us about subsequent

10   follow-up investigative steps that you took and

11   your department took after that day.

12   A. So after that day, I had drafted a search

13   warrant for the phone that was taken from

14   Mr. Patel.

15   Q. And if I could stop you right there. He wasn't

16   taken into custody at this point, right?

17   A. No, he was -- he was released.

18   Q. All right. And so released pending your

19   additional investigation, correct?

20   A. That's correct.

21   Q. All right. And tell us about the steps on

22   those -- the additional investigation that you did.

23   A. So I drafted a search warrant for that as well

24   as -- drafted the search warrant so that it could

25   be analyzed by an analyst within the Merrill Police

1  Department.

2  Q. Now, did you take any investigative steps to

3  try to identify the phone number or the identity of

4  KKT who was directing the defendant when he came to

5  do his pickup?

6  A. Yes.

7  Q. And tell us about what you learned when you --

8  and what steps you took in your investigation as

9  you were identifying KKT.

10 A. So in viewing the contact for KKT in the phone,

11 the phone number came back to an overseas phone

12 number, so I completed a --

13 Q. If I could stop you there.  Just for any

14 members of the jury that are not familiar, how can

15 you identify a phone number as being an

16 international number?

17 A. Because the phone number is in a strange

18 structure.  It has a plus and then there's some

19 numbers and space and some more numbers.  It's not

20 in the normal structure that you would associate

21 with a phone number here in the United States.

22 Q. Right, and part of that is the country code,

23 correct?

24 A. That's correct.

25 Q. All right.  Did you have an occasion to do a

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 252

1   search on this particular international phone

2   number?

3   A.  I did.

4   Q.  And what did you learn?

5   A.  I learned that the phone number is based in

6   Pardesh, India.

7   Q.  And let's go ahead and spell that.  That is

8   P-a-r-d-e-s-h; is that correct?

9   A.  Yes.

10  Q.  Were you able to tell anything else about the

11  phone number other than it went back to Pardesh,

12  India?

13  A.  I could tell that it was -- that the provider

14  was Telenor Unitech, I believe --

15          MS. FRETER:  I'm sorry.  Can you speak up.

16  I just can't hear.

17          THE COURT:  Yeah.

18  BY MR. WEINHOEFT:

19  Q.  If you make sure you're into the microphone,

20  that would be very helpful.

21  Thanks.

22  A.  So the provider was identified as Telenor

23  Unitech.

24  Q.  And Telenor being spelled T-e-l-e-n-o-r,

25  correct?

SEUBERT - DIRECT/WEINHOEFT                 Vol. 2 - 253

1    A.  I believe so.

2    Q.  And "Unitech" all one word?

3    A.  Yes.

4    Q.  Tell us what else -- in addition, you obtained

5    a search warrant for the phone, did some searching

6    and as much investigation as you could to identify

7    the phone number back to India.  What else did you

8    do?

9    A.  I believe I had already written a search

10   warrant for the phone number for the phone for

11   Mr. Patel.

12   Q.  And let's talk about steps you took to confirm

13   the defendant's identification.  Were you able to

14   find an Illinois identification for the

15   defendant?

16   A.  Yes.  We -- at the time of the stop, we had

17   identified him through a picture, Illinois driver's

18   license.

19   Q.  Did he have a social security number?

20   A.  Not that I could find.

21   Q.  Did you also check with ICE, or Immigration and

22   Customs Enforcement, for immigration records for

23   the defendant?

24   A.  I did.

25   Q.  Why?

1    A.  Because I wasn't sure at that point if he was a

2    United States citizen, and I wasn't sure if the

3    information that he had provided to us was

4    accurate.

5    Q.  Okay.  And, again, if he is a U.S. citizen, he

6    would have a social security number?

7    A.  Yes.

8    Q.  And immigration should have records if he

9    entered the country lawfully?

10   A.  Yes.

11   Q.  Were you able to obtain any information from

12   ICE or any information about a social security

13   number?

14   A.  No.

15   Q.  Were you able to identify a passport that

16   showed that he was -- or a visa that he was allowed

17   to come lawfully into the U.S.?

18   A.  No.

19   Q.  What other follow-up investigative steps did

20   you take in this particular case?

21   A.  So I had requested that Detective Waid complete

22   the analysis of the cellular phone of Mr. Patel.

23   Q.  Okay.  And the search warrant was executed and

24   a Cellebrite analysis was done on his phone; is

25   that right?

SEUBERT - DIRECT/WEINHOEFT                Vol. 2 - 255

1    A.  That's correct.

2    Q.  And that's Detective Waid's wheelhouse, I won't

3    get into all of that, but I do want to ask if there

4    was one particular piece of evidence that was found

5    on his phone that you were able to connect your

6    Wisconsin case to an Indiana case involving a

7    different victim?

8    A.  Yes, there was.

9    Q.  If you could, tell us about how you were able

10   to associate your Wisconsin case with a victim

11   named Vonda Lutz from Franklin, Indiana.

12   A.  So Detective Waid went through the phone and

13   located a video or videos -- I believe it was two

14   videos -- on Mr. Patel's phone that showed that

15   person's name in Franklin, Indiana, located on a

16   box.

17   Q.  Boxes on two different occasions; is that

18   actually right?

19   A.  That's correct.

20   Q.  And was that concerning?

21   A.  Yes.

22   Q.  Why was that concerning?

23   A.  Because it was consistent with what I had seen

24   happen with Karen Endres in Merrill and what was

25   being attempted to occur a second time with her.

1    Q.  So seeing the same pattern for Ms. Lutz that

2    you saw for Karen Endres, what did you do?

3    A.  I contacted the Franklin, Indiana, Police

4    Department.

5    Q.  And did you speak with?

6    A.  I spoke with Detective Martin.

7    Q.  Is that Detective Kody Martin?

8    A.  That's correct.

9    Q.  And what did you -- and did you help him

10   associate these two cases?  Is that fair to say?

11   A.  Yes.  I explained the information that we had,

12   the victimization that had taken place in the city

13   of Merrill, and then I explained what Detective

14   Waid had found on the phone, which would be

15   consistent with another fraud or scam.

16   Q.  Now, your sting took place on December 2nd you

17   testified to; is that right?

18   A.  That's correct.

19   Q.  All right.  And then when would you say you

20   were able to make that association with the Indiana

21   case?

22   A.  I don't recall the exact date, but it would

23   have been sometime in early December of 2022.

24   Q.  Moving forward a few months into April, did you

25   have the occasion to connect your case to yet

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 257

1    another fraud in Illinois?

2    A.  Yes.

3    Q.  Tell us about that.

4    A.  So that was a case in Edwardsville, Illinois.

5    I was contacted by a detective -- forgive me.  I

6    forget his name.

7    Q.  Conor Hoyland ring a bell?

8    A.  Yes.

9    Q.  Okay.

10   A.  Spoke with him and he had indicated that he had

11   also had a victim of a scam at the hands of

12   Mr. Patel.  I believe their victim was out

13   initially a hundred thousand dollars, and the

14   detective explained to me that Mr. Patel was --

15           MS. FRETER:  Objection.  Your Honor, this

16   is hearsay.

17           THE COURT:  Well, I don't know where he's

18   going with it because he keeps turning away from

19   the microphone.  I know it's important that you

20   look at the jury, but it's also important that they

21   and I hear you.  So reask the question.

22           MR. WEINHOEFT:  Sure.  Be happy to.

23   BY MR. WEINHOEFT:

24   Q.  You were contacted by Detective Conor Hoyland

25   from the Edwardsville Police Department about

1    another victim in southern Illinois; is that

2    right?

3    A.  That's correct.

4    Q.  And that would have been in April of '23?

5    A.  That's correct.

6    Q.  All right.  And at this point Detective Hoyland

7    was trying to see whether or not your two cases are

8    connected; is that right?

9    A.  Yes.

10   Q.  Did you obtain any pieces of evidence from the

11   Illinois case to compare to your Wisconsin case?

12   A.  Yes, I did.

13   Q.  What evidence did you receive from the

14   Edwardsville detective to associate your Wisconsin

15   fraud with the Illinois fraud?

16   A.  A picture of Mr. Patel and his vehicle.

17   Q.  And did you -- let's take those separately.

18            Did you have the occasion to see the

19   vehicle that was stopped as part of the fraud in

20   Illinois?

21   A.  I saw a photograph.

22   Q.  Photograph of it.  Did you recognize that

23   vehicle?

24   A.  Yes.

25   Q.  How did you recognize that vehicle?

SEUBERT - DIRECT/WEINHOEFT                    Vol. 2 - 259

1    A.  It was the same vehicle that was in Merrill.

2    Q.  It's one that you saw in person in Merrill?

3    A.  Yes.

4    Q.  And looking at the photograph, did you

5    recognize the photograph of the person who was

6    arrested in Illinois?

7    A.  Yes.

8    Q.  And who was it?

9    A.  Nirav Patel.

10   Q.  Same individual that you saw in person in

11   Wisconsin?

12   A.  That's correct.

13          MR. WEINHOEFT:  If I may have one moment,

14   Your Honor.

15          Nothing further, Your Honor.  Thank you.

16          THE COURT:  All right.  Let's approach.

17          (Sidebar proceedings on the record.)

18          THE COURT:  How long do you have?

19          MS. FRETER:  I mean, it will be 30

20   minutes.

21          THE COURT:  All right.  Well, the jurors'

22   lunch gets here at 11:45 or thereabouts.  As soon

23   as their lunch gets here -- all right.  We've been

24   going a little while.  The jurors' lunch gets here

25   at 12:45 (sic), we've been going a little while.  I

SEUBERT - CROSS/FRETER                    Vol. 2 - 260

1    was going to give them a break, but let's just --
2    we'll go to quarter to 12.
3              MS. FRETER:  So, Judge, I misheard you.
4    Is lunch here at is 11:45 or 12:45?
5              THE COURT:  11:45.
6              MS. FRETER:  More or less, and so Jackie
7    can just give me the "hi" sign when it shows up and
8    I'll quit.
9              THE COURT:  I'm going to break at 11:45,
10   okay?
11             MS. FRETER:  Okay.
12             (End of proceedings at sidebar.)
13             THE COURT:  All right.  Thank you.
14             Cross-examination?
15             MS. FRETER:  If I can have just one
16   second.

17                   **CROSS-EXAMINATION**
18   BY MS. FRETER:
19   Q.  Okay.  Lieutenant Detective, your call about
20   this case was on Thanksgiving, which was November
21   24th of '22.  That's when you first got involved,
22   right?
23   A.  That's correct.
24   Q.  Okay.  And after that, do you look at any bank
25   records from Ms. Endres?

1    A.  I had viewed some receipts, yes.

2    Q.  Okay.  When you say "receipts," what do you

3    mean by that?

4    A.  Receipts about withdrawal and receipts about

5    what is left in her accounts.

6    Q.  Okay.  And so like little slips or like full,

7    like, statements?

8    A.  Little slips.

9    Q.  Okay.  And who gave those to you?

10   A.  They came -- they were dropped off -- Officer

11   McCaskill had obtained those from Ms. Endres.

12   Q.  Okay.  And did you -- so Thanksgiving is on the

13   24th.  On the 23rd, the day before, did you or any

14   of your department cause $75,000 to go in and out

15   of Ms. Endres' account?

16   A.  No.

17   Q.  And later when you guys are working on the

18   sting and you have the bank to get the $75,000,

19   that's money that's in her account already,

20   right?

21   A.  That's correct.

22   Q.  The police department wasn't providing the

23   $75,000?

24   A.  No.

25   Q.  And the bank wasn't -- it wasn't like the

SEUBERT - CROSS/FRETER                    Vol. 2 - 262

1  bank's money?  It was money that was already in her

2  account?

3  A. Correct.

4  Q. Okay.  And on the day when you guys were there,

5  December the 2nd, that Friday, you guys withdraw

6  the 75,000, take pictures of it and then put it

7  back in, right?

8  A. So Ms. Endres took pictures of it in accordance

9  with what was requested by the scammer and that

10  money remained on the table until we made sure that

11  he wasn't going to request additional photographs

12  of the box or of the money.

13  Q. And then it went back into the bank account?

14  A. That's correct.

15  Q. The 75,000 never left the bank?

16  A. No.

17  Q. And regarding the money that was taken out

18  before you guys got involved, did you look at

19  records that showed whether she took out 25,000 and

20  had like another 4 at home?  Do you know how that

21  worked or just not real sure?

22  A. What I saw was a receipt from Nicolet Bank

23  indicating that $29,000 had been removed from the

24  account.

25  Q. Did you see any receipts showing that only

SEUBERT - CROSS/FRETER                    Vol. 2 - 263

1    25,000 had been removed?

2    A.  Not that I recall.

3    Q.  When you guys are at the bank all day on

4    December the 2nd, is -- and I'm having -- is it

5    Endres or "Andres"?

6    A.  Endres.

7    Q.  Was she talking on the phone with this guy,

8    Eric?

9    A.  She was doing both.  She was texting or

10   messaging, and then she also spoke.

11   Q.  And you guys are in the room when this is

12   happening?

13   A.  Yes.

14   Q.  Did you record any of those phone calls?

15   A.  I did not.

16   Q.  Did anyone in your department?

17   A.  No.

18   Q.  And did you put the phone on speaker so that

19   you could hear the conversation?

20   A.  Yes.  She had -- she would have the phone on

21   speaker so that I could hear what this person was

22   saying.

23   Q.  Okay.  And did you hear the person identify

24   themselves as Eric?

25   A.  No.

1    Q.  And how would you describe the person's

2    voice?

3    A.  Soft, calm to start with, a male probably.

4    Q.  Okay.  What language were they speaking?

5    A.  English.

6    Q.  Was there any accent?

7    A.  I don't recall a notable accent.

8    Q.  Were there any words or phrases that you recall

9    having difficulty hearing or understanding?

10   A.  Not that I recall.

11   Q.  Okay.  So as you look -- think back on it, it

12   was somebody speaking as clear of English as I'm

13   speaking now?

14   A.  Very nearly, yes.

15   Q.  Okay.  Did you have occasion to hear Mr. Patel

16   either speak with you or with other officers after

17   his stop?

18   A.  I believe I did.

19   Q.  Okay.  What language did he speak?

20   A.  I would describe it as broken English.

21   Q.  Okay.  And when you say "broken English," like

22   what does that mean?

23   A.  So speaking -- he would say some words in

24   English, but it wasn't like he was speaking in full

25   sentences, if that makes sense.

1    Q.  Did he have an accent?

2    A.  Yes.

3    Q.  And was he difficult to understand?

4    A.  From what I recall, to some degree, at times he

5    was.  At other times the words that he would say

6    were clear.

7    Q.  Was he speaking in, like, full paragraphs or is

8    it just short words or sentences?

9    A.  From my recollection, short sentences.

10   Q.  Was that the same or different as what you

11   heard on this phone when you guys had it on

12   speaker?

13   A.  It was different.

14   Q.  How was it different?

15   A.  Just the way the person spoke, the accent

16   was -- accents were different and sentence

17   structure was different.

18   Q.  The person on the phone when you guys were

19   listening on speaker was giving these long

20   directions about all this stuff to do with the

21   money, right?

22   A.  Uh-huh.

23   Q.  And I got to get you to say yes or no.

24   A.  Yes.  I'm sorry.

25   Q.  And they're telling you, I think you testified

1    earlier, about how to, like, arrange it in the box

2    and show it and all this kind of stuff, right?

3    A.  That's correct.

4    Q.  After Mr. Patel was stopped, did you get

5    consent to search his phone or did somebody else?

6    A.  Someone else.

7    Q.  Did you guys have him sign a written form?

8    A.  I don't believe so.

9    Q.  Do you remember who that officer was that got

10   the consent to search the phone?

11   A.  Yes, it was Detective Waid.

12   Q.  Okay.  And was that at the scene there at the

13   car stop?

14   A.  Yes.

15   Q.  And was that, again, in this English that was

16   sort of accented?

17   A.  So I'm not sure if that was done -- again, I

18   wasn't there immediately.  I'm not sure if that was

19   done verbally or if that had been done possibly

20   using some form of translation.  I'm not sure of

21   that.

22   Q.  By the time you were there, they were already

23   having a conversation?

24   A.  They were already looking in the phone when I

25   arrived there.  So whatever the consent was that

SEUBERT - CROSS/FRETER                    Vol. 2 - 267

1    took place, took place prior to my arrival.

2    Q.  And that's what -- is it detective, officer

3    Waid?

4    A.  Detective Waid.

5    Q.  Detective Waid.

6              And the conversations that you're aware of

7    with Mr. Patel, were those all at the car stop or

8    were some of those at the police station?

9    A.  There were none at the police department.

10   Q.  And did you guys let him leave from the car

11   stop area?

12   A.  Yes.

13   Q.  In the same car that he was driving when he was

14   there?

15   A.  Yes.

16   Q.  But he left his phone with you guys?

17   A.  That's correct.

18   Q.  And then after that, you go ahead and you get a

19   search warrant for the phone?

20   A.  That's correct.

21   Q.  And you look -- or Detective Waid looks through

22   it more than just sort of thumbing through it?  He

23   uses this program called Cellebrite?

24   A.  That's correct.

25   Q.  And getting the warrant was just sort of an

SEUBERT - CROSS/FRETER                    Vol. 2 - 268

1    extra -- like an extra step?  You guys already had

2    consent, right?

3    A.  So we had consent to look into the phone to do,

4    what's called, a hand scroll.  This type of

5    extraction is much more detailed than that.

6    Q.  Did you ask Mr. Patel about that, or you didn't

7    need to because you just already had the phone?

8    A.  You mean to do the extraction?

9    Q.  Yeah.

10   A.  I didn't ask -- I did not ask Mr. Patel about

11   that.

12   Q.  And then I want to talk to you a little bit to

13   clear up -- you said that as the sting is going on

14   all day, Ms. Endres -- it was her understanding she

15   was going to go back to the house and facilitate in

16   some way the -- sort of the back end of the sting

17   or the apprehension part; is that right?

18   A.  Correct.  She appeared to be confused about

19   what the plan was.

20   Q.  Well, I want to ask you about that.  Did you

21   guys, like, brief her beforehand?  Did you say,

22   We're going to do all of these steps, or did you

23   guys just sort of say generally, like, We're going

24   to take care of it?

25   A.  So we talked about what is going to happen

1    because we had to have permission to put Detective

2    Cimino in her residence.  So she was made aware

3    that Detective Cimino was going to be acting as her

4    when the scammer arrived.  So she was made aware of

5    what steps were going to take place.

6    Q.  In those conversations, though, did you say,

7    The detective is going to be you, but you are going

8    to stay at the bank the whole time?  You are not

9    going back there?

10   A.  I'm fairly certain that I told her that she

11   would be staying at the bank with me.

12   Q.  So your perception is more of confusion rather

13   than miscommunication?

14   A.  Correct.

15   Q.  And can you describe the color of the car that

16   you saw Mr. Patel in?

17   A.  It's a brownish, maybe off-red, maroon.  Maybe

18   like raisin color.

19   Q.  Okay.  And so when you say brown, do you mean

20   like this color brown of the podium?

21   A.  No, more of the darker tone.

22   Q.  So more brown or -- then when you say maroon,

23   what do you mean by maroon?

24   A.  And maroon is probably a bad choice of words.

25   It's more of like a raisin color, like a deeper

1    brown.

2    Q.  I'm going to have you look at the chair that

3    you're sitting in.  What color would you describe

4    that chair?

5    A.  Almost a purple color.

6    Q.  Okay.  So not -- that wasn't the color of the

7    car?

8    A.  No.

9    Q.  Do you see anything in this room that looks

10   like this maroon, raisin brown that you're --

11   A.  Not really.

12   Q.  Okay.  But definitely not the color of this

13   podium?

14   A.  No.

15   Q.  And none of the colors of any of the browns in

16   the courtroom?

17   A.  Maybe the darker -- darker browns gets close to

18   it but not fully.

19   Q.  But not really, okay.

20         MS. FRETER:  I don't have anything

21   further.

22         MR. WEINHOEFT:  Just two, Judge.

23                **REDIRECT EXAMINATION**

24   BY MR. WEINHOEFT:

25   Q.  Lieutenant, on -- counsel was just asking you

1    questions about the car and the color and things

2    like that.  Did you record the license plate -- or

3    did officers record the license plate of the

4    vehicle that was stopped in Wisconsin?

5    A.  Yes.

6    Q.  And did officers in Illinois record the license

7    plate of the car that was stopped?

8    A.  Yes.

9    Q.  And were they both photographed and videoed?

10    A.  Photographed for sure.

11    Q.  Photographed and they're videoed in

12    Wisconsin?

13    A.  Yes, they were on video in Wisconsin.

14    Q.  And did the license plates match?

15    A.  Yes.

16    Q.  All right.  Counsel also asked you some

17    questions essentially comparing -- if you could

18    compare Mr. Patel's voice to the voice that you

19    heard on the telephone.  Do you remember those

20    questions?

21    A.  I do.

22    Q.  All right.  Questions essentially kind of

23    comparing and contrasting whether or not that was

24    Mr. Patel on the phone.  Do you remember those --

25    kind of that nature -- line of questioning?

SEUBERT - REDIRECT/WEINHOEFT                 Vol. 2 - 272

1    A.  Yes.

2    Q.  From your investigation, you can conclude

3    conclusively that it was not Mr. Patel on the phone

4    with the victim; isn't that right?

5    A.  That's correct.

6    Q.  And how do we know for certain that Mr. Patel

7    was not the one on the phone with the victim?

8    A.  Because of the communication between KKT and

9    Mr. Patel.

10   Q.  And was there other communication from the

11   scammer that you heard that showed he was

12   communicating with the courier for the pickup?

13   A.  I'm not sure I follow.

14   Q.  Think back to 3:36 p.m.  As you are in the

15   bank, was there communication from the scammer on

16   the phone that indicated the scammer was talking to

17   Mr. Patel, who is telling him when he is going to

18   arrive to make the pickup?

19   A.  Yes.  Yes, he stated that the -- that the

20   courier's car had arrived.

21   Q.  Right.  Again, so we know for certain that was

22   not Mr. Patel on the phone?

23   A.  That's correct.

24   Q.  Right.  Very good.

25           MR. WEINHOEFT:  That's all I have.

SIR - DIRECT/WEINHOEFT                          Vol. 2 - 273

1           MS. FRETER:  Nothing further.

2           THE COURT:  All right.  Sir, you may step

3    down.  Thank you.

4           (Witness excused.)

5           THE COURT:  It is 20 minutes to 12.  Your

6    lunch should be arriving shortly -- it has arrived,

7    so timing of this has been perfect.  We will

8    adjourn -- or recess for one hour.  We'll start

9    back -- we'll make it an hour and five minutes.

10   We'll start back at quarter to one.

11          (Lunch recess at 11:40 a.m. until

12   12:48 p.m.)

13          THE COURT:  Call your next witness.

14          MR. REED:  The Government calls Roger Sir,

15   S-i-r.

16          (Witness sworn.)

17          COURTROOM DEPUTY:  Please state your full

18   name and spell just your last name for the Court.

19          THE WITNESS:  Roger Sir, s-i-r.

20          COURTROOM DEPUTY:  Thank you so much.

21          **ROGER SIR, GOVERNMENT'S WITNESS,**

22                **DIRECT EXAMINATION**

23   BY MR. WEINHOEFT:

24   Q.  And, sir if you could -- actually, if you could

25   kind of pull that microphone towards you, the

1   acoustics in here are a little rough, so if you can

2   keep that as close to you when you're speaking as

3   possible, that would be ideal.

4   A.  Okay.

5   Q.  Good afternoon.  If you could, introduce

6   yourself to the members of the grand jury -- I mean

7   to the jury, please.  I'm sorry.

8   A.  My name is Roger Sir.  I'm a sergeant

9   investigator with the Lincoln County Sheriff's

10  Office.  I'm also a task force officer with the

11  FBI.  I'm in Wausau, Wisconsin.  Primarily, I'm a

12  narcotics detective, but I also do general

13  investigations, and I've been a law enforcement

14  officer since 2005.

15  Q.  Okay.  And who do you work for as your

16  full-time agency?

17  A.  The Lincoln County Sheriff's Office in

18  Wisconsin.

19  Q.  And how long have you been employed in law

20  enforcement?

21  A.  I became a cop in 2005.

22  Q.  Tell us about how your career in law

23  enforcement began.

24  A.  I was a campus police officer at the UW-Eau

25  Claire Police Department in Wisconsin.

1    Q.  And where is UW-Eau Claire located?

2    A.  It's in western Wisconsin about an hour from

3    Minneapolis.

4    Q.  And tell us a little bit about your experience

5    working for the university.

6    A.  I was a patrol officer and handled general

7    patrol things and traffic enforcement.

8    Q.  And how about your education, did you have

9    occasion to also study there?

10   A.  I did study there.  I did not finish my degree

11   there.  I have 100 college credits from the

12   University of Wisconsin-Eau Claire.

13   Q.  And what major or course of education were you

14   pursuing while you were there?

15   A.  Criminal justice.

16   Q.  All right.  And so you earned an associate's

17   degree?

18   A.  I did.

19   Q.  Very good.  How long did you work for

20   University of Wisconsin-Eau Claire Police

21   Department?  To what year?

22   A.  2009.

23   Q.  And when you left there, where did you go?

24   A.  I left there and went to the Lincoln County

25   Sheriff's Office, and I've worked there since.

SIR - DIRECT/WEINHOEFT                      Vol. 2 - 276

1    Q.  And so tell us about your career.  When it

2    began, what were your duties?

3    A.  I was a patrol deputy, handled general patrol

4    functions with the sheriff's office and respond to

5    calls and investigate crimes that came in through

6    our dispatch.

7    Q.  If I can maybe get you to pull that microphone

8    over to that side, that might help.  There we go.

9    Thank you so much.

10            How long did you work in patrol?

11   A.  I worked as a patrol deputy until March of

12   2017.

13   Q.  Were you promoted at that time?

14   A.  I was promoted to detective or sergeant

15   investigator at that time.

16   Q.  Tell us what a sergeant investigator does.  How

17   are those duties different?

18   A.  I am ultimately a detective.  I was assigned to

19   the special investigations unit where -- with my

20   primary duties were narcotics investigation.

21   Q.  So you worked for the sheriff's department, and

22   your primary agency is a county sheriff's

23   department, right?

24   A.  Correct.

25   Q.  But you mentioned earlier also that you work as

1    a task force officer in addition to that; is that

2    right?

3    A.  That is correct.

4    Q.  All right.  If you could, explain to the

5    members of the jury what it means to be federally

6    authorized under a -- in a task force officer

7    designation.

8    A.  We're an FBI task force.  It's a

9    multi-jurisdictional task force that's in Wausau,

10   Wisconsin.  I've been deputized with the FBI and

11   with the U.S. Marshals Service to enforce federal

12   narcotics investigations.

13   Q.  And so essentially that means you have FBI

14   credentials, can work out of the FBI space, those

15   sorts of things on federal investigations?

16   A.  Yes, I have a top secret clearance and FBI

17   credentials.

18   Q.  And do you have task force officer or federal

19   designations with any other federal agencies?

20   A.  U.S. Marshals Service.

21   Q.  And obviously, your TFO designation to work

22   with FBI is related to FBI matters.  Tell us how

23   your designation for the Marshals Service authority

24   expands that authority.

25   A.  It gives us arrest authority for federal

SIR - DIRECT/WEINHOEFT                          Vol. 2 - 278

1    crimes.

2    Q.  Help with things like executing federal arrest

3    warrants, fugitives, search warrants, things like

4    that?

5    A.  Yes.

6    Q.  Very good.  And tell us a little bit about the

7    work you do as a TFO and how that compares to the

8    work you do as a sergeant investigator.

9    A.  Generally we work long-time, high-level drug

10   investigations that start in our local jurisdiction

11   and expand out to other states, all the way to the

12   southwest border, and my general duties in Lincoln

13   County, I investigate homicides, I'm a trained fire

14   investigator, I'm a trained cell phone analyst,

15   I've been to things like basic death investigation

16   through our state, and so any general crimes that

17   our bureau -- or detective bureau would

18   investigate, I -- when they need my help or my

19   assistance, I pitch in and do those things.

20   Q.  And in addition to giving assistance in your

21   own department, do you have the occasion to

22   sometimes provide assistance to the city of Merrill

23   when they ask?

24   A.  Yes.  The city of Merrill is in Lincoln County.

25   So when they need help with larger operations or

SIR - DIRECT/WEINHOEFT                        Vol. 2 - 279

1   events, they need more bodies, then they often ask

2   us to assist.

3   Q.  On December 2nd of 2022, did you have the

4   occasion to be contacted with a request for

5   assistance from the City of Merrill Police

6   Department?

7   A.  I did.

8   Q.  And what were you being asked to assist with?

9   A.  I was -- we were told that there's a -- there's

10  going to be somebody coming up to Merrill to pick

11  up some cash, and they needed help with assist --

12  or they needed help with surveillance, so they

13  needed cars to be in the area, and I was in one of

14  those cars waiting until our suspect arrived.

15  Q.  Were you in a marked unit or an unmarked unit

16  that day?

17  A.  I was in an unmarked truck.

18  Q.  And so where were you located?

19  A.  I was just west of the residence down by the

20  ballpark on Sixth Street -- or Sixth --

21  Q.  So just a block or two from where the victim

22  lived?

23  A.  Yeah, just a couple blocks away.

24  Q.  Okay.  Very good.  And your responsibilities

25  were?

SIR - DIRECT/WEINHOEFT                    Vol. 2 - 280

1   A.  Just to be in the area and watch for any

2   vehicles that could possibly be our subject we were

3   waiting for.

4   Q.  And when would you say that you were in place

5   and you began your job providing surveillance on

6   December 2nd?

7   A.  Started about 11:30 a.m.

8   Q.  All right.  So essentially spent the day on

9   surveillance waiting for something to happen?

10  A.  Yes.

11  Q.  Okay.  Let's fast-forward then and take your

12  attention to right around the 3:30 mark; and

13  specifically 3:31, did you receive any messages

14  from Lieutenant Seubert?

15  A.  We were told the subject we were waiting for is

16  in the area.

17  Q.  And did you have any idea roughly about how far

18  away he was going to be?

19  A.  A couple minutes.

20  Q.  And so in addition to the suspect being a

21  couple minutes away, did you have a vehicle

22  description?

23  A.  At one point we were given a vehicle

24  description of a brown sedan, I believe.

25  Q.  And when is it that you learned that that sedan

1   with the courier arrived at the victim's home?

2   A. Detective Waid effected a traffic stop on the

3   vehicle that had approached the house and that --

4   so once I heard that radio traffic, then I started

5   to head towards that direction.

6   Q. All right. So essentially you're, you know, a

7   block or two away. You hear radio traffic. You

8   know, you know, a stop has happened. You respond

9   to help?

10  A. Yes.

11  Q. All right. So paint the picture for us

12  visually. As you're driving up there, what do you

13  see?

14  A. As I drive up, I see a marked squad with lights

15  on. I park my vehicle and I walk up, and the

16  vehicle is stopped on the -- the target vehicle is

17  stopped on the side of the road, and Detective

18  Waid, I believe, is approaching the vehicle.

19  Q. First let's talk about the vehicle. Did you

20  see the vehicle?

21  A. Yes.

22  Q. What type of vehicle was it?

23  A. It's a Nissan Altima.

24  Q. And was the license plate documented in the

25  Wisconsin reports?

SIR - DIRECT/WEINHOEFT                    Vol. 2 - 282

1    A.  Yes, it was.

2    Q.  Okay.  Do you happen to recall it?

3    A.  I know it was an Illinois plate.  I'd have to

4    refer to my notes.

5    Q.  If referring to your notes would assist you in

6    refreshing your memory, that's fine.  Just go ahead

7    and do so.

8    A.  Okay.

9    Q.  And is your memory refreshed now?

10   A.  Yes.

11   Q.  And tell us what that license plate was.

12   A.  DQ99741.

13   Q.  And that's an Illinois plate on a Nissan

14   Altima, correct?

15   A.  It is.

16   Q.  All right.  Very good.  Did you also see the

17   individual who was driving that car?

18   A.  Yes.

19   Q.  I would ask you to look around the courtroom

20   right now, and tell me, do you see the individual

21   who was driving that car present in court?

22   A.  Yes.

23   Q.  If you would please identify him by an article

24   of clothing that he is wearing, please.

25   A.  A gentleman in the blue blazer and the purple

SIR - DIRECT/WEINHOEFT                    Vol. 2 - 283

1    shirt.

2         MR. WEINHOEFT:  Ask the Court record to

3    note the identification.

4         THE COURT:  So noted.

5         MR. WEINHOEFT:  Thank you, sir.

6    BY MR. WEINHOEFT:

7    Q. All right.  So what is the defendant doing as

8    you are pulling up to the scene and as you're

9    getting out of your car?

10   A.  I believe he's being asked to exit the vehicle

11   by Detective Waid, and I approached from the

12   passenger's side of the vehicle.

13   Q. All right.  So you got there pretty quickly?

14   A.  Yes.

15   Q. All right.  So let's talk about when -- what

16   was kind of the division of labor?  Who was doing

17   what in terms of the law enforcement officers who

18   were present?  What was everybody's role?

19   A. At the traffic stop?  Is that what you're

20   asking?

21   Q. Yeah, when you first rolled up.

22   A.  Okay.  So Detective Waid was the driver of the

23   squad that stopped this target vehicle.  He

24   approached the driver's side of the car.  I

25   approached the passenger's side of the car.  When

1   the gentleman was out of the vehicle, then I stood

2   by while Detective Waid searched him for any

3   weapons.

4   Q.  He conducted a pat down?

5   A.  Yes.

6   Q.  Very good.  And did you then begin interviewing

7   the defendant yourself?

8   A.  At some point we did, yes.

9   Q.  Well, tell us about how that process unfolded.

10  A.  We asked the driver why he was where he was in

11  Merrill.

12  Q.  Okay.  Well, before we get into the substance

13  of what he said, let's talk -- let's focus really,

14  primarily, on your ability to communicate or

15  inability to communicate.  I want the make sure the

16  jury kind of has an understanding of how easy or

17  difficult, if you can characterize what the nature

18  of your exchange with the defendant was like?

19  A.  Okay.  The subject was able to speak in some

20  English, it wasn't perfect English, but we were

21  able to ask him questions, and he was able to reply

22  in English to where we could understand each

23  other.

24  Q.  As you were trying to communicate with him,

25  what were the sorts of things that you would try to

1  assess in order to determine whether or not he

2  understood you when you were communicating with

3  him?

4  A.  In asking questions, I'd ask a question, if he

5  replied in English, and I understood what he was

6  asking, I would assume that he understood my

7  question, I understood him, and we were able to

8  communicate.

9  Q.  Meaning, he would be responsive and the

10  conversation had a flow that made sense?  Is that

11  what you're saying?

12  A.  Yes.  He didn't ask me to repeat myself; or if

13  he did, then we would go down that route until he

14  understood what I was asking.

15  Q.  What are some body language indicators that you

16  might be paying attention to when you're trying to

17  assess whether or not he understood you when you

18  were speaking to him?

19  A.  When I speak to people and they understand what

20  I'm asking them, they typically look at me, they

21  reply in kind and respond in English where I

22  know what they -- I knew that -- I recognize that

23  they understood me.  When people typically don't

24  understand me, they look at me with an inquisitive

25  look on their face, they scrunch their eyebrows or

SIR - DIRECT/WEINHOEFT                    Vol. 2 - 286

1    ask what or ask me to repeat myself, and then,

2    obviously, there's a communication barrier.  We

3    need to ask more questions or repeat myself.

4    Q.  Okay.  And given the fact that you described

5    that the defendant spoke some English but with some

6    difficulty, were you paying kind of particular

7    attention to kind of assess your level of

8    understanding and the quality of your

9    communication?

10   A.  Yeah, I wanted to make sure that he understood

11   what I was asking.  So if he's able to communicate

12   it to me in English and I understood what -- the

13   reply and it made sense with what I asked him, then

14   I assumed that we had effective communication and

15   then we moved on to the next.

16   Q.  All right.  And just a moment ago you said that

17   the first question that you asked him -- the first

18   question that was put to him is why are you here or

19   why are you here in Merrill?  Do you remember

20   that?

21   A.  Yes.

22   Q.  So let's focus just on that question.  Is that

23   the first thing that was asked?

24   A.  I don't know if that was the very first

25   question, but it was the first question about why

1  we were there that day.

2  Q.  Okay.  And when the defendant was asked, Why

3  are you in Merrill, how did he respond?

4  A.  He said that he was in town to play music -- or

5  he was a musician and he came up to play music.

6  Q.  Okay.  And at this point, kind of characterize,

7  if you will, the -- you know, the open-endedness of

8  the -- you know, the communication or just put us

9  in the street with you there and kind of help us

10  understand what the flow was like.

11  A.  So we asked him why he was in town, and he gave

12  us the response about being a musician.  So he

13  continued with -- pardon me.  Sorry.  Can you

14  repeat the question?

15  Q.  That's okay.  Yeah.

16          You've already said that he told you that

17  he was there to play music or he was a musician.

18  Let me ask you this:  When he said he was in town

19  to play music, did you -- did that cause you -- or

20  did you look inside his vehicle to see whether or

21  not what he was telling you was truthful?

22          MS. FRETER:  Objection, Your Honor.  It's

23  leading, compound, argumentative.  Just ask him,

24  Did you look in the car?

25          THE COURT:  Overruled.

SIR - DIRECT/WEINHOEFT                    Vol. 2 - 288

1    BY MR. WEINHOEFT:

2    Q.  After he told you that he was in town as a

3    musician, did you look into his car to test his

4    statement?

5    A.  Yes.  We looked in the car and there weren't --

6    we didn't notice anything like instruments or sound

7    equipment that would indicate that he was in town

8    to do that.

9    Q.  If somebody was in town for a show, what other

10   sorts of things might you expect to find in the

11   back of their car?

12         MS. FRETER:  Objection.  Calls for

13   speculation.

14         THE COURT:  Overruled.

15         THE WITNESS:  Speakers, amplifiers,

16   microphones, wires, boxes.  Generally a large

17   amount equipment, musical instruments.

18   BY MR. WEINHOEFT:

19   Q.  Did you see any of those sorts of things?

20   A.  Did not.

21   Q.  Did you follow up with Mr. Patel and ask him

22   where those sorts of things were at, or did someone

23   ask him where his instruments were?

24   A.  I don't know that I asked that question.  It's

25   possible somebody did.  I don't recall.

1    Q.  Okay.  Very good.  What do you remember being

2    asked next about him being here as a musician?

3    A.  We asked him where he was supposed to play, and

4    we didn't get an answer about where he was supposed

5    to play.

6    Q.  Okay.  When you asked the question, did you see

7    any of that -- was there any of that difficulty to

8    understand, wrinkle of the forehead as you

9    described before, or was it just a

10   not-answering-you?

11   A.  No, it wasn't that he -- I don't remember him

12   doing anything like that.  It was a -- just like a

13   nonresponse, like, he wasn't able to give us a

14   definitive place.

15   Q.  Give us an idea about how much time you were

16   asking him about this claim that he was there -- he

17   was in Wisconsin to play music.

18   A.  For several minutes.

19   Q.  At some point -- well, let's just ask, how did

20   the questioning kind of proceed from there?  Did

21   you have concerns about a statement?

22   A.  Yes.  We -- based on what we were seeing and

23   what he was telling us, he didn't seem like he was

24   being honest with us about it, so then we

25   confronted him about why he was there.

1   Q.  Okay.  You just used the word "confronted."

2   What do you mean?

3   A.  Well, typically, when we talk to people on the

4   street or do an interview, we let them tell us

5   whatever story -- whatever their version of events

6   are and let them talk as much as they want about

7   it, and then once we -- when we have a point where

8   we have a provable lie, that we know that they're

9   not giving us the truth, then we can confront them

10  with that and then see what their response is.

11  Q.  So how did you confront Mr. Patel?

12  A.  I told him I didn't believe him that he was

13  here to be a musician.

14  Q.  And would you have confronted him and told him

15  you didn't believe him if you thought this was a

16  communication issue?

17  A.  No.

18          MS. FRETER:  Objection -- never mind.

19          THE COURT:  You may answer the question.

20          THE WITNESS:  I did not.

21  BY MR. WEINHOEFT:

22  Q.  If you had concerns about his understanding,

23  how would you have proceeded differently?

24  A.  I would have asked more questions or -- I would

25  have just continued the communication until I was

1   sure that we were talking about the same thing.

2   Q.  Okay.  So did you challenge him or did you

3   question him a little bit more specifically once

4   you decided to confront him?

5   A.  I told him I didn't believe him.  He was

6   confronted with some of the information we had

7   about the person coming to Merrill to pick up the

8   money -- or a box and told him that his musician

9   story was not correct.

10  Q.  How did he respond?

11  A.  Eventually he told us that he was in town to

12  pick up a box and that the box -- he didn't know

13  what was going to be in the box and that he was

14  getting paid $250 for the trip.

15  Q.  Were there other officers present around the

16  car as you're having this conversation with the

17  defendant?

18  A.  Yes, there were several officers there.

19  Q.  And did one of them locate a cell phone?

20  A.  Yes.

21  Q.  All right.  Talk to us, if you will, about how

22  the process unfolded where officers asked for

23  consent from the defendant to look at his cell

24  phone.

25  A.  We located -- the phone was located in the car,

SIR - DIRECT/WEINHOEFT                    Vol. 2 - 292

1    and we wanted to ask him for consent to look at the

2    phone.  At this point I wanted to make sure that he

3    knew exactly what I was asking him.  So I got on

4    Google Translate, and I used the Hindi language --

5    from English to Hindi languages on there, and I

6    asked him if we could look through his phone.

7    Q.  Okay.  Before we get into the actual consent,

8    let's go back to that Google Translate.  When you

9    decided to pull your phone out and use that

10   translate function on there, why did you choose the

11   Hindi language?

12   A.  Because he indicated he spoke Hindi.

13   Q.  Okay.

14   A.  I asked him what language I should use.

15   Q.  Okay.  So that was the language he asked you to

16   use.

17   A.  I asked him what other -- if he spoke Hindi and

18   he indicated he did or something along those

19   lines.

20   Q.  And at this point you went to the Google

21   Translate to document what?

22   A.  I wanted to ask him evidentiary-type questions

23   to make sure that he understood what I was asking

24   him, so there was no communication barrier, and I

25   also wanted to record that interaction, audio

SIR - DIRECT/WEINHOEFT                    Vol. 2 - 293

1    record it.

2    Q. And obviously there is legal consequence to

3    someone granting consent, and so you wanted to --

4            MS. FRETER:  Objection, Your Honor, to the

5    commentary regarding the question about legal

6    ramifications.  Object to the form of the

7    question.

8            THE COURT:  There is a lot of commentary

9    associated with your questions, so let's try to

10   keep it to simple interrogatory.

11           MR. WEINHOEFT:  Sure.

12   BY MR. WEINHOEFT:

13   Q. Are there legal consequences to requesting

14   consent?

15   A. Yes.

16   Q. And are those significant to you as an

17   investigator?

18   A. Yes.

19   Q. Did that in some way affect your decision to

20   request the use of Google Translate where you could

21   document and record that question and answer?

22   A. Yes.  That's -- I wanted to make sure that he

23   understood exactly what I was asking him so that

24   there was -- if there is any question about it,

25   that he would know exactly what I asked.

SIR - DIRECT/WEINHOEFT                    Vol. 2 - 294

1    Q.  Did you make any other efforts to try to record

2    the communication that was going on between the two

3    of you at this point?

4    A.  Yes, I turned on the recording app on my

5    phone.

6    Q.  And what app did you turn on to try to record

7    your discussions with the defendant?

8    A.  Apple Voice Memos.

9    Q.  So you were trying to use both apps at the same

10   time?  Translate and -- which Apple app was it

11   again?

12   A.  Voice Memos.

13   Q.  Voice Memos.  So you're using Voice Memos and

14   Google Translate -- you're tying to use them at the

15   same time?

16   A.  Yes.

17   Q.  Was the audio recording on Voice Memos

18   ultimately successful?

19   A.  It was not.

20   Q.  Tell us about how you determined it was not

21   successful.

22   A.  This was on a Friday when I came back to work

23   to listen to the recording.  All I heard was

24   static.

25   Q.  And did you listen to the entire recording?

SIR - DIRECT/WEINHOEFT                    Vol. 2 - 295

1    A.  I did.

2    Q.  How long -- how long was the portion of the --

3    that you listened to that recording that was all

4    static, how long was it staticky?

5    A.  The entire duration.

6    Q.  Which was about --

7    A.  Several minutes.  Eight minutes, I think.  I'd

8    have to review it.  I don't know.

9    Q.  Gotcha, okay.  Now, the Voice Memos you were

10   not successful in capturing.  The Google Translate

11   questions that you asked him, were you successful

12   in being able to record those?

13   A.  Yes.

14           MR. WEINHOEFT:  I ask if we can show the

15   witness, please, Exhibit 51.

16   BY MR. WEINHOEFT:

17   Q.  Showing you Government's 51, do you recognize

18   it?

19   A.  I do.

20   Q.  What do you recognize it to be?

21   A.  It's a screenshot of the Google Translate

22   questions I was asking.

23   Q.  And have you reviewed Exhibit 51 prior to

24   coming in to testify today?

25   A.  I have.

SIR - DIRECT/WEINHOEFT                    Vol. 2 - 296

1   Q.  And are the photographs there true and accurate

2   depictions of the exchange that you had with the

3   defendant on the -- I believe that was the 2nd of

4   December; is that right?

5   A.  That is correct.

6          MR. WEINHOEFT:  At this time I'd move for

7   the admission of 51.

8          MS. FRETER:  Your Honor, if they could

9   scroll through all of them.

10          Thank you.  No objection.

11          MR. WEINHOEFT:  Permission to publish.

12          THE COURT:  51, I have as reserved on --

13          COURTROOM DEPUTY:  They just changed that

14   this morning.

15          THE COURT:  You may publish.

16          (Government's Exhibit No. 51 was received

17   in evidence.)

18   BY MR. WEINHOEFT:

19   Q.  All right.  So first of all, before we get into

20   the -- all of the communications back and forth

21   that you had, and it was only a handful here on

22   Google Translate, did you go back and reask any of

23   those original questions about him coming as a

24   musician once you had Google Translate up?

25   A.  I did not.

1    Q.  Okay.  Would you have -- under what

2    circumstances might you have done that?

3    A.  If he just wasn't understanding and if we had

4    to repeat the questions over and over again, I

5    probably would have resorted to this sooner, but it

6    seemed like we were able to talk with him and he

7    was able to answer the questions and understand the

8    questions I was asking him.

9    Q.  Okay.  And the other thing that I'd like to

10   note is that if you look through the different

11   screenshots of those, there's times that are

12   reflected, that you can tell are screenshots off of

13   the phone.  Are the times that are reflected on the

14   top of those reflective of when the actual

15   communication between yourself and the defendant

16   happened?

17   A.  No, it's just reflective of when I took the

18   screenshot.

19   Q.  So the times that are up there, just -- that's

20   when you happened to record them?  Not when the

21   communications were made?

22   A.  Correct.

23   Q.  Okay.  So let's look through Image 1859 first,

24   the first page of the exhibit here.  Tell the

25   members of the jury what this first question was

SIR - DIRECT/WEINHOEFT                    Vol. 2 - 298

1    that you asked on Google Translate.

2    A.  Can we look through your phone?

3    Q.  And, again, what was the purpose for that?

4    A.  We wanted to ask his consent to search through

5    his device.

6    Q.  And when you would ask the question of him --

7    or at least pose it to him on Google Translate in

8    Hindi, would he respond in Hindi?

9    A.  No, he would reply in English.

10   Q.  Okay.  So he gave you a verbal "yes" to that?

11   A.  Yes.

12   Q.  All right.  And so let's look at the next

13   photograph please.  Image 1861 I believe it is

14   identified as.  What is the next question that you

15   posed to him?

16   A.  What is the passcode for your phone?

17   Q.  And talk us through that communication with him

18   as you were trying to discuss how to actually open

19   his phone to be able to scroll through it there on

20   the scene.

21   A.  We -- I always ask -- if we're going to get

22   consent to search their phone, I always ask for a

23   passcode.  If the screen gets locked, we can reopen

24   it and continue the search.  It's also useful for

25   forensic examination at a later time; but when we

SIR - DIRECT/WEINHOEFT                     Vol. 2 - 299

1    asked him what the passcode for his phone was, he

2    said it uses face recognition or unlocks with his

3    face, and then he also gave the passcode, which I

4    believe is 3058.

5    Q. Very good.  So as you were talking with him

6    once you had the passcode to enter the phone, were

7    you going through the phone or were other officers

8    going through the phone?

9    A. Other officers were going through the phone.

10   Q. And so what were you doing while they were kind

11   of flipping through the contents of his phone?

12   A. I was just standing with him until I was fed

13   some questions that they wanted answers to.

14   Q. And what was the next series of questions that

15   the officers wanted answers to?

16   A. I asked him, How did you first meet KKT?

17            MR. WEINHOEFT:  If we can move to the

18   next.

19   BY MR. WEINHOEFT:

20   Q. All right.  So tell us about this.  What is

21   this question that you're asking about KKT?  What

22   is this about?

23   A. There is a WhatsApp conversation with somebody

24   labeled as KKT.

25   Q. Let me interrupt you right there because you

SIR - DIRECT/WEINHOEFT                    Vol. 2 - 300

1    said it's a WhatsApp conversation.  For any member

2    of the grand (sic) jury who are not familiar with

3    WhatsApp, can you explain to them what that

4    application is?

5    A.  It's an end-to-end encrypted texting

6    application.  It's classified as a -- technically

7    as social media.

8    Q.  So basically you can exchange text messages,

9    right?

10   A.  And pictures and other media.

11   Q.  You said it's end-to-end encrypted.  Explain

12   what end-to-end encryption is.

13   A.  End-to-end encryption means that the data is

14   encrypted between the sender and the receiver so it

15   can't be intercepted and read in transit.

16   Q.  But you're able to read it because you have one

17   of the ends of the end-to-end communication; is

18   that right?

19   A.  Right.

20   Q.  All right.  So what's -- this first question

21   about how did you first meet KKT, why did you ask

22   him that?

23   A.  I was asked to ask him about the KKT -- the

24   conversation with KKT in the chat.  There was the

25   suspect -- or not the suspect, but the victim's

SIR - DIRECT/WEINHOEFT                    Vol. 2 - 301

1   home address was in there, so it appeared it was

2   pertinent to why he was in Merrill.

3   Q.  That address had been sent from this KKT as it

4   was saved on his phone to Mr. Patel, right?

5   A.  I believe that to be correct.

6   Q.  Okay.  So you asked him, How did you first meet

7   KKT?  How did he respond?

8   A.  He said he received a call two days prior.

9   Q.  Did he ever indicate that he had ever spoken

10  to, met, talked to or known KKT before those two

11  days previous?

12  A.  No, he did not indicate anything other than he

13  talked to him two days prior.

14  Q.  And what -- tell us what he said happened two

15  days prior when he first spoke to KKT.

16  A.  He was asked to travel to Merrill to pick up

17  this parcel, the box, that he didn't know the

18  contents of.

19  Q.  Did you ask any other questions about who KKT

20  was?

21  A.  I don't recall.

22  Q.  Okay.  Did he provide any other information

23  about who KKT was?

24  A.  I don't believe he did.  I don't remember.

25  Q.  Okay.  And certainly, you would have documented

SIR - DIRECT/WEINHOEFT                    Vol. 2 - 302

1    that if he recalled that at the scene?

2    A.  If he had, I would.

3    Q.  Okay.  So after he said that the person

4    contacted him two days before, what's your next

5    question that you pose to him?

6              MR. WEINHOEFT:  If we go to the next

7    slide, please.

8    BY MR. WEINHOEFT:

9    Q.  What are you asking and why are you asking

10   this?

11   A.  I asked, Why did he call you, in reference to

12   KKT.

13   Q.  And what did he say?

14   A.  He was asked to come to Merrill and pick up

15   this package in exchange for $250.

16   Q.  No other information -- were you trying to

17   determine other information?

18   A.  We were ultimately interested in what his

19   involvement was, so we wanted to know more

20   information, but it wasn't provided.

21   Q.  And if we go to the next slide, what was the

22   next question you asked him about KKT?  What did

23   you ask him?

24   A.  Did you talk to KKT using any other way other

25   than WhatsApp?

SIR - DIRECT/WEINHOEFT                        Vol. 2 - 303

1    Q.  And what did he say?

2    A.  He said he did not.

3    Q.  Did this essentially end the substantive

4    back-and-forth portion of the interview?

5    A.  It did.

6    Q.  If there was any other information, would you

7    have continued and documented it?

8    A.  Yes.

9    Q.  At that point describe what the weather was

10   like.

11   A.  I actually checked historical weather records

12   this morning on Weather Underground, and it says

13   about 15 degrees Fahrenheit.

14   Q.  So it was cold?

15   A.  It was very cold.

16   Q.  All right.  Did the defendant appear like he

17   was uncomfortable and cold?

18   A.  At one point we had to retrieve his jacket from

19   the vehicle.  I was cold out there because I didn't

20   have my jacket or anything on; and so when we were

21   done with the back-and-forth conversation, we

22   wanted to put him -- he wasn't going to be allowed

23   to go back in the vehicle right away, so we wanted

24   to find a warm place for him to be until we had

25   completed our documentation at the scene.

1   Q.  And so where did you tell him you wanted him to

2   go to warm him up?

3   A.  We had the back of a squad car that was warm

4   and running.

5   Q.  And tell us about that exchange.

6   A.  He didn't want to sit in the back of a squad

7   car.

8   Q.  How come?

9   A.  I think he was concerned that he was going to

10   be placed under arrest.

11   Q.  So what did you do?

12   A.  I told him he wasn't under arrest.

13          MR. WEINHOEFT:  Can we go to the next

14   slide, please.

15   BY MR. WEINHOEFT:

16   Q.  And so you told him, You're not placed under

17   arrest?  You're not under arrest at this time?

18   A.  Yes, sir.

19   Q.  Did he accept that right away?

20   A.  I don't know that he believed me right away

21   because he still seemed like he didn't want to go

22   in the back of the car, squad car, so I further

23   explained to him that he was absolutely not under

24   arrest.

25          MR. WEINHOEFT:  If we can go to the next

SIR - CROSS/FRETER                          Vol. 2 - 305

1    page on -- the next slide here.

2    BY MR. WEINHOEFT:

3    Q. All right.  And so tell us what you said to him

4    here and why you said it.

5    A. One hundred percent you are not under arrest.

6    You can sit in the back of the police car to stay

7    warm.  I told him that because that is exactly what

8    was going on.  He wasn't under arrest.  We were

9    still investigating what was going on, and we

10   wanted him to stay warm because we were outside for

11   a while at that point.

12   Q. And after you provided him reassurances a

13   couple times, did he agree to go and sit where it

14   was more comfortable?

15   A. He did.

16   Q. Very good.

17          MR. WEINHOEFT:  Can I have just a moment,

18   Your Honor.

19          That's all I have, Your Honor.

20                    **CROSS-EXAMINATION**

21   BY MS. FRETER:

22   Q. So if I'm this way and I can hear you, that

23   means I know they can hear you, right, because that

24   mic is right there.

25          Did you or Detective Waid have body cams?

1    A.  No.

2    Q.  Did anybody else -- so it was Lincoln County

3    Sheriff's, right?

4    A.  Yes.

5    Q.  And Merrill Police Department was also out

6    there?

7    A.  Yes.

8    Q.  And how many officers would you say total are

9    at the car stop?

10   A.  Right after the stop, five or six maybe.

11   Q.  And like two or three cars?

12   A.  I think just about everybody had a car, their

13   own car while we were there.

14   Q.  So maybe five officers, five cars more or

15   less?

16   A.  Probably about that.

17   Q.  Okay.  And then there were other officers that

18   were at Ms. Endres' house?

19   A.  There was one there, yes.

20   Q.  And to be clear, Lincoln County wasn't in

21   charge of setting up this, sort of, operation?  You

22   guys were providing assist to Merrill PD?

23   A.  We were assisting Merrill Police Department,

24   yes.

25   Q.  So you may not be aware of all of the pieces

SIR - CROSS/FRETER                              Vol. 2 - 307

1   going on?

2   A.  I don't know that I remember all of them

3   verbatim.

4   Q.  Okay.  And then were you the second officer to

5   arrive at the car stop?

6   A.  I believe so.

7   Q.  So it was Detective Waid, and he had pulled the

8   car over to just like the regular side of the

9   road?

10  A.  Yes.  As the vehicle was traveling down it's --

11  the right-hand lane, it pulled over to the

12  right-hand side of the road.

13  Q.  And so Detective Waid parked his car and was

14  getting out toward the driver's side as you parked

15  your side and then you went to the passenger's

16  side?

17  A.  Yes, that seems accurate.

18  Q.  Well, when you say, "seems accurate," I

19  don't -- I mean, do you remember or not or -- I

20  don't want you to guess.

21  A.  Yes, Detective Waid approached from the

22  driver's side.  I approached from the passenger's

23  side.  That is absolutely correct.

24  Q.  Okay.  And then Detective Waid gets Mr. Patel

25  out of the car, right?

1    A.  Yes.

2    Q.  And what color would you describe the car as?

3    A.  Maroonish color.

4    Q.  Okay.  You had been given a description of

5    brown, right?

6    A.  Yes, at some point.

7    Q.  Are brown and maroon the same?

8    A.  They're similar.

9    Q.  Okay.  And so when I say brown, what color is

10   brown?  Like this color of the podium?

11   A.  I would classify the podium as brown.

12   Q.  And can you see anything in the room that you

13   would classify as maroon?

14   A.  Maybe the backs of the chair over there.

15   Q.  And so when you look at the car, you say

16   maroon, right?

17   A.  Yes, I would say it's maroon.

18   Q.  But somebody else may call it brown?

19   A.  Yes.

20   Q.  Detective Waid gets Mr. Patel out of the car.

21   Does he open the door?  Is the window down?  How

22   does that work?

23   A.  I don't recall the exact series of events.  I

24   believe the driver opened the door.

25   Q.  And so this happened in 2022, right?

SIR - CROSS/FRETER                          Vol. 2 - 309

1    A.  Yes, over two years ago.

2    Q.  You've done some work since then?

3    A.  A little bit, yes.

4    Q.  So some things are harder to remember farther

5    away then closer in time?

6    A.  Yes.

7    Q.  Okay.  And so if you don't remember, you don't

8    remember, right?

9    A.  Yes.

10   Q.  Okay.  And so do you remember how Detective

11   Waid got him out of the car?

12   A.  I don't remember if he used -- what verbiage he

13   used or hand signals, smoke signals.  I don't

14   remember.

15   Q.  And Mr. Patel was cooperative?

16   A.  Yes.

17   Q.  He didn't fight or try to drive off?

18   A.  No, not once he stopped.

19   Q.  Okay.  And so Detective Waid gets him out of

20   the car.  Does he put him in handcuffs?

21   A.  No.

22   Q.  Does anybody put him in handcuffs?

23   A.  No.

24   Q.  And where in relation to the car are you guys

25   talking to him at?

SIR - CROSS/FRETER                          Vol. 2 - 310

1    A.  The driver's side or behind the car.  Somewhere

2    between the driver's door and the trunk.

3    Q.  And is that on the street side?

4    A.  It would be street side or just in between the

5    two vehicles, the squad and his vehicle.

6    Q.  And I'm sorry.  I didn't hear the word.  "S"?

7    A.  Squad.

8    Q.  Squad, meaning a patrol car?

9    A.  Yes.

10   Q.  That's a marked patrol car?

11   A.  Correct.

12   Q.  Whose car is the marked one?

13   A.  That was Detective Waid's.

14   Q.  And his lights are on?

15   A.  Correct.

16   Q.  And what time of day is this?

17   A.  Mid afternoon.  3:30 in the afternoon about.

18   Q.  Is it getting dark?

19   A.  Not yet.

20   Q.  And so how long do you guys stand talking to

21   Mr. Patel either at the driver's side or at the

22   trunk side of the car?

23   A.  That was the entirety of the contact until he

24   was placed in the back of the squad to keep warm.

25   Q.  And my question was:  How long did you talk to

1   him for?

2   A.  I don't know how many minutes.

3   Q.  Do you feel like it was more or less than a

4   half an hour?

5   A.  Maybe a little bit more or a little bit less.

6   It was around that half-hour mark --

7   Q.  All right.

8   A.  -- about.

9   Q.  So you have a feeling it's less than an hour?

10  A.  Yes.

11  Q.  But maybe around 30 minutes?

12  A.  About that.

13  Q.  How is it that you guys get into the car to

14  search?

15  A.  We didn't search his car.

16  Q.  So you found the phone in the car?

17  A.  I'm sorry.  Let me rephrase that.  There's a

18  phone in plain view in the car is my

19  understanding.

20  Q.  Okay.  You guys went into the car and got it

21  out, right?

22  A.  Correct.

23  Q.  And so when I said "search," you took that to

24  mean something else?

25  A.  Initially, we just looked through the windows.

SIR - CROSS/FRETER                          Vol. 2 - 312

1    I didn't remember the part about going in and

2    getting the phone.  That would be a "search,"

3    yes.

4    Q.  That's a search.  And when you say search, that

5    has a legal connotation to you; is that right?

6    A.  Yes.

7    Q.  It means something different to you than just

8    going and getting something out of a car?

9    A.  Well, I think it can mean both.

10   Q.  In your capacity outside of your job, going in

11   and getting something out of a car isn't a search,

12   right?

13   A.  Depends on the context.

14   Q.  Okay.  In your capacity as a law enforcement

15   officer, going and getting something out of a car

16   is a search?

17   A.  It depends if there's consent.  It's very

18   gray -- it can be very gray.

19   Q.  Okay.  In this case did you have consent to go

20   get the phone out of the car?

21   A.  I don't know.  I don't know if we asked for

22   consent to get it out of the car.  I don't

23   remember.

24   Q.  Okay.  Well, if you didn't have consent to get

25   the phone out of the car, then you would need a

SIR - CROSS/FRETER                          Vol. 2 - 313

1    warrant or to tow the car, right?

2    A.  Or other warrantless exceptions.

3    Q.  Did you have any of those in this case?

4    A.  I think Carroll Doctrine could be an option to

5    get something out of a vehicle.

6    Q.  Isn't it -- you don't remember Mr. Patel

7    telling you go ahead and get the phone?

8    A.  I don't remember having that conversation.

9    Q.  Do you remember Detective Waid having that

10   conversation?

11   A.  I do not.

12   Q.  Who's talking to Mr. Patel while the phone is

13   being extracted from the car?

14   A.  I think I was standing there.  I was probably

15   standing there with him.  That's my recollection is

16   I was with Mr. Patel pretty much the entire time.

17   Q.  You didn't get the phone out of the car?

18   A.  No, I did not.

19   Q.  Somebody else was getting the phone and saying,

20   Hey, ask him this and ask him that?

21   A.  Yes.

22   Q.  When you're standing around talking to him, he

23   has a thick accent; is that right?

24   A.  He has an accent, yes.

25   Q.  Do you ask him where he's from?

SIR - CROSS/FRETER                           Vol. 2 - 314

1    A.  I don't know if I ever asked him that

2    question.

3    Q.  Okay.  Let's do it this way:  In the 30 minutes

4    when you're standing back there talking to him,

5    what questions do you ask him?

6    A.  We asked him about why he was in Merrill.

7    Q.  And so I want to be clear.  You said, "We

8    asked."  I want to know what questions you

9    personally asked.

10   A.  I asked him all the questions that we saw on

11   the screen.  I would have asked him -- I would have

12   told him that I didn't believe his story and I

13   would have asked him more questions about why he

14   was in Merrill.

15   Q.  Is it fair to say that you don't remember

16   specifically what you asked him other than what was

17   typed?

18   A.  I remember some things.  I don't know if I

19   remember every single question verbatim.

20   Q.  So do you remember the first question you asked

21   him?

22   A.  I remember the first question being, Why --

23   What are you doing in Merrill?  I don't remember

24   who asked it, if it was me or someone else.

25   Q.  And you're sure it was what are you doing in

1    Merrill instead of, What do you do?

2    A.  I don't know why we would ask him, What do you

3    do?

4    Q.  And his response to what are you doing in

5    Merrill was to respond with a job.  I'm here for

6    work.  I'm a musician?

7    A.  It was something to that effect, yes.

8    Q.  What were the words that he said?

9    A.  I don't know them verbatim.

10   Q.  What was the second question you asked?

11   A.  I don't know.  I don't know them all in

12   order.

13   Q.  Well, the verbatim questions that you remember

14   are what are you doing in Merrill and I don't

15   believe you; is that right?

16   A.  That was a statement directed at him, but I

17   remember asking something to that effect, yes.

18   Q.  Do you remember any other verbatim questions

19   that you had in this 30 minutes?

20   A.  Can I review my report?

21   Q.  Sure.

22   A.  I know that I asked him the questions in the

23   Google Translate app verbatim.  Everything else I

24   documented in my report more generally what --

25   generally what did I ask him and generally what did

1    he reply with.

2    Q. So the general gist of the conversation?

3    A. Correct.

4    Q. So what question did you ask him to settle on

5    Hindi as a language for Google Translate?

6    A. I think I asked him if he spoke Hindi because

7    he appeared to be of Indian descent.

8    Q. Did you ask him if his primary language was

9    Gujarati?

10    A. No, I did not ask him that.

11    Q. Are you aware that there are differences

12    between Hindi and Gujarati?

13    A. I've never heard of that language before

14    today.

15    Q. Are you aware -- then you're not aware that

16    Google Translate uses Gujarati?

17    A. I would have never thought of it.

18    Q. And have you ever in Google Translate done a

19    question and answer and then fed the answer, right?

20    So you ask a question in English.  In this case you

21    get an answer in Hindi.  Have you ever fed that

22    question back into Google Translate to see how it

23    comes out in English?

24    A. No.

25    Q. So you don't know the accuracy of the Google

SIR - CROSS/FRETER                    Vol. 2 - 317

1    Translate to go back and forth?

2    A.  I don't work for Google.  I don't know how

3    accurate it is.

4    Q.  Well, in your experience in using it?

5    A.  I use it very rarely.

6    Q.  Have you ever typed a letter using Google

7    Translate?

8    A.  No.

9    Q.  When you're talking to Mr. Patel at the back of

10   the car for 30 minutes, is he free to go?

11   A.  He's been detained at that point.

12   Q.  So not free to go?

13   A.  He's detained while we completed the

14   investigation.

15   Q.  So is he free to go or not?

16          MR. WEINHOEFT:  Objection.  Relevance,

17   Your Honor.

18          THE COURT:  Answer the question.

19   Overruled.

20          THE WITNESS:  He was detained until we

21   could determine if we had probable cause to arrest

22   him.  We didn't think that we did.

23   BY MR. FRETER:

24   Q.  You didn't read a *Miranda*?

25   A.  No, I did not.

SIR - CROSS/FRETER                           Vol. 2 - 318

1  Q.  Did you tell him that he could tell you no

2  about looking in his phone?

3  A.  I don't know that I used that language.

4  Q.  You asked him, Can we look in your phone,

5  what's the passcode, and he gave you all that; is

6  that right?

7  A.  He did give me those things.

8  Q.  He cooperated with you?

9  A.  He did.

10 Q.  And the -- the question that you put on the

11 Google Translate, to your understanding, you typed

12 in how did you first meet KKT; is that right?

13 A.  If that's what it said on the screen.

14        MS. FRETER:  Okay.  If we can pull up

15 Government's Exhibit 51, please.  I think it's page

16 3.

17 BY MS. FRETER:

18 Q.  Is that the question, How did you first meet

19 KKT?

20 A.  Yes.

21 Q.  And what was his answer?

22 A.  He said that he received a phone call two days

23 prior.

24 Q.  Did you ask him -- okay.  So your question was

25 how did you first meet him; is that right?

1  A.  Yes.

2  Q.  He answered, though, that he talked to him on

3  the phone, right?

4  A.  Yes.

5  Q.  That doesn't exactly answer your question,

6  right?

7  A.  I think that it does.

8  Q.  Did you further clarify with him about this

9  phone call?

10  A.  Clarify what?

11  Q.  What phone it was on?

12  A.  Why would we -- we asked him -- we did not ask

13  him what phone it was on.

14  Q.  Okay.  Did you ask him how long a conversation

15  it was?

16  A.  No.

17  Q.  Did you ask him anything else about that

18  phone?

19  A.  The device that we -- that was in his

20  possession at the time of the stop?  That phone or

21  KKT's phone?

22  Q.  No.  I'm asking:  Did you ask Mr. Patel

23  anything else about the phone call?

24  A.  Oh, the phone call.  I didn't hear the "call"

25  part.

1    Q.  We had a miscommunication?

2    A.  Yeah.

3    Q.  Did you ask him anything else about the phone

4    call?

5    A.  I asked him something to the effect of, Why did

6    you drive to Merrill to get this package?  That's

7    when he explained that it was to -- it was to be

8    paid $250.

9    Q.  And your question, Why did you drive to Merrill

10   to get this package, that's not on the Google

11   Translate?

12   A.  No, it is not.

13   Q.  You just asked him that?

14   A.  Correct.

15   Q.  And so his response was, I came to get a

16   package for $250?

17   A.  Sorry.

18   Q.  His response was, I came to get a package for

19   $250?

20   A.  Not verbatim, but generally, that's what it

21   was.

22   Q.  And you don't -- it's okay that you don't, but

23   you don't remember what he said verbatim?

24   A.  No, I don't remember exactly what he said word

25   by word.

1    Q. You were relying on the recording app to do

2    that for you?

3    A. Yes, I was hoping that that would capture

4    that.

5    Q. And it just didn't work?

6    A. Yes.

7    Q. So at the time when you're doing this, you're

8    not -- sort of like right now.  The court reporter

9    is going to take down everything we say, right?

10   A. I hope so.

11   Q. Right.  We don't have to write down every word

12   because the court reporter is going to do that.

13   We're relying on that, right?

14   A. Correct.

15   Q. You were relying on the Notes app to record the

16   conversation?

17   A. The Voice Memos app, yes.

18   Q. And it just didn't work?

19   A. Correct.

20   Q. And so the word-for-word exchange, in theory,

21   if it had worked, we would have had that?

22   A. If it would have worked, we would have it,

23   yes.

24   Q. All we have is your sort of present sense

25   impression of the general gist, right?

SIR - REDIRECT/WEINHOEFT                Vol. 2 - 322

1   A.  For most of the questions, I would say that's

2   probably accurate.

3   Q.  And so you did --

4           THE COURT:  Counsel, is this a good time

5   for a break?  How much longer are you thinking?

6           MS. FRETER:  I know, Judge, every time

7   lawyers say one question it's not, but I think I

8   have three and then I'm done.

9           THE COURT:  Okay.  How long on redirect?

10          MR. WEINHOEFT:  Very brief.

11          THE COURT:  Okay.

12  BY MS. FRETER:

13  Q.  You put into the Google Translate 100 percent

14  you are not under arrest, right?

15  A.  Yes.

16  Q.  And then at the end of the traffic stop, you

17  guys let him go?

18  A.  Yes.

19  Q.  You keep his phone?

20  A.  Correct.

21          MS. FRETER:  I don't have anything else.

22          MR. WEINHOEFT:  Just a couple.

23                  **REDIRECT EXAMINATION**

24  BY MR. WEINHOEFT:

25  Q.  Sergeant, you were asked some questions about

SIR - REDIRECT/WEINHOEFT                    Vol. 2 - 323

1    if you remembered verbatim questions and very

2    specific responses and things like that.  The

3    things that you documented in the report that you

4    remembered, did you recall those clearly?

5    A.  Yes.

6    Q.  When did you prepare your report in relation to

7    this stop?

8    A.  Very shortly after.  Maybe a day or three.  I

9    think it was a Friday so probably a Monday,

10   thereabouts.

11   Q.  Were the events still fresh in your mind when

12   you wrote your report?

13   A.  Yes.

14   Q.  And at that time, that's when you documented

15   him saying he's a musician and all those other

16   things that you testified to?

17   A.  Yes.

18   Q.  We got pretty fair afield when we were asking

19   some questions about giving *Miranda* rights and

20   searching the vehicle and things like that.  Are

21   those all things that you followed procedure for in

22   the manner in which he was questioned and the

23   manner in which you conducted your stops and the

24   like?

25   A.  Yes.

SIR - REDIRECT/WEINHOEFT                    Vol. 2 - 324

1    Q.  And it was routine -- the way things are

2    lawfully and routinely done, correct?

3              MS. FRETER:  Objection, Your Honor, as to

4    the commentary as to the stop.

5              MR. WEINHOEFT:  The door has been

6    opened.

7              THE COURT:  Pardon me?

8              MR. WEINHOEFT:  The door has been

9    opened.

10             THE COURT:  Well, I think she's objecting

11   to the form.  I'm not sure that -- the objection is

12   overruled, but we're asking questions, not

13   giving --

14   BY MR. WEINHOEFT:

15   Q.  I can ask it this way:  Was the defendant

16   subjected to a custodial interrogation that

17   requires *Miranda* under the law?

18   A.  No.

19   Q.  If he had been subjected to that type of what's

20   called a custodial interrogation under the law,

21   what would you have done?

22   A.  We would have read him the *Miranda* and waited

23   for his response before we asked questions.

24   Q.  You were asked questions about the accuracy of

25   the communications with Google Translate.  Do you

SIR - REDIRECT/WEINHOEFT                    Vol. 2 - 325

1   remember those questions?

2   A.  Yes.

3   Q.  When you would ask the question to him, did you

4   ask it in English and then put it into -- input it

5   into Google Translate, it had to -- you would have

6   to say it in English and then it translates it into

7   Hindi, correct?

8   A.  I typed it in.

9   Q.  Oh, you typed it in?

10  A.  I typed it in and it gave me a translation and

11  that's what I used.

12  Q.  Okay.  Would he have seen both what you typed

13  in and what Google said back?

14  A.  Yes.

15  Q.  And when you would do that, how would he answer

16  you?

17  A.  In English.

18  Q.  And were the answers that he gave you

19  responsive and sensical to the questions that were

20  asked?

21  A.  Yes.

22  Q.  If you would have had any question whether or

23  not --

24          MS. FRETER:  Objection.  Leading.

25          THE COURT:  He didn't finish the question

SIR - REDIRECT/WEINHOEFT                    Vol. 2 - 326

1   yet, so I don't know how it ends.

2   BY MR. WEINHOEFT:

3   Q.  If you would have had any question of whether

4   or not he was understanding and you were

5   communicating, what would you have done?

6   A.  We would have asked more questions or asked it

7   a different way.

8           MR. WEINHOEFT:  That's all I have.

9           THE COURT:  Any recross?

10          MS. FRETER:  No, Your Honor.

11          THE COURT:  All right.  Let's take a --

12  thank you, sir.  You may step down.

13          THE WITNESS:  Thank you, Your Honor.

14          (Witness excused.)

15          THE COURT:  Take a 15-minute break post

16  lunch.  We'll start back at 5 after 2.

17          (Recess at 1:50 p.m. until 2:07 p.m.)

18          (Jury present.)

19          THE COURT:  Call your next witness.

20          MR. REED:  Government calls Matthew Waid.

21          COURTROOM DEPUTY:  Please raise your right

22  hand.

23          (Witness sworn.)

24          COURTROOM DEPUTY:  Please state your full

25  name and spell your last name for the Court.

WAID - DIRECT/REED                        Vol. 2 - 327

1           THE WITNESS:  Matthew Waid, W-a-i-d.

2           COURTROOM DEPUTY:  Thank you so much.

3    Have a seat.

4              **MATTHEW WAID, GOVERNMENT'S WITNESS,**

5                      **DIRECT EXAMINATION**

6    BY MR. REED:

7    Q.  Thank you for your time today, Mr. Waid.  I

8    want to take you back to November of 2022.  Where

9    did you work at the time?

10   A.  At the time I was working at the Merrill Police

11   Department as a detective.

12   Q.  When did you start working for the Merrill

13   Police Department?

14   A.  February 9th of 2009.

15   Q.  Okay.  And what was your title when you started

16   there?

17   A.  When I started, I was a patrol officer.

18   Q.  And how long were you a patrol officer?

19   A.  Until September of 2017.

20   Q.  What does a patrol officer do?

21   A.  Commonly, take calls for service, crash

22   investigations, things of that nature.

23   Q.  So you were a patrol officer from 2009 to 2017.

24   Did you take on a new role in 2017?

25   A.  Yes.

WAID - DIRECT/REED                              Vol. 2 - 328

1    Q.  What was that?

2    A.  I became the department's first narcotics

3    officer -- sorry, narcotics detective.

4    Q.  Okay.  And what does a detective do?

5    A.  We handle larger cases that take much more time

6    to investigate, a lot more evidence that is

7    normally in play with those cases.

8    Q.  And were you still a detective in November of

9    2022?

10   A.  Yes.

11   Q.  So as a detective, was it part of your job to

12   do something called a cell phone extraction?

13   A.  Yes.

14   Q.  What is a cell phone extraction?

15   A.  A cell phone extraction is where we would use a

16   device called a Cellebrite Touch2 device, and that

17   would make an image of what is on a device and make

18   an exact copy of the information on that device.

19   Q.  Okay.  So you'd plug the phone in?

20   A.  Yes.

21   Q.  And the software makes the copy you're

22   describing?

23   A.  Correct.

24   Q.  And the software is called Cellebrite?

25   A.  Yes, software -- yes, the tool used to create

WAID - DIRECT/REED                        Vol. 2 - 329

1   the image, I guess, is called the Cellebrite

2   Touch2.

3   Q.  Did you complete any trainings to learn how to

4   do that?

5   A.  Yes.

6   Q.  Tell us about those.

7   A.  I believe it was in 2021.  I went to a two-week

8   training where I was certified in the Cellebrite

9   Touch2 as well as another tool called Cellebrite

10  Physical Analyzer.

11  Q.  And were you so certified?

12  A.  Yes.

13  Q.  When you were a detective, about how many of

14  these phone extractions would you do in a given

15  year?

16  A.  I think the best answer I could give is more

17  than 50, but I don't know where that number would

18  end.  It was a lot.

19  Q.  Okay.  Over a hundred phones in the course of

20  your time as a detective?

21  A.  Potentially.  Potentially 50 to a hundred.

22  Q.  Somewhere in there?

23  A.  Yes.

24  Q.  Okay.  In the course of your duties as a

25  detective, did you become involved in a case

WAID - DIRECT/REED                          Vol. 2 - 330

1   involving a victim named Karen Endres?

2   A.  Yes.

3   Q.  How did you become involved?

4   A.  I was given some brief details about an

5   incident that had occurred prior to this date,

6   which was December 2nd, about an incident where

7   this victim was allegedly a victim of a fraud.  I

8   became aware that the person that had come to the

9   city of Merrill to obtain money from her back in

10  November was going to be coming back again that

11  day, and I was assigned to assist with that.

12  Q.  Okay.  And so what was your role?

13  A.  My role was to be the person that stopped the

14  vehicle if it did, in fact, come to the victim's

15  residence.

16  Q.  Okay.  So did you take up a position?

17  A.  Yes.

18  Q.  Where was that?

19  A.  I was parked in an alley approximately two

20  blocks north of the victim's residence out of

21  sight.

22  Q.  And what kind of vehicle were you driving?

23  A.  I was a driving a marked patrol vehicle -- a

24  marked police vehicle.

25  Q.  Could you see the victim residence from where

WAID - DIRECT/REED                          Vol. 2 - 331

1   you were parked?

2   A.  No.

3   Q.  How were you supposed to know when the courier

4   vehicle arrived there?

5   A.  That was going to be communicated when the --

6   excuse me.  Let me back up.

7          There was another detective by the name of

8   Nicole Cimino that worked for the Merrill Police

9   Department.  She was in the victim's residence with

10  the victim.  There was going to be communications

11  about when that vehicle arrived, and that was going

12  to be relayed to me, and then I would conduct the

13  traffic stop on the vehicle.

14  Q.  Okay.  So at some point that afternoon did you

15  receive word that the suspect vehicle had

16  arrived?

17  A.  Yes.

18  Q.  What did you do?

19  A.  I left my spot, I drove to the location, I

20  located what I believed to be the suspect vehicle,

21  which was facing away from me; and as I approached

22  the vehicle, I activated my emergency lights to

23  conduct a traffic stop on the vehicle.

24  Q.  Okay.  So you turn your lights on to conduct a

25  traffic stop.  What happened then?

WAID - DIRECT/REED                          Vol. 2 - 332

1   A.  When I got behind the vehicle, the vehicle

2   started pulling away from the curb as if they were

3   trying to leave.

4   Q.  So you pull up behind him and he takes off --

5   pulls away.  What are you experiencing as an

6   officer when a car does that?

7   A.  Large amount of nervousness.

8   Q.  Why?

9   A.  It's uncommon for people to attempt to pull

10  away from the police.  That commonly can be

11  associated with someone who is either trying to

12  flee, which can cause a dangerous situation.  Those

13  types of things, they're just going through my mind

14  at the time.

15  Q.  What happened after the vehicle started pulling

16  away?

17  A.  Another unmarked vehicle operated by a

18  detective pulled in front of this vehicle to stop

19  it from going any further, and at that point, the

20  vehicle stopped.

21  Q.  Who approached the vehicle after it stopped?

22  A.  I did.

23        MR. REED:  If we could pull up Exhibit 49

24  for the witness, please.

25  BY MR. REED:

WAID - DIRECT/REED                          Vol. 2 - 333

1    Q. Was the vehicle you were driving that day

2    equipped with a dash camera?

3    A. Yes.

4    Q. Was that your normal vehicle?

5    A. No.

6    Q. Why not?

7    A. As a detective, I drove an unmarked vehicle.

8    More specifically, with my role as a drug

9    detective, drove a vehicle that people wouldn't

10   commonly associate with law enforcement to kind of

11   hide in public, so to speak, so I didn't drive a

12   marked --

13   Q. But this particular day you're driving a marked

14   vehicle?

15   A. Yes.  Due to the fact I was going to be the

16   first contact with this person, we wanted to make

17   sure we had a normal marked police vehicle make

18   that contact.

19   Q. Were you able to record the stop of Mr. Patel

20   on December 2nd of 2022?

21   A. Yes.

22   Q. Is there audio in that recording?

23   A. There is not.

24   Q. Why not?

25   A. There could be two reasons for that.  One could

WAID - DIRECT/REED                          Vol. 2 - 334

1    be that the microphone that the officer is supposed

2    to wear was either not turned on or the battery was

3    dead.  I think the more common reason for that is

4    because I don't drive -- I didn't drive a marked

5    vehicle.  I was not used to having a camera in my

6    car.  My unmarked did not have that, so I likely

7    forgot to even put the microphone in my pocket

8    prior to the stop.

9    Q. So there is a separate lapel mic potentially in

10   that car; it's not your car; you didn't pull it

11   out?

12   A. Correct.

13   Q. So this exhibit, Exhibit 49, have you viewed

14   this video prior to trial?

15   A. Yes.

16   Q. Is this a true and accurate copy of the dash

17   cam recording from December 2, 2022?

18   A. Yes.

19              MR. REED:  Move to admit Exhibit 49.

20              MS. FRETER:  No objection.

21              THE COURT:  It will be admitted without

22   objection.

23              MR. REED:  May I publish?

24              THE COURT:  You may publish.

25              (Government's Exhibit No. 49 was received

WAID - DIRECT/REED                          Vol. 2 - 335

1    in evidence.)

2            MR. REED:  And if we can go ahead and play

3    the first 37 seconds of this video, Sandra.

4            (The video was played at this time.)

5    BY MR. REED:

6    Q.  Okay.  This takes us up to where we were in the

7    narrative earlier.  What did you do once you walked

8    up to the driver's side door?

9    A.  So just prior to that, there were some commands

10   given to let the police see whoever is driving

11   their hands.  Once I could see that the person was

12   raising their hands a little bit, I decided to

13   approach the driver's side of the car.  I opened

14   the car door and asked the male occupant to exit

15   the vehicle.

16   Q.  What happened when he started to get out?

17   A.  Not long after he got out of the vehicle he

18   tried to reach towards the car, like, back into the

19   car, the door was still open, and I grabbed onto

20   his shirt and just pulled him away from that.

21   Q.  Okay.  Could have been benign.  He just looked

22   like he was going to go back in, but why would you

23   not want him to go back in?

24   A.  If he was either going to attempt to flee or

25   obtain a weapon, something of that nature.

WAID - DIRECT/REED                          Vol. 2 - 336

1    Q.  Officer safety kind of concerns?

2    A.  Yeah.

3              MR. REED:  So let's go ahead and keep

4    watching this until about a minute and 36 seconds

5    in.

6              (The video was played at this time.)

7    BY MR. REED:

8    Q.  Is that you?

9    A.  Yes.

10              MR. REED:  Okay.  Let's go ahead and stop

11   this now.

12   BY MR. REED:

13   Q.  And the part that we just watched, are you

14   asking him some questions right here?

15   A.  Yes.

16   Q.  What are you asking him about?

17   A.  Asking him about where he came from, what he's

18   doing here, things of that nature.

19   Q.  Did he respond?

20   A.  There was a combination of me maybe not

21   understanding his answer or an appearance that

22   maybe he didn't understand my question, so I didn't

23   really get any clear answers to those questions.

24   Q.  Okay.  Were you able to identify who the driver

25   was?

WAID - DIRECT/REED                          Vol. 2 - 337

1    A.  Yes.

2    Q.  Did you ask for an ID?

3    A.  Yes, I did.

4    Q.  And the part that we're about to watch, where

5    did he say that his ID was?

6    A.  He said that it was in the backpack.

7    Q.  Did you ask if you could retrieve the backpack

8    for him?

9    A.  Yes, I did.

10   Q.  And did he say that you could?

11   A.  Yes.

12   Q.  Okay.  Are was the identification in the

13   backpack?

14   A.  No, it was not.

15   Q.  Okay.  So what happened then?

16   A.  I believe I asked him where -- I either asked

17   him where it could have been or he offered another

18   location it could have been, it was one of the two,

19   and then he was allowed to retrieve that from a

20   billfold in the vehicle.

21        MR. REED:  So let's start this again; and

22   as we watch, if we could, note the description of

23   the backpack pulled out of the vehicle.

24        (The video was played at this time.)

25        MR. REED:  Okay.  We can stop it right

WAID - DIRECT/REED                        Vol. 2 - 338

1   there.

2   BY MR. REED:

3   Q.  Were you able to -- well, let's start with the

4   backpack.  What did the backpack look like?

5   A.  It was gray and black and kind of rectangular

6   shaped in the front.

7   Q.  Okay.  Black on the side with the straps?

8   A.  Yes.

9   Q.  Gray on the other side?

10  A.  Say again.

11  Q.  Gray on the other side?

12  A.  Yes.

13          MR. REED:  If you could pull up Exhibit 47

14  for the witness.

15  BY MR. REED:

16  Q.  Is this a photo of the ID card the driver gave

17  you?

18  A.  Yes.

19          MR. REED:  Move to admit Exhibit 47 and

20  publish.

21          MS. FRETER:  No objection.

22          THE COURT:  Be admitted without objection.

23          (Government's Exhibit No. 47 was received

24  in evidence.)

25          MR. REED:  Maybe zoom in a little bit on

WAID - DIRECT/REED                          Vol. 2 - 339

1    that.

2    BY MR. REED:

3    Q.  Okay.  So who was the driver?

4    A.  A male by the name of Nirav Patel.

5    Q.  If you saw him again, do you think you would

6    recognize him?

7    A.  Yes.

8    Q.  Is he sitting in the courtroom today?

9    A.  Yes.

10   Q.  Could you please tell us where he's sitting and

11   an article of clothing he is wearing.

12   A.  Yes.  He is seated at the defendant's table in

13   the middle wearing a dark-colored suit coat.

14   Q.  Okay.  As you looked at this license, did Nirav

15   Patel live nearby?

16   A.  No.

17   Q.  Where did he come from?

18   A.  Aurora, Illinois.

19   Q.  Did you also run the license plate on the

20   vehicle?

21   A.  Yes, I did.

22   Q.  Do you recall what that license plate

23   registration was?

24   A.  I don't recall what the number or letters were,

25   no.

WAID - DIRECT/REED                          Vol. 2 - 340

1          MR. REED:  Okay.  Go back to 49 for a

2     moment.  About three minutes in, Sandra.

3              (The video was played at this time.)

4          MR. REED:  And pause it right there.

5     BY MR. REED:

6     Q.  Are you able to make that out?

7     A.  Not in its entirety, no.

8     Q.  Would it be helpful to look at your report?

9     A.  Yes.

10    Q.  Do you have it with you?

11    A.  It is at the back of the courtroom.

12    Q.  That's okay.  I can approach.

13              Is your memory refreshed, sir?

14    A.  Yes.

15    Q.  What was the license plate?

16    A.  DQ99741.

17    Q.  Did you run that registration?

18    A.  Yes, I did.

19    Q.  What did the vehicle -- or who did the vehicle

20    belong to according to the vehicle registration?

21    A.  According to the registration, it belonged to

22    Mr. Patel.

23    Q.  Did you go back to Mr. Patel's vehicle after

24    running the registration?

25    A.  Yes.

1    Q.  And while we have this paused, how would you

2    describe the color of this vehicle?

3    A.  If my memory serves me correctly, I believe it

4    was like a brown, dark brown color or bronze,

5    somewhere in that -- it's difficult it see in

6    the --

7    Q.  Dark color?

8    A.  Dark color, yes.

9    Q.  All right.  When you went back to the vehicle,

10   did you approach the driver's side door again?

11   A.  Yes.

12   Q.  What did you observe from there?

13   A.  I observed a cell phone sitting on a holder on

14   the dash, and it had what appeared to be Google

15   Maps on on the phone, active, as if someone was

16   using it for navigation.

17   Q.  Did you ask Mr. Patel for consent to retrieve

18   the phone?

19   A.  Yes.

20   Q.  Did he give consent?

21   A.  Yes.

22   Q.  Did you retrieve the phone?

23   A.  Yes, I did.

24   Q.  At that point what else did you notice about

25   the phone at the time?

WAID - DIRECT/REED                          Vol. 2 - 342

A.  There was incoming -- I believe it was an
incoming call or calls from someone saved in his
contacts as KKT.  Those were incoming calls to the
phone.

Q.  Okay.  Did officers seek Mr. Patel's consent to
look through the phone?

A.  Yes.

Q.  How was that request conveyed to Mr. Patel?

A.  At this time I believe Detective Sir was
communicating with Mr. Patel, attempting to use
Google Translate to gain a clearer understanding,
and I asked him if he could ask Mr. Patel for his
PIN number and if we could search the phone -- or
yeah, search the phone.

Q.  Did he consent?

A.  Yes.

Q.  Did you later analyze Mr. Patel's cell phone
seized on December 2nd?

A.  Yes.

Q.  Did you complete an extraction of the phone
like we talked about earlier?

A.  Yes.

Q.  When you searched the phone, did you find
photos and evidence from that day when Patel was
pulled over in Wisconsin on December 2, 2022?

1    A.  Yes.

2    Q.  Were there messages with KKT?

3    A.  Yes.

4    Q.  And what phone app or program did Patel use for

5    those communications?

6    A.  There was an app called WhatsApp.

7    Q.  What is WhatsApp?

8    A.  WhatsApp is an app that you can install on your

9    device to communicate with other people in a

10   variety of ways:  text messages, phone calls,

11   things of that nature, but it is outside of the --

12   it's not native to the phone.  It is within the app

13   and is a way to -- it's an app that can create

14   privacy for people having conversations.

15   Q.  And so what are some distinguishing features of

16   WhatsApp?

17   A.  To my understanding, the messages are

18   end-to-end encrypted.

19   Q.  What does that mean?

20   A.  So that means that they are only seen by the

21   two people communicating.  They are not stored on

22   any servers through WhatsApp and are unable to be

23   retrieved through that way.

24   Q.  So if I send a text message from my phone on

25   Verizon, would you be able to get those text

WAID - DIRECT/REED                          Vol. 2 - 344

1    messages from Verizon?

2    A.  Yes.

3    Q.  But with WhatsApp, can the Government get those

4    messages that are end-to-end encrypted?

5    A.  I have not heard of a time when they were

6    successful in doing that.

7    Q.  That's what end-to-end encrypted means?

8    A.  Correct.

9    Q.  Okay.  Are there other distinguishing features

10   of WhatsApp?

11   A.  Another feature that I'm aware of is something

12   called disappearing messages.

13   Q.  What does that mean?

14   A.  That is where someone can activate that setting

15   so that the messages can be -- can disappear and be

16   gone within a certain period of time.  I believe

17   it's 24 hours.

18   Q.  Okay.

19            MR. REED:  If we could put up Exhibit 80,

20   please, for the witness.

21   BY MR. REED:

22   Q.  Are these messages you found on Mr. Patel's

23   phone?

24   A.  Yes.

25            MR. REED:  If you could go back up to page

WAID - DIRECT/REED                          Vol. 2 - 345

1   1.

2   BY MR. REED:

3   Q.  Who is part of this conversation?

4   A.  Nirav Patel and KKT.

5   Q.  Was there a full name for this KKT saved in the

6   phone?

7   A.  I don't believe I ever saw that.

8   Q.  Does this exhibit truly and accurately convey

9   the messages found in the phone extraction to the

10  best of your knowledge?

11  A.  Yes.

12         MR. REED:  Move to admit Exhibit 80 and

13  publish to the jury.

14         MS. FRETER:  No objection.

15         THE COURT:  It will be admitted without

16  objection and may be published.

17         (Government's Exhibit No. 80 was received

18  in evidence.)

19         MR. REED:  If we could zoom in on that

20  first box.

21  BY MR. REED:

22  Q.  Okay.  What time was this message sent, this

23  very first message in this string?

24  A.  December 2, 2022, at 3:46 a.m.

25  Q.  And this message is not in English?

WAID - DIRECT/REED                    Vol. 2 - 346

1    A.  Correct.

2              MR. REED:  Judge, at this time, pursuant

3    to motion in limine 5, I'd move to admit

4    Government's Exhibit 79, to be connected up later,

5    tomorrow, but I ask for permission for 79 now with

6    this witness.

7              THE COURT:  Any objection?

8              MS. FRETER:  Can we approach?

9              (Sidebar proceedings on the record.)

10             MS. FRETER:  You're going to go through

11   this with the translator tomorrow?

12             MR. REED:  Absolutely.  I will connect it

13   up with the translator tomorrow.  Both -- she did

14   two sets of translations, 79 and 85; but as I

15   explained in the motion, she can't be here until

16   tomorrow and so we'll move them in now.  We'll

17   connect them up tomorrow.

18             MS. FRETER:  So this witness doesn't know

19   about this translation?

20             MR. REED:  Knows about the original

21   translation.  It's just what was in the motion in

22   limine.

23             MS. FRETER:  Are you going to ask him

24   questions about the translation?

25             MR. REED:  Yes.  He pulled the originals,

1   so, of course, for the originals to be relevant

2   we'll talk about the translations.

3             THE COURT:  If he doesn't tomorrow, I'll

4   just tell the jurors to disregard the evidence.

5             MS. FRETER:  No, my concern, Judge, is

6   we're fighting about the translation in terms of my

7   interpreter says one thing and their interpreter

8   says something else, which is what I'm going to ask

9   the interpreter about.  I think that there's an

10  instruction that goes with the transcript about --

11  like in the translation about you should be guided

12  by, but what I don't want -- the jury is, when

13  they're reading this, to have no information ahead

14  of time that this is somebody's opinion about what

15  the translation is rather than it's a for sure

16  thing.  I didn't realize that the Government was

17  going to do it with this witness.  I thought it was

18  just coming in through the interpreter.

19            MR. REED:  I thought I raised this at

20  lunch.

21            MS. FRETER:  I understood that she wasn't

22  going to be here today.  I didn't understand that

23  you were putting in this transcript today.  With

24  the interpreter, I'm not going to contest those are

25  the messages; like, I'm not going to say tomorrow,

WAID - DIRECT/REED                          Vol. 2 - 348

1    Oh, it doesn't match the text.  I want, when the

2    transcripts come in, to be able to say to the

3    person who did the transcription --

4          THE COURT:  I'll give an appropriate

5    instruction to the jury.

6          MS. FRETER:  Okay.  I just -- I didn't

7    know it was coming in with this witness.

8          THE COURT:  All right.

9          (End of proceedings at sidebar.)

10          THE COURT:  All right.  Ladies and

11    gentlemen, there is going to be a series of

12    questions about these text messages, and there is

13    another individual who has interpreted these text

14    messages on behalf of the Government, the defense

15    has someone who interpreted these text messages,

16    and their interpretations are different in some

17    respects.  Fair to say?

18          MS. FRETER:  Yes, Your Honor.

19          THE COURT:  All right.  And so you will

20    have a -- you'll hear from a witness tomorrow that

21    the Government had translate these text messages.

22    The witness himself is not -- was not able to

23    translate these text messages into English and is

24    relying upon what he has been informed by the

25    Government's witness that you will hear tomorrow.

1           So keep that in mind, all right, and there

2     may be -- you may hear other witnesses that claim

3     that a more accurate translation suggests a

4     different meaning.

5                All right.  You may proceed.

6                MR. REED:  Okay.  So if we could put up

7     Exhibit 79 -- which for the record, I believe, is

8     admitted subject to being connected up tomorrow --

9     side by side with Exhibit 80, please, and publish

10    to the jury.

11               THE COURT:  You may.

12               MR. REED:  Sandra, if we could move down

13    to page 2 of 79.  Thank you.

14    BY MR. REED:

15    Q. So to orient ourselves, the messages on the

16    left, that's what you recovered from Mr. Patel's

17    phone?

18    A. Yes.

19    Q. And on the right, there's a column that says,

20    "Original Language."  That's what's reflected in

21    the Government Exhibit 80?

22    A. Correct.

23    Q. And on the right is the English translation?

24    A. Okay.

25    Q. So we're looking at this first message, and it

WAID - DIRECT/REED                          Vol. 2 - 350

1    said it was sent at 3:46:52.  What does KKT say

2    according to the translation on the right side of

3    the screen at 3:46 a.m.?

4    A.  "Going to go today."

5    Q.  And the second message on the left, is it also

6    sent at 3:46 a.m.?

7    A.  Yes.

8    Q.  And what does he say there?

9    A.  "After 12:00."

10   Q.  And while we have this message up, you talked

11   about this earlier, but is this WhatsApp's

12   description of end-to-end description -- end-to-end

13   encryption, excuse me?

14   A.  Yes.

15   Q.  How does it describe it here?

16   A.  It says, "Messages and calls are end-to-end

17   encrypted.  No one outside of this chat, not even

18   WhatsApp, can read or listen to them.  Tap to learn

19   more."

20        MR. REED:  Go to page 2, Government's

21   Exhibit 80.

22   BY MR. REED:

23   Q.  The second message here, when was this message

24   sent?

25   A.  When?

WAID - DIRECT/REED                          Vol. 2 - 351

1   Q.  Yes, what time?

2   A.  The same date, 5:37 a.m.

3   Q.  And on the right, what does he say at

4   5:37 a.m.?

5   A.  "Will tell once the confirmation comes."

6   Q.  Okay.  And then in Message 4 -- this one is in

7   English, right?

8   A.  Yes --

9   Q.  What's in this message?

10  A.  The address for the victim in Merrill,

11  Wisconsin.

12  Q.  Karen Endres?

13  A.  Karen, correct.

14  Q.  And when is this message sent?

15  A.  The same date, 11:13 a.m.

16          MR. REED:  And if we could zoom back out.

17  BY MR. REED:

18  Q.  And in this fifth message, what's the English?

19  Message No. 5?

20  A.  I believe it says this is the address.  I

21  can't see the --

22          MR. REED:  Sandra, could you zoom back

23  out.  If you can just leave it here.

24  BY MR. REED:

25  Q.  For the Message No. 5 on the right, what is the

WAID - DIRECT/REED                          Vol. 2 - 352

1    English?

2    A.  "This is the address."

3    Q.  Referring back to Merrill, Wisconsin?

4    A.  Correct.

5    Q.  And what does he say after that in Message 6?

6    A.  Are you referring to the one sent at 11:14

7    a.m.?

8    Q.  Yes, sir.

9    A.  "Leave now."

10   Q.  And how does Patel respond?

11   A.  With, "Okay."

12   Q.  Also at 11:14?

13   A.  Yes.

14   Q.  And KKT responds, "OHJ?"

15   A.  Correct.

16           MR. REED:  If we could move to the next

17   page of Government's Exhibit 80.

18   BY MR. REED:

19   Q.  Is the next message from Mr. Patel?

20   A.  Yes.

21   Q.  What is he sending?

22   A.  It's difficult to see here, but it appears to

23   be an image of maybe Google Maps.  It's a very

24   small thumbnail.

25   Q.  When does he send this?

WAID - DIRECT/REED                          Vol. 2 - 353

1    A.  The same date, 11:16 a.m.
2              MR. REED:  If you could show the witness
3    Government's Exhibit 81.
4    BY MR. REED:
5    Q.  Were you able to find the photo that had the
6    small thumbnail?
7    A.  Yes.
8    Q.  Is this that photo from the phone extraction?
9    A.  Yes, I believe it is.
10             MR. REED:  Move to admit 81 and publish to
11   the jury.
12             MS. FRETER:  No objection.
13             THE COURT:  81 will be admitted.
14             (Government's Exhibit No. 81 was received
15   in evidence.)
16   BY MR. REED:
17   Q.  What does this screenshot communicate to KKT?
18   A.  This appears to be navigation instructions,
19   maps, to show the estimated drive time from the
20   Chicago area to what appears to be Merrill,
21   Wisconsin.
22   Q.  And up at the top you can see it's 11:14 a.m.?
23   A.  Yes.
24   Q.  So 4 hours, 25 minutes.  It's going to be about
25   3:45 p.m.?

WAID - DIRECT/REED                          Vol. 2 - 354

1   A.  Correct.

2   Q.  So assume that the scammer who's talking to

3   Karen Endres said he could have somebody to her

4   house by 4 p.m.  Is this screenshot consistent with

5   that?

6   A.  Yes.

7           MR. REED:  If we go back to Exhibit 79 on

8   the left, 80 on the right, and go to page 2 of 79.

9   I think we're on the next page of 80.  Maybe one

10  more page.  Thank you.

11  BY MR. REED:

12  Q.  Okay.  So we left off with this screenshot

13  being sent at 11:16.  Are there a series of

14  messages from KKT after this?

15  A.  Yes.

16  Q.  When are those messages sent?

17  A.  They are all sent on December 2, 2022, at 11:17

18  a.m.

19  Q.  And these are Messages 10, 11 and 12 in the

20  translation?

21  A.  Yes.

22  Q.  So what do Messages 10, 11 and 12 say?

23  A.  The first one says, "When sit in the car"; the

24  second message says, "Send a photo of the car"; and

25  the final message says, "When you leave".

WAID - DIRECT/REED                          Vol. 2 - 355

1   Q.  And how does Nirav respond?

2   A.  "Okay."

3             MR. REED:  Go to the next page of

4   Government's Exhibit 80.

5   BY MR. REED:

6   Q.  What does KKT say next?  It's Message 14.

7   A.  Okay.  "Left," with two question marks

8   afterwards.

9   Q.  And if we look at the right side of the screen,

10  this was sent at 11:25 a.m.?

11  A.  Yes.

12  Q.  How does Nirav respond?

13  A.  He appears to send an image.  I believe it's

14  the image of a roadway -- yes, it appears to be an

15  image of a roadway taken within a vehicle.

16  Q.  Were you able to find this photo?

17  A.  Yes.

18            MR. REED:  Look at Government's Exhibit

19  82.

20  BY MR. REED:

21  Q.  Is this the photo Patel sends to KKT at

22  11:52?

23  A.  Yes.

24            MR. REED:  Move to admit Exhibit 82.

25            MS. FRETER:  No objection.

WAID - DIRECT/REED                          Vol. 2 - 356

1      THE COURT:  Exhibit 82 is admitted without

2  objection.

3           (Government's Exhibit No. 82 was received

4  in evidence.)

5  BY MR. REED:

6  Q.  What is Mr. Patel communicating to KKT here?

7  A.  It's my belief that he's informing KKT that

8  he's on his way.  He's driving.

9           MR. REED:  If we could go back to 80.  I

10  think we left off on page 4 or 5.  One more and one

11  more.

12  BY MR. REED:

13  Q.  Okay.  How does KKT respond to the photo?

14  A.  I'm looking -- comparing the two here to get

15  where I'm at.  There we go.

16  Q.  I think it's the top left.

17  A.  So Message 16 we're leaving off on.  It looks

18  like some kind of version of the word "okay."

19  Q.  And then Message 17, what does he say there?

20  A.  "Where have you arrived," question mark.

21  Q.  And he sends a couple question marks.

22           MR. REED:  If we can move to the next page

23  of Government's Exhibit 80.

24  BY MR. REED:

25  Q.  How does Nirav Patel respond?

WAID - DIRECT/REED                          Vol. 2 - 357

1    A.  He sends an image at 12:58 p.m.

2    Q.  Were you able to find this image?

3    A.  Yes.

4            MR. REED:  Government's Exhibit 83 for the

5    witness.

6    BY MR. REED:

7    Q.  Is this the image?

8    A.  Yes.

9            MR. REED:  Move to admit 83.

10           MS. FRETER:  No objection.

11           THE COURT:  Be admitted without objection.

12   You may publish.

13           (Government's Exhibit No. 83 was received

14   in evidence.)

15   BY MR. REED:

16   Q.  What is Patel communicating with KKT with this

17   image?

18           MS. FRETER:  Objection.  Calls for

19   speculation.

20   BY MR. REED:

21   Q.  What does this image communicate to you?

22   A.  To me, this is telling me that I have a

23   2-hour-and-39-minute arrival time, estimated, and

24   kind of shows where I am on the map.

25   Q.  What's the ETA according to this screenshot?

1    A.  3:37 p.m.

2            MR. REED:  Go back to 80 and 79; and 80,

3    if we go down, I think we're on page 6 or 7.  I

4    think we're on page 7 if you go down one more.

5    Thank you.

6    BY MR. REED:

7    Q.  So that's the image he sends up on the right.

8    There is a series of messages from KKT in

9    response?

10   A.  Yes.

11   Q.  When are those three messages sent?

12   A.  The same day.  One of them at 3:00 p.m., 3:01

13   p.m. and again at 3:01 p.m.

14   Q.  Okay.  And these are Messages 20, 21 and 22 on

15   the right?

16   A.  Correct.

17   Q.  What does KKT ask Patel here?

18   A.  In the first message, he states, "Please arrive

19   soon."  The second message, "Before that,"

20   parentheses, "she customer walks out"; and the

21   final message, "Let the car go fast" with multiple

22   T's at the end.

23   Q.  What's the nature of this conversation?

24   A.  I believe he is trying to get the person --

25            MS. FRETER:  Objection.  Calls for

WAID - DIRECT/REED                          Vol. 2 - 359

1    speculation.

2          THE COURT:  Sustained.  The jury can

3    figure it out.

4          MR. REED:  Let's go back over to the

5    originals in Gujarati, the next page down, page 8.

6    BY MR. REED:

7    Q.  When does KKT reach out next?  It's at the top

8    here.

9    A.  It appears 3:18 p.m.

10   Q.  Okay.  And there's two messages at 3:18?

11   A.  Yes.

12   Q.  And if we go back over to the translation, it's

13   Messages 23 and 24, what does KKT say here?

14   A.  "How much is left," question mark, and then

15   four question marks.

16   Q.  Okay.  Does Patel respond?

17   A.  No.

18   Q.  And if we go back to the original, what's that

19   next box say, the third one down?

20   A.  Sorry.  Are you looking at --

21   Q.  The third box down -- I apologize.

22   A.  Third box, okay.  It says a missed group voice

23   call at 3:45 p.m.

24   Q.  Okay.  By this time has Nirav Patel been

25   stopped by law enforcement?

WAID - DIRECT/REED                          Vol. 2 - 360

1    A.  Yes.

2             MR. REED:  If we go back to 79 -- actually

3    80.  We look at it, the next page, page 8 of 80,

4    the next page.

5    BY MR. REED:

6    Q.  It's a series of messages in the first three

7    boxes?

8    A.  Yes, starting at 3:56 p.m., if that's what

9    you're referring to?

10   Q.  And then what's in the last two boxes here?

11   A.  3:58 p.m. on both of those -- I'm sorry, the

12   last of the page?

13   Q.  Yes, sir.

14   A.  I'm sorry about that.  4:02 p.m.

15   Q.  Are these missed group voice calls?

16   A.  With the exception of --

17   Q.  The last two?  I apologize.

18   A.  The last two are missed group voice calls.

19            MR. REED:  And then page 10.

20   BY MR. REED:

21   Q.  A couple more messages from him?

22   A.  Yes.

23   Q.  Was there someone else that Patel was

24   communicating with about this money drop on

25   December 2nd?

WAID - DIRECT/REED                          Vol. 2 - 361

1    A.  Yes.

2           MR. REED:  Pull out Government's Exhibit

3    84.

4    BY MR. REED:

5    Q.  Do you recognize this?

6    A.  Yes.

7    Q.  Who's involved in this conversation?

8    A.  Nirav Patel and someone by the name of Danny.

9    Q.  Is this an extraction from Patel's phone?

10   A.  Yes.

11          MR. REED:  Move to admit Exhibit 84 and

12   publish to the jury.

13          MS. FRETER:  No objection.

14          THE COURT:  Be admitted without objection.

15   You may publish.

16          (Government's Exhibit No. 84 was received

17   in evidence.)

18   BY MR. REED:

19   Q.  Is this conversation also in WhatsApp?

20   A.  Yes.

21          MR. REED:  Go to page 2.

22   BY MR. REED:

23   Q.  What does Danny send Mr. Patel in this first

24   box?

25   A.  The address for victim Karen Endres in Merrill,

WAID - DIRECT/REED                              Vol. 2 - 362

1   Wisconsin.

2   Q.  Okay.  And what time does he send that?

3   A.  11:14 a.m. on December 2, 2022.

4   Q.  Almost the same time that KKT sent it to him?

5   A.  Correct.

6           MR. REED:  Zoom back out.

7   BY MR. REED:

8   Q.   Okay.  And then Danny says something that is

9   not in English right after that --

10  A.  Correct.

11  Q.  -- at 11:14?

12          And how does Patel respond?

13  A.  "Ok."

14          MR. REED:  At this time, following the

15  same procedure as earlier, move to admit Exhibit 85

16  to connect it up tomorrow with the same limiting

17  instruction.

18          MS. FRETER:  No objection with the same

19  limiting instruction.

20          THE COURT:  It will be admitted subject to

21  further foundation laid tomorrow.

22          (Government's Exhibit No. 85 was received

23  in evidence.)

24          MR. REED:  Put 84 and 85 next to each

25  other.  Page 2 of 85.

WAID - DIRECT/REED                          Vol. 2 - 363

1   BY MR. REED:

2   Q.  Okay.  It's only one word that's not English in

3   this conversation.  He sends the address.  What

4   does Danny say after he sends the address?

5   A.  "Leave."

6   Q.  And Patel says, "Ok"?

7   A.  Correct.

8   Q.  All right.  Were there other WhatsApp message

9   strings from that day?

10  A.  I believe so.

11          MR. REED:  If we could pull out

12  Government's Exhibit 86.

13  BY MR. REED:

14  Q.  Do you recognize this exhibit?

15  A.  Yes.

16  Q.  Who's involved in this message string?

17  A.  Someone by the name of Pablo, Danny, Nirav

18  Patel and KKT.

19  Q.  Is this a true copy of what could be extracted

20  from Patel's phone when you did the extraction?

21  A.  Yes.

22          MR. REED:  Move to admit Exhibit 86.

23          MS. FRETER:  No objection.

24          THE COURT:  86 will be admitted without

25  objection.

WAID - DIRECT/REED                          Vol. 2 - 364

1          (Government's Exhibit No. 86 was received

2     in evidence.)

3     BY MR. REED:

4     Q.  Before I get too far, if we could look at the

5     participants box here.

6     A.  Uh-huh.

7     Q.  The number for KKT here, what is it?

8     A.  91-9054370138.

9     Q.  Does this have something called a country code

10    or country ID number?

11    A.  I believe that would be the first digit, yes.

12    Q.  Okay.  It's more than the usual 10 digits you

13    would expect to see?

14    A.  Correct.

15         MR. REED:  And zoom back out.

16    BY MR. REED:

17    Q.  If we look at that first box there, when was

18    this group created?

19    A.  The date was 11/17 of 2022 at 3:10 p.m.

20         MR. REED:  If we go to page 2, and the

21    third message down here -- I'm sorry.  The second

22    message down.  I counted wrong.

23    BY MR. REED:

24    Q.  All right.  The previous box has just talked

25    about end-to-end encryption like we saw before.

WAID - DIRECT/REED                          Vol. 2 - 365

1    Okay.  What does this third box say?

2    A.  It says, "Nirav B. Patel," and then, in

3    parentheses, it has the phone and @WhatsApp owner

4    turned on disappearing messages.  All new messages

5    will disappear from this chat 24 hours after they

6    are sent.  Tap to change.

7    Q.  When did this happen?

8    A.  December 2, 2022, at 3:18 p.m.

9    Q.  When was Nirav Patel stopped in Wisconsin?

10   A.  3:37 p.m. on the same date.

11   Q.  So about 20 minutes after he turned on

12   disappearing messages in this message stream?

13   A.  Correct.

14        MR. REED:  Zoom back out.

15   BY MR. REED:

16   Q.  And then there's two additional messages in

17   this string.  What's going on here?

18   A.  It says, "Pablo added Nirav B. Patel."  That

19   was the same date at 3:18 p.m.  And then it says,

20   "Pablo removed Nirav B. Patel" at 3:21 p.m.

21   Q.  So they're also taking him out of the text

22   message string?

23   A.  Correct.

24        MR. REED:  Go back up to page 1.

25   BY MR. REED:

WAID - DIRECT/REED                          Vol. 2 - 366

1    Q.  Is KKT part of this text message string?

2    A.  Yes.

3    Q.  And it was created on November 17 of 2022?

4    A.  Correct.

5    Q.  Is that more than two days before Patel was

6    stopped in Wisconsin?

7    A.  Yes.

8    Q.  More like 15 days?

9    A.  Yeah, approximately.

10   Q.  At the time you did this extraction, were there

11   any messages at all in this message string?

12   A.  I don't believe so.  If it was the string we

13   were just reviewing, no.

14   Q.  The one we just looked at?  No messages?

15   A.  No.

16          MR. REED:  Pull up Government's Exhibit 87

17   for the witness.

18   BY MR. REED:

19   Q.  Do you recognize this?

20   A.  Yes.

21   Q.  What is it?

22   A.  That is the extraction report for Nirav Patel's

23   iPhone.

24   Q.  Are we looking at calls now?

25   A.  Yes.

WAID - DIRECT/REED                          Vol. 2 - 367

1   Q.  And in this first call, who's involved?

2   A.  The first call is KKT -- thank you very much --

3   to Nirav Patel.

4   Q.  Is Pablo also involved in that?

5   A.  Yep.  Sorry.  I did not see the middle one.

6   Yes, also, Pablo.

7   Q.  And this is the missed call on 12-2 of 2022 at

8   4:02?

9   A.  Yes.

10   Q.  So is this a true and accurate copy of the call

11   information for these parties from the phone?

12   A.  Yes.

13          MR. REED:  Move to admit Government's

14   Exhibit 87.

15          MS. FRETER:  No objection.

16          THE COURT:  Be admitted without objection.

17          (Government's Exhibit No. 87 was received

18   in evidence.)

19   BY MR. REED:

20   Q.  So we saw that KKT and Danny sometimes

21   communicated with Patel by text messages for things

22   like Vonda Lutz's address; is that right -- or

23   Karen Endres' address; is that right?

24   A.  Correct.

25   Q.  Did they sometimes communicate by voice call

WAID - DIRECT/REED                          Vol. 2 - 368

1   instead of by text message?

2   A.  Yes.

3   Q.  Is this a record of WhatsApp phone calls

4   involving KKT and Mr. Patel that were still

5   available on the phone when you saw it?

6   A.  Yes.

7   Q.  If we go all the way down to the last page, how

8   many calls were left on the phone?

9   A.  How many calls -- can you say that again?

10  Q.  How many calls were left on the phone?  How

11  many phone calls could you see had occurred?

12  A.  Oh, I'm sorry.  Nineteen.

13  Q.  Just from the last day or two, December 2nd and

14  December 1st?

15  A.  I'm seeing four on this page.

16          MR. REED:  Go up a page.

17          THE WITNESS:  Four on this page.

18  BY MR. REED:

19  Q.  Okay.  More here?

20  A.  Yes.

21          MR. REED:  Go to page 2, Call No. 6.  We

22  can just, actually, leave it at this if you can see

23  it.

24          THE WITNESS:  Yes.

25  BY MR. REED:

WAID - DIRECT/REED                          Vol. 2 - 369

1    Q.  When did Call No. 6 happen?

2    A.  On December 2, 2022, at 2:56 p.m.

3    Q.  And how long did it last?  Is that what's in

4    the third column?

5    A.  Yes.  It was 1 minute, 25 seconds.

6    Q.  And then Call No. 5, same format, when did that

7    call happen?

8    A.  December 2, 2022, 3:22 p.m.

9    Q.  Okay.  And then Call No. 4, when did this call

10   happen?

11   A.  Same date, 3:28 p.m.

12   Q.  Okay.  And how long did this call, Call No. 4

13   last?

14   A.  Ten minutes and 34 seconds.

15   Q.  So if the call was made at 3:28 p.m. and lasts

16   ten minutes, are they still on the phone at 3:38

17   p.m.?

18   A.  Yes.

19   Q.  When was Mr. Patel arrested -- or when was

20   Mr. Patel stopped?

21   A.  Approximately 3:37 p.m.

22            MR. REED:  If we could go back to the dash

23   cam video, Exhibit 49.  Just play about 30 seconds

24   here.

25            (The video was played at this time.)

WAID - DIRECT/REED                          Vol. 2 - 370

1          MR. REED:  Go ahead and stop it right
2     there.
3     BY MR. REED:
4     Q. Okay.  At the top is there a time stamp for
5     this video?
6     A. Yes.
7     Q. So what time is it right here?
8     A. 3:37 p.m.
9     Q. Okay.  Fair to say that KKT is on the phone
10    with Mr. Patel when you pull in behind Patel and
11    Patel starts pulling away?
12    A. Yes.
13          MR. REED:  Exhibit 88, please.
14    BY MR. REED:
15    Q. What is this?
16    A. This is a call log from Mr. Patel's phone.
17    Q. Who are the parties to this first call?
18    A. The "From" is Danny and the "To" is Nirav
19    Patel.
20    Q. Is this a record of calls between Mr. Patel and
21    Danny that were still available on the phone when
22    you did the extraction?
23    A. Yes.
24          MR. REED:  Move to admit 88.
25          MS. FRETER:  No objection.

WAID - DIRECT/REED                    Vol. 2 - 371

1          THE COURT:  88 will be admitted.

2          (Government's Exhibit No. 88 was received

3    in evidence.)

4          MR. REED:  If we could scroll down to page

5    5, Call 18.  If you could zoom in on 18.

6    BY MR. REED:

7    Q.  When does this first call on December 2nd from

8    Danny occur?

9    A.  6:27 a.m.

10          MR. REED:  If we scroll up -- scroll up

11   from 18 all the way up.

12   BY MR. REED:

13   Q.  Do all 18 of these calls occur on December

14   2nd?

15   A.  Yes.

16   Q.  Fair to say that Danny and Nirav Patel are in

17   regular communication throughout the day on

18   December 2nd?

19   A.  Yes.

20   Q.  Okay.  So that wraps up the phone records for

21   December 2nd.

22          Earlier we looked at Nirav Patel's

23   Illinois license --

24   A.  Yes.

25   Q.  -- do you recall that?

WAID - DIRECT/REED                           Vol. 2 - 372

1          Okay.  Were you able to identify a social

2    security number for Mr. Patel?  Did he have a

3    social security number when you looked it up?

4    A. I don't recall.

5    Q. Okay.  When you looked up the phone, did you

6    also look for evidence about Mr. Patel's

7    identity?

8    A. Yes.

9          MR. REED:  Could we put up Government's

10   Exhibit 78, please.

11          THE COURT:  All right.  I have 78 is

12   reserved.

13          MR. REED:  It was added last week.

14   BY MR. REED:

15   Q. Was this file on Mr. Patel's phone as well?

16   A. Yes.

17   Q. At the top what does this document purport to

18   be?

19   A. An Application for Visitor Visa from the

20   Government of Canada.

21   Q. Who is -- what's the name listed in the Box

22   No. 1?

23   A. Last name, Patel; first name, Nirav.

24   Q. Middle name start with a B?

25   A. Yes.

WAID - DIRECT/REED                              Vol. 2 - 373

1    Q.  And what is the date of birth on this

2    application, Box No. 4?

3    A.  May 30th of 1980.

4            MR. REED:  Jump down to page 12.

5    BY MR. REED:

6    Q.  What does this appear to be?

7            MR. REED:  I think it's up to page 11.  I

8    may have the wrong page.  Thank you.

9    BY MR. REED:

10   Q.  What does this appear to be?

11   A.  Appears to be some sort of an identification

12   from the Republic of India for Nirav Patel.

13   Q.  Same birth date, 5-30-1980?

14   A.  Yes, just in a different format.

15           MR. REED:  Move to admit Government's

16   Exhibit 78.

17           MS. FRETER:  No objection.

18           THE COURT:  78 will be admitted.

19           MR. REED:  And publish to the jury,

20   please.

21           (Government's Exhibit No. 78 was received

22   in evidence.)

23           MR. REED:  Okay.  This is back up to page

24   1.  In Box No. 2, could we zoom in on that,

25   please -- Box No. 2 at the top.  I'm sorry.

WAID - DIRECT/REED                          Vol. 2 - 374

1   Multiple number 2's.

2   BY MR. REED:

3   Q.  All right.  This box asks, "I want service in,"

4   and what's the response?

5   A.  "English."

6         MR. REED:  Move down to Box No. 7.

7   BY MR. REED:

8   Q.  Where does he live at the time?

9   A.  It says "Citizen of India."

10        MR. REED:  Okay.  Page No. 2, please.  At

11   the top if we could look at the box that says

12   "Languages."

13   BY MR. REED:

14   Q.  Do you see in Box 1(A) where it says about a

15   native language or mother tongue?

16   A.  Yes.

17   Q.  What is listed here?

18   A.  "Hindi."

19   Q.  Not Gujarati?

20   A.  No.

21   Q.  And in Box No. B, what does it say there?

22   A.  Are you able to communicate in English and/or

23   French, question mark, and then the answer,

24   "English."

25        MR. REED:  You could zoom back out.

WAID - DIRECT/REED                          Vol. 2 - 375

1   BY MR. REED:

2   Q.  Further down on this page there is a box that

3   says, "USPR card."  Do you see that?  Can we look

4   at that?  What's Question No. 1 here?

5   A.  "Are you a lawful permanent resident of the

6   United States with a valid alien registration

7   card," parentheses, green card, question mark, with

8   a check mark selected "No."

9   Q.  This is Canada asking if the applicant is a

10  resident -- a permanent resident of the United

11  States?

12  A.  Correct.

13  Q.  And the answer is, "No"?

14  A.  Correct.

15        MR. REED:  Lets's go over to Page No. 3.

16  It's the next page.  We'll look at the "Education"

17  box, please.

18  BY MR. REED:

19  Q.  What degree is listed here on the visa

20  application?

21  A.  An MBA from Asia Pacific Institute of

22  Management.

23  Q.  And when was it completed?

24  A.  April of 2001 to June of 2003.

25        MR. REED:  Zoom back out.  If we could

WAID - DIRECT/REED                          Vol. 2 - 376

1   look at the "Employment" box.

2   BY MR. REED:

3   Q.  All right.  So Box No. 2 is the older listing.

4   When was this job held by the applicant?

5   A.  In Box 2?

6   Q.  Yes, sir.

7   A.  October of 2004 to June of 2010.

8   Q.  And what company did the applicant work for

9   from 2004 to 2010?

10  A.  PricewaterhouseCoopers PVT LTD.

11  Q.  National accounting firm?

12  A.  I don't know.

13          MR. REED:  Okay.  Strike the question

14  then.

15  BY MR. REED:

16  Q.  Box No. 1, where did he work after

17  PriceWaterHouseCoopers?

18  A.  Accenture Services Private LTD.

19  Q.  Also in India?

20  A.  Yes.

21          MR. REED:  Jump down to page 9, please.

22  Look at the Section A, please.

23  BY MR. REED:

24  Q.  Does this list a spouse of Nirav Patel, the

25  applicant?

WAID - DIRECT/REED                          Vol. 2 - 377

1   A.  Yes.

2   Q.  What is the present occupation of Nirav Patel's

3   spouse?

4   A.  "Doctor."

5   Q.  It's over here on the right?

6   A.  Correct.

7           MR. REED:  Page 7, please.

8   BY MR. REED:

9   Q.  Look at Question No. 8 at the very bottom.

10  Does this question ask about previous travel?

11  A.  Yes.

12  Q.  Does he respond, "Yes"?

13  A.  Yes.

14  Q.  And then it asks to give the details below

15  that?

16  A.  Correct.

17          MR. REED:  Can we go to the next page.

18  Zoom in on that chart, please.

19  BY MR. REED:

20  Q.  Okay.  According to this application, where has

21  Nirav Patel been before this?

22  A.  Just by location?

23  Q.  Yes, sir.

24  A.  Malaysia, Indonesia, Singapore, Thailand, South

25  Africa, Dubai, Thailand, Malaysia, Sydney and

1     Singapore.

2              MR. REED:  Can we go all the way to the

3     very end.  It's page 55.

4     BY MR. REED:

5     Q.  Is there a date on this page at the top?

6     A.  Yes.

7     Q.  What's the date?

8     A.  November 25, 2021, at 2:33 p.m.

9     Q.  Okay.  And does this page have a stamp in the

10    upper right?

11             MR. REED:  If we can look at that.  I'm

12    sorry.  Just the part with the flag on the right.

13    BY MR. REED:

14    Q.  Okay.  Canadian flag, Immigration, Refugees and

15    Citizenship Canada?

16    A.  Yes.

17             MR. REED:  Can we go all the way to page 5

18    now.

19    BY MR. REED:

20             Okay.  Is this copy of the visa

21    application signed?

22    A.  No.

23             MR. REED:  Page 11 if we could.

24    BY MR. REED:

25    Q.  But it includes pictures of an Indian passport

WAID - DIRECT/REED                    Vol. 2 - 379

1    in Nirav Patel's name; is that right?

2    A. Yes.

3             MR. REED:  And if we could scroll through

4    pages 15 down to 25.

5    BY MR. REED:

6    Q. Okay.  Based on what we just looked at, does it

7    also include pictures of all the pages in that

8    Indian passport?

9    A. Yes.

10   Q. Various locations he had visited like we looked

11   at earlier?

12   A. Correct.

13            MR. REED:  Page 27, if we look at just the

14   top -- top two boxes here.

15   BY MR. REED:

16   Q. Does this application also include bank records

17   for Nirav Patel?

18   A. Yes.

19            MR. REED:  And page 34.

20   BY MR. REED:

21   Q. Also Indian income tax records for Nirav

22   Patel?

23   A. Correct.

24   Q. And this whole application, all 55 pages, it

25   was located in the extraction of Patel's phone?

WAID - DIRECT/REED                          Vol. 2 - 380

1    A.  Yes.

2            MR. REED:  All right.  We can take that

3    down.

4            THE COURT:  Peter, how much longer you

5    got?

6            MR. REED:  Quite a bit, Judge.

7            THE COURT:  All right.  Why don't we take

8    another recess, ten-minute break, and that should

9    get us through to the end of the day.

10           (Recess at 3:13 p.m. until 3:39 p.m.)

11           (Jury present.)

12           THE COURT:  Back on the record.

13           Still under oath.

14           Counsel, please proceed.

15   BY MR. REED:

16   Q.  Detective Waid, we had just worked through that

17   passport application and, before that, the

18   Wisconsin pickup on December 2nd.  Did you find any

19   evidence in that phone that Nirav Patel was the one

20   who came to Karen Endres' residence to pick up an

21   earlier box of money?

22   A.  Yes.

23   Q.  And did you find any evidence that Nirav Patel

24   was involved with picking up assets from a victim

25   in Indiana?

WAID - DIRECT/REED                          Vol. 2 - 381

1    A.  Yes.

2    Q.  Let's take a look at those starting with the

3    first Wisconsin pickup.

4           MR. REED:  If we could look at

5    Government's Exhibit 89 for the witness.

6    BY MR. REED:

7    Q.  Do you recognize this?

8    A.  Yes.

9    Q.  What is it?

10   A.  It is a screenshot -- excuse me.  It is a

11   screenshot of what appears to be Google Maps.

12   Q.  Is it from the extraction of Mr. Patel's

13   phone?

14   A.  Yes.

15          MR. REED:  We'd move to admit 89 at this

16   time.

17          MS. FRETER:  No objection.

18          THE COURT:  89 will be admitted.

19          (Government's Exhibit No. 89 was received

20   in evidence.)

21          MR. REED:  Since we're coming close to the

22   end of the day, there's one of these photos per

23   exhibit, if we can show just the witness 90, 91,

24   92, 93 and 94.

25   BY MR. REED:

WAID - DIRECT/REED                          Vol. 2 - 382

1    Q.  That series of photos we just looked at, do you

2    recognize them?

3    A.  Yes.

4    Q.  Are they all from an extraction of Mr. Patel's

5    phone?

6    A.  Yes.

7              MR. REED:  Move to admit Exhibits 90

8    through 94.

9              MS. FRETER:  No objection.

10             THE COURT:  Be admitted without objection.

11             (Government's Exhibit Nos. 90 through 94

12   were received in evidence.)

13   BY MR. REED:

14   Q.  Were you also able to locate on Patel's phone

15   the metadata for these photos and others that we

16   will look at?

17   A.  Yes.

18   Q.  For the jury, what is metadata for a phone?

19   A.  Metadata is data about data.  It is usually

20   associated with a date and a time stamp and

21   sometimes coordinates to show where and when an

22   image was taken or a video.

23   Q.  So if I pull out my phone, and I want to look

24   at Christmas pictures from December 25th, I can go

25   down to that date, December 25th of 2024, that is

WAID - DIRECT/REED                        Vol. 2 - 383

1   the data we're talking about with dates?

2   A.  Correct.

3   Q.  What other kind of information would be

4   available with a photo?

5   A.  GPS coordinates, the name of the image.

6   Probably things I'm not thinking of right now but

7   those are the two that come to mind.

8           MR. REED:  Okay.  If we can look at

9   Government's Exhibit 96.  Move to page 2.

10  BY MR. REED:

11  Q.  Do you recognize this, sir?

12  A.  Yes.

13  Q.  Is this a metadata report for a series of items

14  from Patel's phone?

15  A.  Yes.

16          MR. REED:  Move to admit 96.

17          MS. FRETER:  No objection.

18          THE COURT:  Which one is this?

19          MR. REED:  96, sir.

20          THE COURT:  Will be admitted.

21          (Government's Exhibit No. 96 was received

22  in evidence.)

23          MR. REED:  All right.  With that out of

24  the way, could we go back to 89.

25  BY MR. REED:

WAID - DIRECT/REED                        Vol. 2 - 384

1   Q.  All right.  What are we looking at here?

2   A.  That is a screenshot of likely Google Maps

3   showing his location with the estimated drive time

4   of 4 hours and 26 minutes at 5 -- and an arrival

5   time -- excuse me, estimated arrival time of

6   5:14 p.m.

7           MR. REED:  Now, if we can go to

8   Government's Exhibit 96 -- actually, it would be

9   helpful to put these side by side.  96 was the

10  other one.  Go to page 5 of this -- of 96.  Can we

11  zoom in on that Box No. 24 at the very bottom.  See

12  if that's possible.

13          All right.  Perfect.

14  BY MR. REED:

15  Q.  Okay.  This Box No. 24, is this the photo from

16  Exhibit 89?

17  A.  Yes.

18  Q.  What day was this photo taken?

19  A.  The created date would be the date and time

20  that that was taken, which was 11-23 of '22 at

21  12:49 p.m.

22  Q.  Below the created date, there's a deleted date.

23  What was that?

24  A.  December -- excuse me, November 27, 2022, at

25  1:01 p.m.

WAID - DIRECT/REED                      Vol. 2 - 385

1   Q. Does this indicate the photo was later deleted

2   off this device?

3   A. Yes.

4   Q. Why is it still on the device if it's been

5   deleted?  Why are you able to find it?

6   A. Cellebrite has capabilities of removing deleted

7   items from a device.

8   Q. So pulling those out even after I've dragged it

9   to the trash bin?

10   A. Correct.

11   Q. Okay.

12         MR. REED:  If we can zoom back out; and on

13   the left, if we can put up Exhibit 90.

14   BY MR. REED:

15   Q. Another photo with a slightly later ETA of

16   5:22 p.m.?

17   A. Correct.

18   Q. And then 91, ETA at 5:16 p.m.?

19   A. Yes.

20   Q. And then 92, ETA of 5:24 p.m.?

21   A. Correct.

22   Q. And on the right side of the screen, if we look

23   at Boxes 21 through 23, these are those three

24   screenshots we just looked at?

25   A. Correct.

1    Q.  All created on 11-23 during the course of that

2    afternoon?

3    A.  Correct.

4    Q.  All deleted on 11-27?

5    A.  Correct.

6            MR. REED:  Zoom back out.  If we could go

7    to the full screen because this would be a little

8    harder to see.  Can we look at Government's Exhibit

9    93.

10   BY MR. REED:

11   Q.  What are we looking at here?

12   A.  That is a photo taken on the side of the

13   road on --

14   Q.  The railroad tracks?

15   A.  Yes.

16   Q.  Do you recognize this street?

17   A.  Yes.

18   Q.  How do you recognize it?

19   A.  I don't know if you need to zoom in or not, but

20   there's a red car parked down at the end there in

21   the photo by a stop sign next to a lighter-colored

22   house.  As a drug investigator, that was actually a

23   residence I was watching and a vehicle that I

24   was -- that was part of a different investigation,

25   so I know exactly where that was.

WAID - DIRECT/REED                          Vol. 2 - 387

1    Q.  Spent a lot of time on this street?

2    A.  Yes.

3    Q.  What city was this photo taken in?

4    A.  Merrill, Wisconsin.

5    Q.  Who lives by these railroad tracks?

6    A.  The victim Karen Endres.

7    Q.  And this was taken with the iPhone of the

8    defendant, Nirav Patel?

9    A.  Yes.

10   Q.  Look at Government's Exhibit 50.  What does the

11   red dot on this map indicate?

12   A.  That is the location of the victim -- victim's

13   residence, Karen Endres.

14   Q.  And the vehicle -- the picture that we just

15   saw, was that taken here on Sixth Street?

16   A.  Yes.

17            MR. REED:  Could we go back to -- I

18   apologize -- 93.

19   BY MR. REED:

20   Q.  Is there snow on the ground?

21   A.  Yes.

22   Q.  What else do you notice about the weather here

23   in Merrill in December -- or late November,

24   northern Wisconsin?

25   A.  Ice on the road.

WAID - DIRECT/REED                          Vol. 2 - 388

1    Q.  Ice on the road, snow?

2    A.  Yep.

3    Q.  Glad I live down here.

4         MR. REED:  Back to Government's Exhibit

5    96, page 5, if we could look at that Box 20 for the

6    photo by the railroad tracks.

7    BY MR. REED:

8    Q.  What date and time did Nirav Patel take this

9    picture showing the railroad tracks on Karen

10   Endres' block?

11   A.  November 23, 2022, 5:31 p.m.

12   Q.  Was this photo deleted from Nirav Patel's

13   phone?

14   A.  Yes.

15   Q.  When was it deleted?

16   A.  November 27, 2022, at 1:01 p.m.

17   Q.  Government's Exhibit 94, what is this?

18   A.  That is an image of a box taken within the

19   vehicle.

20   Q.  From what you can see, can you tell where it

21   was taken?

22   A.  Other than within a vehicle?

23   Q.  That will work.

24   A.  All right.

25        MR. REED:  Can we pull up 96, please.  Go

WAID - DIRECT/REED                          Vol. 2 - 389

1   down to page 5, Box 19.

2   BY MR. REED:

3   Q.  What's the created date for this file?

4   A.  November 23, 2022, at 5:52 p.m.

5              MR. REED:  Now, could we put that picture

6   of the Box 94 up side by side with Exhibit 43.

7   BY MR. REED:

8   Q.  Does this appear to be the same box based on

9   the pattern on the box?

10  A.  Yes.

11  Q.  And the photos on the right, these are from the

12  victim Karen Endres?

13  A.  Yes.

14  Q.  And the photo on the left, that's from Nirav

15  Patel's phone?

16  A.  Correct.

17             MR. REED:  All right.  We can pull those

18  down, and if we can show the witness Exhibit 95,

19  please.  If we can just pull it up and stop it

20  right there.  Thank you.

21  BY MR. REED:

22  Q.  Exhibit 95 here, do you recognize this?

23  A.  Yes.

24  Q.  What is it?

25  A.  This is a video taken of this box that was

WAID - DIRECT/REED                          Vol. 2 - 390

1  extracted from -- excuse me, that was on the

2  extraction from Mr. Patel's phone.

3          MR. REED:  Move to admit 95 and publish

4  for the jury.

5          MS. FRETER:  No objection.

6          THE COURT:  95 is admitted.  You may

7  publish.

8          (Government's Exhibit No. 95 was received

9  in evidence.)

10          (The video was played at this time.)

11  BY MR. REED:

12  Q.  Okay.  Who's name was on that box?

13  A.  Victim Karen Endres.

14          MR. REED:  Can we play this again.

15          (The video was played at this time.)

16  BY MR. REED:

17  Q.  There is a backpack behind the box.  Could we

18  look at that.  How would you describe that backpack

19  that's on the seat there?

20  A.  Black and gray in color.

21  Q.  Okay.  Does it appear to be the same backpack

22  that you retrieved from Nirav Patel's car on

23  December 2nd?

24  A.  Yes, based on the colors.

25          MR. REED:  Government's Exhibit 96, page

WAID - DIRECT/REED                      Vol. 2 - 391

1    6, in that Box No. 3, please.  Box No. 3 at the

2    bottom.

3    BY MR. REED:

4    Q.  Is this the metadata for the video we just

5    watched?

6    A.  Yes.

7    Q.  When was this video created?

8    A.  11-23-2022 at 5:52 p.m.

9    Q.  The date that the first box was picked up from

10   Karen Endres?

11   A.  Say that again.  I'm sorry.

12   Q.  The date the first box was picked up from Karen

13   Endres?

14   A.  Yes.

15   Q.  Was this video deleted?

16   A.  Yes.

17   Q.  And there's some new data here for the video

18   where it says location?

19   A.  Yes.

20   Q.  What are those strings of numbers to the right

21   of location?

22   A.  Those are GPS coordinates that the video would

23   have been taken at.

24   Q.  Are you able to plug these GPS coordinates into

25   a mapping program to determine where this video was

WAID - DIRECT/REED                          Vol. 2 - 392

1    taken?

2    A.  Yes.

3              MR. REED:  Pull up Defendant's Exhibit 97.

4    BY MR. REED:

5    Q.  Are the coordinates up at the top of this

6    map?

7    A.  Yes.

8    Q.  So what does this map show?

9    A.  That shows most of the city of Merrill.

10   Q.  Okay.  And that red dot, is it the coordinates

11   from the video of the shoebox we just looked at?

12   A.  Yes.

13             MR. REED:  Move to admit 97 and publish to

14   the jury.

15             MS. FRETER:  No objection.

16             THE COURT:  Be admitted without objection.

17   You may publish.

18             (Government's Exhibit No. 97 was received

19   in evidence.)

20   BY MR. REED:

21   Q.  The red dot over here, that's the GPS

22   coordinates where the video was created?

23   A.  Yes.

24   Q.  Okay.  Ms. Endres, she lives -- well, what

25   street were you on when you did the sting?  Was it

WAID - DIRECT/REED                          Vol. 2 - 393

1   Douglas?

2   A.  Douglas Street.

3   Q.  Okay.  And then there's some railroad tracks

4   right here?

5   A.  Railroad tracks would go left to right on this

6   screen.

7   Q.  Can you see the --

8   A.  There you go.  Yes.  I'm sorry.  Not left to

9   right.  You're right.

10  Q.  I covered them up.  I don't know how you were

11  supposed to see them.

12          Douglas -- this video was created not too

13  far from Karen Endres' house?

14  A.  Correct.

15  Q.  Now, when we looked at pictures from that later

16  Wisconsin trip that ended in you stopping Patel's

17  car, we saw a bunch of WhatsApp messages from Patel

18  sending photo updates to KKT and Danny about his

19  arrival time.  Do you remember looking at those?

20  A.  Correct.

21  Q.  Were you able to find similar messages in

22  WhatsApp for this trip on November 23rd of 2022?

23  A.  I believe so.

24  Q.  Well, if it was eight or nine days earlier,

25  would there be correspondence messages in

WAID - DIRECT/REED                          Vol. 2 - 394

1    WhatsApp?

2    A.  There could have been.  I don't recall offhand

3    the specific dates, no.

4    Q.  Okay.  Fair enough.  And the files we looked

5    at, the location, the map screenshots, Patel

6    deleted those?

7    A.  Correct.

8    Q.  And you said earlier that WhatsApp has a

9    disappearing messages feature.  How does that

10   work?

11   A.  According to what WhatsApp has stated that they

12   delete from the -- the communication within 24

13   hours.

14   Q.  Okay.  All right.  So that wraps up Mr. Patel's

15   first trip to Merrill, Wisconsin.  Did you find any

16   evidence that Patel also drove to Indiana for a

17   money drop?

18   A.  Yes.

19         MR. REED:  Can we look at Exhibit 98 for

20   the witness only, please.

21   BY MR. REED:

22   Q.  Who is involved in this exchange?

23   A.  Nirav Patel and Nirav India.

24         MR. REED:  Can we look back at those

25   again, please.

WAID - DIRECT/REED                          Vol. 2 - 395

1    BY MR. REED:

2    Q.  The Nirav India number, does it start with the

3    same 91-9 as the KKT number we looked at earlier?

4    A.  Yes.

5            MR. REED:  Zoom back out.  Go to page 2.

6    BY MR. REED:

7    Q.  Are these additional messages from those two

8    participants taken from Nirav Patel's phone?

9    A.  Yes.

10           MR. REED:  Move to admit 98 and publish to

11   the jury.

12           MS. FRETER:  No objection.

13           THE COURT:  Admitted and you may

14   publish.

15           (Government's Exhibit No. 98 was received

16   in evidence.)

17           MR. REED:  If you could move down to page

18   2, please, and the second box, if we could look at

19   that.

20   BY MR. REED:

21   Q.  When was this message sent?

22   A.  2:11 a.m. on November 24th, 2022.

23   Q.  So we left Patel in Merrill, Wisconsin, at

24   about 6:00 p.m.  Does that sound right?

25   A.  Correct.

1   Q. So this is about eight hours later?

2   A. Yes.

3   Q. What's the message?

4   A. It's an image sent.

5   Q. Were you able to find this image?

6   A. Yes.

7        MR. REED:  Can we look at Government's

8   Exhibit 99 for the witness.

9   BY MR. REED:

10  Q. Is this the file?

11  A. Yes.

12       MR. REED:  Move to admit 99 and publish.

13       MS. FRETER:  No objection.

14       THE COURT:  Be admitted without objection.

15       (Government's Exhibit No. 99 was received

16  in evidence.)

17  BY MR. REED:

18  Q. Okay.  So at 211 -- or 2:11 a.m. on November

19  24th, what's the message?

20  A. It's a photo of a name, Vonda Lutz, with an

21  address of 1435 Christian Boulevard, Apartment 118

22  in Franklin, Indiana.

23       THE COURT:  Can you hold on just a second.

24       I apologize for that.  You may continue.

25       MR. REED:   Show Exhibit 100 to the

WAID - DIRECT/REED                          Vol. 2 - 397

1   witness, and then 101, 102, 103, 104, 105.

2   BY MR. REED:

3   Q.  Do you recognize these photos?

4   A.  Yes.

5   Q.  Are Exhibits 100 through 105 a series of photos

6   taken from Patel's phone relating to that first

7   money drop in Indiana?

8   A.  Yes.

9           MR. REED:  Move to admit Exhibits 100

10  through 105.

11          MS. FRETER:  No objection.

12          THE COURT:  Shall be admitted.  You may

13  publish.

14          (Government's Exhibit Nos. 100 through 105

15  were received in evidence.)

16          MR. REED:  Publish Number 100 for the

17  jury.

18  BY MR. REED:

19  Q.  What does this show?

20  A.  That is a map of -- as you see the top, it says

21  your location, which appears to be near the Chicago

22  area, with a destination of 1435 Christian

23  Boulevard.

24  Q.  Is that that address we just looked at?

25  A.  Yes.

WAID - DIRECT/REED                          Vol. 2 - 398

1          MR. REED:  Go to Exhibit 96, please, page
2      5, Box 18.
3      BY MR. REED:
4      Q.  When was this screenshot showing directions to
5      Christian Boulevard created?
6      A.  November 24, 2022, at 2:13 a.m.
7      Q.  In the middle of the night?
8      A.  Yes.
9      Q.  Couple minutes after he got that screenshot
10     with the address?
11     A.  Correct.
12     Q.  By the way, November 24, 2022, we talked about
13     this a couple times, that's Thanksgiving Day?
14     A.  Yes.
15     Q.  Exhibit 101, what's this?
16     A.  That is a screenshot of a map.  It appears to
17     be as they're driving on I-65 South.
18     Q.  What's the ETA?
19     A.  8:57 a.m.
20     Q.  Exhibit 102, what's this?  What's the ETA
21     here?
22     A.  ETA, 8:57 a.m.
23     Q.  Exhibit 103, what is this?
24     A.  That is a photo taken of the address on
25     Christian Boulevard in Franklin, Indiana, from

WAID - DIRECT/REED                          Vol. 2 - 399

1    inside a vehicle.

2            MR. REED:  Could we put photo -- or

3    Exhibit 20 next to Exhibit 103, please.

4    BY MR. REED:

5    Q.  Okay.  So the photo on the right, Exhibit 20,

6    there is a sign that says Christina Place in the

7    front.  Do you see that?

8    A.  Yes.

9    Q.  Does this appear to be the same building?

10   A.  Yes.

11   Q.  The photo on the left is from Nirav Patel's

12   phone?

13   A.  Correct.

14           MR. REED:  Go to Exhibit 96, please, page

15   4, Box 15.

16   BY MR. REED:

17   Q.  When did Nirav Patel's phone take this picture

18   of Christina Place in Indiana?

19   A.  On November 24th, 2022, at 8:09 a.m.

20   Q.  Was this photo deleted from Nirav Patel's

21   phone?

22   A.  Yes.

23   Q.  When was it deleted?

24   A.  November 27th, 2022, at 1:01 p.m.

25   Q.  About the same time as all the Merrill,

WAID - DIRECT/REED                          Vol. 2 - 400

1    Wisconsin, photos?

2    A.  Yes.

3    Q.  Look at Government's Exhibit 104 now.  Does

4    this appear to be the same building?

5    A.  Yes.

6    Q.  And Exhibit 105, what's pictured here?

7    A.  That is a photo of a box taken within a

8    vehicle.

9    Q.  Is there a video from about this same time?

10   A.  Yes.

11           MR. REED:  Could you show the witness

12   Government's Exhibit 106.

13           (The video was played at this time.)

14   BY MR. REED:

15   Q.  Is this the video taken from Nirav Patel's

16   phone?

17   A.  Yes.

18           MR. REED:  Move to admit 106.

19           MS. FRETER:  No objection.

20           THE COURT:  Admitted and you may publish.

21           (Government's Exhibit No. 106 was received

22   in evidence.)

23           MR. REED:  If we can go ahead and play

24   that.

25           (The video was played at this time.)

WAID - DIRECT/REED                          Vol. 2 - 401

1    BY MR. REED:

2    Q.  Okay.  Was there a backpack behind the box

3    again?

4    A.  Yes.

5    Q.  Same backpack?

6    A.  It appeared to be.

7    Q.  Gray and black?

8    A.  Yes.  I would also point out it has a black

9    emblem on the top that I believe you can also see

10   in the patrol squad video.

11            MR. REED:  Okay.  Go ahead and take that

12   down and pull 96 up again, please.  Go down to page

13   6, please.  96, page 6 and then Box No. 2.

14   BY MR. REED:

15   Q.  Is this the metadata for the video we just

16   looked at?

17   A.  Yes.

18   Q.  When was this video created?

19   A.  November 24, 2022, 8:31 a.m.

20   Q.  Was this photo deleted --

21   A.  Yes.

22   Q.  -- or video, excuse me.  Was this video

23   deleted?

24   A.  Yes.

25   Q.  And when was it deleted?

WAID - DIRECT/REED                          Vol. 2 - 402

1    A.  The same day as the others, 11-27-2022 at 1:01

2    p.m.

3    Q.  Does this metadata also provide GPS coordinates

4    for where this video was created?

5    A.  Yes.

6           MR. REED:  Show the witness Government's

7    Exhibit 108.

8    BY MR. REED:

9    Q.  Is this a map of those GPS coordinates?

10   A.  Yes.

11          MR. REED:  Move to admit 108.

12          MS. FRETER:  No objection.

13          THE COURT:  Admitted without objection.

14          (Government's Exhibit No. 108 was received

15   in evidence.)

16   BY MR. REED:

17   Q.  So where was the video of the box created?

18   A.  At the address of the other victim.

19   Q.  In Greenwood?

20   A.  Yes.

21   Q.  Off 31?

22   A.  Right.

23   Q.  Indiana?

24   A.  Yes.

25          MR. REED:  You can take that down.  Onto

WAID - DIRECT/REED                          Vol. 2 - 403

1    the next batch of exhibits for the witness only,

2    please, 109, 110, 111, 112, 113.

3    BY MR. REED:

4    Q.  Are each of these photos taken from the

5    extraction of Patel's phone?

6    A.  Yes.

7    Q.  Taken shortly after that November 24th pickup

8    from Vonda Lutz in Indiana?

9    A.  Yes.

10             MR. REED:  Move to admit Exhibits 109 to

11   113.

12             MS. FRETER:  No objection.

13             THE COURT:  They will be admitted.

14             (Government's Exhibit Nos. 109 through 113

15   were received in evidence.)

16             MR. REED:  Move to publish 109.

17   BY MR. REED:

18   Q.  Okay.  Here in Government's Exhibit 109, what

19   are we looking at here?

20   A.  It's a screenshot of Google Maps with an ETA of

21   1:10 p.m.

22   Q.  Patel is headed somewhere else?

23   A.  Yes.

24             MR. REED:  Exhibit 96, please, page 4 and

25   Box No. 12.  There it is.

WAID - DIRECT/REED                          Vol. 2 - 404

1   BY MR. REED:

2   Q. All right.  When is this screenshot of the maps

3   taken?

4   A. 11-24-2022, 11:04 a.m.

5   Q. So we're still Thanksgiving morning, a couple

6   hours after he picked up the box in -- at the

7   Christina Place?

8   A. Yes.

9   Q. Let's look at 110.  What are we looking at

10  here?

11  A. A United States $1 bill.

12  Q. Does the bill number here end in 82D?

13  A. Yes.

14  Q. Is there anything written on this bill?

15  A. No.

16  Q. Look at 111.  Is this the same dollar bill with

17  the bill number ending in 82D?

18  A. Yes.

19  Q. What's written on it now?

20  A. It appears to be nine-four received or

21  something similar to a four.

22  Q. Nine-K, nine-four, one or the other?

23  A. Something like that.

24          MR. REED:  Government's Exhibit 96, page

25  4, Boxes 10 and 11 -- start with 11, I'm sorry.  I

WAID - DIRECT/REED                              Vol. 2 - 405

1    didn't realize it was a page break.

2    BY MR. REED:

3    Q.  And this is the first picture of the dollar

4    bill?

5    A.  Yes.

6    Q.  Created about the time of the ETA on the

7    previous map photo?

8    A.  I don't recall offhand what the previous ETA

9    was.

10   Q.  Fair enough.  When was this picture taken?

11   A.  1:53 p.m. on November 24, 2022.

12   Q.  And if we could go back up to Box No. 11, this

13   is the second photo with nine-four or nine-K

14   received, right?

15   A.  Yes.

16   Q.  This is taken when?

17   A.  Same date, 1:56 p.m.

18   Q.  About two or three minutes later?

19   A.  Yes.

20   Q.  So the bill was marked sometime between 1:53

21   and 1:56 p.m.?

22   A.  Correct.

23           MR. REED:  Go back to Exhibit No. 112.

24   BY MR. REED:

25   Q.  On the road again in 112?

WAID - DIRECT/REED                           Vol. 2 - 406

1    A.  Yes.

2    Q.  All right.  When's the ETA here?

3    A.  4:05 p.m.

4    Q.  All right.  And 113, what is this?

5    A.  A different $1 bill.

6    Q.  Does this one have a handwritten notation?

7    A.  Yes.

8    Q.  What does it say?

9    A.  "27120" and then something that could be a

10   signature underneath or something like that.

11   Q.  Were these photos significant to you as an

12   investigator in your training and experience?

13   A.  At the time I did this extraction, no.

14   Q.  Okay.  How about now?

15   A.  Yes.

16   Q.  How so?

17   A.  It appears to me that it is a way of

18   communicating when money has been received or

19   obtained, and it's a way of messaging another

20   person involved in this to let them know that.

21   Q.  Okay.  Karen Endres, did she put $29,000 in

22   that first box?

23   A.  I was not a part of that investigation, but

24   relayed through the investigators, yes, that's my

25   understanding.

WAID - DIRECT/REED                          Vol. 2 - 407

1    Q.  Okay.  And we can look at it.

2            MR. REED:  It's Exhibit 43, page 2.  If we

3    can just put it side by side with 113.  Okay.  And

4    then in 43, if we can go down to page 2.  Just look

5    at that banking slip that's in the box on page 2 at

6    the very top.

7    BY MR. REED:

8    Q.  All right.  Banking slip says 29,000?

9    A.  Yes.

10   Q.  Dollar bill on the right says 27,120?

11   A.  Yes.

12   Q.  So 27,120 is only part of the money that was in

13   Karen Endres' box, right?

14   A.  Correct.

15           MS. FRETER:  Well --

16   BY MR. REED:

17   Q.  In your training and experience, what does that

18   tell you?

19   A.  That would indicate to me that some of the

20   money would have gone to the person obtaining it.

21   Q.  But not all of it?

22   A.  Correct.

23   Q.  You'd open -- to get 27,120 out of a box, you

24   would need to open it?

25   A.  Yes.

WAID - DIRECT/REED                          Vol. 2 - 408

1    MS. FRETER:  I'm sorry.  I didn't hear the

2    question.

3    BY MR. REED:

4    Q.  To get $27,120 out of a box of $29,000, you'd

5    need to open the box?

6    A.  Yes.

7    MR. REED:  Exhibit 96, page 3, Box

8    No. 8.

9    BY MR. REED:

10   Q.  This is that second bill with the "27120" on

11   it?

12   A.  Yes.

13   Q.  When was this photo created?

14   A.  Same date, November 24, 2022, at 4:33 p.m.

15   Q.  So we're still on Thanksgiving Day.  We're end

16   of the afternoon?

17   A.  Yes.

18   MR. REED:  The photos -- if we can zoom

19   back out to this page.

20   BY MR. REED:

21   Q.  The photos that we just looked at of the dollar

22   bills and maps in between, were all those photos

23   deleted by Mr. Patel?

24   A.  It appears the last three --

25   Q.  Let's do them one at a time.  Box 8 deleted?

1    A.  Yes.

2    Q.  Box 9 deleted?

3    A.  Yes.

4    Q.  Box 10 --

5    A.  Yes.

6    Q.  -- deleted?

7         Go to the next page.  Box 11 deleted?

8    A.  Yes.

9    Q.  Box 12 deleted?

10   A.  Yes.

11        MR. REED:  Okay.  Go ahead and take those

12   back down.

13   BY MR. REED:

14   Q.  Okay.  Were you able to find any files on the

15   phone suggesting Nirav Patel was involved with a

16   second in-person pickup from the Indiana victim?

17   A.  I don't recall.

18   Q.  Okay.  It's been a long afternoon.

19        MR. REED:  Can we show the witness

20   Government's Exhibit 114 and then 115 and then 116

21   and 117 and 118.

22   BY MR. REED:

23   Q.  Do you recognize these photos?

24   A.  Yes.

25   Q.  Are Exhibits 114 through 118 files taken from

WAID - DIRECT/REED                           Vol. 2 - 410

1    Patel's phone?

2    A.  Yes.

3                MR. REED:  Move to admit 114 through

4    118.

5                MS. FRETER:  No objection.

6                THE COURT:  Be admitted.  You may publish.

7                (Government's Exhibit Nos. 114 through 118

8    were received in evidence.)

9                MR. REED:  Can we put up 114, please.

10   BY MR. REED:

11   Q.  All right.  What's this?

12   A.  Screenshot of maps with a starting point of

13   your location, which appears to be up in the

14   Naperville, Illinois, area with a destination of

15   1435 Christian Boulevard.

16   Q.  Same destination as the last time we went to

17   Indiana?

18   A.  Yes.

19                MR. REED:  If we could, look at

20   Government's Exhibit 96, page 3, Box 7.

21   BY MR. REED:

22   Q.  Is this that screenshot we were just looking

23   at?

24   A.  Yes.

25   Q.  When was this photo created?

WAID - DIRECT/REED                          Vol. 2 - 411

1    A.  December 1, 2022, 4:41 a.m.

2    Q.  Early in the morning?

3    A.  Yes.

4    Q.  And the other pictures we saw relating to

5    Indiana, that was November 24th?

6    A.  Yes.

7    Q.  This is a different day here?

8    A.  Correct.

9    Q.  Back to Indiana?

10   A.  Yes.

11   Q.  And to orient ourselves, this is December 1st

12   of 2022.  What day did he come to Merrill,

13   Wisconsin, that ended in this traffic stop?

14   A.  December 2nd, 2022.

15   Q.  This is the day before?

16   A.  Yes.

17   Q.  Let's look at 115.  What's this?

18   A.  It's a screenshot of a mapping program with an

19   ETA of 9:44 a.m.

20   Q.  116, have we seen this building before?

21   A.  Yes.

22   Q.  What does it appear to be?

23   A.  I believe it's called Christina's Place on

24   Christian Boulevard.

25   Q.  117, what's pictured here?

WAID - DIRECT/REED                         Vol. 2 - 412

1    A.  Appears to be the same building.

2              MR. REED:  Let's go ahead and go back to

3    Exhibit 96, please, page 3, Box No. 4 -- oops.  I'm

4    off.  Box No. 4.

5    BY MR. REED:

6    Q.  When is this photo of Christina Place

7    created?

8    A.  December 1st, 2022, at 8:48 a.m.

9              MR. REED:  We can zoom back out.

10   BY MR. REED:

11   Q.  The previous photo of Christina Place also

12   created on December 1st?  It's Box No. 5.

13   A.  Asking for the creation date, I'm sorry.

14   12-1-2022 at 8:48 a.m.

15   Q.  The photo in Box Nos. 4, 5, 6, 7, 8, those are

16   the ones we just looked at?

17   A.  Yes.

18   Q.  4, 5, 6, 7 -- I went too far.  To 7?

19   A.  Yes.

20   Q.  All created on December 1st just to be clear.

21              MR. REED:  Okay.  We can go ahead and take

22   that down.

23   BY MR. REED:

24   Q.  Was there also a video created this day on

25   December 1st?

WAID - DIRECT/REED                          Vol. 2 - 413

1    A.  Yes.

2            MR. REED:  Put up for the witness only

3    Exhibit No. 119.

4            (The video was played at this time.)

5            MR. REED:  Go ahead and pause that.

6    BY MR. REED:

7    Q.  Is this the video?

8    A.  Yes.

9            MR. REED:  Move to admit 119.

10           MS. FRETER:  No objection.

11           THE COURT:  I mean -- I interpret that to

12   mean no objection?

13           MS. FRETER:  I'm sorry.  No objection.

14           THE COURT:  Admitted without objection.

15           (Government's Exhibit No. 119 was received

16   in evidence.)

17           MR. REED:  Could we play 119 for the jury,

18   please.

19           (The video was played at this time.)

20   BY MR. REED:

21   Q.  Did you see the backpack again in this video?

22   A.  Yes.

23   Q.  It looks like the same backpack?

24   A.  Yes.

25           (The video was played at this time.)

WAID - DIRECT/REED                         Vol. 2 - 414

1          MR. REED:  Thank you.  Go to -- look at

2    Exhibit 96, page 6, Box No. 1.

3    BY MR. REED:

4    Q.  Is this the metadata for the video we just

5    looked at?

6    A.  Yes.

7    Q.  When was that video created?

8    A.  December 1, 2022, 9:09 a.m.

9    Q.  And is there a location data for this video as

10   well?

11   A.  Yes.

12          MR. REED:  Pull up Government's Exhibit

13   121 for the witness, please.

14   BY MR. REED:

15   Q.  Is this where that video was created?

16   A.  Yes.

17          MR. REED:  Move to admit 121.

18          MS. FRETER:  No objection.

19          THE COURT:  Admitted without objection.

20          (Government's Exhibit No. 121 was received

21   in evidence.)

22   BY MR. REED:

23   Q.  We're back in Greenwood, Indiana, to create

24   this video?

25   A.  Yes.

WAID - DIRECT/REED                        Vol. 2 - 415

1    Q.  Okay.  We're almost there.

2            MR. REED:  Exhibit 124 for the witness.

3    BY MR. REED:

4    Q.  All right.  What are we looking at here?

5    A.  A dollar bill.

6    Q.  Also from Patel's phone?

7    A.  Yes.

8            MR. REED:  Move to admit 124 and

9    publish.

10           MS. FRETER:  No objection.

11           THE COURT:  Admitted.

12           (Government's Exhibit No. 124 was received

13   in evidence.)

14   BY MR. REED:

15   Q.  Is this picture focused on the bill number like

16   before?

17   A.  Yes.

18   Q.  Okay.  Was there a corresponding photo with a

19   notation on it for this dollar bill?

20   A.  I don't believe there was.

21           MR. REED:  Okay.  So if we could go to

22   Exhibit 96, page 2, Box 2.

23           We're up to Box 2, which means we're

24   really almost there, I promise.

25   BY MR. REED:

WAID - DIRECT/REED                          Vol. 2 - 416

1    Q.  All right.  This is the metadata for this

2    photo?

3    A.  Yes.

4    Q.  When is the created?

5    A.  December 2nd, 2022, 11:06 a.m.

6    Q.  This is the day he goes to Merrill?

7    A.  Yes.

8    Q.  And you stop him?

9    A.  Yes.

10   Q.  Okay.  So zooming back out, all of the photos

11   we just looked at of the second drop in Indiana

12   that occurred on December 1st, these are a lot

13   closer in time to when you seized Patel's phone; is

14   that right?

15   A.  Yes.

16   Q.  So the photos from the second Indiana drop,

17   were those deleted?

18   A.  No, I don't believe they were.  No.

19   Q.  They had just been taken the day before?

20   A.  Correct.

21          MR. REED:  Can we look at Government's

22   Exhibit 122, please.

23   BY MR. REED:

24   Q.  Is this another message string?

25   A.  Yes.

WAID - DIRECT/REED                      Vol. 2 - 417

1   Q.  Who are the parties, I'm sorry?

2   A.  Danny and then there's a phone number listed

3   which does not have a contact with it.

4           MR. REED:  Yeah, and if we can look at the

5   first box.

6   BY MR. REED:

7   Q.  Okay.  Is Danny the owner of the phone?

8   A.  No.  Sorry.

9   Q.  No problem.

10          MR. REED:  Move to admit 122.

11          MS. FRETER:  No objection.

12          THE COURT:  Be admitted.

13          (Government's Exhibit No. 122 was received

14   in evidence.)

15  BY MR. REED:

16  Q.  We're already on here.  How does this message

17  string with Danny start?

18  A.  The owner of the phone, which would be

19  Mr. Patel, sends Danny the video that we watched.

20  Q.  Okay.  The video from Franklin, Indiana, that

21  we just watched?

22  A.  Yes.

23  Q.  Okay.  And when is he sending this video?

24  A.  December 1st, 2022, at 9:12 a.m.

25          MR. REED:  Zoom back out.  Go down to

WAID - DIRECT/REED                           Vol. 2 - 418

1    page 2.

2    BY MR. REED:

3    Q.  How does Danny respond to receiving the video

4    of the box?

5    A.  "Ok."

6              MR. REED:  Back up and then the next two

7    boxes.

8    BY MR. REED:

9    Q.  Looks like he sent him the same video a couple

10   more times?

11   A.  Yes.

12             MR. REED:  Page 3.

13   BY MR. REED:

14   Q.  All right.  And then he sends this photo.  When

15   did he send this photo?

16   A.  December 2nd, 2022, at 11:16 a.m.

17   Q.  Is this soon after that picture of the dollar

18   bill that had no notation?

19   A.  Yes.

20   Q.  Okay.  Were you able to find this photo that he

21   sent at 11:16 on 12-2?

22   A.  Yes.

23             MR. REED:  Look at Government's Exhibit

24   125 for the witness.

25   BY MR. REED:

WAID - DIRECT/REED                          Vol. 2 - 419

1   Q.  Is this it?

2   A.  Yes.

3   Q.  All right.  What is it?

4   A.  It's a screenshot of Google Maps.  The starting

5   point is covered by what appears to be, like, an

6   incoming message from Danny with the Merrill

7   victim's address and the destination is GPS

8   coordinates which are located in Merrill,

9   Wisconsin.

10              MR. REED:  Move to admit 125.

11              MS. FRETER:  No objection.

12              THE COURT:  Admitted.

13              (Government's Exhibit No. 125 was received

14   in evidence.)

15   BY MR. REED:

16   Q.  This is the screenshot that Patel sends to

17   Danny at about 11:16 on December 2nd?

18   A.  Yes.

19   Q.  And it's in the same message string as the

20   video of the box from Indiana?

21   A.  Correct.

22   Q.  And you mentioned it, but the jury can see it

23   now.  At the top there is a message from Danny.

24   Whose address is that?

25   A.  That is the victim, Karen Endres, in Merrill,

WAID - CROSS/FRETER                    Vol. 2 - 420

1    Wisconsin.

2    Q. So you were present at the scene of the arrest

3    later that day.  Having worked all the way through

4    this extraction, what was the significance of the

5    phone extraction data to your investigation?

6    A. Now or that day?

7    Q. Now.  Now that you've been through it all.

8    A. Now there's obviously a lot more pieces of

9    information that were -- became relevant instead of

10   December 2nd, 2022.

11   Q. Able to connect him to Indiana?

12   A. Yes.

13   Q. And the prior stop in Wisconsin?

14   A. Yes.

15           MR. REED:  I'll pass the witness.

16                    **CROSS-EXAMINATION**

17   BY MS. FRETER:

18   Q. So where are you employed at right now?

19   A. I work in the private sector for an insurance

20   company.

21   Q. Okay.  And when did you start that?

22   A. May -- I can't give you the exact date.  I

23   think it was the 22nd of 2023.

24   Q. Okay.  And did you leave the police department

25   to go to that job, or was there something in

WAID - CROSS/FRETER                    Vol. 2 - 421

1    between?

2    A.  Yes, directly to that, yes.

3    Q.  And is that job also in Wisconsin?

4    A.  Yes.

5    Q.  And so you just talked to the Government a

6    little bit about -- and I don't want to belabor

7    this but that Mr. Patel sent or Mr. Patel drove,

8    and what you're looking at when you're doing this

9    is you're looking at what the phone says, right?

10   A.  Yes.

11   Q.  You don't know who's using the phone?

12   A.  I think there are times that you might be able

13   to prove that and times you would assume that.

14   Q.  Okay.  But I mean, it's sort of a language

15   issue.  I can hand you my phone, and you can text

16   from my phone, right?

17   A.  I think that's possible.

18   Q.  Have you ever texted from someone else's

19   phone?

20   A.  Probably not since high school.

21   Q.  Okay.  Do you have kids?

22   A.  Yes.

23   Q.  Do they text?

24   A.  One does, yes.

25   Q.  Okay.  So when you're looking at these phones,

WAID - CROSS/FRETER                           Vol. 2 - 422

1    you're seeing what the phone is doing, what data

2    the phone is sending out, right?

3    A.  Yes.

4    Q.  You're not looking at who is doing the

5    sending?

6    A.  Not in live time, no.

7    Q.  Or in any time, you can't see who is pushing

8    the keys?

9    A.  No, but I think there are circumstances that

10   would help prove that the person is operating the

11   phone.

12   Q.  Well, that's an extrapolation, right?  That

13   it's somebody's phone and you can extrapolate from

14   circumstances maybe that's a person?  That's a

15   deduction, right?

16   A.  True.

17   Q.  But you don't know, right?

18   A.  I think the evidence points directly to the

19   fact that someone commonly operates their own

20   phone.

21   Q.  The names that are assigned in a phone are

22   names that the user attaches to numbers, phone

23   numbers; is that right?

24   A.  I would say it can be that way unless they are

25   obtained through maybe a different app and are

WAID - CROSS/FRETER                        Vol. 2 - 423

1  saved through that app.  That way they can be added

2  to the phone contacts in the same way; but I would

3  agree, yes, it could be changed to whatever you

4  want it to be.

5  Q.  Like, say, Big Bird 6 maybe goes with a phone

6  number, right?

7  A.  Sure.

8  Q.  Or the name can be imported?  If you import a

9  contact, sometimes that comes with it, right?

10 A.  Correct.

11 Q.  So you've talked a little bit about Cellebrite

12 Reader and end to end -- or I'm sorry, WhatsApp.

13 WhatsApp is an application that you can make phone

14 calls with, right?

15 A.  Yes.

16 Q.  And you can send text messages with?

17 A.  Yes.

18 Q.  There are other apps that also do that,

19 correct?

20 A.  Yes.

21 Q.  iMessage is one of those apps that sends

22 messages, right?

23 A.  I am an owner of an Android, so I'm not

24 extremely familiar with iMessage.

25 Q.  Okay.  And so as an owner of an Android, right,

WAID - CROSS/FRETER                    Vol. 2 - 424

1    people, rather than using iMessage, if you have an

2    Android, you often -- people use WhatsApp instead

3    of whatever messaging thing comes with the Android

4    phone, right?

5    A.  I use an app that's native to the phone.

6    Q.  You do?

7    A.  Yeah.

8    Q.  But people use -- they load WhatsApp and they

9    use it, right?

10   A.  True.  Some people do.

11   Q.  Snapchat is another messaging app that you can

12   load onto your phone, right?

13   A.  Yes.

14   Q.  And it has this thing where it deletes the

15   messages after some sort of period of time,

16   right?

17   A.  I don't have Snapchat, but I believe that's the

18   case.

19   Q.  Well, I mean, you were certified to do this

20   phone work, right?

21   A.  Uh-huh.

22   Q.  And I got to get you to say yes or no because

23   she can't take down the uh-huh.

24   A.  Sorry.  Yes.

25   Q.  It's okay.  It's hard to remember.

WAID - CROSS/FRETER                          Vol. 2 - 425

1          You have special training with phones and

2     applications that go with it, right?

3     A.  Yes.

4     Q.  Okay.  And Snapchat is an application that uses

5     text messages, right?

6     A.  I'm not that familiar with Snapchat to know

7     that answer.

8     Q.  How about Facebook instant messenger?

9     A.  Yes.

10    Q.  Do you know that?

11    A.  Yes, yes.

12    Q.  And you can send messages over Facebook in an

13    instant message or a direct message called a DM,

14    right?

15    A.  Yes.

16    Q.  And are those end-to-end protected?

17    A.  Yes.

18    Q.  Okay.  So this WhatsApp isn't like some super

19    special thing?  There's lots of apps that do this,

20    right?

21    A.  I think there are many, yeah.

22    Q.  It's just outside of your phone company

23    recording your data?  It's just contained in this

24    application?

25    A.  Correct.

WAID - CROSS/FRETER                         Vol. 2 - 426

1    Q.  And people who own the applications sometimes

2    don't want to store all that data, right?

3    A.  Yes.

4    Q.  So they delete it, right?

5    A.  Yeah, I think they just don't store it.

6    Q.  Which maybe your phone company with the SMS

7    message, maybe they don't care so much, so they

8    keep that data sometimes, right?

9    A.  Possible.

10   Q.  Okay.  So if we can go to Government's

11   Exhibit -- let's just do 122.  We were just looking

12   at this -- this is -- what is this, 122?

13   A.  It is the extraction report for Mr. Patel's

14   phone, and this is the native -- a native message

15   to the phone.

16   Q.  Okay.  And so Cellebrite -- and I think they've

17   changed their name now.  Are you familiar with

18   that?

19   A.  No.

20   Q.  Okay.  When you were doing it, it was called

21   Cellebrite.  They're a company, right?

22   A.  Yes.

23   Q.  And they put out both hardware and software; is

24   that correct?

25   A.  I believe so.

WAID - CROSS/FRETER                          Vol. 2 - 427

1   Q.  And it's their propriety stuff that they write

2   code for that they sort of oversee.  It goes with

3   their company, right?

4   A.  Yes.

5   Q.  And so that's -- it's propriety because if law

6   enforcement or somebody else uses it, maybe

7   Cellebrite is better than the other guy kind of

8   thing.  It's just a brand that goes with that

9   company, right?

10  A.  Yes.

11  Q.  It's not -- there could be a different company

12  that also puts out phone extraction software or

13  hardware, right?

14  A.  True.

15  Q.  The one you happen to use is this thing called

16  Cellebrite, right?

17  A.  Yes.

18  Q.  And you don't have access to the -- sort of the

19  back end of what their software, what their

20  algorithms look like; is that right?

21  A.  No.  I'm only trained in the use of their

22  device.

23  Q.  That's their proprietary stuff, whatever they

24  do with it, you're just using the product, right?

25  A.  Yes.

1    Q. Sort of with your Android phone, you don't have

2    access to all the backend code for that?  You're

3    just using the phone, right?

4    A. Correct.

5    Q. Okay.  And Apple users have maybe even less

6    access to the backend data than Android users do?

7    Is that fair to say?

8    A. I don't know the answer to that.

9    Q. So when you went to Cellebrite, you learned how

10   to do two things.  One was how to use the hardware,

11   which is, essentially, in a very limited way, how

12   to plug the phone into this box thing, right?

13   A. Very, very general sense, yes.

14   Q. And you learned how to make sure that the box

15   thing that you plug the phone in works, right?

16   A. Yes.

17   Q. And after you do that, it takes the box thing

18   that has their software on it, extracts, or it

19   takes out, the data from that phone, and it puts it

20   into a more usable and readable format; is that

21   right?

22   A. It doesn't remove the data from the phone.  It

23   makes a -- I guess I would say, a mirror image of

24   the data, and then yes, you use Physical Analyzer,

25   the software, to organize that in a readable

1   format.

2   Q.  Because the phone is just -- and the software

3   and the whatever, it's just 01s, right?  We can't

4   read that.  It has to -- when you look at an app or

5   whatever, it's changing those 01s into something

6   that we can read; is that right?

7   A.  Correct.

8   Q.  And so you plug the thing in, it does the

9   extraction, meaning it makes the copy, and then it

10  changes it into a usable format.  The stuff that

11  you get out is only as good as whatever the

12  Cellebrite product does; is that right?

13  A.  I think that's fair to say.

14  Q.  Okay.  You don't have any way to check the

15  Cellebrite product extracted 67 apps, right, but

16  really there's 69 on the phone?  You don't have a

17  way to check that because you're using the

18  Cellebrite product to look at the stuff on the

19  phone, right?

20  A.  I don't recall if there's a way to show what's

21  on the phone and what Cellebrite imaged.  I don't

22  recall that.

23  Q.  And more so for computers and phones, but

24  sometimes there's this space there called black

25  space or dead space or empty space where, in

WAID - CROSS/FRETER                      Vol. 2 - 430

1    theory, like there's nothing there; is that

2    right?

3    A.  I don't recall.

4    Q.  It's just like empty memory that's there?

5    A.  I don't recall that part of the training.

6    Q.  So when you use Cellebrite, you're also going

7    to use a tool as part of this reading software

8    called Cellebrite Reader; is that correct?

9    A.  Yes.

10   Q.  And in Cellebrite Reader, is it fair to say,

11   that's a software program?

12   A.  I believe -- I guess maybe I can explain a

13   little better.  So Cellebrite Physical Analyzer is

14   the initial software used to analyze the data image

15   from the phone.  Cellebrite Reader, how I've always

16   used it, is that is then a copy of what Physical

17   Analyzer did for us.  So it's just like a -- you

18   can use it in a clickable format but mainly just a

19   Reader format, PDF format or kind of like what we

20   see on the screen today.

21   Q.  You can -- in Cellebrite Reader, you can search

22   for terms?

23   A.  Yes.

24   Q.  And you can go into -- it looks more like --

25   and we see here in Government's Exhibit 112 (sic)

WAID - CROSS/FRETER                    Vol. 2 - 431

1    how these text messages or these WhatsApp messages

2    are in different colors?

3    A.  Are you talking about the one that's on the

4    screen, 122?

5    Q.  I'm sorry, 122.  They're in different colors

6    sort of like what you would see on your phone?

7    A.  Similar, yeah.

8    Q.  That's what you called native; meaning, the

9    Cellebrite software has made it kind of be in these

10   different colors, right?

11   A.  That's not what a native means.

12   Q.  Well, it's like it's -- it's like it's the

13   original part, right?  You haven't extracted it and

14   put it in a PDF or something, right?

15   A.  Native to the phone means it's using the native

16   text messaging function of the phone, I guess, for

17   lack of better words.

18   Q.  Like the original sort of?

19   A.  I guess I don't know what you mean by

20   "original," but they're not using an app.

21   Q.  Okay.  And so when you were looking at this

22   phone, you went through and you searched for

23   conversations or messages or photographs that you

24   thought were relevant to this investigation; is

25   that right?

1  A. Yes, and to be more specific, what I knew at

2  the time and, more specifically, prior to me

3  leaving law enforcement.

4  Q. Okay.  But the exhibits that we've looked at

5  aren't everything on the phone, right?

6  A. No.

7  Q. It's when you went through it, it's stuff you

8  thought was relevant or important, in part, to this

9  investigation?

10  A. At the time, yes.

11  Q. Okay.  And then within this -- like this

12  Government's Exhibit 122, it says extraction

13  report.  You decided, in looking at it, I want to

14  pick this message and then these ones that go

15  underneath it, right?

16  A. If I thought they were relevant, I would

17  have -- like I don't know if I did this in this

18  case, but what I would commonly do is I would tag

19  the items, basically, as either important or, you

20  know, relevant; and then after I've gone through

21  the extraction and tagged the items that I thought

22  were relevant or important, I would then create

23  another Reader report with just those tagged items.

24  So you're going from maybe 40,000 items in a phone

25  to 40.

1    Q.  Because we don't need every cat video, right,

2    that's on the phone?

3    A.  Correct.

4    Q.  Not relevant to this case, right?

5    A.  Correct.

6    Q.  And when you say "tagged," that's something you

7    do within the Cellebrite Reader software?  You're

8    able to tag it?

9    A.  Yes.

10   Q.  And it sort it sections it off into its own

11   little part?

12   A.  It tags it.

13   Q.  And then you move those tags into sort of

14   another location and you package it kind of -- you

15   have it do this report so that we can look at it?

16   Is that fair to say?

17   A.  I think what you're doing is you're asking the

18   software to only then to provide a report with only

19   the tagged items that you've tagged.

20   Q.  Okay.  So sort of like a sorting function?  I

21   only want to see these things in this report?

22   A.  Yes.

23   Q.  I don't want to see all the cat videos.  I'm

24   just looking at this part?

25   A.  Sure.

1    Q.  And so in this Government's Exhibit 122, if we

2    scroll down or zoom in a little bit -- or I can do

3    it -- the start time is December 1st, 2022, 9:12:46

4    a.m., and then it says UTC-6.  What is UTC-6?

5    A.  This stands for -- I believe it's something

6    similar to universal time conversion or something

7    like that.  What that means -- it's like a -- it's

8    a standardized time, and what it's saying is that

9    this was taken 6 hours before the UTC time.

10   Q.  And that's that minus 6 there?

11   A.  Yes.

12   Q.  And sometimes, depending on where it is, it may

13   say something different based on what time zone in

14   the world you are?

15   A.  Correct.  The time zone could also have to do

16   with daylight savings.

17   Q.  Right.  And so did you go through with these

18   times and figure out whether it was Central Time or

19   West Coast time or -- did you do that, or it's just

20   this 9:12 UTC-6?

21   A.  So when you open up Cellebrite Reader, there is

22   a prompt that comes up that recognizes the time

23   zone and asks you if you want to just automatically

24   use that time zone to display it, which is what we

25   did here.  So it's displaying the Central Time

1    Zone.

2    Q.  Okay.  You selected for it to be the time zone

3    in which you were looking at the data?

4    A.  Yes.

5    Q.  Central Time at that time?

6    A.  Yes.

7              MS. FRETER:  I want to go to -- we can do

8    Government's Exhibit 100.

9    BY MS. FRETER:

10   Q.  So I believe you testified that this

11   Government's Exhibit 100 is a screenshot of

12   something that was on the phone; is that right?

13   A.  Yes.

14   Q.  And so a screenshot is when you have your phone

15   and you take a picture of it and then it gets saved

16   as a picture in the phone somewhere; is that

17   right?

18   A.  Yes.

19             MS. FRETER:  And then if we could go to

20   Government's Exhibit 98, and if we could zoom in on

21   that thumbnail picture there.

22   BY MS. FRETER:

23   Q.  And do you recognize this Exhibit 98?  You

24   talked about it with the Government before.  Do you

25   recognize that?

WAID - CROSS/FRETER                    Vol. 2 - 436

1    A.  Partially.  I don't remember seeing this one

2    earlier, I guess.

3              MS. FRETER:  Okay.  Maybe if we zoom out

4    and if we scroll down.

5    BY MS. FRETER:

6    Q.  This is the one that was between Nirav India

7    and Nirav B. Patel, owner?

8    A.  Yes, now I recognize it.

9    Q.  So if we zoom in again on the thumbnail, when

10   it says group photos, there's a picture of somebody

11   there with a -- what looks like a drum kit; is that

12   right?

13   A.  Right now my screen is zoomed in on something

14   different than what you're referring to.

15             MS. FRETER:  I'm sorry.  I forgot about

16   the attachment.  The top thumbnail.

17   BY MS. FRETER:

18   Q.  And that's a picture of somebody with a -- it

19   looks like a drum set; is that right?

20   A.  Yes.

21   Q.  Do you have a date or time or anything for that

22   picture that you found in your investigation?

23   A.  I would have to look through the photos to find

24   that.  I don't recall that as -- I don't recall

25   flagging that as relevant at the time.

WAID - CROSS/FRETER                    Vol. 2 - 437

1    Q.  Okay.  And when you say "look through the

2    photos," you mean as a part of Cellebrite Reader

3    when it extracted the photos, all the other photos

4    that are in there?

5    A.  I would like to go -- in order to find this, I

6    would go to the Cellebrite Physical Analyzer first

7    to locate this photo.

8    Q.  And I made a little joke about cat videos, but

9    there could be all kinds of photos in there; is

10   that right?

11   A.  Yes, there were.

12   Q.  In the way that people take a lot of pictures

13   on their phone?

14   A.  Yes.

15   Q.  And for the most part, mostly all of those

16   photos that people take on their phone are

17   associated with the metadata that has a location on

18   it if there's GPS turned on?  Is that fair to

19   say?

20   A.  Yes.  I believe GPS has to be turned on on the

21   phone in order to capture that specific

22   information.

23   Q.  Okay.  But mostly most pictures have GPS, at

24   least on this phone, associated with them that were

25   taken?

WAID - CROSS/FRETER                        Vol. 2 - 438

1    A.  I don't know if most of them did or did not.

2    Q.  Okay.  We looked at videos that had GPS

3    associated with them; is that right?

4    A.  Yes.

5    Q.  But you didn't find GPS associated with the

6    same photos; is that true?

7    A.  I don't remember -- are you talking about like

8    when we would see an image of -- like we were

9    talking about the box and then -- are you saying

10   that image or just generally any other image?

11   Q.  Sometimes.  Well, I'll move on because we've

12   gone far afield.

13   A.  Okay.

14          MS. FRETER:  If we could have Government's

15   Exhibit 43.

16   BY MS. FRETER:

17   Q.  And then this is a picture of the box that had

18   cash money in it; is that right?

19   A.  Yes.

20   Q.  Okay.  And there's a date stamped on there of

21   November 23, 2022, 11:31 a.m.  This is -- from your

22   understanding, where did this picture come from?

23   A.  I had not seen this picture until recently.  I

24   believe this was the picture taken by victim Karen

25   Endres.

WAID - CROSS/FRETER                          Vol. 2 - 439

1    Q. And then you associated 43 with -- I think it's

2    Government's 94; is that right?

3    A. Yes.

4    Q. And there's also video that goes with that; is

5    that right?

6    A. Yes.

7    Q. And to you, those appear to be the same or very

8    similar box.  It has that little flecky marbling on

9    it; is that right?

10   A. Yes.

11   Q. And that 94 looks a little bit more brown and

12   this other picture looks a little bit more gray,

13   but it looks like it's the same box, right?

14   A. It appears to be the same box based on

15   pattern.

16   Q. And inside 43, there's a number of moneys that

17   are 50 or 100 dollar bills that are wrapped in --

18   well, they're in wrappers, right?

19   A. I don't have the image on my screen, but --

20   Q. I'm sorry.

21   A. Yes, Federal Reserve Bank wrapping on it.

22   Q. And then there's some 50s down on the bottom

23   that have, like, a paper clip on them; is that

24   correct?

25   A. Yes.

1    Q.  And the video that we watched, that box -- for

2    you, when you are searching the phone, that video

3    is the only video on the phone that has that box in

4    it, right?  Like there weren't ten more videos of

5    that box that you didn't include?

6    A.  No, I don't believe so.

7    Q.  You included the ones that you found -- or

8    we've seen those here, right?

9    A.  Yes.

10   Q.  And in that box -- it was wrapped in that

11   video, right?

12   A.  Yes, I think it was taped.

13   Q.  And you didn't find a video where somebody was

14   untaping that box; is that right?

15   A.  No, I did not.

16   Q.  In fact, of the videos that you looked at at

17   all, you didn't see any of the boxes untaped; is

18   that right?

19   A.  I don't believe so.

20   Q.  And the videos -- all of the videos with boxes

21   or the videos that you thought were relevant to

22   this case, we've seen those, right?

23   A.  I -- when I did the extraction and analyzed the

24   information, I documented the items that I believed

25   were important, I then left the Merrill Police

WAID - CROSS/FRETER                          Vol. 2 - 441

1    Department, and it's my understanding there's a lot

2    of work done since then.

3    Q.  Okay.

4    A.  That maybe more information -- relevant

5    information was taken from the phone that I did not

6    do.

7    Q.  But for your part anyway, everything that you

8    thought was relevant we've looked at?

9    A.  I believe so.

10             MS. FRETER:  And then if we could go to

11   Government's Exhibit 78.

12             THE COURT:  Counsel, how much longer do

13   you think you've got?

14             MS. FRETER:  It might be a little while,

15   Judge.

16             THE COURT:  Might have to bring you back

17   tomorrow.

18             MS. FRETER:  Sorry.

19             THE COURT:  I try to make a hard stop at

20   4:30.  If you're saying "a little while," at least

21   another 20 minutes?

22             MS. FRETER:  Probably.  Maybe.  Sorry.

23             THE COURT:  Good news, you get to spend

24   another day in beautiful downtown East St. Louis.

25             MS. FRETER:  Sorry.

WAID - CROSS/FRETER                          Vol. 2 - 442

1          THE COURT:  Center of the universe.

2          All right.  I promised the jury I will get

3     them out -- I'll try to get them out by 4:30.  We

4     went a little longer, but we will -- we will recess

5     for the night.  We'll come back tomorrow at 9 a.m.

6          (Proceedings recessed at 4:42 p.m. until

7     9:00 a.m. February 5, 2025.)

8

9               * * * * * * * * * * * *

10

11            CERTIFICATE OF COURT REPORTER

12

13      I, Erin M. Materkowski, hereby certify that

14    the foregoing is a true and correct transcript from

15    reported proceedings in the above-entitled matter.

16

17    /s/ Erin M. Materkowski          Date: 06/30/2025
      ERIN M. MATERKOWSKI, RPR, CRR
18    Official Court Reporter
      Southern District of Illinois
19    East St. Louis Division

20

21

22

23

24

25