UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,  )
                           )
        Plaintiff,         )
                           ) Cause No.
  vs.                      ) 3:23-cr-30076-SPM-1
                           ) East St. Louis, IL
NIRAV B. PATEL,            ) February 5, 2025
                           ) 9:11 a.m.
        Defendant.         )

Before the
HONORABLE JUDGE STEPHEN P. MCGYLNN

**TRANSCRIPT OF JURY TRIAL**
**VOLUME 3**


FOR PLAINTIFF:    Mr. Peter T. Reed
                  Mr. Steven D. Weinhoeft
                  United States Attorney's Office
                  9 Executive Drive
                  Fairview Heights, Illinois  62208
                  peter.reed@usdoj.gov
                  steven.weinhoeft@usdoj.gov


FOR DEFENDANT:    Ms. Kim C. Freter
                  Federal Public Defender's Office
                  650 Missouri Avenue, Suite G10A
                  East St. Louis, Illinois  62201
                  kim_freter@fd.org


INTERPRETERS:     Nita Shah and Chetan Vyas


COURT REPORTER:   Erin M. Materkowski, RPR, CRR
                  erin_materkowski@ilsd.uscourts.gov
                  750 Missouri Avenue
                  East St. Louis, IL  62201

(Proceedings taken by machine shorthand; transcript
produced by computer-aided transcription)

1                               **INDEX**

2                         **WITNESSES INDEX**

3   **PLAINTIFF'S WITNESSES**                              **PAGE**

4   MATTHEW WAID

5     Continued Cross By Ms. Freter ..................... 446

6     Redirect By Mr. Reed................................. 494

7   VIRGINIA BRYAN

8     Direct By Mr. Weinhoeft............................. 502

9     Cross By Ms. Freter ................................. 530

10   ELIZABETH SURMEIER

11     Direct By Mr. Weinhoeft............................. 532

12     Cross By Ms. Freter ................................. 554

13   DANNY ALLISON

14     Direct By Mr. Weinhoeft............................. 557

15   IAN HARDCASTLE

16     Direct By Mr. Reed.................................. 591

17     Cross By Ms. Freter ................................. 596

18     Redirect By Mr. Reed................................ 599

19     Recross By Ms. Freter ............................... 599

20   KEVIN GELTMAKER

21     Direct By Mr. Reed.................................. 601

22     Cross By Ms. Freter ................................. 605

23   ANAR BHATT

24     Direct By Mr. Reed.................................. 607

25     Cross By Ms. Freter ................................. 621

WITNESSES INDEX

**PLAINTIFF'S WITNESSES**                                      **PAGE**

JUSTIN TOWELL

    (Video Deposition) ................................... 633

CONOR HOYLAND

    Direct By Mr. Reed..................................... 636


EXHIBITS INDEX

**EXHIBITS**                                         **EVIDENCE**

Government's No. 2 ....................... 604

Government's No. 3 ....................... 594

Government's No. 61...................... 551

Government's No. 62...................... 551

Government's No. 63...................... 551

Government's No. 65...................... 506

Government's No. 66...................... 633

Government's No. 67...................... 666

Government's No. 68...................... 634

Government's No. 73...................... 641

Government's No. 74...................... 551

Government's No. 79...................... 618

Government's No. 85...................... 621

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 446

1           (In open court.)

2           (Jury present at 9:11 a.m.)

3           THE COURT:  Government, call your next

4    witness.

5           MR. REED:  Judge, I believe we're in the

6    cross-examination of --

7           THE COURT:  Oh, that's right.  I hope they

8    put you up somewhere fancy last night.

9           THE WITNESS:  It was nice.  Do I need to

10   get sworn again?

11          THE COURT:  No, you're still under oath.

12          **MATTHEW WAID, GOVERNMENT'S WITNESS,**

13                 **PREVIOUSLY SWORN,**

14            **CONTINUED CROSS-EXAMINATION**

15   BY MS. FRETER:

16   Q.  So I'm going to go to Exhibit 49, which is the

17   Government's exhibit that's already been admitted.

18          MS. FRETER:  And if we can show from this

19   computer to everybody.

20   BY MS. FRETER:

21   Q.  Can you see it, Mr. Waid?

22   A.  No, I can't see anything yet.

23          MS. FRETER:  My computer.  Sorry.

24          COURTROOM DEPUTY:  Okay.

25          (Off the record.)

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 447

1   BY MS. FRETER:

2   Q.  Can you see it now?

3   A.  Yes, I have it.

4   Q.  And so this is Government's Exhibit 49.  You

5   looked at this yesterday, right?

6   A.  Yes.

7   Q.  And remind us what this is.

8   A.  The video from the patrol squad I was driving

9   that day.

10  Q.  Okay.  So it's commonly called like a dash cam

11  video?

12  A.  Sure, uh-huh.

13  Q.  And did you have on a body camera or body

14  mic?

15  A.  So the Merrill Police Department did not have

16  body cameras, but we did have microphones that

17  synced with the cameras, but I was not wearing that

18  microphone that day to my knowledge.

19  Q.  Or a body cam?

20  A.  Correct, we didn't have them.

21  Q.  You didn't have them.

22          And so, to sort of set the scene again,

23  you had been told that there was an investigation

24  or a sting that was going to happen relative to

25  some fraud; is that right?

WAID - CONTINUED CROSS/FRETER            Vol. 3 - 448

1    A.  Very basically, that's accurate, yeah.

2    Q.  And that you were going to provide support --

3    that your role in the operation was to provide

4    support to stop a car if it had stopped near the

5    Ms. Endres' house; is that right?

6    A.  Yes.

7    Q.  And your understanding from the operation is

8    that different officers would be doing other tasks

9    and different things within the operation?

10   A.  Yes.

11   Q.  And one of those officers was going to be with

12   Ms. Endres at her house?

13   A.  Yes.

14   Q.  Okay.  And it was your understanding that

15   Ms. Endres was going to be in the house with the

16   agent in case the person showed up there?

17   A.  I don't remember if she was there or if she was

18   with Lieutenant Seubert at a different location.

19   Q.  And that wasn't part of your investigation?

20   A.  Say that --

21   Q.  That wasn't part of your role?  That was

22   somebody else's part?  Where Ms. Endres was, that

23   wasn't your job?

24   A.  Correct.

25   Q.  Your job was to stop the car?

WAID - CONTINUED CROSS/FRETER            Vol. 3 - 449

1    A.  Correct.

2    Q.  And when you're on this street, do you travel

3    for a little ways before you hit the dash cam?

4    A.  So I don't turn the dash cam on.  What happens

5    is when you turn the lights on, the dash camera

6    starts, and I believe it actually also -- well,

7    yes, according to this, the video actually starts a

8    little bit before the lights go on to give you that

9    little extra video.

10   Q.  And so from what I have on Government's Exhibit

11   49, it's at -- now it's at 000, right?

12   A.  Where are you looking at?

13   Q.  At the time reader part on, like, the bottom

14   left above --

15   A.  Oh, of this video, sure.

16   Q.  Of this view, right?

17   A.  Yes.

18   Q.  So the date up at the top is December 2nd of

19   '22?

20   A.  Yes.

21   Q.  And it's 15:37:33 seconds; is that right?

22   A.  Yes.

23   Q.  So that 3:37ish; is that right?

24   A.  Yes.

25   Q.  And so are the lights on your vehicle at this

WAID - CONTINUED CROSS/FRETER              Vol. 3 - 450

1    point, or is this where it starts recording before

2    they turn them on?

3    A.  This is where it starts recording before they

4    turn it on.  If you look at the bottom section -- I

5    guess, I don't know if you want me to get into

6    that, but I was just going to explain --

7    Q.  Sure.

8    A.  Okay.  If you look at the bottom section under

9    "trigger," you will see wireless mic is number 1,

10   emergency lights rear is number 2, emergency lights

11   front is number 3, and then there's -- like if

12   you're hitting the brakes, wireless mic active,

13   wireless mic mute.  Those last two might be the

14   lapel mic.  It might be the microphone within the

15   squad.  I'm not sure what those mean, but long

16   story short, when you see number 2 and 3 change

17   colors, that's when the lights were active.

18   Q.  Okay.  And so can you see on your screen -- you

19   can see my cursor circling, sort of, this "trigger"

20   word?

21   A.  Say that again.

22   Q.  When you look at your screen --

23   A.  Yes.

24   Q.  -- you can see my cursor circling "trigger,"

25   right?

WAID - CONTINUED CROSS/FRETER          Vol. 3 - 451

1    A.  Yes.

2    Q.  And you're talking about the little boxes that

3    are underneath that, right?

4    A.  Yes.

5    Q.  And the media player sort of covers that up a

6    little bit, but we can see what you're talking

7    about here where my cursor is, it says, "wireless

8    mic," correct?

9    A.  Yes.

10   Q.  And this number 2, "EL rear" is in a

11   highlighted type blue color; is that right?

12   A.  Yeah.

13   Q.  And that means that the EL rear, and that's the

14   emergency lights rear, that means that they're

15   on?

16   A.  No, not right now.

17   Q.  Okay.

18   A.  You'd have to play the video for the -- you'll

19   see them -- those boxes change colors as you play

20   the video; and that's -- when they change colors is

21   when they were activated.

22   Q.  So we're looking for the changing colors

23   between number 2, emergency lights rear, and number

24   3, emergency lights front --

25   A.  Correct.

WAID - CONTINUED CROSS/FRETER              Vol. 3 - 452

1    Q.  -- right?

2             I'm going to press play, and so I'm going

3    to pause right here.  This -- we can see here where

4    my cursor is, there's a car up there, and is that

5    the car that you ultimately stop that has Mr. Patel

6    in it?

7    A.  Yes.

8    Q.  And are the hazard lights flashing?

9    A.  On his vehicle?

10   Q.  Yes.

11   A.  Yes.

12   Q.  And you can see that both from the dash cam and

13   from when you're sitting in the car; is that right?

14   A.  Yes.

15   Q.  And were you alerted by somebody else in the

16   investigation, Hey, we think the car is at

17   Ms. Endres' house?

18   A.  I was alerted, I believe, by Detective Cimino

19   that the vehicle was parked out front.

20   Q.  And where is that detective located at?

21   A.  At Ms. Endres' house.

22   Q.  Okay.  That's the detective that's inside?

23   A.  Yes.

24   Q.  Okay.  Got it.  And so that detective calls you

25   or calls somebody else on the radio?  Do you

WAID - CONTINUED CROSS/FRETER              Vol. 3 - 453

1   remember how that worked?

2   A.  I don't remember how the communication

3   happened, but I just remember being told the person

4   was there.

5   Q.  Okay.  They said the car is here?

6   A.  Yes.

7   Q.  And so you left from wherever your location was

8   to go intercept the car?

9   A.  Yes.

10  Q.  And that's what we're watching?

11  A.  Yes.

12          (The video was played at this time.)

13  BY MS. FRETER:

14  Q.  And so is that little -- now that it's

15  highlighted, that number 2 EL rear --

16  A.  Yes.

17  Q.  -- that means that the emergency lights have

18  come on?

19  A.  Yes.

20  Q.  And when I say, "emergency lights," those are

21  what we think of red and blue flashing lights?

22  A.  Yes.

23  Q.  Okay.  And so I'm going to pause it.

24          The hazard lights for this car are still

25  on; is that right?

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 454

1    A. Sorry.  I wasn't looking, but I believe they

2    are.  I believe they don't stop for a little bit.

3    Q. Can you tell us, is this -- where my cursor is,

4    is this white house -- is this Ms. Endres' house?

5    A. No.  It was across the street on the right

6    side.  I don't know if you are willing to back up

7    the video just a little bit.  I can show you what,

8    I believe, is her house on the corner.

9    Q. And so when you say "corner," what do you mean

10   by that?

11   A. It's hard to describe verbally.  I guess, if

12   you were willing to play the video, I can kind of

13   stop you and tell you which one I'm looking at.

14   Q. Okay.  I'm going to pause -- not yet, right?

15   A. Not yet.

16   Q. Okay.  Not yet?

17   A. Nope.

18           Okay.  Stop there.

19   Q. Sorry.

20   A. I believe it was the house right on the right

21   side of the screen kind of where that railroad sign

22   is, like, on the corner.

23   Q. So where my cursor is, is it over -- oh, no,

24   that's too far, right?

25   A. Yeah, that's too far.

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 455

1              Okay.  Stop there.  I believe it's this

2     house with the white fence.

3     Q.  This house where I'm sort of circling at with

4     the picket fence?

5     A.  Yes.

6     Q.  And your lights are on, and then this street

7     here, this is -- this is a -- we saw it on a

8     video -- it's like a cross street, right?

9     A.  Yes.

10    Q.  And there's this crosswalk that's marked right

11    here; is that right?

12    A.  Yes.

13    Q.  And how far would you estimate between the back

14    of this car and this curb here?  Is it a full one

15    of your car lengths?  Like if you'd pulled up right

16    behind this car, would your car have been in the

17    crosswalk?

18    A.  Yes.

19    Q.  And then I'm going to switch a little bit, but

20    you talked about -- you testified when you were

21    looking at the phone information that -- and you

22    went through with the Government at around 3:30 to

23    3:37 to 3:40ish, there were both phone calls and

24    text messages going to or happening on Mr. Patel's

25    phone; is that right?

WAID - CONTINUED CROSS/FRETER              Vol. 3 - 456

1    A.  Yes, around this time, yes.

2    Q.  So based on the time stamps on the phone and

3    the time stamps on the dash cam, it's fair to say

4    that the phone inside the car at this point is

5    having both text and audio communication with the

6    outside; is that right?

7    A.  Can you say that again?

8    Q.  The phone is -- there's texts going into the

9    phone and there's phone calls happening with the

10   phone at this 15:37 mark?  Like while we're looking

11   at this, somebody is using the phone?

12   A.  If I recall correctly, we believed it was

13   likely that Mr. Patel was on the phone with another

14   person at the time I stopped the vehicle.

15   Q.  And there's also text messages coming through

16   WhatsApp at this time?

17   A.  Yes, I just don't exactly remember the times

18   offhand, but around this time frame.

19   Q.  And so you pull up behind the car, and were you

20   stopped at -- right here you're -- part of your car

21   is in the crosswalk; is that right?

22   A.  Yes.

23   Q.  Okay.  And we're looking at it.  What color

24   would you say that car is?

25   A.  It's hard to tell in the video; but if I

1   remember right, it was like a dark brown color.

2   Q.  And dark brown like this table?

3   A.  Darker than that.  It's -- yeah, it's difficult

4   to see in the video.

5   Q.  And so then the car, sort of, pulls up and then

6   it goes, sort of, back into the curb; is that

7   right?  Like it kind of pulls out and then it goes

8   back in?

9   A.  Yes.

10  Q.  And then at this same time, there is another

11  officer coming from the other direction; is that

12  right?

13  A.  Yes.

14  Q.  And we see that on the video.

15          (The video was played at this time.)

16  BY MS. FRETER:

17  Q.  So the hazard lights for the car are still on;

18  is that right?

19  A.  Yes.  I don't know if they -- it looked like

20  they stopped for a second, but maybe it was because

21  the brakes were activated.  I'm not sure.

22  Q.  Okay.  But at this point, the hazard lights are

23  still on?

24  A.  Yes.

25  Q.   And so the officer who is in the other car in

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 458

1    the front, who is that?

2    A.  I know one of them was Detective Ruleau from

3    the sheriff's office.  I believe there was a second

4    one there.  I just don't remember who that was.

5    Q.  Your best recollection is the car in front was

6    not from Merrill Police Department?

7    A.  No, I believe it was the Lincoln County

8    Sheriff's Office.

9    Q.  And then that's you right there?

10   A.  Yes.

11   Q.  And you go up to the car, you open the door,

12   and then would you say you get Mr. Patel out?

13   A.  I asked him to get out of the vehicle.

14   Q.  Okay.  So at this point your hand is on the

15   handle to the door.  Are you talking to him?

16   A.  I think that -- if I remember right, I think

17   the door was locked, and I asked for maybe it to be

18   unlocked.  There was a little delay there of me

19   being able to open the door, and then I asked him

20   to get out of the car.

21   Q.  Do you remember if you're pulling on it or you

22   don't remember?

23   A.  It looks like I might have been, yes.

24   Q.  And do you see, sort of, motion there like

25   this; is that right?

WAID - CONTINUED CROSS/FRETER          Vol. 3 - 459

1    A. Yes.

2    Q. And is it your recollection then, after you do

3    that motion, the door gets unlocked?

4    A. That makes sense.  I don't recall, but that

5    would make sense.

6    Q. That's fine.  And then you open the door, and

7    that's what we're seeing right here?

8    A. Yes.

9    Q. And then we're stopped at 15:39:03.  Do you

10   remember, are you saying anything at this point?

11   A. I asked him to get out of the car from my

12   recollection.

13   Q. And you've got your hand, sort of, on the door,

14   and you're kind of leaning in, but you're also,

15   sort of, staying back with your right hand at the

16   back just in case, right?

17   A. Yes.

18   Q. Because you never know with a traffic stop?

19   A. Yes.

20   Q. And then this officer who's coming up from the

21   right side in the vest, who is that?

22   A. That is Detective Sir.

23   Q. Okay.  And then Mr. Patel gets out of the car

24   with his hands up; is that right?

25   A. Yes.

WAID - CONTINUED CROSS/FRETER            Vol. 3 - 460

1    Q.  Did you tell him to put his hands up?

2    A.  Prior to me approaching the vehicle, there were

3    commands given for us to see his hands, and I

4    believe he was still -- still taking that order in

5    consideration, and you'll see once I get him to the

6    back of the car, I said, Hey, you can put your

7    hands on the car.

8    Q.  So when you say there were directions given to

9    put your hands up, who gave those directions?

10   A.  I don't recall if it was me, the other officers

11   in front of him or a combination thereof.  I just

12   remember that it happened.

13   Q.  Are you yelling or is it through a bullhorn or

14   how is that working?

15   A.  Just verbally, yeah, with no microphones or

16   bullhorn.

17   Q.  And when you say before you approach the car,

18   where in this sequence is that?  Like where are you

19   when you're saying, "Put your hands up"?

20   A.  Next to my patrol vehicle after I got out.

21   Q.  And I'm sorry.  It was too fast for me.  Next

22   to your patrol vehicle?

23   A.  After I had gotten out of my patrol vehicle.

24   Q.  I'm going to back up.  You tell me to stop when

25   you say, "Put your hands up."  Have you said it at

WAID - CONTINUED CROSS/FRETER          Vol. 3 - 461

1    this point?

2    A. Well, like I said, I don't remember if I said

3    it, the other detective said it, or if it was a

4    combination thereof, but it would have -- I heard

5    it, so I would have been out of the car.

6    Q. And I'm going to get you to slow down just a

7    little bit because I'm having a hard time.  We're

8    just going to slow down a little bit.  You're

9    conveying a lot of information.  So just slow down

10   just a tad.

11   A. Okay.

12   Q. What you're telling me is you don't remember

13   exactly who said, "Put your hands up"?

14   A. Yes.

15   Q. You do remember, though, that was when you were

16   still by your car?

17   A. Yes.

18   Q. Okay.  Tell me to stop when you -- when you

19   think that somebody said, "Put your hands up."

20              (The video was played at this time.)

21              THE WITNESS:  So at some point after you

22   see my patrol vehicle stop, you will see the dash

23   camera kind of jiggle.  That is likely me shutting

24   my door.  So at that point, I would have been out

25   of the vehicle, and it would have been sometime --

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 462

1   right there.

2   BY MS. FRETER:

3   Q.  There was the jiggle.  So that's when you get

4   out?

5   A.  Yes.

6   Q.  And so it's around this time somebody says,

7   "Put up your hands"?

8   A.  Yes.

9   Q.  And can you, from where you're standing, see

10  Mr. Patel in this car?

11  A.  I can see part of him.

12  Q.  Okay.  Are his hands up?

13  A.  This very second, no.

14  Q.  Do you see when he does put his hands up?

15  A.  Yes.

16  Q.  When is that?

17  A.  Between right now and the time that I decide to

18  walk into view.

19           (The video was played at this time.)

20  BY MS. FRETER:

21  Q.  Can you see him put his hands up on the camera

22  part?

23  A.  Right now on the screen, I can -- it's hard to

24  see.  There is a bit of a glare.

25  Q.  But you remember that happening from your

WAID - CONTINUED CROSS/FRETER          Vol. 3 - 463

1    memory?

2    A.  Yes.

3    Q.  Okay.  And so he comes out with his hands up.

4    Are you still talking to him at this point?

5    A.  Yes.  I think I'm asking him to go to the back

6    of the vehicle at this point.

7    Q.  And he -- it looks like from the video -- you

8    tell me if I'm wrong -- like he tries to go back

9    into the vehicle?

10   A.  Yes.

11   Q.  Is he saying anything to you at that point?

12   A.  Nothing that I recall.

13   Q.  You grab -- he is wearing a gray hoodie.  You

14   grab that hoodie, right?

15   A.  Yes.

16   Q.  In order to, sort of, get control of him to

17   make sure he doesn't go back into the car for a

18   weapon or something like that?

19   A.  Yes.

20   Q.  And when you guys go through the car and

21   through your investigation, you don't find any

22   weapons in the car?

23   A.  No, I don't believe -- I don't remember if we

24   searched the entire vehicle or not, but we did not

25   find any weapons.

WAID - CONTINUED CROSS/FRETER               Vol. 3 - 464

1    Q. You did look through the backpack later, right?

2    A. Yes, I believe so.

3    Q. Because you were trying to find his ID?

4    A. Yes.

5    Q. And there wasn't a gun or anything in there?

6    A. No.

7    Q. And also, at some point, you go into the car --

8    you personally go into the car to get the cell

9    phone; is that right?

10   A. Yes.

11   Q. And Mr. Patel gave you consent to get the

12   backpack, right?

13   A. Yes, yes.

14   Q. Because you're trying to find his ID?

15   A. Yes.

16   Q. And he said, Go look at my backpack, and you

17   guys said, Sure, I'll go get it or whatever?

18   A. Yes.

19   Q. And the same is true for the phone.  He said,

20   Go ahead and look at my phone; is that right?

21   A. He had provided consent to search his phone at

22   some point in this video, yes.

23   Q. Okay.  And through the process of both

24   retrieving the backpack and getting the phone and

25   then being there by the car, you guys don't find

WAID - CONTINUED CROSS/FRETER            Vol. 3 - 465

1    weapons?

2    A.  No.

3    Q.  And so the purpose of you grabbing his hoodie

4    and then kind of moving him is what?

5    A.  For officer safety.

6    Q.  Okay.  And can you explain that just a little

7    bit more, what you mean by that?

8    A.  To make sure that we are safe.

9    Q.  And that you have control over Mr. Patel's

10   person so that his movements, until you know more

11   about what's going on, are restricted; is that

12   right?

13   A.  Yes.

14   Q.  And so then he points to the back of the car,

15   and then you also point to the back of the car; is

16   that right?  Here, I can --

17            (The video was played at this time.)

18   BY MS. FRETER:

19   Q.  He points to the back of the car, you point to

20   the back of the car.  You have this, sort of,

21   pantomime communication.  You tell him to put his

22   hands on the car and he does so; is that right?

23   A.  Yes.

24   Q.  Do you remember if you're trying to talk to him

25   at that point?

WAID - CONTINUED CROSS/FRETER              Vol. 3 - 466

1   A.  Yeah, throughout this time I was trying --

2   basically starting in this general area, I was

3   starting to try to communicate with him.

4   Q.  Okay.  And is he trying to talk back to you?

5   A.  Yes.

6   Q.  What is he saying to you?

7   A.  The only thing that I recall him -- because

8   there was conversation about me asking him, you

9   know, where he was coming from, what he was doing

10  here, things of that nature, and he had said

11  something similar to the fact that he was coming to

12  this spot.  That is only thing I remember him

13  saying.  There was a communication issue.  I wasn't

14  understanding some of his responses.  I believe he

15  wasn't understanding some of my questions.

16  Q.  And so just in this little vignette of you

17  trying to get him out of the car safely and put him

18  in a place safely until you can figure out what's

19  going on, you're telling him go to the back of the

20  car, back of the car.  Is he saying at this point

21  anything to you?

22  A.  If he did, I don't recall what it was.

23  Q.  At this point you're not to the point of the

24  conversation yet where you're saying, "What are you

25  doing here?"  You're just trying to get him, sort

1  of, secured?

2  A.  Yes, I think, basically, at this point in the

3  video is where that conversation begins.

4  Q.  Okay.  When you said you had difficulty with

5  language or understanding, why was that?  In just

6  very basic terms, what were the issues that you

7  guys were having?

8  A.  Very bluntly, I did not know that he was able

9  to speak English.

10  Q.  Did he have a thick accent?

11  A.  Yes.

12  Q.  And the accent was such that it was -- it just

13  was difficult to understand what he was saying?

14  A.  Difficult to understand what he was saying and

15  gave an impression that he may not understand what

16  I was asking.

17  Q.  And that included basic things like, "Don't go

18  back into the car.  Go to the rear of my vehicle";

19  is that right?

20  A.  Yeah, I started using -- I started using hand

21  gestures, like, to try to communicate better rather

22  than just verbally.

23  Q.  And that process wasn't about what he was doing

24  here or something?  That was -- difficulty in

25  communication was just about very basic things

WAID - CONTINUED CROSS/FRETER            Vol. 3 - 468

1    about where to get out of the car and where to go

2    so that everybody was safe?

3    A.  Yes.

4    Q.  And then now we're at 15:39 in the video, and

5    the video started around 15:37.  Would you say that

6    that time is accurate?  Like this whole thing up to

7    where we are took about two minutes?

8    A.  Yes.

9    Q.  And then we see on the video you're talking to

10   Mr. Patel, and he's talking back to you; is that

11   right?

12   A.  Yes.

13   Q.  And you can -- you remember he was talking back

14   to you, but we can also see, like, hand movements

15   and stuff; is that right?

16   A.  Yes.

17   Q.  And then he sort of gestures and you look, and

18   everybody is just sort of trying to figure out

19   what's going on.  Is that fair to say?

20   A.  Yes.  We're trying to have a conversation about

21   what he's doing there.  At some point I believe I

22   ask him if he has an ID or driver's license.

23   Q.  Okay.  And then why do you start patting him

24   down here?

25   A.  So right around this time I'd asked him if he

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 469

1    would allow me to pat him down, and he said yes.

2    So then I patted him down for weapons.

3    Q.  And you don't find anything?

4    A.  Correct.

5    Q.  And then what do you say there?

6    A.  I patted him on the back and said hang out with

7    this guy for a minute.

8    Q.  And what's your intention to go do now?

9    A.  Obtain the driver's license.

10   Q.  Which he told you, Go ahead and get it?

11   A.  I don't know if he said it at this point or if

12   that is a little bit further in the video, but I --

13   this could be that part.

14   Q.  Okay.  I'll sort of ask it this way:  At no

15   point in your dealings with Mr. Patel did he ever

16   say, Don't go into my car?

17   A.  No.

18   Q.  And at no point did he ever say, And don't look

19   in my backpack?

20   A.  No.

21   Q.  And at no point did he ever say, Don't look at

22   my phone?

23   A.  No.

24   Q.  The communication, in whatever manner it was,

25   that he was giving to you was -- and you

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 470

1    interpreted it that way was go ahead and do all

2    those things, right?

3    A.  Yes, it was consent.

4    Q.  He never said, No, no, no, nothing like that?

5    A.  No.

6    Q.  And in the process, like, with the phone, he

7    gives you the password; is that right?

8    A.  Yes.

9    Q.  And I wasn't sure I understood.  Did it have

10   facial recognition too or just the password?

11   A.  I don't remember if it had both.  I just know

12   that a PIN number was able to unlock the phone.

13   Q.  Okay.  And at this point in the video, he's

14   sort of trying to go back into the car, and you

15   guys say, No, stay at the rear; is that right?

16   A.  Could you play the video?

17   Q.  Yeah.

18            (The video was played at this time.)

19   BY MS. FRETER:

20   Q.  There it was, right?

21   A.  So yes, it looks like there is communication

22   about where the backpack might be in the vehicle

23   and us communicating about obtaining it.

24   Q.  Because you're looking for his ID?

25   A.  Yes.

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 471

1    Q. So he kind of makes a move, and you guys say,

2    No, no, stay back there, kind of?

3    A.  It looks like that might have happened.

4    Q.  And then you point inside the car, and you have

5    some sort of communication, and then you go inside

6    the car and you get the backpack?

7    A.  Yes.

8    Q.  And then you're -- are you talking to him at

9    this point?

10   A.  Yes.  I don't exactly know what I'm asking

11   about at this point, but it looks like we are

12   talking.

13   Q.  Okay.  And then who's this gentleman that comes

14   up on the left all of the sudden?

15   A.  So that is Detective Ruleau.  That was the

16   gentleman I was talking about earlier that was in

17   the other vehicle in front of Mr. Patel.

18            THE COURT:  Can you spell that officer's

19   last name.  You're saying it fast and so I want to

20   make sure --

21            THE WITNESS:  It's R-u-l-e-a-u, Ruleau.

22            THE COURT:  Thank you.

23   BY MS. FRETER:

24   Q.  And then the other detective who's in the blue

25   shirt is saying something now and he's pointing; is

WAID - CONTINUED CROSS/FRETER              Vol. 3 - 472

1    that right?

2    A.  It looks to be that way.

3    Q.  And then at this point, before you give him the

4    backpack, have you already, sort of, looked through

5    it or felt it to make sure there's no weapons in

6    there?

7    A.  I don't remember if I did that or not.

8    Q.  Okay.  But at this point, you're not super

9    worried about it; otherwise, you wouldn't have

10   given him the backpack to look through, right?

11   A.  Right.

12   Q.  And are you having him look through the

13   backpack because he wasn't totally able to

14   articulate where the identification was?

15   A.  From my recollection, he initially believed his

16   ID was in his backpack, and we allowed him to kind

17   of look through that to get that.  That's why, I

18   believe, we were allowing him to look in those

19   pockets.

20   Q.  And then you guys let him go back into the

21   car?

22   A.  So yeah.  So if you saw earlier -- like I was

23   able to see, you know, there was nothing dangerous

24   in that front seat, and he -- somewhere right in

25   this part, he said, My ID is in my wallet, or

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 473

1    something similar to that, and he walks up and

2    retrieves it.

3    Q.  And because it's safeish -- or you feel it's

4    safe, it's more efficient to have him get it rather

5    than him trying to tell you where it is?

6    A.  Yes, especially with the communication issue.

7    Q.  Okay.  So he pulls out his wallet, and then he

8    gives you something, and that's that Illinois ID

9    that we looked at yesterday; is that right?

10   A.  Yes.

11   Q.  And you run it and you do all the things that

12   you do when you get somebody's ID; is that right?

13   A.  Yes.

14   Q.  And you also run the registration on the car;

15   is that correct?

16   A.  Yes.

17   Q.  And that registration came back to Mr. Patel?

18   A.  Yes.

19   Q.  And then we're not going to watch the whole

20   video, but you've seen this whole video; is that

21   right?

22   A.  I have seen several minutes of this video.  I

23   don't know if I've seen all 34 minutes, but I've

24   seen what I believe to be the relevant parts of the

25   video.

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 474

1    Q.  And it fairly and accurately reflected what you

2    remembered happening at the time?

3    A.  Yes.

4    Q.  And so who's this -- is that a woman in the red

5    hat?

6    A.  Yes, that is Detective Cimino who has now

7    walked from the victim's residence to the traffic

8    stop.

9    Q.  And that's the person who was inside

10   Ms. Endres' house?

11   A.  Yes.

12           THE COURT:  Can you spell her name.

13           THE WITNESS:  C-i-m-i-n-o.

14           THE COURT:  Thank you.

15   BY MS. FRETER:

16   Q.  And so I'm going to just slide forward, so

17   we're now at 15:50, and so you guys have been out

18   there for ten minutes or so, and it's cold that

19   day; is that right?

20   A.  Yes.

21   Q.  And so at this point, you guys have not

22   sufficiently concluded your scene investigation; is

23   that right?  You're not done with Mr. Patel yet?

24   A.  Correct.

25   Q.  You have some more stuff it do?

WAID - CONTINUED CROSS/FRETER              Vol. 3 - 475

1   A.  Yes.

2   Q.  And at this point you're not exactly sure how

3   long it's going to take, so you guys are going to

4   give him a coat and make him more comfortable so

5   that he's not out in the cold; is that right?

6   A.  Yes.  You're -- when you say that, I'm starting

7   to remember some things that I had forgotten about

8   this video, so yes, I do believe that happened.

9   Q.  We'll press play and see if that happens.

10            (The video was played at this time.)

11  BY MS. FRETER:

12  Q.  Who is the gentleman on the far left?

13  A.  That is Detective Ruleau.

14  Q.  The guy who was in the car.

15            And then is this you in the far left in

16  the red jacket?

17  A.  No.

18  Q.  Who's that?

19  A.  That is Detective Burkhardt from the Lincoln

20  County Sheriff's Office.  He may have been in the

21  other police vehicle in front of Mr. Patel.  It was

22  either that or he came from around the corner in a

23  different vehicle.

24  Q.  Where are you at in this moment?

25  A.  I believe I'm still in the patrol vehicle.

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 476

1    Q.  And then here's the coat?

2    A.  Yes.

3    Q.  At this point do you have the phone?

4    A.  I don't know that that's happened yet.

5    Q.  Okay.  I'll skooch forward a little bit.

6            This is you back over here on the left; is

7    that right?

8    A.  Yes.

9    Q.  You've got on the hat and glasses maybe?

10   A.  Yes.

11   Q.  At this point do you have the phone?

12   A.  I believe so.  If you look on the right side of

13   the screen, you'll see Detective Cimino in the

14   white coat.  I'm right behind her, and I believe

15   it's at this point that we are looking at the

16   phone.

17   Q.  Okay.  When you say "behind," you're closer to

18   the car or you're in -- in front toward like -- are

19   you talking to her, and we just can't see you?

20   A.  Yes.

21   Q.  Okay.

22   A.  We're right next to each other.

23   Q.  So you're not at her back?  You're at her

24   front?

25   A.  Correct.

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 477

1    Q.  And at this point you guys are looking at the

2    phone?

3    A.  Yes.

4    Q.  And then who is this gentleman here talking to

5    Mr. Patel?

6    A.  That is Lieutenant Seubert.

7    Q.  Can you spell that?

8    A.  S-e-u-b-e-r-t.

9    Q.  And you're standing, sort of, closer to the

10   camera here?  You have this "police" on the back of

11   your vest; is that right?

12   A.  Yes.

13   Q.  And Detective Sir is over here with the blue

14   shirt?

15   A.  Yes.

16   Q.  And Mr. Patel is the sort of -- shorter than

17   Detective Sir on the left?

18   A.  Yes.

19   Q.  And are you able to hear this conversation or

20   you're too far away?

21   A.  I don't remember what the context of the

22   conversation was at this point if I was able to

23   hear.

24   Q.  And you guys do some more stuff, okay, and so

25   now we're at 16:11 or so.  What's happening now?

1    A.  Generally, in this area, is, I think, we're
2    kind of having final discussions about what we want
3    to do and what's going to happen next in the
4    investigation.
5    Q.  And who's the decision maker of this crew of
6    law enforcement?
7    A.  So I don't know if there's a designated person
8    necessarily; although, one could maybe argue that
9    Lieutenant Seubert would have the ultimate decision
10   on what would happen next, but usually we have a
11   conversation collectively of maybe what the best
12   course of action is next.
13   Q.  But if somebody had to decide, it would be him
14   because he was the highest-ranking officer from
15   Merrill that was there?
16   A.  I mean, I think you could -- I think you could
17   say that; although, that maybe doesn't always
18   happen, but I think that is probably mostly
19   accurate.
20   Q.  You guys are all, like, walking back to the
21   car.  What's happening here?
22   A.  I don't know what's happening right now unless,
23   I guess, I watch what's happening.
24   Q.  And then we can see this EL rear and EL front.
25   Those are still highlighted.  So that means the

WAID - CONTINUED CROSS/FRETER          Vol. 3 - 479

1    lights are still on; is that right?

2    A.  Yes.

3    Q.  I'll skooch ahead.  Do you know where Mr. Patel

4    is at this point at 16:15?

5    A.  I don't know if I'm accurate, but thinking back

6    right now -- it's been a long time since this

7    happened, but something tells me we maybe allowed

8    him to sit in the car to stay warm.  I don't know

9    if that's accurate, but something tells me

10   that's --

11   Q.  And you guys here at 16:15 are still sort of

12   talking about what you're going to do moving

13   forward?

14   A.  Yes.  Kind of discussions about, you know, what

15   each person gained for information and kind of

16   exchanging that information amongst each other.

17   Q.  Okay.  And then this video ends at 16:22; is

18   that right?

19   A.  Yes.

20   Q.  Okay.  And that last sort of snapshot was

21   Detective Sir walking Mr. Patel back to his car; is

22   that right?

23   A.  Yes.

24   Q.  And the decision was made at that time

25   Mr. Patel was free to go and was on his way; is

WAID - CONTINUED CROSS/FRETER              Vol. 3 - 480

1    that right?

2    A.  Yes.

3    Q.  And the video stopped?

4    A.  Yes.

5    Q.  And you guys kept the phone?

6    A.  Yes.

7          MS. FRETER:  Jackie, if I could turn my

8    monitor off from the big group.  I'll just unplug

9    it.  That will work, won't it?

10         COURTROOM DEPUTY:  You're okay.  I got

11   it.

12         MS. FRETER:  I'm going to switch now to

13   Government's Exhibit 113, and if we could show this

14   to the witness and the jury.

15   BY MS. FRETER:

16   Q.  And so do you remember this, Government's

17   Exhibit 113?

18   A.  Yes.

19   Q.  And remind us what that is.

20   A.  It was an image of a $1 bill with writing on

21   it.

22   Q.  And this is an image that came off of

23   Mr. Patel's phone when you looked at it with the

24   Cellebrite?

25   A.  Yes.

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 481

1    Q.  And it would be what we call extracted via

2    their software and hardware; is that right?

3    A.  Yes.

4    Q.  This is not an image -- when you guys were

5    looking through the phone, this isn't an image that

6    you somehow captured that way; is that right?

7    A.  No, this was not from the scene of the traffic

8    stop.

9    Q.  This is an image that sometime later back in

10   your office you did with the Cellebrite to

11   extract?

12   A.  Yes.

13   Q.  I won't go through it again.  We talked all

14   about Cellebrite yesterday, right?

15   A.  Yes.

16   Q.  And so on this is written this 27120; is that

17   right?

18   A.  Yes.

19   Q.  And then this little scribble here; is that

20   correct?

21   A.  Yes.

22   Q.  And you testified -- remind us, you did drug

23   investigations; is that correct?

24   A.  Yes.

25   Q.  You didn't find any drugs in anything related

WAID - CONTINUED CROSS/FRETER          Vol. 3 - 482

1    to this car, backpack, anything like that; is that
2    right?
3    A.  No.
4    Q.  And you surmised -- you extrapolated that you
5    thought that this was a way -- these pictures of
6    money was a way for people to communicate with each
7    other; is that right?
8    A.  Yes.
9    Q.  And that's based on your drug investigations or
10   just it's your feeling or some other training?
11   Like why are you surmising that?
12   A.  I think if you look at the totality of the
13   circumstances, it was the most likely conclusion
14   based on training, previous investigations, how
15   people covertly communicate, and just our belief
16   based on those things.
17   Q.  And so you're offering an opinion; is that
18   right?
19   A.  Yes, I formed a belief.
20   Q.  I'm going to go to Government's Exhibit 119.
21   Do you remember this Exhibit 119 from yesterday?
22   A.  I remember the video.  I just don't remember
23   exactly which of the videos it was.
24   Q.  Okay.  Generally speaking, it's a package
25   that's taped up that there's a video of -- that's

WAID - CONTINUED CROSS/FRETER          Vol. 3 - 483

1    on Mr. Patel's phone; is that right?

2    A.  Yes.

3    Q.  And you extracted it the same way you extracted

4    the picture?

5    A.  Yes.

6              (The video was played at this time.)

7    BY MS. FRETER:

8    Q.  Okay.  And then in this video, the package is

9    being turned around; is that right?

10   A.  Yes.

11   Q.  And there's this number on it, 1027.  Do you

12   know what that means?

13   A.  No.

14   Q.  Do you think that this is a way to communicate

15   like this picture here that has this 21 -- 27120?

16   Do you know what this is?

17   A.  Based on how it's written and the fact that

18   it's a shipping box, I believe it likely has

19   something more to do with being associated with

20   whatever the original package came from.

21   Q.  Okay.  And that's an opinion or extrapolation

22   that you've made; is that right?

23   A.  Yes.

24   Q.  But you don't know who wrote the numbers on the

25   package?

WAID - CONTINUED CROSS/FRETER          Vol. 3 - 484

1    A.  No.

2    Q.  And the same way, you don't know who wrote

3    these numbers on this dollar bill?

4    A.  Is this the -- I guess I have a question.  Is

5    this the dollar bill that previously did not have

6    writing on it that was located in the images, or is

7    this the other one?  Because I do remember there

8    was one where we -- there was both.

9    Q.  I think that that was the one that said -- it

10   looked like maybe received or something like that.

11   I think that was --

12   A.  Yes, okay.

13   Q.  The one that ended in 89 or --

14   A.  Sure.  So when you take that in consideration

15   with the other dollar bills compared to this image,

16   and we show that there was an image of a dollar

17   bill with no writing and then a few minutes later

18   there's writing on it taken by the same phone, I

19   think it's logical to form the opinion that

20   Mr. Patel wrote that.  So then you get into this

21   image and can form the belief that it happened with

22   this one too.

23   Q.  So I'm going to break that down a little bit.

24   The Government -- and I don't have it handy.

25   They'll bring it up if they want to go back through

1    it.

2          There were pictures we saw yesterday.  It

3    is a dollar bill.  They talked about the serial

4    number on the dollar bill and those are unique to

5    money; is that right?

6    A. Yes.

7    Q.  Okay.  And it talked about the last three

8    digits, and there's a picture on the phone with no

9    writing on it, and then you found a time-stamped

10   picture just a little bit later that had writing on

11   it; is that right?

12   A.  Yes.

13   Q.  And you have formed an opinion, or you yourself

14   have extrapolated, that because the dollar bill

15   didn't have writing on it and then it did have

16   writing on it that someone who had access to the

17   phone close in time wrote on it; is that right?

18   A.  That makes the most sense, that someone wrote

19   on that within that period of time.

20   Q.  And it is your opinion that it is, in your

21   opinion, Mr. Patel; is that right?

22   A.  Yes.

23   Q.  Okay.  You don't know, though, who else was in

24   the car with him, right?

25   A.  On the day that the photos were taken?

WAID - CONTINUED CROSS/FRETER              Vol. 3 - 486

1    Q.  Yeah.

2    A.  Correct.

3    Q.  You don't know if he stopped somewhere?

4    A.  No.

5    Q.  You are extrapolating, or forming an opinion,

6    that it was him because it was on his phone; is

7    that right?

8    A.  Yes.

9    Q.  But you don't know for sure?

10   A.  But it is most logical that he was the operator

11   of his phone.

12   Q.  So true for this Exhibit 113, there's no

13   similar picture with no writing for this dollar

14   bill; is that right?

15   A.  Not to my knowledge.

16   Q.  Okay.  And you don't know who wrote 27120 on

17   it?

18   A.  No.

19   Q.  Just like with this package -- oops.  Wrong

20   one.

21           Just like with this package, you don't

22   know who wrote 1027 on it?

23   A.  Correct.

24   Q.  Is it significant to you that these are the

25   same 0127 (sic) numbers with both the package and

WAID - CONTINUED CROSS/FRETER              Vol. 3 - 487

1    the dollar?

2    A.  They're not the same numbers and they're

3    written differently with different ink, and you

4    commonly find writing on packages not on dollar

5    bills.

6    Q.  Okay.  And so my question was:  Was it

7    significant to you that 1027 and 27120 are both on

8    this package and on this dollar bill?

9    A.  Are you asking me if they're both significant

10   to me?

11   Q.  Yes.  The fact that it's some combination of

12   1's, 0's, 2's and 7's on both the package and both

13   the dollar bill.  Is that significant to you?

14   A.  I would say that the writing on the dollar bill

15   is more significant than the writing on the

16   package.  I don't know how else to answer that.

17          MS. FRETER:  Jackie, if we could switch

18   back to the Government's computer.  If I could have

19   Exhibit No. 78, please.

20   BY MS. FRETER:

21   Q.  Okay.  Can you see Exhibit 78?

22   A.  Yes.

23   Q.  And remind us what this is.

24   A.  This is an Application for Visitor Visa from

25   Canada.

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 488

1    Q.  And this is -- do you remember how many pages

2    long this is?

3    A.  I don't.

4    Q.  If we could scroll to --

5    A.  Looks like 6 possibly.

6    Q.  Six?

7    A.  Maybe not.

8    Q.  It says 55 up there.  Is that 55?

9    A.  I'm guessing so.

10   Q.  Is it 55 pages?  Does that sound right?

11   A.  Yes, on the first page, I apologize, it says

12   Page 1 of 6 at the top, but I think that's just for

13   the application part.

14   Q.  If we click through 1, 2, 3, down to page 7,

15   okay, and then to page 8 and then page 9.  So this

16   goes on for a while.  This entire document, this

17   entire Exhibit 78 is 55 pages; is that right?

18   A.  Yes.

19   Q.  And this, again, was something that you

20   extracted from the phone?

21   A.  Yes.

22   Q.  Using the Cellebrite?

23   A.  Yes.

24   Q.  Was this contained in what flavor of format?

25   When I say that, does that make sense or not

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 489

1    really?

2    A.  No, but I think I know what you mean.

3    Q.  So let me see if I can clear it up.  There's

4    different formats that stuff can be in.  JPEG, for

5    example; is that right?

6    A.  Yes.

7    Q.  And that usually is pictures?

8    A.  Yes.

9    Q.  Or PDF, which stands for portable document

10   something with an F, right, which we all use a lot?

11   It's usually used for more written stuff?  Is that

12   fair to say?

13   A.  Yes.

14   Q.  You can have pictures it in though?

15   A.  Yes.

16   Q.  The PDF or the JPEG has to do with some -- just

17   the electronic format of the thing; is that

18   right?

19   A.  I don't know what the "thing" is, but --

20   Q.  Whatever you're --

21   A.  -- electronic format of the item you're looking

22   at.

23   Q.  Item, right.  And so I said "flavor," right?

24   What type of thing, what flavor of item was this

25   Exhibit 78 in the phone?

1   A.  Without reviewing the download, I don't know,

2   but it appears to be, at face value, a PDF version

3   of a document.

4   Q.  And was it all contained in one document, all

5   55 pages together in one PDF, or was it split up

6   over several parts?

7   A.  I don't remember that.  I believe it was all

8   one document.

9           MS. FRETER:  And if we could go back to

10   page 1, please.

11   BY MS. FRETER:

12   Q.  At the bottom there when it says date, it says

13   2010, dash, 01, dash, 23.  Do you see that?  It's

14   will --

15   A.  In Box 10 all the way to the right?

16   Q.  Yes.

17   A.  Yes.

18   Q.  Do you know what that references?

19   A.  If you'd zoom out, I believe it had to do with

20   married status.

21   Q.  Okay.  And then the date of birth, up there, is

22   5-30-1980; is that right?

23   A.  Yes.

24   Q.  And then this is for a visitor visa to Canada;

25   is that correct?

1    A.  Yes.

2              MS. FRETER:  And if you could go to page

3    2.

4    BY MS. FRETER:

5    Q.  This appears to be page 2 of that document; is

6    that right?

7    A.  I think so, yes.  Yes.

8              MS. FRETER:  And then page 3 -- oh, wait.

9    I want to stop for just a second.

10   BY MS. FRETER:

11   Q.  In the middle here where it says contact

12   information, there's a postal code, and then it

13   says District, Gujarat.  Do you know what that is?

14   District, Gujarat, does that have any meaning to

15   you?

16   A.  No.

17             MS. FRETER:  If we could go to page 3.

18   BY MS. FRETER:

19   Q.  And then this is another page for this?  It's

20   in the same document; is that right?  Same Canadian

21   application for visa; is that correct?

22   A.  Yes.

23             MR. REED:  And page 4 and then page 5.

24   BY MS. FRETER:

25   Q.  Okay.  Down here -- and where it says date, it

WAID - CONTINUED CROSS/FRETER                Vol. 3 - 492

1    says, 2019-12-20; is that right?

2    A. Yes.

3    Q. And other places than the United States

4    sometimes put the year first; is that right?

5    A. I've seen that, yes, different formats.

6    Q. And then the month and then the day?

7    A. Yes.

8    Q. And in the U.S., usually we put the month first

9    and then the day and then the year; is that

10   right?

11   A. Yes.

12   Q. And in this case, it specifies "year, month,

13   day" on the form there?

14   A. Yes.

15   Q. And so the year would be 2019; is that right?

16   A. Yes.

17   Q. Okay.  And there's no signature on this

18   application; is that correct?

19   A. Correct.

20   Q. You don't know who filled out this

21   application?

22   A. I can't say who filled it out, no.

23   Q. And it's also typewritten; is that correct?

24   A. Yes.

25          MS. FRETER:  And then if you could scroll

WAID - CONTINUED CROSS/FRETER            Vol. 3 - 493

1    down one more page.  I'm sorry.  One more.

2    BY MS. FRETER:

3    Q.  And then this is page, I think, 8 of the

4    document.  Do you know what this is?

5    A.  It says Application for Temporary Residence at

6    the top.

7    Q.  And, again, for Canada; is that correct?

8    A.  Yes.

9    Q.  And all of the documents contained in this

10   page -- this 55-page document all related to

11   Canada; is that right?

12   A.  In the -- yeah, the application part, I think

13   there were some additional attachments, but yes.

14   Q.  And in looking at this, there was no signature

15   on it; is that correct?

16   A.  I don't recall seeing a signature.

17   Q.  And there was no other date other than 2019 in

18   terms of, like, a submission date?  That was the

19   last date on this?

20   A.  From what you've shown me, yes.  I don't

21   remember seeing if there were any other dates on

22   the document.

23        MS. FRETER:  Okay.  I don't have anything

24   further.

25        THE COURT:  Okay.

WAID - REDIRECT/REED                          Vol. 3 - 494

1          MR. REED:  Just briefly, Judge.

2              **REDIRECT EXAMINATION**

3    BY MR. REED:

4    Q.  Good morning, Detective Waid.

5    A.  Good morning.

6    Q.  Yesterday do you recall defense counsel asking

7    you about the Cellebrite program?

8    A.  Yes.

9    Q.  Is that commonly used in police departments?

10   A.  Yes.

11   Q.  Across the country as far as you know?

12   A.  Yes.

13   Q.  It's kind of the gold standard?

14   A.  Yes.  I would say it's most likely the only one

15   used in my area if not most of the country.

16   Q.  Next, yesterday defense counsel showed you a

17   picture of Karen Endres' first box, the one with

18   the speckled pattern on the outside?

19   A.  Yes, are you referring to the one that had the

20   money in the box?

21   Q.  Yes, sir.

22   A.  Yes.

23   Q.  And then showed you a picture of the same box

24   in the car?

25   A.  Yes.

WAID - REDIRECT/REED                          Vol. 3 - 495

1    Q.  And suggested that the tone of color could be

2    interpreted as being slightly different?

3    A.  Yes.

4              MR. REED:  Could we look briefly at

5    Exhibit 95.

6    BY MR. REED:

7    Q.  Okay.  Same box right here?

8    A.  Yes.

9    Q.  Okay.  It has Karen Endres' name on the top?

10   A.  Yes.

11   Q.  And this was created on November 23rd?

12   A.  I don't remember the day this was created

13   compared to the other videos.

14   Q.  That's okay.

15             MR. REED:  And we're finished with this.

16   If we can look at 96.

17   BY MR. REED:

18   Q.  All right.  This is the report with the

19   metadata.

20             MR. REED:  Can we go down to page 6,

21   please, and Box No. 3?

22   BY MR. REED:

23   A.  Okay.  Yes.

24   Q.  This is the video we just watched?

25   A.  Yes.

WAID - REDIRECT/REED                         Vol. 3 - 496

1    Q.  Dated November 23rd?

2    A.  Yes.

3              MR. REED:  Can we look at Government's

4    Exhibit 43, I believe it is.

5    BY MR. REED:

6    Q.  All right.  These are the pictures of the box

7    also dated November 23rd?

8    A.  Yes.

9    Q.  Okay.  Thank you.

10             This morning defense counsel asked you a

11   number of questions about that dash cam video.  Do

12   you recall that?

13   A.  Yes.

14   Q.  And you indicated that when you walked up,

15   initially you had some difficulty understanding

16   him?

17   A.  Mr. Patel, yes.

18   Q.  But you asked him to put his hands up and he

19   did?

20   A.  Yes.

21   Q.  You asked him to get out of the car and he

22   did?

23   A.  Yes.

24   Q.  You asked him about his ID and he understood

25   that?

1   A.  Yeah, he gave directions on where it could be

2   and -- yes.

3   Q.  He told you it was in the backpack?

4   A.  Yes.

5   Q.  And then he went and got his wallet?

6   A.  Yes.

7   Q.  And then at that point you get in the car,

8   right?

9   A.  In my car?

10  Q.  To your car to run the ID?

11  A.  Yes.

12  Q.  So there was a large chunk of time I think that

13  we skipped over when we watched it this morning,

14  but you're in the car for a while; is that

15  accurate?

16  A.  Yes.

17  Q.  Okay.  And during that time is Detective Sir

18  talking to Mr. Patel?

19  A.  Yes.

20  Q.  And it's a few minutes down the road, but

21  Detective Cimino walks up a little later?

22  A.  Yes.  Later on, yes.

23  Q.  So there is a while when Detective Sir is

24  talking to Mr. Patel while you're in the vehicle?

25  A.  Yes.

WAID - REDIRECT/REED                          Vol. 3 - 498

1              MR. REED:  All right.  Could we look at --
2    let's pull up 96 again.  Go down -- I think it's
3    going to be page 3.  If we can just scroll down.
4    Keep going.  All right.  Stop right here.
5    BY MR. REED:
6    Q.  Okay.  Do you recall defense counsel asking
7    about the writing on the dollar bills?
8    A.  Yes.
9              MR. REED:  On this sheet, Sandra, if you
10   can go down to Box 11, please.
11   BY MR. REED:
12   Q.  Box 11, do you see that?
13   A.  Yes.
14   Q.  All these pictures, when you look at the name,
15   they're in sequential order.  This is IMG361; is
16   that correct?
17   A.  Yes.
18   Q.  And this is the picture of the dollar bill with
19   no writing on it; is that correct?
20   A.  Yes.
21   Q.  When was this taken?
22   A.  12-2 -- excuse me.  11-24-2022 at 1:53 p.m.
23             MR. REED:  If we can go back to the main
24   page, and if we can go up to Number 10.
25   BY MR. REED:

WAID - REDIRECT/REED                        Vol. 3 - 499

1    Q.  This is the next one.  What is the name of this
2    file?
3    A.  IMG362.
4    Q.  So again, it's in the same order?
5    A.  Yes.
6    Q.  And when was this photo taken?
7    A.  11-24-2022 at 1:56 p.m.
8    Q.  Three minutes later?
9    A.  Yes.
10   Q.  And she asked whether you surmised that these
11   photos were taken by someone who was present when
12   the handwriting was put on the bill.  Do you
13   remember her asking you about that?
14   A.  Yes.
15   Q.  Why do you make that inference?
16   A.  Why do I make the --
17   Q.  The inference that someone must have been there
18   to take both of these pictures?
19   A.  I believed it was likely the same person that
20   took the same pictures.
21   Q.  Took both pictures?
22   A.  Both pictures, yes.
23   Q.  And why do you think it's the same person?
24   A.  Because they're taking a picture of the same
25   thing once without writing, once with, and I don't

WAID - REDIRECT/REED                    Vol. 3 - 500

1    know why that would be someone different.

2    Q.  Okay.  And the file names, the fact that these

3    numbers are in sequential order, what does that

4    tell you?

5    A.  That they were taken one right after another

6    with no other photos taken in between.

7    Q.  Okay.  What about what device they were taken

8    with?

9    A.  That would -- yes, that would also have

10   information about, you know, the same phone or not,

11   and I guess I wasn't looking at that part, but you

12   can see in the path on the type of device it was

13   taken with.

14   Q.  Okay.  And what device was it taken with?

15   A.  An iPhone.

16   Q.  Same device with all the other photos we looked

17   at?

18   A.  Yes, to my knowledge.

19   Q.  And that's why they're in sequential order.

20   It's 361, 362, 363, 364.  They keep going up?

21   A.  Correct.

22   Q.  So when you surmise that someone must have been

23   present when the handwriting was put on the bill,

24   it's because the phone was present?

25   A.  Yes.

WAID - REDIRECT/REED                          Vol. 3 - 501

1            MS. FRETER:  I'm sorry.  I didn't hear

2       the --

3       BY MR. REED:

4       Q.  When you surmise that the person who took the

5       picture must have been present when the handwriting

6       was put on the bill, it's because the phone was

7       present?

8       A.  Yes.

9       Q.  To take the picture?

10      A.  Yes.

11      Q.  Looking back at this, you mentioned that the

12      path says iPhone mobile media.  Do you see that?

13      What kind of phone was this that Mr. Patel had?

14      A.  An Apple iPhone.

15            MR. REED:  No further questions.

16            MS. FRETER:  I don't have anything

17      further.

18            THE COURT:  All right.  Let's take a

19      five-minute recess.  You may step down, sir.

20            THE WITNESS:  Thank you.

21            (Witness excused.)

22            (Recess at 10:15 a.m. until 10:24 a.m.)

23            (Jury present.)

24            THE COURT:  Call your next witness.

25            MR. WEINHOEFT:  Thank you, Your Honor.

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 502

1   The Government calls Virginia Bryan.

2           COURTROOM DEPUTY:  Raise your right hand.

3           (Witness sworn.)

4           COURTROOM DEPUTY:  Speak into the

5   microphone for me.  Pull that closer to you.

6           THE WITNESS:  Okay.

7           COURTROOM DEPUTY:  Yes.

8           THE WITNESS:  Yes.

9           COURTROOM DEPUTY:  State your full name

10  and spell your last name for the court reporter.

11          THE WITNESS:  Okay.  I am Virginia

12  Bryan.

13          COURTROOM DEPUTY:  Spell the last name.

14          THE WITNESS:  And at this point, I'm still

15  Virginia Bryan, okay, so --

16          THE COURT:  All right.  I know you're a

17  little nervous.

18          MR. WEINHOEFT:  Yeah.

19          THE COURT:  Understandable.  If you need a

20  break, let us know.  If there's a question that's

21  confusing, let us know.  We can have it reasked.

22  Okay.  And you spell your last name B-r-y-a-n-t

23  (sic).  Okay.

24          **VIRGINIA BRYAN, GOVERNMENT'S WITNESS,**

25                  **DIRECT EXAMINATION**

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 503

1   BY MR. WEINHOEFT:

2   Q.  Good morning, Virginia.  How are you?

3   A.  I'm okay.

4   Q.  A little nervous?

5   A.  Always maybe a little nervous, you know, just

6   standing there and doing things and --

7   Q.  Okay.

8   A.  -- I think the big difference is that I was

9   very young when all of this started and

10   misunderstood all of the --

11   Q.  It's okay.  Virginia, if you can pull that

12   microphone a little closer to you, and I'll ask a

13   couple questions, okay?

14   A.  Okay.

15          THE COURT:  And what we'll do is so that

16   we make sure we get this right, he's going to ask

17   you a question, you listen to his question and

18   answer that question.  Okay?  Then he'll move to

19   the next question, and so it will move smoother

20   that way, and that way I make sure our court

21   reporter gets everything down, okay?

22          THE WITNESS:  Okay.  The first

23   thing that's --

24          THE COURT:  Hold on.  Let him ask you a

25   question.

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 504

1    BY MR. WEINHOEFT:

2    Q.  I'll get you started, okay, so I'll just ask

3    you the questions and just listen.  If you don't

4    understand what I'm asking or you need me to

5    clarify it, you just let me know, okay?

6    A.  Okay.

7    Q.  All right.  Tell us a little bit about your

8    background.

9    A.  Well, I was -- had come back from the time when

10   I was in Hawaii, and so this was coming back, and

11   the first thing I saw was something that said I was

12   owing money to -- because everything was not

13   perfect and --

14   Q.  Okay.  If I can ask you a question about that.

15   A.  Yeah.

16   Q.  So you got a message saying that you owed

17   money?

18   A.  Yes.

19   Q.  Do you remember where that message came from?

20   A.  Well, that came from someone who had found

21   data, and everything that was supposed to be there

22   and that I owed money, and that was the one time

23   that I looked at that.  There were some things that

24   said, Well, you have to do this.  There has to be

25   money that you put in and things like that.

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 505

1    Q.  Okay.  So let's talk about when they first --
2    when you got a message telling you that you owed
3    money, did that come on your phone?
4    A.  It was not all from phone, but that's the way
5    it turned out, but this was others also saying that
6    if I did not do that, I would be owing money too.
7    Q.  Okay.  So you knew you were going to -- that
8    there was a problem with money?
9    A.  Yes.
10   Q.  And so there were some communications on your
11   phone, right?
12   A.  Yes.
13   Q.  And were there some also on your email?
14   A.  Yes.
15   Q.  Okay.  And do you remember when you got
16   messages telling you that there was a problem with
17   your money, who did you think you were getting
18   those messages from?
19   A.  Well, the first place all of that seemed to be
20   real and everything like that, that I really did
21   owe that and I believed it at the time because
22   there was documents and everything telling me how
23   much that was.
24   Q.  Okay.  Well, let's just go ahead and go to the
25   document that you just referenced.

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 506

1          MR. WEINHOEFT:  If we could see -- if the

2    witness could see, please, Government's Exhibit No.

3    65.

4    BY MR. WEINHOEFT:

5    Q.  Virginia, if I can ask you to look at your

6    screen there, there's going to be a copy of a

7    letter that I'm going to ask you if you recognize.

8          THE COURT:  Has it already been admitted?

9          MR. WEINHOEFT:  No.

10         THE COURT:  Okay.  Is there going to be

11   any objection to this?

12         MS. FRETER:  No, Your Honor.

13         MR. WEINHOEFT:  Can I move for admission

14   of 65?

15         THE COURT:  All right.  It's admitted and

16   you can broadcast to the jury.

17         (Government's Exhibit No. 65 was received

18   in evidence.)

19         MR. WEINHOEFT:  If we can publish 65

20   then.

21   BY MR. WEINHOEFT:

22   Q.  Okay.  Virginia, can you see your screen

23   there?

24   A.  Yes.

25   Q.  And if I could ask you to talk right into that

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 507

1    microphone.

2            Does that letter look familiar?

3    A.  That -- once I had all of the various things

4    that were in where it was and documents and

5    everything, I had no idea at that time how to do

6    that, and I did my best in order to look at that.

7    Q.  I'm sure you did.

8            Looking at the top of 65 there on that

9    screen right there, is that the letter that you got

10   that -- when they were talking with you about your

11   money?

12   A.  Yes.

13   Q.  Okay.  And who did you think this letter came

14   from; and if I could ask you to make sure you talk

15   right into that microphone for me.

16   A.  Well, because of the documents that I did get

17   and things like that, I was really looking for how

18   much money I needed to do and tried to do all of

19   that.

20   Q.  Okay.  So when you got this letter here, this

21   Number 65, for example, did you think you were

22   getting a letter from the Government?

23   A.  Yes.

24   Q.  Okay.  And were you talking with anybody on the

25   phone that told you he was a government agent and

BRYAN - DIRECT/WEINHOEFT                 Vol. 3 - 508

1    was telling you that you needed to keep your money

2    safe?

3    A.  Yes.

4    Q.  If you can tell us a little bit about some of

5    those conversations and how that began.

6    A.  Well, a lot of that was because I did not

7    understand how this would be done, but it was

8    appointed, and everything that I was told, that it

9    was the Government, and so this was now looking for

10   how I would deal with that.

11   Q.  Okay.  And if we could go to page 3, and this

12   is the second letter that I think you got.  I'm

13   going to ask you if you recognize that letter.  Is

14   this another letter that you got on your email or

15   on your phone from the person who told you he was

16   with the Government?

17   A.  Yes.

18          MR. WEINHOEFT:  Okay.  And Sandra, if we

19   can blow up in that third paragraph, first

20   sentence.

21   BY MR. WEINHOEFT:

22   Q.  In that letter did they tell you in writing

23   that you need to cooperate with the authorities?

24   Do you see that written there, Virginia?

25   A.  Yes, I do.

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 509

1    Q.  Okay.  Now the person that you were talking

2    with, did he tell you the same thing, that you had

3    to pay money back and that you were required to

4    cooperate?

5    A.  Yes.

6    Q.  And did you believe him?

7    A.  Yes.

8    Q.  Okay.  When they first tried to get you to pay

9    money back, and they -- I guess, when they first

10   got some of your money, do you remember putting

11   some money into some machines?

12   A.  Yes.

13   Q.  Okay.  And if I could have you talk right into

14   that microphone.

15   A.  Okay.  Yes.

16   Q.  You can move that, too, if you'd like.  If you

17   want to slide that to make it easier, you go right

18   ahead, okay?

19   A.  Okay.

20   Q.  So when -- and do you remember the person who

21   called you, did he call himself Timothy, the person

22   who said he was a government agent?

23   A.  Yes.

24   Q.  How often would Timothy call you?

25   A.  He did do that as long as he could because he

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 510

1    said that that was what was necessary, but I had no

2    idea how I would put that money in at the point,

3    and he made lots of conversation with me that I had

4    to do that.

5    Q.  Right.  This was something he told you you had

6    to do?  You didn't have a choice, right?

7    A.  That's right, and that determined that I had to

8    figure out how to pay that.

9    Q.  Okay.  And did Timothy tell you that he wanted

10   you to take money out of the bank and put it into a

11   machine?

12   A.  Yes.

13   Q.  Okay.  And tell us a little bit about that.

14   Had you ever used something called a Bitcoin

15   machine before?

16   A.  No.

17   Q.  Virginia, do you know what Bitcoin even is?

18   A.  I do know a little bit more about it because it

19   was there all the time, and I did take money out to

20   do that and was then chose -- shown how to put it

21   into Bitcoins and stuff like that.

22   Q.  Okay.

23   A.  I had never done -- I had talked to one person

24   slightly about what it was, what it would do, but

25   that was all that was said, and the rest of it, I

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 511

1    had to figure out and be correct.

2    Q.  All right.  So it's safe to say before you

3    spoke to Agent Timothy, you had never used Bitcoin

4    before?

5    A.  I had never done that.  I didn't know really --

6    well, I knew that that was, you know, something

7    that people did, but I only got something that sort

8    of told me how to sort of not do anything but just

9    do it the way it should be, and so -- and --

10   Q.  Did this Agent Timothy who was calling you try

11   to get you to set up something called a wallet to

12   hold Bitcoin -- to hold your money in?

13   A.  Yes.

14   Q.  Okay.  And did he have to help you get that set

15   up?

16   A.  The first time, yes.

17   Q.  Okay.  Did you send him a picture of your

18   driver's license, for example?

19   A.  I had to do everything from all of my -- what I

20   was -- where -- you know, my driver's license, all

21   kinds of other things in order to do that.

22   Q.  Okay.  And so would you, like, take a picture

23   on your phone and send those to this Agent

24   Timothy?

25   A.  Well, yes.  They were all there in his, and

BRYAN - DIRECT/WEINHOEFT                 Vol. 3 - 512

1   so --

2   Q.  Then after your Bitcoin wallet got set up, did

3   you get text messages and emails that showed that

4   was set up, that you could now use that wallet?

5   A.  Yeah.

6   Q.  Okay.  You got text messages and knew you could

7   go to the machines now?

8   A.  I had to, yes.

9   Q.  Okay.  And so let's talk about -- did you ever

10  go to any machines and put some of your money into

11  those Bitcoin machines?

12  A.  Okay.  After I had started that and there was

13  more people telling me that that was -- you could

14  do it, but it was not going to be your money and

15  everything like that, and the only thing I managed

16  to do was go in and actually figure out how I could

17  put some things in that, and that was, again, the

18  very documents that I was being given and things

19  like that.

20  Q.  Right.  And that's how to get things set up to

21  begin with, right?

22  A.  Yes, it was.

23  Q.  Okay.  Once everything was set up, did this

24  Agent Timothy talk to you about taking your money

25  out of the bank in cash and putting cash into the

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 513

1   machines?

2   A.  Of course.

3   Q.  All right.  Did you know where to find a

4   Bitcoin machine?

5   A.  It took me a long time to find it.

6   Q.  How did you find one?

7   A.  I was told how to find that, but it did take a

8   little while because I had really no idea what I

9   was up to.  What was I to find where it was?  Now,

10  where it was, at the beginning of all of this, was

11  very hard to find that.

12  Q.  And how were you able -- and this was -- did

13  you go to a business called Farm Fresh in East

14  Alton?  Is that where your machine was at?

15  A.  Yeah, yes.

16  Q.  How did you find that there was a machine at

17  the Farm Fresh in East Alton?

18  A.  It took several times because at the point

19  where I was to find this, you could give me a way

20  to drive, but at the beginning, there was enough

21  various things that did not show where you even had

22  to start, and so it took me a very long drive the

23  first two times and finally managed to find the

24  right road to go, so that wasn't perfect the first

25  time.  I could go in.  I could try to get out to

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 514

1    find it, and I had to turn around, go ahead, try to

2    figure out everything and eventually found it.

3    Q.  But the actual machine, you found that because

4    Timothy told you where to go on the phone, right?

5    A.  Yes.

6    Q.  Okay.  And did he also send you that address of

7    telling you where to go?

8    A.  Yes.

9    Q.  All right.  Did he ask you where your bank

10   accounts were held?

11   A.  Well, yes.

12   Q.  And did you tell him where your bank -- your

13   money was in the bank?

14   A.  Yes.

15   Q.  And so when he told you you had to take money

16   out of the bank, did you do what he said and go to

17   the bank to withdraw money?

18   A.  Yes.

19   Q.  Now, tell us, were you on the phone, literally,

20   with this Agent Timothy while you're inside the

21   bank?

22   A.  Well, yes, I was looking for things to do that,

23   and the first time, obviously, I had collected

24   money from banks.

25   Q.  And he kept you on the phone, actually, while

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 515

1    you were inside the bank, right?

2    A.  Yes, especially the first time.

3    Q.  And that was to make sure you actually withdrew

4    your money?

5    A.  Yes.

6    Q.  All right.  And so how many times -- or do you

7    remember withdrawing money more than once from the

8    bank?

9    A.  Yes.

10   Q.  Do you think you took money out of your bank

11   maybe about five times?

12   A.  Yes.

13   Q.  All right.  And at the time you were banking at

14   Busey Bank; is that correct?

15   A.  Yes.

16   Q.  And do you remember changing banks in the

17   middle of all -- in the middle of all of this?

18   A.  A lot of that I did use different ones because

19   there were some that I really didn't understand

20   that were willing to give me that much money to do

21   that, and so there was some talking to things and

22   collecting my own money in order to do things.

23   Q.  Okay.  So when you were at Busey Bank, you

24   would withdraw, you know, 10, 12 and $15,000 at a

25   time; is that right?

BRYAN - DIRECT/WEINHOEFT                Vol. 3 - 516

1    A.  Yes.

2    Q.  Okay.  And when you were doing that, talking to

3    the teller to get that cash, you were actually on

4    the phone with Timothy when you were doing that; is

5    that right?

6    A.  Yes, I did.

7    Q.  And do you remember the tellers talking to you

8    or questioning you about what you're doing?

9    A.  Not -- not as much.  I eventually figured out I

10   didn't have to listen to him.  I had already

11   figured out how to do my own.

12   Q.  Okay.  I know you kind of figured that out a

13   little bit later, but before we get to that, was

14   Timothy unhappy with the way the tellers were

15   asking you questions?

16   A.  Yes.

17   Q.  Tell us about that.

18   A.  I was supposed to be able to figure everything

19   out just by what he was talking about, and I could

20   not always do that because he was arguing one way

21   and I was looking at all the things I needed to put

22   in there, and so it was partly what I was doing

23   also.

24   Q.  Okay.  And so did you wind up taking all of

25   your money out of Busey Bank and putting it into

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 517

1    Chase Bank?

2    A.  Not all of the money, but --

3    Q.  Okay.  And then did you later change from Chase

4    Bank to U.S. Bank kind of all in this short period

5    of time?

6    A.  Yes.

7    Q.  Okay.  And a lot of that was because Timothy

8    was unhappy with the questions you were getting?

9    A.  Yes.

10    Q.  Okay.  When all of this was going on, do you

11    think you took out money to put into the Bitcoin

12    machine about five different times?  That's your

13    best guess?

14    A.  Yes.

15    Q.  All right.  And do you have a daughter?

16    A.  Yeah.

17    Q.  And what's her name?

18    A.  What?

19    Q.  What's your daughter's name?

20    A.  Beth.

21    Q.  Beth, okay.  And Beth is sitting right outside

22    for you, right?

23    A.  Yes.

24    Q.  Okay.  Did you tell Beth what was happening,

25    that this government agent was telling you that you

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 518

1    owed money and you had to pay money and was sending

2    you to the bank?  Did you tell Beth about this?

3    A.  By the time I talked to her about it,

4    obviously, she was unhappy.

5    Q.  I bet.

6    A.  And she got asked to see if this was a proper

7    way to do things.

8              MR. WEINHOEFT:  Okay.  And if we could

9    display Government 65, page 2, first full

10   paragraph.

11   BY MR. WEINHOEFT:

12   Q.  And in that letter you got that you thought

13   that came from the government, did it tell you that

14   if you disclose this matter to any person it will

15   directly or indirectly make them, an innocent

16   person, a part of the investigation and the

17   government agencies will have to start an

18   investigation on them too?  Did you get a letter

19   telling you that?

20   A.  I don't recall getting a letter like that.  It

21   was talk -- it was mainly talking to my daughter.

22   Q.  Well, before you told Beth about what was

23   happening -- you didn't tell her for quite a while,

24   right?

25   A.  That's right.

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 519

1    Q.  Okay.  And is that because you were told not to

2    tell anyone?

3    A.  Yeah.

4    Q.  Okay.  And tell us about -- tell us about that,

5    how you were told not to tell anyone?

6    A.  Yes, and --

7    Q.  Did he tell you that by phone, by text, by

8    message, by conversation?  Just the best you can do

9    for us.

10   A.  Yes.

11   Q.  Mostly by conversation?

12   A.  Yeah.

13   Q.  All right.  Let's get to -- at some point you

14   kind of started to figure out there was a problem,

15   right?

16   A.  Yes.

17   Q.  And you decided you didn't want to give them

18   any more money into the Bitcoin; is that correct?

19   A.  That's correct.

20   Q.  All right.

21   A.  And this was also done by when I was there,

22   someone told me that it wouldn't come back to me,

23   that I -- and all of that was the fact that I had

24   to put how much it was in and things like that.

25   Q.  Okay.  So when you started -- you started

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 520

1   thinking, You know what, I want to be done with

2   this, and I don't want to put any more money in

3   into that machine, how did you try to start -- you

4   know, trying to tell this Agent Timothy no?

5   A.  That was mainly when I was so angry that when I

6   got there, I knew where it was, I knew things, and

7   I said I'm done with this, and so I had never gone

8   in and done that.  I would park outside.  I would

9   sit there for a while, as long as I felt I could,

10  and then just left.

11  Q.  Okay.  So did you start making excuses to him

12  for why you couldn't send him any more money

13  through Bitcoin?

14  A.  No.

15  Q.  And did Agent Timothy just say okay and go

16  away, or did he keep pestering you for more

17  money?

18  A.  He probably felt that he had done -- that I had

19  given him enough money for everything he had asked

20  for from his documents.

21  Q.  Okay.  Well -- before we get towards the end,

22  there was a time where you were telling him you

23  were done with Bitcoin?

24  A.  Yes.

25  Q.  And so tell us about some of the excuses -- you

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 521

1   made some excuses to him for why you couldn't keep

2   sending Bitcoin, right?

3   A.  Yes.

4   Q.  Tell us about some of the excuses you gave him.

5   A.  In part, it was that I had already given all of

6   the money that he had first asked for and then

7   finally said that I couldn't do that anymore and

8   that should be it.

9   Q.  And so after that, did he then tell you if you

10  can't send it through Bitcoin, I can send somebody

11  to your house to pick it up?

12  A.  Unfortunately, yes.

13  Q.  All right.

14  A.  And I did that also.

15  Q.  Okay.  So let's talk about the first time

16  somebody came to your house to pick up money from

17  you.  Did you go to the bank to get money out?

18  A.  Yes.

19  Q.  And did you take out, I believe it was,

20  $51,900?

21  A.  Yeah.

22  Q.  Okay.  And why did you take that much money out

23  of the bank?

24  A.  I had to.  That was the only place I had the

25  money.

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 522

1   Q. And he told you you had to do this, correct?

2   A. Yeah.

3   Q. And so tell us about how it was that -- when

4   you took the money out of the bank, tell us about

5   how you had to communicate with this Agent Timothy

6   before the pickup happened.

7   A. Yes.  He had said I had to give the money he

8   wanted, and I could do this in my room, and then

9   all of that was put in for the amount that he said

10  he had to have.

11  Q. Okay.  And how were you supposed to package it

12  up?

13  A. Well, you put it in, you told how much money

14  was in there, and I could then also take pictures

15  of it so it was seen, and then --

16  Q. I'm sorry to interrupt you, Virginia.  But you

17  said you took pictures of that money; is that

18  right?

19  A. I could.

20  Q. And did you have to send those pictures to

21  Agent Timothy after you took the money out of the

22  bank?

23  A. Of course.  Otherwise, he wouldn't know what I

24  was doing, and this was required, so --

25  Q. Okay.  And so, you know, taking your attention

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 523

1   to April 10th, is that when -- of 2023, is that

2   when you took that large -- that $51,900, took

3   pictures of it and sent those pictures to Agent

4   Timothy?

5   A. Yes, I did.

6   Q. And did he tell you how someone was going to

7   come and pick up that money from you?

8   A. Yes.

9   Q. What did he say?

10  A. The thing I had to do there was the money was

11  put in a box, and it would be then covered up, and

12  there were other things that were on it so that it

13  was covered up and in a box, and that was then

14  again -- had -- was not just put there, but I had

15  to seal it away and everything so that I could

16  carry it out when he came in front of my house.

17  Q. What did he tell you about the person that

18  would be coming to pick up your money?

19  A. Just that they would come, and they could come

20  not at a particular hour, but they would wait and

21  just pick it up when they wanted to, and then the

22  whole box was with them, and I was not to see that

23  again.

24  Q. And how often during this time frame after

25  you've sent him that picture, before that money got

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 524

1    picked up, how frequently were you talking and how

2    much were you on the phone with this Agent

3    Timothy?

4    A.  I had to be fairly honest with what I was

5    doing, and so everything in there could be things

6    such as just putting another paper or something so

7    it just looked like sort of a box and that had to

8    look very much the same.

9    Q.  Did he keep you on the phone that day while you

10   were waiting for the person to come pick up your

11   money?

12   A.  Of course.

13   Q.  And were you talking to him the whole time or

14   was sometimes the phone left with the line open?

15   A.  It was the line could be open on some of that.

16   The time that the -- a car would come in to pick it

17   up, I could have to wait until they had a car there

18   that was back, would come up, and then simply pick

19   up the box and drive away.

20   Q.  Okay.  Let's talk about that.  Did Agent

21   Timothy tell you what type of car was going to come

22   and pick up your money?

23   A.  He never said which kind of car would come, and

24   every time they came, it appeared to be a different

25   car.

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 525

1    Q.  Okay.  This pickup of the 51,900, do you

2    remember the color of the car that they sent to you

3    that day?

4    A.  I don't remember that, but it was different

5    than any of the others that came, and only one time

6    do I recall that there were two people in the car

7    when they picked it up.

8    Q.  Okay.  Was that on the first pickup or is that

9    on the one that we're talking about right now, the

10   51,900?

11   A.  I think it was -- well, it had to be the second

12   time that someone picked it up.  The car was not

13   the same, but two people were in there, and only

14   one did I hear slightly, and they picked it up and

15   took it home.

16   Q.  Okay.  And was -- and so do you think that was

17   the first time or do you think maybe that was the

18   second time?

19   A.  It was the second time.

20   Q.  Okay.  Tell us about what happened the first

21   time you remember somebody picking it up then.

22   A.  Yes, that there was no conversation.  Simply

23   stopped and I could walk up to them in the -- and

24   hand it to them and they drove off.

25   Q.  Okay.  Do you remember what type of car either

BRYAN - DIRECT/WEINHOEFT                  Vol. 3 - 526

1    of them were?

2    A.  I don't recall any of the cars being exactly

3    the same.

4    Q.  Okay.  Do you remember the color of the cars?

5    A.  They were various cars, colors, and so I could

6    tell that they -- you know, were waiting or coming

7    to do that, but they were all different and not

8    really big cars or anything but different colors,

9    different things, and I could just stand around and

10   wait until they came.

11   Q.  Okay.  So you remember giving someone money on

12   two different occasions that came to make pickups

13   for Agent Timothy?

14   A.  Yeah.

15   Q.  Okay.  So after -- do you remember -- I know

16   there was $51,900 involved in the second one.  How

17   much money do you think you remember being given on

18   the first one?

19   A.  Almost the same but not quite possibly.

20   Q.  Not sure?

21   A.  But all I could do to say how much money was in

22   there was to take pictures of all of the money that

23   was there that I then put in the box.

24   Q.  Okay.  So now at this point they've sent you to

25   the Bitcoin machine five times and you've had money

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 527

1    picked up at your house twice?  That's your

2    recollection?

3    A.  That was the first two, yes.

4    Q.  Okay.  So I want to take your attention -- now

5    we're going to move up to April 20th.  Do you

6    remember a day when your daughter Beth figures out

7    what's happening to you?

8    A.  Yes.

9    Q.  All right.  Were you on the phone with Timothy

10    on April 20th when your daughter Beth -- thank you.

11    Why don't you go ahead and take a little break.  Do

12    you want a drink?

13    A.  Sure.

14    Q.  That's awesome.  I'll do the same.

15          THE COURT:  I got stuff a little stronger

16    if you need it.

17    BY MR. WEINHOEFT:

18    Q.  Probably wouldn't hurt, would it?

19    A.  No.

20          So at that point we were at -- trying to

21    keep the money to me and things like that.

22    Q.  Okay.  Well, let's talk about how Beth figured

23    out what was happening to you, okay?

24    A.  Yes.  She had made -- telephone with exactly

25    what I was doing and told me how bad it was that I

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 528

1    was doing that.

2    Q.  Okay.  Well, before we get into her getting a

3    little upset with you, let's talk about how she

4    first kind of figured it out, right?

5              Did she have trouble getting a hold of you

6    one day and just kind of showed up at your house?

7    A.  Yes.

8    Q.  And were you on the phone with Agent Timothy

9    when she got there?

10   A.  Yes, but she was also talking to other

11   people.

12   Q.  Right.  But this was the first time you

13   started -- and you told Beth then you had been

14   given some money and that you owed this money and

15   you had to pay this money and kind of gave her an

16   explanation of what you've told us here today?  Is

17   that about -- is that pretty fair?

18   A.  Yeah.

19   Q.  Okay.  So what did Beth do with you then?

20   A.  Well, there are police people --

21   Q.  Well, before we get to the police.  You thought

22   you had to go to the bank that day, right?

23   A.  Yes.

24   Q.  Because they were still trying to get more

25   money from you; is that right?

BRYAN - DIRECT/WEINHOEFT                    Vol. 3 - 529

1    A.  Yes.

2    Q.  So did Beth offer to take you to the bank, and

3    this is where you're kind of having this

4    conversation on the way to the bank?

5    A.  Yes.

6    Q.  And after you get done at the bank and Beth

7    kind of figures out what's going on here, then

8    where does Beth take you?

9    A.  To better understanding of what I -- I should

10   have done, and she did also talk to police

11   people.

12   Q.  Okay.  She took you to the Edwardsville Police

13   Department, right?

14   A.  Yes.

15   Q.  Because when she took you to the bank that day,

16   that was to withdraw 35,000 more dollars, right?

17   A.  Yes.

18   Q.  And that's because Agent Timothy was still

19   trying to pick up more money from you?

20   A.  Yes.

21   Q.  All right.  What did you talk about -- did you

22   tell the police when Timothy was sending his

23   courier to come make his pickup?

24   A.  Yes.

25   Q.  When was that supposed to happen?

BRYAN - CROSS/FRETER                    Vol. 3 - 530

1    A.  Well, that again was sort of waiting for it to

2    be picked up and things like that, but we -- I did

3    go to a bank just for the most I had to do for -- I

4    think, the first time and the second time was I had

5    to talk to her and maybe I didn't put quite enough

6    money in that -- in the second one.

7    Q.  Okay.  But after Beth took you to the police

8    department, did you agree to help the police catch

9    the person that was coming to pick up and take your

10   money that day?

11   A.  Of course.

12            MR. WEINHOEFT:  Okay.  If I can have a

13   moment, Your Honor.

14            Judge, that's all I really have for this

15   witness.  Thank you.

16                    **CROSS-EXAMINATION**

17   BY MS. FRETER:

18   Q.  Ma'am, can you tell the jury what the Timothy

19   voice sounded like?  What did it sound like to

20   you?

21   A.  What?

22   Q.  Timothy's voice, what did it sound like to

23   you?

24   A.  Well, he talked a great deal, and I pretty much

25   questioned exactly where he was, what he was doing

BRYAN - CROSS/FRETER                        Vol. 3 - 531

1    and almost understood from the voice that I had

2    heard him when he was talking just about himself

3    and all the other things, and so I became quite

4    angry with what I had been pushed through, and

5    pretty much at that point the places that I had

6    picked up money, I would pick them up but never

7    again.  Everything was cut off, and that was the

8    way I felt I had to be, and that's the way the

9    police also thought it was the best way to be at

10   that point, so I had a little help in saying no.

11   Q.  Did Timothy's voice have an accent?

12   A.  Well, he just really said that it was still

13   what I should be doing, but I could at times,

14   rather than putting all of the money in, maybe say,

15   Oh, I forgot, and that went away.  Now, my daughter

16   did not say that.  That was in my voice going on

17   and doing it, so I was still responsible for what

18   was happening.

19              MS. FRETER:  Thank you so much.

20              THE COURT:  Are you done?

21              MS. FRETER:  Yes, Your Honor.

22              MR. WEINHOEFT:  We're all done.

23              THE COURT:  Thank you, Virginia.

24              MR. WEINHOEFT:  You're all done.  Nice and

25   easy.  Come down here, and you're all done.

SURMEIER - DIRECT/WEINHOEFT                Vol. 3 - 532

1          Is it okay if she stays in here, Judge?

2          THE COURT:  She may remain.  Are you

3     calling the daughter next?

4          MR. REED:  Yes.

5          MR. WEINHOEFT:  Your Honor, the Government

6     calls Beth Surmeier.

7          COURTROOM DEPUTY:  Please raise your right

8     hand.

9          (Witness sworn.)

10         COURTROOM DEPUTY:  Please state your full

11    name and spell your last name for the court

12    reporter.

13         THE WITNESS:  Elizabeth Surmeier,

14    S-u-r-m-e-i-e-r.

15         COURTROOM DEPUTY:  Thank you so much.

16         **ELIZABETH SURMEIER, GOVERNMENT'S WITNESS,**

17                  **DIRECT EXAMINATION**

18    BY MR. WEINHOEFT:

19    Q. All right.  If I could ask you to scoot up and

20    speak into the microphone because our acoustics

21    aren't great in this room.

22    A. Okay.

23    Q. So just as close as you can get to there is

24    probably helpful for us.

25         If you could introduce yourself to the

SURMEIER - DIRECT/WEINHOEFT                    Vol. 3 - 533

1    members of the jury here and tell them how you're

2    related to Virginia Bryan.

3    A.  I'm Beth Surmeier.  I am her daughter.

4    Q.  If you would, maybe take us through a little

5    bit of your family history, both -- a little bit

6    about your mom's background and about your own.

7    Could you tell us a little bit about, first of all,

8    you know, where you were little, where you grew up,

9    those sorts of things.

10   A.  I mainly grew up in Ohio, Connecticut and

11   Illinois.  My mother got the job here when I was

12   entering high school, has been at SIU for a number

13   of years.  She was in the department of chemistry,

14   started the Office of Science and Mathematics

15   Education, or OSME.

16   Q.  She was a professor; is that correct?

17   A.  Yes.

18   Q.  How long was -- and that was at SIU

19   Edwardsville?

20   A.  Uh-huh.

21   Q.  How long was she a professor at SIU

22   Edwardsville?

23   A.  Decades, it seemed.  A long time.  She started

24   there in, I believe, '85.

25   Q.  And she taught chemistry?

SURMEIER - DIRECT/WEINHOEFT                    Vol. 3 - 534

1    A.  Yes.

2    Q.  And she was actually the chair of the physics

3    department as well --

4    A.  Yes.

5    Q.  -- for a time, wasn't she?

6    A.  Yes.

7    Q.  So she had a nice, long career at SIU.

8            Can you tell us a little bit about her

9    educational background.

10   A.  She went to Teachers College at CO.  Got her

11   doctorate from the University of Minnesota.

12   Q.  Okay.  And how about yourself.  Where do you

13   work?

14   A.  I work for Meridian Village in their memory

15   support division.

16   Q.  What do you do for Meridian Village?

17   A.  I'm an office assistant.

18   Q.  Are you married?

19   A.  Yes.

20   Q.  And where do you live in relationship to your

21   mom?

22   A.  I live in O'Fallon.

23   Q.  Okay.  And back at -- during the time when this

24   was happening, where was Mom living?

25   A.  She was in Edwardsville.

SURMEIER - DIRECT/WEINHOEFT                Vol. 3 - 535

1   Q.  Okay.  And at that time was she independent,

2   living independently?

3   A.  Yes.

4   Q.  And at that time was she still kind of managing

5   her own finances and that sort of thing?

6   A.  Yes.

7   Q.  All right.  If you could, could you talk to us

8   about -- her husband passed away --

9   A.  Yes.

10  Q.  -- is that right?

11         First of all, tell us his name.

12  A.  His name was Jim Eilers.

13  Q.  Okay.  And how long was your mom married to Jim

14  Eilers?

15  A.  Oh, 17 years, I think, when he passed.

16  Q.  He was also a professor at SIU, wasn't he?

17  A.  Yes.

18  Q.  So when he passed, did she inherit money

19  from -- and was there an estate involved where she

20  wound up receiving a distribution of money?

21  A.  Some.  The estate was a bit of a mess.  Will

22  had not been updated for probably 20 years.

23  Q.  Okay.

24  A.  And it took a while to settle.

25  Q.  And so when did you say he passed?

SURMEIER - DIRECT/WEINHOEFT                    Vol. 3 - 536

1    A.  Beginning of the pandemic.

2    Q.  So March of 2020?

3    A.  That sounds right.

4    Q.  And about how long does it take to settle that

5    estate?

6    A.  About a year and a half.

7    Q.  And what -- when Virginia received money from

8    that, do you know what she did with that money?

9    A.  I believe she put most of it in the bank.  Some

10   of it went to a scholarship at SIU.

11   Q.  And where was she banking at the time?

12   A.  I'm sorry.  I didn't hear.

13   Q.  Sure.  Where was she banking at the time?

14   A.  Busey Bank.

15   Q.  And back at this time, would you say your mom's

16   memory was better --

17   A.  Yes.

18   Q.  -- than -- have you seen a change in her

19   condition really since this time?

20   A.  I'm so sorry.

21   Q.  It's okay.  You see a kind of -- this kind of

22   precipitated?  You can see a decline --

23   A.  Yes.

24   Q.  -- in her cognitive functioning?

25   A.  Uh-huh, yes.

SURMEIER - DIRECT/WEINHOEFT                Vol. 3 - 537

1    Q. All right.  Did you know anything about her

2    being contacted by someone posing as a federal

3    agent?

4    A. No.

5    Q. Tell the members of the jury, if you will, how

6    it is that you first learned about the scam with --

7    that she was subjected to.

8    A. I had been having some trouble reaching my

9    mother via the phone or her cell phone so wound up

10   going over to her house.

11   Q. What do you mean you were having some

12   trouble?

13   A. I mean both lines were continually busy.

14   Q. And when you say "both lines," how many phone

15   lines did Virginia have?

16   A. Two.  She had a home phone and a cell phone.

17   Q. And so was -- were you -- give us an idea of

18   how often at this time -- and, again, we're back

19   in, you know, the April of 2023.  About how often

20   you were seeing Mom, how often you were

21   communicating with Mom, those sorts of things?

22   A. I was visiting my mother once, twice a week.

23   Communicating with her almost daily when I could

24   get through.

25   Q. Okay.  And so you noticed it was starting to

SURMEIER - DIRECT/WEINHOEFT                    Vol. 3 - 538

1   get increasingly difficult to reach her?  Is that

2   basically what you said?

3   A.  Yes.

4   Q.  And so when you couldn't reach her on both the

5   landline and the cell phone line, was that

6   unusual?

7   A.  Yes.

8   Q.  Tell us why.

9   A.  Usually one line you could either leave a

10  message or -- and she would call back or, you know,

11  if she was out of the house, it wasn't uncommon

12  that, Oh, I was out doing something.  I'll call you

13  back.  Call back as soon as she got in the house.

14  But the fact that I couldn't leave messages, that

15  both phones seemed to be off the hook was

16  concerning.

17  Q.  So what did you do?

18  A.  I went over.

19  Q.  And this was April 20th of 2023; is that

20  right?

21  A.  Yes.

22  Q.  All right.  And did she have to let you in, or

23  did you have your own key?

24  A.  I have my own key.

25  Q.  Okay.  Did you let yourself in?

SURMEIER - DIRECT/WEINHOEFT          Vol. 3 - 539

1    A.  Yes.

2    Q.  Tell us what you found when you walked inside.

3    A.  Well, cell phone was with my mom.  Home phone

4    was off the hook still.  I hung it up and put it

5    back on the charger.  And Mom came in shortly

6    thereafter.  She was flustered, turned off her cell

7    phone, and she said she needed to go to the bank.

8    Q.  So at this point you don't have any idea that

9    anything is going on yet; is that right?

10   A.  No.

11   Q.  All right.  So just Mom said she needs to go to

12   the bank, so you're going to run her to the bank?

13   A.  Yep.

14   Q.  Where does she bank?

15   A.  She was headed to U.S. Bank which was not a

16   bank that I was familiar with, so she had to give

17   me directions.

18   Q.  Okay.  So that's the first red flag for you.

19   All of the sudden there's a new bank that you

20   didn't know about?

21   A.  Yes.

22   Q.  All right.  And where had she previously

23   banked?

24   A.  Busey was the only bank that I knew of.

25   Q.  And were you on that account as well?

SURMEIER - DIRECT/WEINHOEFT               Vol. 3 - 540

1   A.  I think so at that time.

2   Q.  And so now Mom asked you to take her to a new

3   bank?

4   A.  Right.

5   Q.  And so kind of scratch your head a little bit,

6   she gives you directions and you go; is that

7   correct?

8   A.  Uh-huh.

9   Q.  All right.  So tell us what happens when you go

10  to the bank.

11  A.  She said she needed to withdraw money, she took

12  the cell phone with her, and she was on the phone

13  when she walked into the bank.

14  Q.  Okay.

15  A.  So --

16  Q.  Did she tell you how much money she had to

17  withdraw or anything like that yet?

18  A.  No.  She told me afterwards.

19  Q.  All right.  And so tell us about that.

20  A.  When she came out of the bank with a lot of

21  cash, I turned her cell phone off, drove home and

22  asked her what was going on, and she had said she

23  had received phone calls and some letters that she

24  owed money to the Government.

25  Q.  So first of all, let's put that in a little bit

SURMEIER - DIRECT/WEINHOEFT                Vol. 3 - 541

1    of context because did that raise big alarm bells

2    immediately?

3    A.  Yes.   That's when I wanted to see the letters,

4    and then I wanted to take her to the police.

5    Q.  Okay.  So did you -- did you receive the

6    letters and see the letters that she had gotten?

7    A.  She showed me a couple letters.  I looked at

8    them.  I went upstairs, looked online to see if, A,

9    the government office actually existed and, B, if

10   this person was employed by them; and when I

11   couldn't find his name anywhere, we went to the

12   police station.

13   Q.  If I can direct your attention to Exhibit 65

14   that's already been admitted, can you see that on

15   your screen?

16   A.  Yes.

17           MR. WEINHOEFT:  And Sandra, if we can

18   scroll through those.

19   BY MR. WEINHOEFT:

20   Q.  And are these the letters that your mom showed

21   you that she had received?

22   A.  Yes.

23   Q.  All right.  Do you remember how much cash you

24   saw that your mom had withdrawn that day?

25   A.  I think it was 30 or 40,000.  It was a lot of

SURMEIER - DIRECT/WEINHOEFT               Vol. 3 - 542

1    money.

2    Q.  If you can make sure you speak into that.

3    A.  Sorry.  It was 30 or 40,000.  It was a lot of

4    money.

5    Q.  And so you took her pretty much straight away

6    over to the police department in Edwardsville; is

7    that correct?

8    A.  Yes.

9    Q.  All right.  As you were on your way over there

10   or as you were at home, along this process, did she

11   ever turn her phone back on?

12   A.  The phone was on.  There were calls.

13   Q.  Were you able to hear those calls?

14   A.  I was able to hear a little bit of it.  She had

15   hearing aids at the time, so a lot of it went

16   straight to Bluetooth but --

17   Q.  You were still able to hear some of the

18   conversation?

19   A.  A little bit, yeah.

20   Q.  What were you able to hear?

21   A.  Instructions mainly, that, No, we need to do

22   the pickup, we need to do this, we need to do X,

23   and yeah, I was not happy.

24   Q.  All right.  And did you ask your mom what she

25   was going to be doing with this 30 or $40,000 she

SURMEIER - DIRECT/WEINHOEFT              Vol. 3 - 543

1   just withdraw?

2   A.  Yeah, she said she had been doing Bitcoin,

3   wasn't comfortable with Bitcoin, so they were just

4   going to pick it up.

5   Q.  And did -- were there any photographs taken or

6   anything like that at this point yet?

7   A.  No.

8   Q.  All right.  So you take her to the police.  Do

9   you remember roughly what time you got there?

10  A.  No.

11  Q.  Okay.

12  A.  It was in the morning, but I don't remember the

13  time.

14  Q.  That's fine.  That's fine.

15          THE COURT:  Ma'am, you're really going to

16  have to speak up.  I know you want to help your

17  mom; but if we can't hear what you're saying, we

18  don't know what your testimony is.  I want you to

19  speak loud enough so that you're convinced that

20  these ladies in the back of the courtroom can hear

21  you, and that's as to every answer.  I know you're

22  soft-spoken, but what happens is your words are

23  starting to tail off, and it's very important that

24  I make sure that every word you speak gets on the

25  record.  Okay?

SURMEIER - DIRECT/WEINHOEFT                Vol. 3 - 544

1          THE WITNESS:  Okay.

2          THE COURT:  Thank you.

3   BY MR. WEINHOEFT:

4   Q.  So you went to the Edwardsville Police

5   Department?

6   A.  Yes.

7   Q.  And do you remember who you spoke with?

8   A.  I don't remember his name.

9   Q.  Police officer though?

10  A.  Yes.

11  Q.  And you made a report?

12  A.  Yes.

13  Q.  While you were down there talking with the

14  police, did your mom receive any more phone calls

15  from this Agent Timothy?

16  A.  Yes.

17  Q.  Okay.  Was that put to speakerphone?

18  A.  Yes.

19  Q.  And could you hear it?

20  A.  Yes.

21  Q.  Describe, if you will, for the members of the

22  jury, what you were able to hear.

23  A.  He was trying to set up some sort of pickup for

24  the cash.

25  Q.  And was this on -- this was on speaker then,

SURMEIER - DIRECT/WEINHOEFT                Vol. 3 - 545

1    correct?

2    A.  Yes.

3    Q.  And were you able to hear the person's voice?

4    A.  Yes.

5    Q.  How would you characterize his voice?

6    A.  Foreign.

7    Q.  I'm sorry?

8    A.  Foreign.

9    Q.  Foreign.  What type of accent would you

10   describe it as?

11   A.  I would have said Indian.

12   Q.  Were you able to hear any type of background

13   noise?

14   A.  There seemed to be a lot of people on phones.

15   More call-center-type than just an office-type

16   background.

17   Q.  Okay.  And what was the subject of -- what was

18   Timothy, the person, asking to do when he called?

19   A.  He had asked her to take photos of the money,

20   to make sure that it was in a box, that the box was

21   sealed, and they were setting up a time.

22   Q.  And they wanted to pick it up that day; is that

23   right?

24   A.  Correct.

25   Q.  And so did you and your mom agree to work with

SURMEIER - DIRECT/WEINHOEFT          Vol. 3 - 546

1    the police to participate in this sting to arrest

2    the driver that was coming to make the pickup?

3    A.  Yes.

4    Q.  So tell us about that.  How did the agents ask

5    you about your willingness to participate and how

6    that decision was made?

7    A.  They asked if they could be there for it, if

8    they could be in the house to wait, and if they

9    could use some of the money that she withdrew as a

10   way of tracking it, you know, put a tracker in with

11   the money, and use that as part of the sting.

12   Q.  So they put a -- they put a GPS tracker in a

13   box with a little portion of the money --

14   A.  Yes.

15   Q.  -- to go out and to deliver to the courier to

16   make sure they could track it and keep it safe if

17   something happened with the sting?  Is that your

18   understanding?

19   A.  Correct.

20   Q.  All right.  So talk to us about what happened

21   throughout the course of that day as you were

22   preparing and waiting for the courier to arrive to

23   make the pickup.

24   A.  The money was photographed, I believe, on a

25   piece of cloth so that they could see the

1    denominations and what was coming.  At one point

2    while the money was being packaged with trackers,

3    Mom was asked to either take a picture of herself,

4    or some sort of selfie, so that they would be able

5    to identify her.  She was asked if there were

6    vehicles in the driveway, what the house looked

7    like, things like that.

8    Q.  And so all that information was provided

9    back?

10   A.  Yes.

11   Q.  All right.  And so tell us about -- this was,

12   you said, morning time when you first made the

13   report.  Probably closing in on lunchtime --

14   A.  Right.

15   Q.  -- by the time you're wrapping this up?  Is

16   that fair to say?

17   A.  Yes.

18   Q.  Approximately when was the pickup supposed to

19   happen?

20   A.  It was supposed to happen at five.  It kept

21   getting pushed back.  First half an hour at a time,

22   and then he'll be by later.

23   Q.  Describe how frequent the communication was

24   throughout the course of the day from the time

25   the -- that you're first packaging up money until

SURMEIER - DIRECT/WEINHOEFT               Vol. 3 - 548

1    when this courier is supposed to show up.

2    A.  Almost continuously.  We'd hang up the phone,

3    and then there be would another phone call 15

4    minutes, half an hour later.  You very much wanted

5    just to stay on the line, and well, they insisted

6    on hanging up.

7    Q.  Do you remember -- at some point did an

8    individual arrive to pick up the money?

9    A.  Yes.

10   Q.  Where were you at while that happened?

11   A.  I was in the den.

12   Q.  In the den?

13   A.  Uh-huh.

14   Q.  And how about your mom, where was your mom?

15   A.  Mom was in the kitchen with the police.

16   Q.  Okay.  And so what was the plan for when the

17   individual arrived to pick up the package?

18   A.  Mom was to head out the front door, walk the

19   box up to the car, place the box in the car and

20   return.

21   Q.  Okay.  And police officer hiding in the bushes

22   to keep her safe and the whole bit?

23   A.  Yes.

24   Q.  All right.  So tell us what happened when the

25   -- at some point, you said, the vehicle arrived to

SURMEIER - DIRECT/WEINHOEFT          Vol. 3 - 549

1  pick up the money?

2  A.  Yes.

3  Q.  All right.  Tell us what happened.

4  A.  The police were in position.  They were

5  watching the vehicle.  The vehicle -- because she

6  lived on a dead-end street -- drove up the street,

7  turned around, came back.  Mom got the phone call

8  to take the box out.  She went out the front door,

9  took the box up, put it in the car, turned around,

10  started walking back, the car started to drive

11  away, and apparently, she was grabbed and returned

12  to the house.

13  Q.  Meaning the police made sure she was safe?

14  A.  Yes.

15  Q.  And then they stopped the vehicle; is that

16  right?

17  A.  Uh-huh.

18  Q.  Okay.  This is -- all of this happens in one

19  day for you?

20  A.  Yes.

21  Q.  All right.  So it's a big day?

22  A.  Yes.

23  Q.  Lot to process?

24  A.  Yes.

25  Q.  All right.  After the arrest happens and now

SURMEIER - DIRECT/WEINHOEFT                Vol. 3 - 550

1    you're trying to unwind everything that your mom's

2    been through, what did you do to go through to try

3    to assess the damage, if you will, to find out just

4    how badly she had been defrauded?

5    A.  Went through the bank records and started to

6    switch banks, the process of at least figuring out

7    where the money went and how much and to whom.

8           MR. WEINHOEFT:  All right.  And now if we

9    can show the witness first Exhibit 61.

10   BY MR. WEINHOEFT:

11   Q.  Let me know when you can see that.  If we can

12   scroll through those, do you recognize those?

13   A.  Yes.

14   Q.  What do you recognize those to be?

15          THE COURT:  Is there going to be an

16   objection to this?

17          MS. FRETER:  No, Your Honor.

18          THE COURT:  All right.  Let's not go

19   through --

20          MR. WEINHOEFT:  Perfect.  Motion to admit

21   Exhibits 61, 62, 63, bank records from Chase,

22   Busey, and U.S. Bank.

23          MS. FRETER:  No objection.

24          THE COURT:  They will be admitted without

25   objection, and you may publish them now.

SURMEIER - DIRECT/WEINHOEFT                Vol. 3 - 551

1          (Government's Exhibit Nos. 61 through 63
2     were received in evidence.)
3          MR. WEINHOEFT:  Actually, I'm going to
4     make this easier on you, Your Honor.  Can you show
5     the witness Exhibit 74.
6     BY MR. WEINHOEFT:
7     Q.  Prior to coming to Court today, did we prepare
8     a summary chart so that we could go through the
9     losses to your mom and all of these voluminous
10    records more conveniently?
11    A.  Yes.
12         MR. WEINHOEFT:  Your Honor, I'd move for
13    the admission of Exhibit 74 under Federal Rule
14    1006.
15         MS. FRETER:  No objection.
16         THE COURT:  Be admitted.
17         (Government's Exhibit No. 74 was received
18    in evidence.)
19         THE COURT:  You may publish.
20    BY MR. WEINHOEFT:
21    Q.  So after examining all of the bank records,
22    account statements, check images, deposit slips,
23    all of this, is this an accurate assessment of what
24    happened with your mom's money?
25    A.  Yes.

SURMEIER - DIRECT/WEINHOEFT            Vol. 3 - 552

1    Q. So let's take this through first.  Did you find

2    that she had made a Bitcoin deposit on March the

3    21st in the amount of $14,900, and that there was a

4    corresponding withdrawal from Busey Bank for

5    $15,000 the day before?

6    A. Yes.

7    Q. Taking you to the next day, March 22nd, did you

8    find a second Bitcoin ATM transaction where she

9    sent $10,000 that she had withdrawn from Busey Bank

10   on that same morning?

11   A. Yes.

12   Q. Taking you to March 23rd, do you find she had

13   withdrawn -- or rather, purchased $12,000 of

14   Bitcoin, and that was made up from two withdrawals:

15   one on March the 21st, the second one on March the

16   23rd; 10,000 and $2,000, respectively?

17   A. Yes.

18   Q. The following day, March 24th, did you find

19   that she had made a $10,000 ATM transaction -- or

20   Bitcoin ATM, purchase of Bitcoin, where she had

21   withdrawn all $10,000 from Busey Bank also on the

22   same day that the Bitcoin was purchased?

23   A. Yes.

24   Q. All right.  On March 24th did she change banks

25   from Busey Bank to Chase Bank where she transferred

SURMEIER - DIRECT/WEINHOEFT                Vol. 3 - 553

1    $90,000 out of Busey and deposited it into Chase?

2    A. Yes.

3    Q. Okay.  A little over a week later did you

4    find -- on April 4th did you find a funds transfer

5    where that $90,000 was withdrawn from Chase, and

6    60,000 was then deposited into a U.S. Bank account

7    but 30,000 was withdrawn in cash?

8    A. Yes.

9    Q. All right.  Moving forward three days to April

10   the 7th, did you find a Bitcoin ATM purchase for

11   $3,100 of Bitcoin purchased using a portion of the

12   cash withdrawn on April the 4th?

13   A. Yes.

14   Q. Directing your attention to April the 10th, did

15   you find a cash pickup where $51,900 was picked up,

16   which came from a $10,000 withdrawal on April the

17   10th, a $15,000 check that had been written to cash

18   at Busey Bank on April 10th, and then $26,900,

19   which was the remainder of the $30,000 cash

20   withdraw that was made on April the 4th?

21   A. Yes.

22   Q. Okay.  Directing your attention to April the

23   12th, that $60,000 cashier's check that had been

24   withdrawn from Chase Bank, did you find it had been

25   deposited at U.S. Bank?

SURMEIER - CROSS/FRETER                    Vol. 3 - 554

1    A.  Yes.

2    Q.  And then that was the source of funds that was

3    used on April 20th when your mom withdrew $35,000

4    of cash for when they were attempting to pick up

5    that day; is that correct?

6    A.  Correct.

7    Q.  Total loss to your mom was $101,900?

8    A.  Yes.

9          MR. WEINHOEFT:  That's all I have, Your

10   Honor.

11         THE COURT:  Cross?

12                   **CROSS-EXAMINATION**

13   BY MS. FRETER:

14   Q.  When you were with your mom at the police

15   department, they put the phone on speakerphone; is

16   that right?

17   A.  Yes.

18   Q.  And you were able to listen to the person on

19   the phone that your mom knew as Timothy give

20   instructions?

21   A.  Yes.

22   Q.  And how would you describe that voice?  You

23   said there was an accent to it?

24   A.  There was an accent, and honestly, because I've

25   dealt with call centers, it honestly sounded like

SURMEIER - CROSS/FRETER                    Vol. 3 - 555

1    any other call center.

2    Q.  And when you say "call center," you mean like

3    there's kind of noiseish in the background?

4    A.  In the background, lots of talking going on.

5    Q.  And the background talking, you can't really

6    sort of hear what they're saying, but you can hear

7    that there's people talking?

8    A.  Right, uh-huh.

9    Q.  And the Timothy voice, were they speaking

10   English?

11   A.  Yes.

12   Q.  And was it -- were you able to understand what

13   they were saying in English?

14   A.  Yes.

15   Q.  Would you describe the accent -- how would you

16   describe the accent?  As thick or light?  Anything

17   else like that?

18   A.  It was a thicker accent.  The English was

19   clear.  The accent was pronounced, but obviously

20   somebody who spoke English and spoke it well.

21   Q.  And do you have any information that your

22   mother, before the day that you took her to the

23   police, had she gone to the police before?

24   A.  She told me she had started to go to the police

25   and fill out a report.  She did not give me any

SURMEIER - CROSS/FRETER                    Vol. 3 - 556

1    details of that.

2    Q.  The first day that you learn about anything is

3    in April, and you take her to the police station.

4    They do the sting.  They arrest somebody.  That's

5    all in one day for you?

6    A.  Yes.

7            MS. FRETER:  I don't have anything else.

8            THE COURT:  Redirect?

9            MR. WEINHOEFT:  None, your Honor.

10           THE COURT:  All right.  We're going to

11   break for lunch, and we've got a lot of witnesses.

12   Is 45 minutes going to be enough time for lunch?

13   Is that going to be enough time for the parties, or

14   do you need an hour?

15           MR. WEINHOEFT:  We'll be fine.

16           THE COURT:  All right.  Let's break for --

17   we'll come back at 20 after 12:00.

18           Again, you're not to communicate with

19   anybody about this case, even amongst yourself, or

20   by cell phone, email, text messaging.  You're not

21   to conduct any research about this case, about the

22   parties, about anything that you've heard, the

23   locations or the evidence.

24           If someone approaches you to try to talk

25   to you about this case, you should let me know at

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 557

1    your first opportunity.

2              Finally, you're to keep an open mind until

3    you hear all the evidence that's been received, and

4    then you will be able to deliberate with your

5    fellow jurors.  See you in 45 minutes.

6              (Lunch recess at 11:37 a.m. until

7    12:27 p.m.)

8              (Jury present.)

9              THE COURT:  All right.  Call your next

10   witness.

11             MR. WEINHOEFT:  Thank you, Your Honor.

12   The Government calls Danny Allison.

13             COURTROOM DEPUTY:

14             (Witness sworn.)

15             COURTROOM DEPUTY:  Please state your full

16   name and spell your last name for the Court.

17             THE WITNESS:  Danny Allison, D-a-n-n-y

18   A-l-l-i-s-o-n.

19             COURTROOM DEPUTY:  Thank you so much.

20   Have a seat.

21             **DANNY ALLISON, GOVERNMENT'S WITNESS,**

22                  **DIRECT EXAMINATION**

23   BY MR. WEINHOEFT:

24   Q.  Good afternoon, sir.  If you could, please

25   introduce yourself to the members of the jury and

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 558

1    tell them where you work.

2    A.  My name is Danny Allison.  I'm a detective

3    sergeant with the Caseyville Police Department.

4    I've been a police officer for about 12 years.

5    Q.  All right.  And, Danny, if I could -- if I

6    could ask you to move that microphone real close to

7    you.  You can pull it, and it's a little easier for

8    everybody to hear as long as we're using the

9    microphone.

10   A.  Okay.

11   Q.  You're a detective sergeant; is that correct?

12   A.  That's correct.

13   Q.  All right.  Tell us about how your law

14   enforcement career began.

15   A.  It began in 2013.  I was hired with the

16   Fairmont City Police Department.  I worked there

17   part time for about four-and-a-half years, and then

18   I was hired at the Caseyville Police Department in

19   June of 2017, and I've been there ever since.

20   Q.  All right.  Tell us a little bit, first of all,

21   before we get much more into your career, about

22   your educational background.

23   A.  I received an associate's degree from

24   Southwestern Illinois College in Belleville.  After

25   that, I received a bachelor's degree from

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 559

1    Lindenwood University in criminal justice, and then

2    I went on to get my master's degree from Lindenwood

3    University as well in criminal justice

4    administration.

5    Q.  How long did you work for Fairmont City as a

6    police officer?

7    A.  Approximately four-and-a-half years.

8    Q.  Okay.  And what did you do for Fairmont?

9    A.  I was just the basic patrol officer during that

10   time period.

11   Q.  When did you move to the Caseyville Police

12   Department?

13   A.  In June of 2017 is when I got hired in

14   Caseyville.

15   Q.  Okay.  And tell us a little bit about the

16   nature of your duties with Caseyville.

17   A.  Currently I'm a detective sergeant, so I

18   investigate cases that are -- every single felony

19   that comes through Caseyville comes through me and

20   my partner, so I just manage his caseload as well

21   as mine.

22   Q.  Do you also have a specialization as a subject

23   matter expert on digital investigations and

24   cryptocurrency tracing for your department?

25   A.  I do.

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 560

1   Q. All right.  Let's talk just a little bit about

2   that first.  How did you get into being interested

3   in cyber investigations and digital forensics and

4   computer-related investigations?

5   A.  I've always kind of been interested in

6   technology.  Whenever I first took over as a

7   detective, I noticed there was a need for

8   specialties in digital forensics and things of that

9   nature.  Not a lot of detectives did it at the

10  time, so I started looking into it, and I developed

11  a passion for it, and I've kind of just been doing

12  it ever since.

13  Q. Okay.  And in addition to working for

14  Caseyville, do you have responsibilities also with

15  the Major Case Squad of the Greater St. Louis?

16  A.  Yes.  I've been on the Major Case Squad since

17  2018, and I've been promoted to the rank of deputy

18  report officer, which is essentially the number 2

19  in charge of any homicide or major crime

20  investigation, keeping track of the police reports

21  and guiding, you know, the direction of the case

22  while it's in progress.

23  Q. Well, first of all, tell us what the Major Case

24  Squad is.  What's it made up of?

25  A.  The Major Case Squad is a bunch of different

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 561

1    agencies in Illinois and Missouri.  They have one

2    or two detectives per police department that are on

3    the Major Case Squad.  Whenever there is a homicide

4    or a major crime, the detectives all come together,

5    and we attempt to solve that crime.

6    Q.  Are you also certified as a lead homicide

7    investigator for Major Case?

8    A.  That's correct.

9    Q.  And have you had the occasion to use your

10   skills in -- with digital evidence and cyber and

11   computer-related investigations as a member of the

12   Major Case Squad?

13   A.  Yeah, every investigation nowadays involves

14   some sort of digital evidence, whether it's

15   Facebook, Instagram, Google, cell phone records.

16   There always some sort of digital evidence on every

17   investigation nowadays.

18   Q.  I want to kind of streamline your background

19   here and kind of just cut to specifically issues

20   relating to cyber crimes and cryptocurrency since

21   that was your involvement in this particular case.

22            Have you had occasion to undergo any

23   professional training with cyber crimes and

24   cryptocurrency?

25   A.  Yes.  I've been to National Computer Forensics

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 562

1    Institute in Hoover, Alabama, where I went for a

2    week-long training there specifically on all

3    different types of cryptocurrency.

4    Q.  Okay.  So for anyone who's not familiar with

5    the Forensic Institute in Hoover, explain what that

6    is.

7    A.  It is a facility that's ran by the Secret

8    Service, and they train members of local law

9    enforcement as well as Secret Service agents on

10   many different aspects of computers and cyber

11   crimes and all different types of digital things.

12   It's funded by the government, and they provide

13   training.  They also provide you tools once you

14   leave to take back home.

15   Q.  What's the significance of the institute being

16   run by the Secret Service?

17   A.  I've been on the Secret Service Financial and

18   Cyber Crimes Task Force since 2020, and it's just

19   one or two detectives from specific agencies that

20   get together to help solve digital crime.

21   Q.  Before we get to the task force, I want to talk

22   with your training in Hoover first.

23   A.  Okay.

24   Q.  That's run by the Secret Service; is that

25   right?

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 563

1    A.  Correct.

2    Q.  Tell us a little bit about the Secret Service's

3    charter.  We all know the Secret Service protects

4    the President and does executive protection,

5    right?

6    A.  Correct.

7    Q.  Okay.  The Secret Service also has another very

8    important part of their mission.  Tell us, what is

9    that?

10   A.  So the second part of the Secret Service is

11   they protect the economy, essentially, from digital

12   and financial and cyber crimes.  They're in charge

13   of protecting our dollar.

14   Q.  And so this institute that they run in Hoover,

15   Alabama, is it safe to say that's --

16          MS. FRETER:  Mr. Weinhoeft, could you slow

17   down just a little bit for us over here.

18          MR. WEINHOEFT:  You bet.  You bet.  Sorry.

19   Trying to move through quickly.  I apologize.

20          MS. FRETER:  That's okay.

21   BY MR. WEINHOEFT:

22   Q.  Is it safe to say the institute in Hoover is

23   the premier law enforcement training facility in

24   the United States for computer forensics and cyber

25   crime and cryptocurrency investigations?

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 564

1    A.  Yes, I would say so.

2    Q.  Tell us about the training you took there and

3    the courses you received.

4    A.  I've taken courses on digital forensics there,

5    digital evidence investigations, cryptocurrency,

6    credit card skimming devices, basic network

7    investigative technique, open-source intelligence,

8    and I'm scheduled to go back next month for a

9    command line principles course on computers as

10   well.

11   Q.  Okay.  And to put just a little bit of meat on

12   the bones there, what's open-source intelligence?

13   A.  Open-source intelligence is information that's

14   out there on the Internet that anyone is available

15   to find if you know where to look.

16   Q.  You mentioned that you were trained on digital

17   currency.  Let's take just a second to make sure

18   everybody understands what digital currency is.

19   Kind of big picture first.

20   A.  So digital currency is an asset that is

21   digital, that's not the same as paper money, but

22   it's an asset that the majority of people agree

23   that has value, and it can be traded via one

24   computer or one cell phone from person to person.

25   Q.  And there are dozens and dozens and dozens of

ALLISON - DIRECT/WEINHOEFT          Vol. 3 - 565

1    different types of digital currency that exist?

2    A.  Correct, yeah, there's who knows how many.

3    Hundreds, I assume.

4    Q.  Right.  And I mean, we can get into a whole

5    side discussion on tokens and all the rest of that

6    stuff, but suffice it to say, Bitcoin is probably

7    the most widely known of the digital currencies.

8    Would you agree with that?

9    A.  Yes.

10   Q.  Tell us a little bit about digital forensics.

11   What does that mean, and how do you conduct cyber

12   investigations and digital forensics?

13   A.  You may do several different things.  You may

14   extract data from someone's cell phone.  You may

15   get cell phone records.  You may analyze their

16   computer.  You may trace their cryptocurrency

17   transactions.  There's several different things

18   that it could mean.

19   Q.  Very well.  Let's go into that last one you

20   mentioned, cryptocurrency tracing.  What is

21   cryptocurrency tracing?  What does that mean?

22   A.  So cryptocurrency tracing is following

23   transactions via the cryptocurrency blockchain in

24   order to figure out where the ultimate destination

25   of funds went.

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 566

1    Q. So essentially, it's just tracing the flow of

2    money?  It's really, in a lot of ways, just that

3    simple conceptually?

4    A. Yes.

5    Q. All right.  And in addition to your training

6    with cryptocurrency training -- or in addition to

7    your training with cryptocurrency tracing, have you

8    had the opportunity to perform that type of

9    analysis in your work?

10   A. Yes.

11   Q. Have you had the occasion to become associated

12   with any professional groups related to

13   cryptocurrency investigations?

14   A. Yes.  Currently, like I said, I'm on the Secret

15   Service Financial and Cyber Crimes Task Force, and

16   I'm also on the Midwest Cryptocurrency Task

17   Force.

18   Q. So let's talk about the Secret Service Task

19   Force first.  You mentioned before the role of the

20   Secret Service in really safeguarding the nation's

21   financial infrastructure.  That's essentially what

22   they do; is that right?

23   A. Yes.

24   Q. All right.  What types of task forces has the

25   Secret Service established nationally to address

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 567

1    emerging threats that occur from cryptocurrency
2    crimes?
3    A.  They do their own cryptocurrency investigations
4    if it meets a certain threshold.  They develop
5    smaller task forces, like the one that I'm on,
6    which is local law enforcement agencies, to handle,
7    you know, the smaller, every day-to-day cases that
8    happen the most often.
9    Q.  Is it fair to say that the Secret Service Task
10   Forces are designed to enhance cooperation and
11   coordination between state, federal and local law
12   enforcement?
13   A.  Yes.
14   Q.  And just to, again, give a real practical
15   example of that, just in the Metro East region
16   here, you might have Belleville police, O'Fallon
17   police, Caseyville police, the like; not
18   necessarily practical to have a subject matter
19   expert at each and every department; so rather,
20   there's certain experts that are identified that
21   help more regionally?  Is that fair to say?
22   A.  Yeah, that's fair to say.  If someone needs
23   something that they don't currently have, it's a
24   resource for them to reach out to a task force like
25   the Midwest Crypto Task Force or the Secret Service

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 568

1    Task Force.

2    Q.  So in addition with your Secret Service

3    Cryptocurrency Task Force, you mentioned a

4    different task force called the Midwest

5    Cryptocurrency Task Force.  Are you also a member

6    of it?

7    A.  Yes.

8    Q.  Tell us what that is.

9    A.  It's a task force that was developed in

10   St. Louis County out of their police headquarters.

11   I was one of the first original members, but now, I

12   believe the task force is in 13 states.

13   Q.  And do you provide services for other law

14   enforcement agencies in tracing cryptocurrency and

15   assisting with these types of investigations?

16   A.  Yes.

17   Q.  And give us an idea of the geographic span of

18   how far away different agencies that you've worked

19   with.

20   A.  I've worked with agencies all over the Metro

21   East as far north as like Joliet in Illinois, and

22   I've also assisted in a few agencies in Kentucky,

23   actually, seized some crypto for them as well.

24   Q.  And when you perform cryptocurrency analysis,

25   give us an idea, just in general terms, how that

ALLISON - DIRECT/WEINHOEFT              Vol. 3 - 569

1  happens.  What do you do?

2  A.  I have software that helps me analyze the

3  transactions.  Anyone can go online and see a

4  cryptocurrency transaction, but the software that I

5  have attributes wallet addresses to a certain

6  place, where they go, and that's -- I just,

7  essentially, follow the flow of the money until it

8  gets to somewhere that they can either sell it,

9  swap it or keep it in their wallet at that place.

10  Q.  And so for how many years have you been using

11  these skills in doing cryptocurrency investigations

12  and tracing?

13  A.  Approximately two years.

14  Q.  And approximately how many times a week would

15  you say you use these skills practically

16  speaking?

17  A.  It just varies by week.  I mean, some weeks I

18  can have one.  Some weeks I can have ten, but I

19  mean, I know I've looked at -- there's no

20  telling -- over a hundred cases for sure.  I mean,

21  more than that.  I haven't kept track.

22  Q.  Do you hold any professional licensing or

23  certification as it relates to cryptocurrency

24  investigation?

25  A.  Just the training that I did at The National

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 570

1    Computer Forensics Institute, I have a certificate

2    from there for completing the digital currency

3    course.

4    Q.  And were you previously qualified as an expert

5    in digital cases in the case of *State vs. Justin*

6    *Griffin,* a St. Clair County case, that was charged

7    in 2021?

8    A.  Yeah, during that case, I was an expert for

9    some cell phone records and cell phone records

10   analysis in that case.

11   Q.  Very good.

12           MR. WEINHOEFT:  Your Honor, at this time I

13   will tender Sergeant Allison as an expert in the

14   field of cryptocurrency investigations.

15           MS. FRETER:  No objection.

16           THE COURT:  Sergeant Allison is qualified

17   to offer opinions in this area.

18           MR. WEINHOEFT:  Very good.

19   BY MR. WEINHOEFT:

20   Q.  All right.  We're going to go through, you

21   know, a little abbreviated -- just to make sure

22   everybody understands what crypto is, how it's

23   traced.  Tell us, how is it money?  How is

24   cryptocurrency -- how is this thing that I can't

25   put in my pocket, how is that money?

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 571

1    A.  It's something that the majority of people

2    agree that has value.  Just -- it's no different

3    than gold or it's no different than silver or an

4    actual piece of paper that everyone agrees has

5    value that can be traded among people.

6    Q.  Okay.  So it's a store of value?

7    A.  Yes.

8    Q.  It's also a unit of count?  You can keep track

9    of how much you have?  Is that fair to say?

10   A.  Yes.

11   Q.  And it's something that's widely exchanged

12   between people around the world; is that true?

13   A.  Yes.

14   Q.  All right.  So tell us how is it issued, if you

15   will, and I don't want to get into mining and all

16   of those things.  No need to go down that road, but

17   who issues it if -- I'll start with that question.

18   Who issues it?

19   A.  So the vast majority of people are going to

20   purchase cryptocurrency from a cryptocurrency

21   exchange.  An exchange is a place where you can

22   buy, sell, trade, swap cryptocurrency.  That's

23   where the majority of the people are going to be

24   purchasing cryptocurrency, but there's also

25   different ways, like things, like Bitcoin ATMs

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 572

1    where you can purchase cryptocurrency as well.

2    Q.  But it's not issued by a government?

3    A.  It's not.

4    Q.  It's not issued by a bank?

5    A.  No.

6    Q.  So it's actually created by its own software

7    protocol?  Is that fair to say?

8    A.  That's correct.  It's maintained by the

9    software protocol, and it's also maintained by

10    people.  It's decentralized.  It doesn't require a

11    bank, and transactions can be done 24 hours a day,

12    seven days a week.

13    Q.  Okay.  And how can cryptocurrency be exchanged?

14    You talked about a cryptocurrency exchange to begin

15    with.  You mentioned that, so let's start there.

16    What is a cryptocurrency exchange?

17    A.  Essentially an online bank where you can sell

18    it for cash.  You can buy it with cash.  You can

19    trade one type for another.  It's just -- it's a

20    digital bank essentially.

21    Q.  It's -- as the name implies, it's an

22    exchange?

23    A.  Yes.

24    Q.  And you can trade different types of

25    cryptocurrency in an exchange as well; is that

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 573

1    right?

2    A.  That's right.

3    Q.  Swap Ethereum for Bitcoin if you wanted, things

4    like that?

5    A.  Yes.

6    Q.  All right.  So you can conduct transactions

7    through an exchange.  That's one way we can do a

8    transaction?

9    A.  Yes.

10   Q.  Have you heard of a peer-to-peer transaction?

11   A.  Yes.

12   Q.  How is a peer-to-peer transaction different

13   than the transaction that goes through an

14   exchange?

15   A.  Peer-to-peer transaction is a person-to-person

16   transaction that can be done 24 hours a day, seven

17   days a week.  I can send money to anyone on the

18   planet any time I want as long as I have their

19   wallet address to be able to send them the funds.

20   Q.  So if you wanted to send me $100 for something,

21   as long -- you could send that money through

22   cryptocurrency directly to me, wallet to wallet,

23   without it going through an exchange or without it

24   going through a bank or without it going through

25   any government entity; is that true?

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 574

1    A.  Yes.

2    Q.  All right.  And that's what we mean by

3    peer-to-peer; is that right?

4    A.  Yes.

5    Q.  Okay.  So we've got exchange transactions,

6    we've got peer-to-peer transactions, and then you

7    also mentioned Bitcoin ATMs.  All right.  Bitcoin

8    ATMs are just a little bit different, and tell us

9    how.

10   A.  Bitcoin ATMs are popping up everywhere.  I'm

11   sure a lot of the people in this room have seen

12   them.  You can walk into a store, a mall.  You can

13   purchase Bitcoin directly from the ATM with cash,

14   you can tell the Bitcoin ATM company where you

15   would like it sent, and then they will do that on

16   your behalf after they take their fees.

17   Q.  All right.  I previously used the term

18   "wallet."  We should explain what that means.

19   Where does a person keep their cryptocurrency?

20   A.  They keep it in what's called a wallet.  A

21   wallet is just a digital application where you can

22   store, receive or send cryptocurrency.

23   Q.  All right.  So while we call it a wallet, it's

24   not something leather that's going to sit in my

25   pocket?

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 575

1    A.  No.  A wallet can be on your phone.  A wallet

2    can be something similar to a hard drive.  A wallet

3    can be on a piece of paper.  It's just something

4    that interacts with the blockchain where you can

5    store, receive or send cryptocurrency.

6    Q.  The wallet itself wouldn't be on a piece of

7    paper --

8    A.  The wallet --

9    Q.  -- the receipt might be?

10   A.  The wallet address.

11   Q.  The wallet address could be there?

12   A.  Yes.

13   Q.  And you can also store -- have a digital wallet

14   in an exchange.  You can store Bitcoin in an

15   exchange as well; is that right?

16   A.  Yes.

17   Q.  All right.  So for folks who have never engaged

18   in a cryptocurrency transaction before that say,

19   But wait a second, I can make copies of things on

20   my phone.  It's digital.  It can be copied.  How do

21   I know that Bitcoin is being transacted, and how do

22   I know -- much like when I take a check, how do I

23   know there's money in the account so that this

24   check is going to be good and this check wouldn't

25   bounce?  Do you understand my analogy?

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 576

1    A.  Yes.

2    Q.  Help the jury understand how it is that the

3    Bitcoin system maintains its security and its

4    integrity so that we don't have what's commonly

5    called the double spending problem, like basically

6    writing multiple checks out of the same account?

7    A.  Yeah, so every Bitcoin transaction that has

8    ever occurred is on the Bitcoin blockchain.  So the

9    Bitcoin blockchain is maintained by hundreds, if

10   not thousands, of individuals around the globe, and

11   every transaction is open-source.  It can be viewed

12   by anyone.  So the wallet addresses that have

13   previously interacted are checked when a

14   transaction occurs to ensure that there are funds

15   in the account.

16   Q.  Is it fair to characterize the blockchain as a

17   ledger?

18   A.  Yes.

19   Q.  All right.  So before a Bitcoin transaction can

20   happen, if I send -- try to send you Bitcoin that

21   has to -- that transaction has to be verified

22   electronically before the transaction is validated;

23   is that right?

24   A.  Yes.

25   Q.  And that validates that I actually have the

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 577

1    money?

2    A.  Yes.

3    Q.  And I actually have the Bitcoin that I say that

4    I have?

5    A.  Yes.

6    Q.  And that you have a valid wallet that can

7    accept that Bitcoin?

8    A.  Yes.

9    Q.  And once the system, through the mining and the

10   rest of that, confirms the validity of the

11   transaction, it's added to the blockchain to record

12   it?

13   A.  Yes.

14   Q.  And then the money flows through to you?

15   A.  That's correct.

16   Q.  And once a transaction is on the blockchain, is

17   that stable and secure?

18   A.  Yes.  Once it's on the blockchain it can never

19   be altered or changed.  The blockchain is

20   permanent.

21   Q.  And what does the blockchain record?  If I

22   send -- again, let's take it back to -- you know,

23   instead of me taking $100 from you.  This time you

24   get to take $100 from me, right?  I send you a

25   $100.  What's the blockchain going to record when I

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 578

1    initiate a Bitcoin transaction from my wallet to

2    your wallet?

3    A.  It's going to record the amount of

4    cryptocurrency that you sent me, you know, the

5    dates, the times, from what wallet address it was

6    sent from to the wallet address it was sent to.

7    Those are the main things that it records.

8    Q.  And the wallet address -- give the members of

9    the jury an idea of kind of just how unique or

10   complex those address strings are and what that

11   actually looks like when you're doing your work.

12   A.  So a wallet address is a string of several

13   characters that can be letters, numbers, they can

14   be capitalized, they're completely random in order

15   to ensure that they are unique, so they can be

16   quite complex, and the -- they can be several

17   different characters.  So each individual -- so

18   there's a bunch of different wallet addresses

19   available for everyone.  So as long as you have the

20   right one, you can complete a transaction.

21   Q.  So your process when you do Bitcoin tracing --

22   again, to maybe oversimplify a little bit -- you're

23   simply looking at what wallets the Bitcoin

24   transfers move between; is that right?

25   A.  Yes, I'm essentially looking to see which

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 579

1    wallet it came from and which wallet it went to,

2    and I do that process over and over until I can

3    identify where it goes and, ultimately, it always

4    goes to an exchange.

5    Q.  And do you have software that helps you

6    accomplish this task?

7    A.  Yes.

8    Q.  What software do you use to accomplish this

9    task?

10   A.  Software is called TRM Labs.

11   Q.  Why do you use TRM Labs to conduct your

12   cryptocurrency tracing investigations?

13   A.  That is the software that I got when I went to

14   the National Computer Forensics Institute.  Most

15   people in the crypto tracing community agree that

16   it's the gold standard when it comes to blockchain

17   tracing.  It's very user friendly, and like I say,

18   the general consensus is it's the best software out

19   there.

20   Q.  And this is an industry standard used not only

21   in law enforcement but also in private business; is

22   that correct?

23   A.  That's correct.  Even the cryptocurrency

24   exchanges, a lot of them use TRM Labs to trace

25   incoming transactions to them as well.

ALLISON - DIRECT/WEINHOEFT              Vol. 3 - 580

1    Q.  So this is a software that's generally accepted
2    in the forensic cryptocurrency tracing community;
3    is that correct?
4    A.  Yes.
5    Q.  And the software itself, have you been able to
6    find it reliable; meaning, that different analysts
7    look at the same problem, they come up with
8    consistent and same results?
9    A.  Yes.
10   Q.  And is the software also subject to peer review
11   and peer testing within the community of
12   cryptocurrency investigators?
13   A.  Yes.  If there was an issue with the software,
14   a lot of people would know about it really fast.
15   Q.  All right.  And so in your capacity as a
16   cryptocurrency investigator, did you have the
17   occasion to become involved in the investigation of
18   some cryptocurrency transactions that happened from
19   a woman that lives in Edwardsville by the name of
20   Virginia Bryan?
21   A.  I did.
22   Q.  How did you become involve in this particular
23   investigation?
24   A.  Detective Conor Hoyland from Edwardsville
25   Police Department contacted me, told me about the

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 581

1    case.  He sent me information that he had that I

2    could start tracing on the blockchain.  He sent me

3    some QR codes of some wallet addresses and some

4    Bitcoin ATM receipts that were discovered in the

5    victim's cell phone.

6    Q.  All right.  There is a another new concept that

7    we need to talk about for a second, QR codes.  What

8    is a QR code?

9    A.  A QR code is not specific to cryptocurrency.

10   It's just a -- something you can scan with the

11   camera of your cell phone, and it will take you to

12   a certain place.  A lot of people and a lot of

13   exchanges put Bitcoin wallet addresses onto QR

14   codes because they're so complex that a lot of

15   people just want to copy and paste the wallet

16   address without messing it up, so they attach it to

17   a QR code.

18   Q.  And so QR codes are just a common way to store

19   Bitcoin wallet addresses.  Would you agree with

20   that?

21   A.  Yes.

22   Q.  All right.  So in this particular case, did you

23   look at five individual transactions of Bitcoin

24   purchases?

25   A.  I did.

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 582

1    Q. All right.  So let's also make sure the jury

2    understands -- because these terms will probably

3    come up, Coinhub and Coinbase.  Okay.

4         You mentioned a Bitcoin ATM.  Can you tell

5    us what Coinhub is and how Coinhub is related to

6    ATM networks?

7    A. Coinhub is an ATM company.  It's a Bitcoin ATM

8    company.  It's just one of the many companies out

9    there.  There's Bitcoin Depot, there's all

10   different kinds, but Coinhub is just a specific

11   Bitcoin ATM company.

12   Q. Okay.  So, again, let's take this back to

13   things we're all familiar with.  If we went to an

14   ATM machine to get money out of our account, for

15   example, that ATM machine we use at the

16   drive-through, or wherever, can connect to all

17   sorts of different banks.  That ATM is not where

18   the money is actually stored.  Is that fair to

19   say?

20   A. Yeah, it's fair it say.  People insert money

21   into Bitcoin ATMs; and then once a transaction is

22   initiated, it's initiated from the Bitcoin ATM

23   company's wallet address to the destination address

24   that the person put in when they completed the

25   transactions.

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 583

1    Q. So if I go to a Bitcoin ATM machine and feed it

2    money, I'm actually purchasing Bitcoin; is that

3    true?

4    A. Yes.

5    Q. And then that money, once it's converted into

6    Bitcoin, where does it go?

7    A. A courier, in general, that I've heard, comes

8    by and picks up the cash.

9    Q. No, no, not the actual cash.  I'm not talking

10   about the cash.

11   A. All right.

12   Q. I'm talking about if I go to -- if I want to

13   buy Bitcoin at a Bitcoin ATM machine, once I feed

14   my money into that machine and I've purchased

15   Bitcoin, that Bitcoin, you know, I need to send

16   that somewhere.  How do I do that?

17   A. So the Bitcoin ATM company does that on your

18   behalf because you have to put in a destination

19   wallet address when you purchase it and tell the

20   company where to send it.

21   Q. So when I purchase that Bitcoin, I tell the

22   machine to send it to your wallet if I want to send

23   that money to you; is that right?

24   A. Correct, yes.

25   Q. And so Coinhub is the business that operated

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 584

1    the ATM machine that you examined in this

2    particular case; is that right?

3    A.  That's correct.

4    Q.  All right.  So now tell us what Coinbase is.

5    A.  Coinbase is one of the most popular

6    cryptocurrency exchanges in the United States.

7    They have to follow United States' regulations and

8    laws.  There's also a couple different ones in the

9    United States, Kraken and Binance, but Coinbase is

10   definitely the number one cryptocurrency exchange

11   in the United States.

12   Q.  And so that is -- that's also a custodial

13   location for -- where wallets can hold and host

14   money as well; is that right?

15   A.  Yeah, that's correct.

16   Q.  All right.  And if we could publish Exhibit No.

17   74, please.  For the sake of brevity of going

18   through your analysis in this case, let me know

19   when you can see Exhibit 74.  Can you see it now?

20   A.  Yes.

21   Q.  This was previously admitted through another

22   witness, and you'll see five different entries for

23   March 21st, 22nd, 23rd, 24th and April 7th where

24   there were Bitcoin purchases at a Bitcoin ATM

25   machine.  Do you see those entries?

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 585

1    A.  I do.

2    Q.  Are those the same transactions that you traced

3    and investigated in this particular case?

4    A.  They are.

5    Q.  All right.  And let's just take them all

6    together because the analysis is quite simple in

7    this case.  Is that fair to say?

8    A.  Yeah, it's an extremely simple trace in this

9    particular case.

10   Q.  As far as crypto investigations go, this is

11   about as easy as it gets?  Is that fair to say?

12   A.  That's fair to say.

13   Q.  All right.  Tell us where the money went in

14   each of these instances.  I don't need the exact

15   wallets.  We don't need to get into the weeds.

16   Just make sure we understand where did the money go

17   on each of these five transactions.  From the time

18   the Bitcoin was purchased, where was the next

19   stop?

20   A.  After it was purchased, it was sent to the

21   wallet address that the person input whenever

22   purchasing it; and then after that particular

23   wallet address, it went to a cryptocurrency

24   exchange.  So there's only three addresses for each

25   transaction involved in this case.

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 586

1    Q.  Okay.  So in this case Virginia had made the

2    purchase.  So she would have had to -- with one of

3    those QR codes that came on her phone would have

4    had to tell the machine where to send the Bitcoin,

5    right?

6    A.  Yes.

7    Q.  All right.  And so then that wallet would have

8    received the Bitcoin; is that correct?

9    A.  Correct.

10   Q.  And are you able to identify any individual or

11   any person from that first stop?

12   A.  No.  You can't really identify someone based

13   off of an unattributed wallet.  You can't identify

14   anyone based off of it.

15   Q.  Let's go back to the example of if I send

16   you -- if I pull out my phone, and I pull up my app

17   that has a wallet that contains crypto, and I send

18   some to you, the blockchain will show those numbers

19   of our wallets, but those are basically anonymous,

20   and there is not a way to specifically attribute

21   those to a person independently just by themselves?

22   Is that fair to say?

23   A.  That's correct.

24   Q.  All right.  What is the best way to be able to

25   identify an individual person that's engaging in a

ALLISON - DIRECT/WEINHOEFT                    Vol. 3 - 587

1    Bitcoin transaction?

2    A.  The best way is to figure out where the funds

3    end up, which is ultimately a cryptocurrency

4    exchange, and then reach out to the cryptocurrency

5    exchange and see if they'll provide you the

6    information on who owns the wallet address where

7    the funds were sent.

8    Q.  So let's be a little precise here.  So if I

9    want to get my money back out -- if I hold money in

10   my wallet in Bitcoin and I want to turn it into

11   cash, right, that's got to come out of the system

12   at some point, and that's most commonly done at an

13   exchange; is that right?

14   A.  Yes.

15   Q.  So businesses and companies that engage in

16   Bitcoin transactions or are located in the United

17   States are subject to federal laws known as KYC, or

18   Know Your Customer; is that right?

19   A.  That's correct.

20   Q.  How does that help you in your investigation?

21   A.  It's huge for an investigation.  Whenever I

22   contact a cryptocurrency exchange and request KYC,

23   or Know Your Customer, they have to provide -- in

24   the United States at least -- name, date of birth,

25   address, phone number, email address.  They provide

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 588

1    IP logs, device access information.  They provide a

2    lot of information that will let me know who the

3    owner of that wallet address is.

4    Q.  And if I'm using a cryptocurrency exchange that

5    operates in the United States, and I'm engaging

6    with transactions with them, and I have a wallet

7    there, I have to send them a copy of my driver's

8    license, a picture of it -- a picture so they can

9    see my face, so she can see my driver's license, so

10   we literally know your customer; is that right?

11   A.  That's correct --

12   Q.  All right.  Now, how about companies that don't

13   exist in the United States -- cryptocurrency

14   exchanges that don't -- aren't -- they don't reside

15   here, they don't do business in the United

16   States?

17   A.  They essentially do whatever they want to do

18   wherever they are located.  I've seen some collect

19   pretty decent KYC on their customers, I've seen

20   collect none, but I've sent legal process to them,

21   and I have not heard back, and there is nothing I

22   can do about it because they are not based in the

23   United States and don't have to follow our laws.

24   Q.  And so different countries, you get different

25   rates of cooperation with law enforcement; is that

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 589

1   right?

2   A.  That's right.

3   Q.  All right.  So our tracing in this case is

4   pretty simple.  It goes from -- Virginia makes a

5   purchase.  She sends it -- it goes to a private

6   wallet that was designated to her, correct?

7   A.  Correct.

8   Q.  Were you able to see that money come out of

9   that private wallet and go somewhere else?

10  A.  Yes.

11  Q.  And did all five of those transactions end up

12  in that same place?

13  A.  Yes.

14  Q.  Where did those -- each of those five

15  cryptocurrency transactions end up?

16  A.  They all ended up at a cryptocurrency exchange

17  that's based in the Seychelles called MEXC

18  Global.

19  Q.  So ME-- MECX or --

20  A.  MEXC.

21  Q.  XC, very good.  And that is in Seychelles,

22  spelled S-e-y-c-h-e-l-l-e-s; is that right?

23  A.  Correct.

24  Q.  Okay.  Where is Seychelles?

25  A.  Seychelles is in the Indian Ocean, like

ALLISON - DIRECT/WEINHOEFT                Vol. 3 - 590

1    Southwest of India, off the East Coast of Africa.

2    It's a really small island nation.  MEXC, I

3    believe, has their main headquarters there, but

4    they also have some headquarters that are, you

5    know, based around the globe, but that's their main

6    headquarters.

7    Q.  Okay.  At the time of the investigation, were

8    they cooperative with law enforcement as you tried

9    to trace the transfer of funds beyond their receipt

10   in that tiny island nation, Seychelles?

11   A.  They were not.  They would not even let you

12   make a request to them based off of your IP address

13   being in the United States at that time.

14   Q.  So you essentially lost the money -- lost track

15   of the money once it went to the Indian Ocean?

16   A.  Yes.

17   Q.   All right.  Very good.

18        MR. WEINHOEFT:  Those are all of my

19   questions, Your Honor.

20        MS. FRETER:  I don't have any questions.

21        THE COURT:  You're done.  Free to go.

22        (Witness excused.)

23        THE COURT:  Who is our next witness?

24        MR. REED:  We have two bank witnesses

25   next, Judge.

HARDCASTLE - DIRECT/REED                    Vol. 3 - 591

1              THE COURT:  Two what?

2              MR. REED:  Bank wire witnesses.

3              THE COURT:  Those shouldn't take too long,

4     but it is right after lunch.  Let's do a quick

5     five-minute break.  Get your guys lined up and

6     we'll get to it.

7              (Recess at 1:03 p.m. until 1:14 p.m.)

8              (Jury present.)

9              THE COURT:  Call your next witness.

10             MR. REED:  Yes, Judge, the Government

11    calls Ian Hardcastle.

12             COURTROOM DEPUTY:  Please raise your right

13    hand.

14             (Witness sworn.)

15             COURTROOM DEPUTY:  Please state your name

16    and spell your last name for the Court.

17             THE WITNESS:  Hi, my name is Ian Michael

18    Hardcastle, H-a-r-d-c-a-s-t-l-e.

19             COURTROOM DEPUTY:  Thank you so much.

20             **IAN HARDCASTLE, GOVERNMENT'S WITNESS,**

21                      **DIRECT EXAMINATION**

22    BY MR. REED:

23    Q.  Good afternoon, Mr. Hardcastle.  Thank you for

24    your time.

25             Could you tell the jury where you work,

HARDCASTLE - DIRECT/REED                    Vol. 3 - 592

1    sir.

2    A.  I'm currently employed for U.S. Bank.

3    Q.  And how long have you been with U.S. Bank?

4    A.  Just over ten years.

5    Q.  And what do you do there?

6    A.  I am a market operations analyst in support of

7    our Missouri and Arkansas market which includes

8    some periphery areas like Illinois Metro East

9    here.

10   Q.  And as a market operation analyst, kind of what

11   do you do?

12   A.  I support our brick-and-mortar retail branches

13   operationally with anything from like training to

14   processing transactions to back office research,

15   anything outside of, like, sales or revenue

16   production.

17   Q.  Okay.  So in that role are you familiar with

18   the electronic systems used to log transactions at

19   U.S. Bank?

20   A.  Yes.  As far as they interact with our retail

21   branches, yes, sir.

22   Q.  Okay.  Can you tell us about that process.

23   A.  Whenever you do a physical transaction in a

24   brick-and-mortar branch, any kind of negotiable

25   item that you might bring in like a check or a bank

HARDCASTLE - DIRECT/REED                    Vol. 3 - 593

1    payment, anything like that, is going to be scanned

2    and then imaged and then stored on servers.  Along

3    with any kind of transaction ticket, like a

4    withdrawal, deposit ticket, anything like that,

5    that you would use for cash back would also be

6    scanned at that time at the teller station on a

7    little scanner and then stored on our servers.

8    Q.  And where are those servers located?

9    A.  Chaska, Minnesota, and Olathe, Kansas.

10   Q.  All right.  So when I go in with my withdrawal

11   slip to U.S. Bank, it's going to go from that bank

12   wherever I am to Minnesota or Kansas?

13   A.  That is correct.

14           MR. REED:  Okay.  Can we put up Exhibit

15   No. 3 for the witness, please.

16   BY MR. REED:

17   Q.  Tell me when you can see that, sir, on the

18   screen in front of you.  There it is.  Okay.

19           Are these U.S. Bank records for Virginia

20   Bryan?  Her name is up at the top.

21   A.  I don't have it on my screen yet.

22   Q.  Oh I'm sorry.  It's not up there?

23           COURTROOM DEPUTY:  It should be.

24           THE WITNESS:  There we go.

25   BY MR. REED:

HARDCASTLE - DIRECT/REED                    Vol. 3 - 594

1    Q.  Okay.  See the name "Virginia Bryan" at the

2    top?

3    A.  Yes, I do.

4    Q.  It says U.S. Bank?

5    A.  Yep.

6           MR. REED:  Move to admit Number 3.

7           MS. FRETER:  No objection.

8           THE COURT:  Admitted without objection.

9           (Government's Exhibit No. 3 was received

10   in evidence.)

11          MR. REED:  Can we go down to page 14

12   briefly, please.

13   BY MR. REED:

14   Q.  Do you see this check from Chase Bank?

15   A.  Yes, I do.

16   Q.  Okay.  Trying to find a number for you.  There

17   we go.

18          MR. REED:  Thank you.

19   BY MR. REED:

20   Q.  Does this show an initial deposit of $60,000?

21   A.  Yes, it does.

22   Q.  On April 12, 2023?

23   A.  That is correct.

24   Q.  Okay.  And from these numbers, can you tell

25   me --

HARDCASTLE - DIRECT/REED                    Vol. 3 - 595

1          MR. REED:  I think it's on the back of the

2     check if we can look at the back of the check.

3     There it is.  Thanks.

4     BY MR. REED:

5     Q.  Okay.  Can you tell from the notations on the

6     back of this check what bank location Ms. Bryan

7     visited to make this deposit?

8     A.  Yes.  On the typing there in the middle on the

9     second line, the fourth, fifth, sixth and seventh

10    digits, 8502, correspond with a branch number.

11    That would be the Edwardsville, Illinois,

12    location.

13    Q.  Okay.  So would this deposit have been logged

14    from Edwardsville, Illinois, to those servers in

15    Minnesota and Kansas?

16    A.  That is correct.

17         MR. REED:  If we could jump down to page

18    21.

19    BY MR. REED:

20    Q.  Okay.  What are we looking at here on page

21    21?

22    A.  This is an item that's created whenever a

23    withdrawal is done in person.  So on the top here,

24    you've got the amount as well as the account it

25    came out of as well as the date and the time; and

HARDCASTLE - CROSS/FRETER                 Vol. 3 - 596

1    then on the back, similarly to the other one,

2    you'll have a corresponding branch number in the

3    typed line there --

4    Q.  Okay.

5    A.  -- the 8502.

6    Q.  The same branch as before, Edwardsville,

7    Illinois?

8    A.  That is correct.

9           MR. REED:  Go back to the full Screen.

10   BY MR. REED:

11   Q.  This transaction for $35,000 occurred on April

12   20, 2023?

13   A.  That is correct.

14   Q.  And so same deal here.  It would have gone from

15   that Edwardsville, Illinois, branch and been logged

16   on those servers in Minnesota or Kansas?

17   A.  That is correct.

18           MR. REED:  No further questions.

19                    **CROSS-EXAMINATION**

20   BY MS. FRETER:

21   Q.  So I think I got confused.  When you say logged

22   on, what do you mean by that?

23   A.  When -- you'd have to --

24   Q.  So you just were asked, And this was "logged

25   on" a server?

HARDCASTLE - CROSS/FRETER                    Vol. 3 - 597

1    A.  Oh.

2    Q.  I don't -- when you say logged on, I'm not

3    understanding what you mean.

4    A.  The physical item is going to be copied or

5    scanned on our systems, on a physical scanner, and

6    then it's going to be uploaded onto one of those

7    two scanners would probably be a better way to put

8    it.

9    Q.  Okay.  Like if -- is what you're saying, like,

10   I come in with my deposit slip, I give it to the

11   teller, they put it on a scanner -- like just a

12   document scanner?

13   A.  No, it's like a small scanner like this that

14   runs things horizontal, like IDs, deposit slips,

15   things generally bill size to fit through it; and

16   then it makes a copy on both sides as it runs

17   through.

18   Q.  Like a SnapScan?

19   A.  It's got wheels, so yeah.

20   Q.  Okay.  Just a --

21   A.  Small conveyor belt scanner would be a good way

22   to put it.

23   Q.  And that's my little handwritten deposit slip.

24   It scans the document and then it saves the

25   document and sends it to a server that's somewhere

HARDCASTLE - CROSS/FRETER                    Vol. 3 - 598

1  else; is that right?

2  A.  To one of two servers, that's correct.

3  Q.  I'm sorry.  I didn't -- it was too fast for me.

4  A.  Oh, I'm sorry.  To one of two servers, that's

5  correct.

6  Q.  One of two servers.

7         Okay.  U.S. Bank has a server in Nebraska,

8  and it has a server in Minnesota.

9  A.  Kansas and Minnesota.

10  Q.  Sorry.  And the server is just like a -- it's

11  an electronic data storage thing, right?

12  A.  My understanding of what a server is, yes.

13  Q.  Okay.  But it's -- it's storing the scanned

14  deposit slip as a record so you could look at it

15  later, right?

16  A.  Yes, and in some instances, like, checks to be

17  verified kind of in realtime with other systems.

18  Q.  Okay.  This logging and storing, it's just a

19  record keeping mechanism; is that right?

20  A.  As opposed to?

21  Q.  I think I --

22  A.  I'm not sure what other kind of storing or

23  record keeping would exist besides -- sorry.  Go

24  on.

25         MS. FRETER:  Okay.  I don't think I have

HARDCASTLE - RECROSS/FRETER          Vol. 3 - 599

1    any other questions.

2                    **REDIRECT EXAMINATION**

3    BY MR. REED:

4    Q.  Okay.  Let's clarify that.  When I get my bank

5    statement from U.S. Bank -- well, I'll start with:

6    I go into U.S. Bank.  I want to make a withdrawal.

7    U.S. Bank needs to know how I have -- whether I

8    have $35,000 in my account?

9    A.  Yes, sir.

10   Q.  Okay.  Is that the process you're describing?

11   A.  Yes.

12               MR. REED:  Okay.  No further questions.

13                   **RECROSS-EXAMINATION**

14   BY MS. FRETER:

15   Q.  If I go into the bank and I want to take out

16   $50 from my account, the cash that I get is from

17   that branch where I've said, Hey, give me $50; is

18   that right?

19   A.  That is correct.

20   Q.  Okay.  Is what you're saying the verification

21   process for whether I have the $50 is run through

22   these servers in Minnesota or Nebraska (sic)?

23   A.  Yes.  From my understanding all of our DDA,

24   demand deposit account, resources are stored on

25   those two servers.

HARDCASTLE - RECROSS/FRETER              Vol. 3 - 600

1    Q.  Okay.  And so when you say from your

2    understanding, what does that mean?

3    A.  I guess I've never been to the server myself,

4    but that's where we access the documents from,

5    yes.

6    Q.  Okay.  But the 50 bucks is actually coming from

7    the bank that I'm at when they give it to me?

8    A.  If it's physically cash, yeah.

9              MS. FRETER:  I don't think I have anything

10   else.

11             MR. REED:  Nothing else, Judge.

12             THE COURT:  Thank you.

13             THE WITNESS:  Thank you.

14             (Witness excused.)

15             THE COURT:  Call your next banker.

16             MR. REED:  Judge, the Government calls

17   Kevin Geltmaker.

18             COURTROOM DEPUTY:  Please raise your right

19   hand.

20             (Witness sworn.)

21             COURTROOM DEPUTY:  Please state your full

22   name and spell your last name for the Court.

23             THE WITNESS:  Kevin Geltmaker,

24   G-e-l-t-m-a-k-e-r.

25             COURTROOM DEPUTY:  Thank you.  Have a

GELTMAKER - DIRECT/REED                    Vol. 3 - 601

1   seat.

2                **KEVIN GELTMAKER, GOVERNMENT'S WITNESS,**

3                       **DIRECT EXAMINATION**

4   BY MR. REED:

5   Q.  Mr. Geltmaker, if you wouldn't mind moving in

6   so you're speaking in the microphone or you can

7   move the microphone towards you.  Either way.

8        Where do you work, Mr. Geltmaker?

9   A.  Busey Bank.

10  Q.  How long have you been with Busey Bank?

11  A.  Ten years.

12            MR. REED:  Can you guys hear him okay?

13            (Jurors indicating.)

14            THE WITNESS:  Closer.

15  BY MR. REED:

16  Q.  You're fine.  It's hard to hear in this

17  courtroom.

18        Okay.  How long have you been with Busey

19  Bank?

20  A.  Ten years.

21  Q.  And what do you do there?

22  A.  I'm a director of IT and infrastructure.

23  Q.  And in that role, what are some of the things

24  you oversee?

25  A.  My team manages the back end of structure

GELTMAKER - DIRECT/REED                    Vol. 3 - 602

1    server storage data centers.

2    Q.  And in that role, are you familiar with the

3    electronic systems used to log transactions for

4    Busey Bank accounts?

5    A.  Yes.

6    Q.  Can you tell us a little bit about that system.

7    A.  It's called Jack Henry.  It's our core banking

8    system.

9    Q.  Okay.  So let's start at the local branch.  If

10   you start at the local branch with a transaction

11   there, kind of trace it for us back to Jack Henry.

12   A.  Yeah, the customer goes to the teller, the

13   teller would insert that transactions into the Jack

14   Henry software that's on the teller machine.  That

15   transaction would go back to our data center in

16   Illinois which goes to what we consider kind of a

17   gateway server that is running the Jack Henry

18   software.  From that server, the transaction goes

19   to the hosted data center at Jack Henry, which is

20   in Texas and Missouri.

21   Q.  Okay.  So if I'm here in O'Fallon, Illinois, I

22   walk into the bank branch, it's going to go from

23   that computer where the teller is, right, O'Fallon,

24   Illinois, to what I think you described a gateway

25   server in -- where is that?

GELTMAKER - DIRECT/REED                    Vol. 3 - 603

1    A.  That's in Illinois in our data center.

2    Q.  Also in Illinois, okay, and then it's going to

3    go from there to the Jack Henry servers?

4    A.  Correct.

5    Q.  In Texas and Missouri?

6    A.  Correct.

7    Q.  And that's an electronic transfer, one to the

8    other to the other?

9    A.  Yeah, we have a secure network connection with

10   them.

11   Q.  Okay.  And so if I were to walk into the bank

12   and ask for $1,000 out of my account, does that

13   request have to be processed through those servers

14   and then come back so the bank knows I have $1,000

15   in my account?

16   A.  Yes.

17           MR. REED:  If we could put on the screen

18   Government's Exhibit No. 2.

19           COURTROOM DEPUTY:  Just for the witness?

20           MR. REED:  Just for the witness.  Thank

21   you, Jackie.

22   BY MR. REED:

23   Q.  Are those Busey Bank records for Virginia Bryan

24   and Elizabeth Surmeier?

25   A.  Yes.

GELTMAKER - DIRECT/REED                    Vol. 3 - 604

1        MR. REED:  Move to admit Government's

2   Exhibit 2.

3        MS. FRETER:  No objection.

4        THE COURT:  Be admitted.

5        (Government's Exhibit No. 2 was received

6   in evidence.)

7        MR. REED:  Go to page 6, please.

8        THE COURT:  Do you want the jury to see

9   it?

10        MR. REED:  Yes, please, and publish to the

11   jury.  Thank you.

12        Zoom in on the two transactions on April

13   10, 2023.

14   BY MR. REED:

15   Q.  What transactions happened here on April 10 of

16   2023?

17   A.  It looks like a withdrawal for 10,000 and a

18   check for 15,000.

19   Q.  Okay.  So focus first on the $10,000

20   withdrawal.  Would that transaction have been

21   funneled through the Busey Bank server in Illinois

22   and then processed by the Jack Henry servers

23   located in Texas or Missouri?

24   A.  Yes.

25   Q.  Now, the check --

GELTMAKER - CROSS/FRETER                    Vol. 3 - 605

1          MR. REED:  If we go down to page 13, let's

2     see, it's the fourth image down on the right.

3     BY MR. REED:

4     Q.  Is this that $15,000 transactions on April

5     10th?

6     A.  Yes.

7     Q.  Okay.  Does it appear to be a check to

8     "Cash"?

9     A.  Yes.

10    Q.  So this check to "Cash," would it, too, have

11    been funneled through the Busey Bank server in

12    Illinois and then processed by the Jack Henry

13    servers located in Texas or Missouri?

14    A.  Yes.

15         MR. REED:  No questions.

16                    **CROSS-EXAMINATION**

17    BY MS. FRETER:

18    Q.  And when you say funneled through or processed,

19    can you describe what that means?

20    A.  All the transactions go through a secure

21    network connection that we have with Jack Henry as

22    our hosted core provider, so it's going over,

23    basically, the virtual wire if you will.

24    Q.  Okay.  And when you say "going over," I'm just

25    not understanding what that means.

GELTMAKER - CROSS/FRETER                    Vol. 3 - 606

1                I go to the bank with my check for cash.

2    I hand it to them, right, and then they hand me

3    back my cash, right?

4    A.  The virtual -- yeah, a virtual, I guess,

5    transaction through the computer system.  Jack

6    Henry is, essentially, our -- say, your online

7    checking.  It's your virtual checkbook if you will.

8    We don't hold any of that data within Busey Bank.

9    So the funds -- the transaction is, you know,

10   binary.  It's digital across the wire, across the

11   network, secured connection.

12                MS. FRETER:  Okay.  I don't have anything

13   further.

14                MR. REED:  Nothing else.  You can step

15   down, sir.

16                (Witness excused.)

17                THE COURT:  Your next witness?

18                MR. REED:  The Government would call Anar

19   Bhatt, and her name is spelled A-n-a-r, and her

20   last name is spelled B-h-a-t-t.

21                THE COURT:  While she's getting the

22   witness, if it's an exhibit that's not going to be

23   objected to, we don't have to go through the longer

24   process.

25                MS. FRETER:  I think, with this witness,

BHATT - DIRECT/REED                              Vol. 3 - 607

1    Judge, the exhibit is already in.

2              THE COURT:  Okay.  So we'll save a little

3    time.

4              COURTROOM DEPUTY:  Please raise your right

5    hand.

6              (Witness sworn.)

7              COURTROOM DEPUTY:  Please state your full

8    name and spell your last name.

9              THE WITNESS:  Good afternoon.  My name is

10   Anar Bhatt.  Last name is B, as in boy; H, hotel;

11   A, Alpha; T, Tom; T, Tom.

12             COURTROOM DEPUTY:  Thank you so much.

13   Have a seat.

14             **ANAR BHATT, GOVERNMENT'S WITNESS,**

15                    **DIRECT EXAMINATION**

16   BY MR. REED:

17   Q.  Ma'am, if you could, pull your seat in and move

18   the microphone forward and talk right into the

19   microphone for us.  Thank you so much.  The ceiling

20   kind of kills the sound so whatever we can do to

21   make it easier to hear.

22             Would you mind moving -- if you don't

23   mind.

24   A.  Okay.  Is this okay?

25   Q.  That's perfect.

BHATT - DIRECT/REED                    Vol. 3 - 608

1    A.  Thank you.

2    Q.  Just keep in mind there are people in the back,

3    so if you can speak up, that would be great.

4         Okay.  Good afternoon, Ms. Bhatt.  Thank

5    you for your time.

6    A.  Good afternoon, Counsel.  My pleasure indeed.

7    Q.  How are you employed, ma'am?

8    A.  I'm sorry?

9    Q.  How are you employed?  Where do you work?

10   A.  I work for many states court in the U.S.  I

11   have worked for U.S. State Department as a subject

12   matter expertise for the Gujarati language.

13   Q.  I'll get there in a moment.

14        Are you a freelance contractor?

15   A.  Yes, I am.

16   Q.  And what kind of work do you do?

17   A.  I do interpretation and translation for

18   Gujarati language, Hindi language and Marathi

19   language.

20   Q.  Okay.  Thank you, ma'am.

21   A.  You're welcome.

22   Q.  Where are you from, Ms. Bhatt?

23   A.  I'm originally from India, from the state of

24   Gujarat.

25   Q.  Okay.  What is your native language?

BHATT - DIRECT/REED                        Vol. 3 - 609

1    A.  My native language is Gujarati.

2    Q.  And are you a native speaker, then, of

3    Gujarati?

4    A.  I do.

5    Q.  And how did you come to learn English?

6    A.  English was the medium of education right from

7    my nursery, kindergarten until I completed Bachelor

8    of Laws.

9    Q.  Okay.  So all the way through school you were

10   in English-speaking schools?

11   A.  Yes, I did.

12   Q.  But at home you would speak Gujarati?

13   A.  Both languages were spoken in my home.

14   Q.  Okay.  Gujarati and English?

15   A.  Gujarati, English and Hindi.

16   Q.  Okay.  And you mentioned this already, but did

17   you obtain a college degree?

18   A.  I did.

19   Q.  What is your college degree in, and when did

20   you get it?

21   A.  I passed my Bachelor of Commerce in 198- -- I

22   believe -- I'm not sure.

23   Q.  1980s?

24   A.  Eighties, yes, and Bachelor of Law for

25   practicing as an attorney I completed in October

BHATT - DIRECT/REED                           Vol. 3 - 610

1    1991.

2    Q.  Okay.  And where did you complete those

3    degrees?

4    A.  Ahmedabad.

5    Q.  Okay.

6              THE COURT:  Can you spell that?

7              THE WITNESS:  Yes, Your Honor.  A, as in

8    apple; H, hotel; M, Mary; E, Edward; D, Delta; A,

9    Alpha; B, boy; A, Alpha; D, Delta.

10   BY MR. REED:

11   Q.  And ma'am, you said you obtained a Bachelor of

12   Law.  Did you work as an attorney?

13   A.  Yes, I did till I came to United States.

14   Q.  Okay.  So you practiced as an attorney in

15   India?

16   A.  Yes, I did in the High Court of Gujarat.

17   Q.  How long did you practice law in India?

18   A.  Right from 1991 till I came here in 2007 or

19   2008.

20   Q.  What brought you to the United States?

21   A.  Because my husband was a U.S. citizen, and I

22   got married to him.

23   Q.  That will do it.

24             So you moved to the United States in 2008

25   after practicing law for 17 years.  Did you

BHATT - DIRECT/REED                    Vol. 3 - 611

1    practice law here?

2    A.  No, I did not.

3    Q.  Okay.  So when did you begin working as a

4    translator?

5    A.  I was translating right when I was in India

6    because the medium of argument and petitions and

7    applications in High Court was English, but it was

8    incumbent and mandatory for the attorney to

9    interpret and translate the documents for the

10   parties concerned and state an oath before a notary

11   before filing any pleadings at the Court, so I used

12   to do that.

13   Q.  Okay.  So that was part of your law practice in

14   India.  Because the Court was in English, your

15   client would have known Hindi or another --

16   A.  Correct.

17   Q.  So when you came to the United States, did you

18   continue to do translation work?

19   A.  Absolutely.

20   Q.  When and in what state did you first become

21   court certified as an interpreter?

22   A.  Maryland, state of Maryland.

23   Q.  Okay.  And was that soon after coming to the

24   United States?

25   A.  Yes.

BHATT - DIRECT/REED                      Vol. 3 - 612

1   Q.  Are you also a court-certified interpreter in

2   other states?

3   A.  I am a court-qualified interpreter because

4   certification in my language is Gujarati, Hindi and

5   Marathi is not available.

6   Q.  Okay.

7   A.  It's almost equal to certification, but it is

8   called qualified interpretation.

9   Q.  Okay.  And are you so qualified in a number of

10  states?

11  A.  Yes, I am.

12  Q.  Okay.  Nebraska, California?

13  A.  Yes.

14  Q.  Vermont, Massachusetts, Minnesota, North

15  Carolina?

16  A.  Many more.

17  Q.  All over the place?

18  A.  All over the place, yes.

19  Q.  And does that mean that you're doing what these

20  folks are doing at the table here when you're a

21  court interpreter?

22  A.  Yes.

23  Q.  Okay.  And is that what you do most of the

24  time?

25  A.  Yes.

BHATT - DIRECT/REED                    Vol. 3 - 613

1   Q.  Okay.  How many court proceedings in the U.S.
2   have you handled as an interpreter over the
3   years?
4   A.  Sir, I cannot count on my fingers.
5   Q.  This is the second one of the week, isn't it?
6   A.  Yes.
7   Q.  Okay.  Hundreds?
8   A.  Maybe thousands.
9   Q.  Maybe thousands, okay.
10         Do you also work as an independent
11  contractor for a number of translation services
12  companies?
13  A.  I do.
14  Q.  Okay.  What are some are those?
15  A.  Agencies?
16  Q.  Yes, ma'am.
17  A.  I work for Lionbridge, Language Line Solutions.
18  I work for Certified Languages, MasterWord.  I work
19  for so many agencies I cannot count.
20  Q.  Many agencies?
21  A.  Many agencies.
22  Q.  Okay.  And what kind of work does that involve
23  with those agencies?
24  A.  I work as they request me.  It could be
25  translating a script, translating some audios.  It

BHATT - DIRECT/REED                    Vol. 3 - 614

1    would be anything -- any documents that they need,
2    even for, like, USCIS phones or birth certificates,
3    anything that they require me to translate from
4    Gujarati or Hindi or English or Marathi.
5    Q.  Have you also worked as a consultant, ma'am?
6    A.  Yes.
7    Q.  Tell us about that.
8    A.  As a consultant, I have been approached to be a
9    subject matter expertise --
10   Q.  Subject matter?
11   A.  -- subject matter expertise, and I give my
12   ideas and what I think about it, and clear out the
13   concepts and if need be, assist them.
14   Q.  And for whom have you been a subject matter
15   expert?
16   A.  I have worked for -- I have proudly worked for
17   the U.S. State Department.
18   Q.  And are you also a language consultant?
19   A.  Yes, I am.
20   Q.  Tell us about that.
21   A.  I have worked for National Language Service
22   Corp.
23   Q.  And in fact, part of your work is also to test
24   and grade others who want to become interpreters;
25   is that right?

BHATT - DIRECT/REED                          Vol. 3 - 615

1    A.  Yes.  I test and grade and evaluate the

2    potential interpreters by taking the test, so I

3    would be testing them in the Gujarati, Hindi or

4    Marathi language and there would be co-test in

5    English as well, and then I grade them.

6    Q.  Okay.  So given all that, are you proficient in

7    translating from Gujarati into --

8    A.  I believe so, yes.

9             MR. REED:  Judge, I move to qualify

10   Ms. Bhatt as an expert in translation and

11   interpretation from the Gujarati language to the

12   English language.

13            MS. FRETER:  No objection.

14            THE COURT:  The Court recognizes her as

15   having such expertise and may testify -- offer

16   opinions.

17   BY MR. REED:

18   Q.  Ma'am, how did you become involved in this

19   case --

20            THE COURT:  Can I stop you though.  Was

21   some of the translations she was doing from English

22   to Hindi and not Gujarati?

23            MR. REED:  No, Judge, she only translated

24   Gujarati to English.  Thank you.

25   BY MR. REED:

BHATT - DIRECT/REED                    Vol. 3 - 616

1   Q.  How did you become involved in this case,

2   ma'am?

3   A.  I was approached to translate a document, and I

4   accepted the request.

5   Q.  Was that through Lionbridge?

6   A.  Yes.

7   Q.  And through a contract with Homeland Security

8   Investigations?

9   A.  Yes.

10  Q.  Are you compensated for your work through

11  Lionbridge?

12  A.  Yes.

13  Q.  Okay.  And were you separately retained to

14  travel and testify?

15  A.  Yes.

16  Q.  Lionbridge doesn't cover testifying?

17  A.  No.

18  Q.  So were you separately retained by my office --

19  A.  Yes.

20  Q.  -- the U.S. Attorney's office?

21          Okay.  And are you being compensated to

22  testify as well?

23  A.  Yes.

24          MR. REED:  Okay.  So I'd like to show on

25  the screen Government's 79 side by side with 80,

BHATT - DIRECT/REED                        Vol. 3 - 617

 1   and they're both already in.
 2            MS. FRETER:  I'm sorry?  Side by side
 3   with?
 4            MR. REED:  79 and 80.
 5            Can we go to page 2 on 79, please.
 6   BY MR. REED:
 7   Q.  Ma'am, when we look at 79, on the left side,
 8   there's a column for the original language?
 9   A.  Yes.
10   Q.  What is that language?
11   A.  Gujarati.
12   Q.  Okay.  And what's in the original language is
13   from Government's Exhibit 80?
14   A.  Yes.
15   Q.  Okay.  And then in the right column, under the
16   word "English," is that the translation of the
17   original?
18   A.  Yes.
19   Q.  Is it a true and accurate translation of the
20   original --
21   A.  Yes.
22   Q.  -- in Exhibit 84 (sic)?  Okay.
23            MR. REED:  Judge, I would move, having
24   waived further foundation, for the admission of
25   79.

BHATT - DIRECT/REED                    Vol. 3 - 618

1           MS. FRETER:  No objection.

2           THE COURT:  Court finds there's adequate

3     foundation and shall be admitted.

4           (Government's Exhibit No. 79 was received

5     in evidence.)

6     BY MR. REED:

7     Q.  Ma'am, when you're doing a translation like

8     this, is it possible that two different translators

9     might choose different words?

10    A.  Yes, it's just choice of words, yes.

11    Q.  You talk about choice of words.  Does that

12    change the meaning?

13    A.  I don't think so.

14    Q.  Okay.  Why is that?

15    A.  Because there's a way of approach; like, you

16    may say something which means the same thing and I

17    would say it differently, but it conveys the same

18    meaning.

19    Q.  Okay.  And would you describe that as a

20    non-substantive --

21    A.  I would.

22    Q.  Okay.  One thing I wanted to ask you about on

23    page 2 of 79 -- I'm sorry, page 3 of 79.

24          Okay.  In English we talk about slang,

25    right; where, we use a word to mean something else?

BHATT - DIRECT/REED                              Vol. 3 - 619

1    A.  Yes.

2    Q.  Does that also happen in Gujarati?

3    A.  Yes.

4    Q.  Okay.  If I were to tell you that this top

5    message -- well, let me start with this:  Message

6    26, is this your translation of the message in Line

7    26?

8    A.  Yes.

9    Q.  Okay.  And you translate it as maternal uncle

10   gone?

11   A.  Yes, that's the literal translation.

12   Q.  That's the literal translation?

13   A.  Yes.

14   Q.  If I were to tell you that this exchange of

15   messages came at a time when the recipient of the

16   message had been stopped by law enforcement, could

17   that have a different meaning?

18   A.  It may have slang to it which may indicate a

19   policeman.

20   Q.  Say that again.

21   A.  It may have a slang to it.  It could mean

22   policeman.

23   Q.  Okay.  So the word translated "maternal uncle"

24   could mean "policeman"?

25   A.  No -- yes.  Mama means maternal uncle.

BHATT - DIRECT/REED                    Vol. 3 - 620

1    Q.  Right.

2    A.  But sometimes in India we call police mama

3    also.

4    Q.  Kind of like we sometimes talk about the blue

5    when we talk about --

6    A.  Correct.

7    Q.  Okay.  But aside from that, are these

8    translations the literal translations of the

9    original?

10   A.  As the document was given, yes.

11   Q.  Okay.  No further questions -- well, sorry.  I

12   have no further questions on this one, but I have

13   one more of these.

14           MR. REED:  If we can put Exhibit 84 up

15   next to 85.  Go to page 2 of 85.

16   BY MR. REED:

17   Q.  Okay, ma'am, on the left side, 84 --

18           MR. REED:  If we can go down a page so we

19   can see it.

20   BY MR. REED:

21   Q.  All right.  That's the original?

22   A.  Yes.

23   Q.  It's partially in English?

24   A.  Yes.

25   Q.  There's one word, "nikar," what language is

BHATT - CROSS/FRETER                    Vol. 3 - 621

1   that?

2   A.  Gujarati.

3   Q.  And on the right, in Government's Exhibit 85,

4   is that a true and accurate translation --

5   A.  Yes.

6   Q.  -- of the word "nikar"?

7            MR. REED:  Judge, at this time I'd move to

8   move in 85 as we discussed earlier.

9            MS. FRETER:  No objection.

10           THE COURT:  Be admitted.

11           (Government's Exhibit No. 85 was received

12   in evidence.)

13           MR. REED:  No further questions, ma'am.

14   Thank you.

15           THE WITNESS:  Thank you.

16           MS. FRETER:  Could we show the witness and

17   the jury -- this is Government's -- we were just

18   looking at this.  This is Government's Exhibit 80.

19                    **CROSS-EXAMINATION**

20   BY MS. FRETER:

21   Q.  Do you recognize that?

22   A.  I do.

23   Q.  Okay.  And then this is Government's Exhibit

24   79.  We were just talking about this; is that

25   right?

BHATT - CROSS/FRETER                    Vol. 3 - 622

1   A.  Correct.

2   Q.  Okay.  And so you were given Government's

3   Exhibit 80, this extraction report, and you were

4   asked to translate it; is that right?

5   A.  Correct.

6   Q.  And the language, for the most part, 99 percent

7   of this, in the messages, is Gujarati; is that

8   right?

9   A.  I would say so.

10  Q.  The language used isn't Gujarati?

11  A.  Yes.

12  Q.  Oh, it is.  And I'm sorry I'm having a hard

13  time hearing you.

14  A.  Are you able to hear me, Counsel?

15  Q.  Yes.

16          And so the language used in the text

17  messages is Gujarati; is that right?

18  A.  Yes, this is Gujarati.  There is also English

19  in it.

20  Q.  Would you say most of it is Gujarati?

21  A.  If I look at it every time, because if my

22  memory serves right, yeah, that is Gujarati.

23  Q.  And what is the difference between Gujarati and

24  Hindi?

25  A.  Both are different languages.  Absolutely

BHATT - CROSS/FRETER                    Vol. 3 - 623

1    different languages.

2    Q.  Okay.  And is there anything that you can

3    compare the difference in Gujarati and Hindi to in

4    relation to English?  So is it like the difference

5    between Spanish and English; like, they use the

6    same alphabet, but they're totally different

7    languages?  How do you they compare?

8    A.  I don't know about Spanish, so I cannot say

9    about it; but Gujarati and Hindi, the language, the

10   words, the script is different.

11   Q.  And is the gender sometimes different?

12   A.  The -- how you pronounce it?  Is that what you

13   meant?

14   Q.  Gender meaning the -- with the male and female

15   in terms of how the words are termed?

16   A.  Yes.

17   Q.  Is that different?

18   A.  Yes.  Many of times, yes.

19   Q.  And gender is different than pronunciation?  Is

20   that fair to say?

21   A.  I'm not able to understand you.

22   Q.  Okay.  You were given this text message

23   exchange, and then you went through and you created

24   this Exhibit 79; is that right?

25   A.  Correct.

BHATT - CROSS/FRETER                          Vol. 3 - 624

1    Q.  And you were the person who put in all the

2    typed words and -- in the original language as well

3    as in the English; is that right?

4    A.  Right, I picked it up from the message and I

5    transcribed it.

6    Q.  And made it into this nice chart?

7    A.  Right.

8    Q.  And in doing translations from Gujarati into

9    English, sometimes it's hard to get it -- there's a

10   science to it, but there's also a little bit of an

11   art to it.  Is that fair to say?

12   A.  I don't follow you.

13   Q.  Okay.  When you're translating for somebody --

14   when you're in court and you're translating

15   for somebody, sometimes you're just getting sort of

16   the general gist or the general idea of what's

17   being said; is that right?

18   A.  May I kindly clarify?  Are you asking about

19   interpretation or translation?

20   Q.  I'm asking about interpretation right now.

21   A.  Okay.

22   Q.  Is that right, that you just get, sort of, the

23   general gist or general idea when you're doing

24   interpretation?

25   A.  The science of interpretation says that you

BHATT - CROSS/FRETER                        Vol. 3 - 625

1    have to convey the meaning.

2    Q.  Not the exact words; is that right?

3    A.  Not necessarily; but so far as I am concerned,

4    I make sure as far as possible to use the

5    meaning -- original words and convey the same

6    meaning without altering it.

7    Q.  Okay.  And so when you do translation, that's

8    the written; is that right?

9    A.  Correct.

10   Q.  Okay.  And so just like you were talking to the

11   Government, when you're translating something, the

12   context in which it's contained can be important in

13   terms of finding meaning; is that right?

14   A.  Generally, when we translate, we try to keep

15   the meaning intact, what it means.

16   Q.  Okay.  And so you were talking to the

17   Government about Line 26, and is that "mama" --

18   A.  "Gaya."

19   Q.  -- "gaya."  And so you've translated that as,

20   "maternal uncle gone;" is that right?

21   A.  Because "mama" in Gujarati means maternal

22   uncle, that is mom's brother or mom's cousin's

23   brother, whatever it means.  That is how it is

24   understood.

25   Q.  But it could also mean police officer?

1    A.  In a slang.

2    Q.  And so the context, what's happening around

3    when this is getting typed, could provide context

4    or meaning to the word; is that right?

5    A.  I don't understand you.

6    Q.  If you knew that the person typing 26 was

7    speaking to a police officer, that circumstance,

8    that context, would that make you more likely to

9    translate it as police officer or maternal uncle?

10   A.  Police officer, if I had known that the context

11   was in reference with police officer and the

12   individual.

13   Q.  So context is important in terms of translating

14   or can be?

15   A.  It could be, yes.

16   Q.  Okay.  And so I'm going to back up now to Line

17   1.  You have it translated as "going to go today;"

18   is that right?

19   A.  Yes.

20   Q.  Could that also be translated as "you need to

21   go today"?

22   A.  It is choice of words.  I did not use "you need

23   to go today" because there is no word in the

24   original translation.  "Need" means indiscernible

25   (speaking Gujarati).  That is not there.  So I just

1    translated "aje javanu che"  "Aje" means today.

2    "Javanu che" means going.

3    Q.  In the context of text messaging going back and

4    forth between someone -- just like if you knew they

5    were talking to a police officer, and two people

6    are talking to each other to give directions, if

7    you had that context, could you -- would it be

8    appropriate to translate Line 1 as "you need to go

9    today"?

10   A.  I cannot say because I was not knowing about

11   that.  I use this word as I know, and this is my

12   choice of word.

13   Q.  That's your choice of word, okay.  And so for

14   Line No. 3, you have "will tell once the

15   confirmation comes;" is that right?

16   A.  Yes.

17   Q.  Okay.  Could that also be translated as "as

18   soon as you get the confirmation"?

19   A.  Ma'am, it's, again, choice of words, so --

20   Q.  So "as soon as you get the confirmation," would

21   not be a wrong translation; is that --

22   A.  "As soon as" means indiscernible (speaking

23   Gujarati).

24   Q.  Okay.  And then going down to Line 10, you have

25   it translated as "when sit in the car"?

BHATT - CROSS/FRETER                      Vol. 3 - 628

1    A.  Uh-huh.

2    Q.  Is that right?

3    A.  Yes, yes.

4    Q.  And people, when they're having conversation

5    with each other, don't usually say "when sit in the

6    car;" is that right?

7    A.  Why would they not say?

8    Q.  Okay.  Could you also translate Line 10 as "go

9    sit in the car"?

10   A.  No, because it would mean indiscernible

11   (speaking Gujarati) or indiscernible (speaking

12   Gujarati) as per me -- as per my understanding, and

13   again, it's choice of word.

14   Q.   And then on Line 12 you have it translated as

15   "when you leave;" is that correct?

16   A.  Yes.

17   Q.  Could that also just be translated as "leave"

18   or "you leave"?

19   A.  Then there is a word, "aetale."  "Aetale" means

20   when or "aetale" means -- that's how the choice of

21   word are.

22   Q.  Okay.  And then on Line 21 you have it -- you

23   have it translated as "before that" and then she,

24   in parentheses, "customer walks out."  Why do you

25   have it with the "she" in parentheses?  Why is

BHATT - CROSS/FRETER                          Vol. 3 - 629

1    that?

2    A.  That is to bring to the attention that the

3    customer that is narrated in this is a she customer

4    because it is written as "peli."  "Peli" means it

5    is a feminine gender.

6    Q.  And instead of "peli" in Gujarati, what would

7    "she" in the Hindi -- what would the word be in

8    Hindi instead of "peli"?

9    A.  It would sound like -- I have not done a Hindi

10   in this, so I wouldn't -- rather not give my

11   comments on that.

12   Q.  Okay.  On Line 21 could you also translate it

13   as "before the customer leaves"?

14   A.  Then the feminine gender that is spoken here as

15   "peli" fades away or is not interpreted -- is not

16   translated in my opinion.

17   Q.  Okay.  What about before the female customer or

18   before she leaves?

19   A.  Did you say before female customer?

20   Q.  Sure, or she?  Before she leaves?

21   A.  That is what I said.  Before she leaves is

22   "peli" indiscernible (speaking Gujarati) "pehla."

23   Q.  And on Line 21, the word "customer," is that a

24   Gujarati word?

25   A.  No, it's an English word.

1    Q.  And so on 21, "customer" "customer," those are

2    both English words?  Both in the original text

3    message and in your translation?

4    A.  Yes, ma'am.

5    Q.  And they're in between Gujarati words?

6    A.  Correct.

7    Q.  And so the use of a word "customer" isn't a

8    choice of word or a choice of translation?  It's

9    English used in both places?

10   A.  It's a literal meaning -- literal word use

11   because there was no translation needed.

12   Q.  And then on Line 27, you have it translated as

13   "from;" is that right?

14   A.  Right.

15   Q.  Okay.  Could it also be translated as "with"?

16   A.  "Jode thi," I don't believe that it's, again, a

17   choice of word, but I stand by my translation.

18   Q.  So when you say it's a choice of word, you

19   think that -- is that where like reasonable minds

20   could disagree?

21   A.  No, I don't think so, but this "jode thi" word

22   would -- if I were to be given a context what it is

23   related to, so that is how I would, but it was just

24   "jode thi" that was the message, so it was a

25   literal translation meaning "from."

BHATT - CROSS/FRETER                    Vol. 3 - 631

1    Q.  Have you ever used or familiar with Google

2    Translate?  Have you ever used that program?

3    A.  I'm familiar with, but I don't trust Google

4    Translate always.  It could not mean the exact

5    meaning -- or it could change the meaning.

6    Q.  And why is your translation or interpretation

7    better than Google Translate?

8    A.  Because I am a native speaker.  I understand

9    that language.  Google does not.

10   Q.  And have you ever used Google Translate where

11   you put something in and then you reverse it, and

12   it comes out totally different?

13   A.  It could be.

14   Q.  Okay.  And that's because it's a computer

15   program doing it, not somebody like yourself who is

16   a native speaker with experience?

17   A.  I don't know.  It depends on who thinks about

18   it.  I do my job.

19   Q.  But you don't recommend people to use Google

20   Translate?

21   A.  I don't recommend to anybody -- I'm not a

22   person to give my recommendation.  I don't give

23   advice or suggestions.

24   Q.  Okay.  But you yourself don't trust Google

25   Translate?

Vol. 3 - 632

1   A.  Not always.

2           MS. FRETER:  Thank you.

3           I don't have anything further.

4           MR. REED:  Nothing further, Judge.

5           THE COURT:  Thank you, ma'am.

6           MR. REED:  You may step down.

7           THE WITNESS:  Thank you, Your Honor.  May

8   I be excused?

9           THE COURT:  Pardon me?

10          THE WITNESS:  May my presence be excused?

11          THE COURT:  Yes.

12          THE WITNESS:  Thank you.  Have a good day,

13  everybody.

14          (Witness excused.)

15          MR. REED:  Thank you, ma'am.

16          Judge, at this time the Government would

17  play the deposition transcript -- or deposition

18  testimony of Officer Towell.

19          THE COURT:  And how long is that?

20          MR. REED:  It's about -- what is it -- I

21  think it's about an hour and 30, hour and 25.

22          THE COURT:  Let's take a five-minute

23  recess before we watch, I'm sure, the dramatic

24  video deposition.  All right.  Five minutes.  Don't

25  talk about it.

Vol. 3 - 633

1          (Recess at 2:00 p.m. until 2:10 p.m.)

2          (Jury present.)

3          THE COURT:  Please be seated.  Thank you.

4          All right.  At this point you're going to

5    play a deposition taken of a witness in this case?

6          MR. REED:  That's right, Judge, pursuant

7    to the prior motion filed with the Court, we'll

8    play the deposition testimony of a witness who is

9    on active duty and out of the country, and so we

10   had to take his testimony earlier.

11         THE COURT:  All right.

12         MR. REED:  Can you put that on the

13   monitor.

14         (Video deposition, Government's Exhibit

15   No. 66, Deposition of Justin Towell, played for the

16   Court and jury.)

17         (Video deposition, Government's Exhibit

18   No. 66, Deposition of Justin Towell, paused.)

19         MR. REED:  Judge, to have it on our

20   record, we move to admit Government's Exhibit 66.

21         THE COURT:  66 is in.

22         (Government's Exhibit No. 66 was received

23   in evidence.)

24         (Video deposition, Government's Exhibit

25   No. 66, Deposition of Justin Towell, resumed.)

Vol. 3 - 634

1              (Video deposition, Government's Exhibit
2     No. 66, Deposition of Justin Towell, paused.)
3              MR. REED:  And at this time we'll move to
4     admit Government's Exhibit 68.
5              MS. FRETER:  No objection.
6              THE COURT:  68 is admitted.
7              (Government's Exhibit No. 68 was received
8     in evidence.)
9              (Government's Exhibit No. 68, a video, was
10    played for the Court and jury.)
11             (Video deposition, Government's Exhibit
12    No. 66, Deposition of Justin Towell, video
13    deposition, resumed to the end of the video.)
14             THE COURT:  Counsel, approach.
15             (Sidebar proceedings on the record.)
16             THE COURT:  How much do we have left that
17    we can accomplish today?
18             MR. REED:  I have another witness ready to
19    go.  It'll take a couple of hours, so we'll have to
20    keep him over --
21             THE COURT:  Okay.
22             MR. REED:  -- but we can get him started.
23             THE COURT:  Who is our next witness?
24             MR. REED:  Conor Hoyland.
25             THE COURT:  Okay.  And you've got some

Vol. 3 - 635

1    videos of Patel at a gas station; is that right?

2                MR. REED:  That's part of his testimony,

3    yes, and also the phone that was recovered during

4    this pickup this time.

5                THE COURT:  All right.  Then we will plan

6    on going to 4:30, but I'll give the jury a quick

7    break.

8                MR. REED:  All right.  Thank you, Judge.

9                (End of proceedings at sidebar.)

10               THE COURT:  All right.  Ladies and

11   gentlemen, we've got another witness that's cued

12   up.  That witness is going to take a while.  So why

13   don't we -- I'm going to give you -- I'll give you

14   a ten-minute recess.  We'll come back, and then we

15   will go until 4:30.

16               (Recess at 3:34 p.m. until 3:45 p.m.)

17               (Jury present.)

18               THE COURT:  Call your next witness.

19               MR. REED:  Judge, the Government calls

20   Conor Hoyland.

21               COURTROOM DEPUTY:  Please raise your right

22   hand.

23               (Witness sworn.)

24               COURTROOM DEPUTY:  Please state your full

25   name and spell your last name for the Court.

HOYLAND - DIRECT/REED                    Vol. 3 - 636

1            THE WITNESS:  My name is Conor Hoyland.

2    Last name is spelled H-o-y-l-a-n-d.

3            COURTROOM DEPUTY:  Thank you.  Have a

4    seat.

5            **CONOR HOYLAND, GOVERNMENT'S WITNESS**

6                    **DIRECT EXAMINATION**

7    BY MR. REED:

8    Q.  And Detective Hoyland, if you'd move that mic

9    over a little bit closer to the screen.  The whole

10   base moves if you need it.  It's hard to hear in

11   here.

12            Where do you work, sir?

13   A.  I work for the Edwardsville Police

14   Department.

15   Q.  How long have you worked for the Edwardsville

16   Police Department?

17   A.  I was hired in April of 2014, so 10, almost 11

18   years.

19   Q.  What was your role when you started there?

20   A.  I was hired as a patrol officer.

21   Q.  How long did you work as a patrol officer?

22   A.  I was assigned to patrol until August of

23   2022.

24   Q.  And did you change roles in August of 2022?

25   A.  I did.  In August of 2022 I was moved into our

1    investigations division where I assigned to be a

2    detective.

3    Q. And so how long have you been a detective?

4    A. Just shy of three years.

5    Q. What did you do -- well, what kind of casework

6    do you do as a detective?

7    A. We handle a wide variety of crimes.  They can

8    range from property crimes all the way up to

9    violent crimes.  Everything from property damage,

10   theft, burglary, fraud cases, all the way up to

11   assault, battery, even homicide.

12   Q. And before you joined Edwardsville PD, did you

13   go to college?

14   A. I did.  I attended Western Illinois

15   University.

16   Q. And what was your degree in there?

17   A. I obtained a bachelor's degree in law

18   enforcement and justice administration, and I

19   minored in computer sciences.

20   Q. Okay.  In addition to your college classwork,

21   do you complete ongoing training as a detective?

22   A. I do.

23            (Interruption by the court reporter.)

24   BY MR. REED:

25   Q. Generally, what kind of training do you do?

HOYLAND - DIRECT/REED                    Vol. 3 - 638

1   A.  Wide variety of training covering everything

2   from cell records analysis to homicide investigator

3   courses.  More specifically, I also take -- I've

4   taken several courses in various aspects of

5   computer and cell phone forensics.

6   Q.  Tell us about those trainings in computer and

7   digital forensics.

8   A.  So I currently hold a certification from Mile2

9   Cybersecurity as a certified digital forensics

10  examiner.  In addition to that, I've completed

11  numerous courses with the National White Collar

12  Crime Center, also called NW3C.  Those courses

13  cover everything from advanced forensic analysis of

14  Mac operating systems, Windows operating systems,

15  Linux operating systems and Android and iPhone

16  operating systems.

17  Q.  Okay.  So five separate courses, I think, is

18  what I heard there?

19  A.  Yes.

20  Q.  All right.  How long were each of those five

21  courses?

22  A.  They varied in time from 20 -- I'm sorry, 32 to

23  48 hours -- or 32 to 40 hours.  I apologize.

24  Q.  Okay.  So three or four weeks' worth of

25  trainings?

HOYLAND - DIRECT/REED                    Vol. 3 - 639

1    A.  Yes.

2    Q.  Did you also complete training in

3    cybersecurity?

4    A.  Yes, I did.

5    Q.  And you used the term "digital forensics."

6    Just plain English, what is that about?

7    A.  Digital forensics refers to gathering and

8    collecting digital evidence off of various devices

9    or storage medias, like thumb drives, hard drives,

10   things like that, in a forensically sound way that

11   protects the integrity of the data.

12   Q.  Does that include cell phone extractions?

13   A.  Yes, it does.

14   Q.  How many cell phone extractions do you think

15   you did in 2023 when you worked on this case?

16   A.  I don't recall the exact number offhand;

17   however, in excess of 50.

18   Q.  About 50 a year?

19   A.  That's a fair number.

20   Q.  Okay.  So in plain English, what is a cell

21   phone extraction?

22   A.  A cell phone extraction is using specialized

23   devices, whether that's called GrayKey or

24   Cellebrite or other forensic software, to create a

25   copy or to collect data off of a cell phone that,

1    once again, we can store in a way that protects its

2    integrity and is forensically sound.

3    Q.  Did you work on a case involving a victim named

4    Virginia Bryan?

5    A.  Yes, I did.

6    Q.  During the course of your investigation, did

7    you examine Virginia Bryan's cell phone for

8    evidence of the crimes against her?

9    A.  Yes, I did.

10   Q.  How did you get the phone?

11   A.  It was provided to me by Virginia Bryan.

12   Q.  Did you make an extraction like we talked

13   about?

14   A.  Yes, I did.

15   Q.  When you're looking at the phone extraction,

16   were you looking for specific numbers?

17   A.  Yes, I was.  I was looking for numbers in

18   reference to a scam that she had reported that

19   occurred over the course of several months.

20   Q.  And also messages about Bitcoin -- some Bitcoin

21   transactions?

22   A.  That is correct.

23            MR. REED:  I put on the screen what's been

24   marked as Government's Exhibit 73.  For the

25   witness, please.  Go down to page 2, please, and

HOYLAND - DIRECT/REED                    Vol. 3 - 641

1    page 3 and the next page, please, and the next page

2    after that.  There it is.

3    BY MR. REED:

4    Q.  Okay.  Was one of the numbers you were looking

5    for this number ending in 2637?

6    A.  Yes, it was.

7    Q.  And also a number that appeared on some fake

8    documents that ended in 1778?

9    A.  That's correct.

10   Q.  Does this exhibit truly and accurately report

11   that data from Ms. Bryan's phone?

12   A.  Yes, it does.

13            MR. REED:  Move to admit Exhibit 73.

14            MS. FRETER:  No objection.

15            THE COURT:  Admitted.

16            (Government's Exhibit No. 73 was received

17   in evidence.)

18            MR. REED:  Publish to the jury, please.

19   BY MR. REED:

20   Q.  Okay.  When reading this, where is the text of

21   the message itself on this box?

22   A.  The third item from the bottom directly across

23   from "text."  So in this instance, it would say

24   "Hi."

25   Q.  So this is the scammer saying "Hi" to

HOYLAND - DIRECT/REED                    Vol. 3 - 642

1    Ms. Bryan?

2    A.  That's correct.

3    Q.  On March 20, 2023?

4    A.  That is correct.

5    Q.  And it starts this way, but during the course

6    of your investigation, did you learn that the

7    scammer also called Ms. Bryan's home phone?

8    A.  That is correct.

9    Q.  And of course, the calls to her home phone

10   aren't going to show up on an extraction of her

11   cell phone?

12   A.  That is correct.

13          MR. REED:  If we could go down to the next

14   page, to page 7.  Stop right there.

15   BY MR. REED:

16   Q.  A couple message later Ms. Bryan responds by

17   sending her driver's license?

18   A.  Yes.

19          MR. REED:  Page 8, next page.

20   BY MR. REED:

21   Q.  And then she sends -- or the scammer sends an

22   address; is that right?

23   A.  That is correct.

24   Q.  Is this a Busey Bank?  2004 Troy Road?

25   A.  Yes, it is.

HOYLAND - DIRECT/REED                    Vol. 3 - 643

1   Q.  Page 11, what is he sending here?

2   A.  In this message, the scammer is sending

3   Ms. Bryan the location of a Farm Fresh at 740 East

4   Airline Drive in East Alton, Illinois.

5   Q.  Why Farm Fresh?

6   A.  At that Farm Fresh, there is a Bitcoin ATM.

7   Q.  Next page, this top box, Number 9, what are we

8   looking at here?

9   A.  That is an authentication code that would have

10  been sent from Coinhub to Ms. Bryan.

11  Q.  Fair to say there's a lot of these on this

12  day?

13  A.  Yes.

14  Q.  Any sign she actually got the machine to work

15  on the 20th?

16  A.  I don't recall.

17          MR. REED:  Okay.  If we could move down to

18  page 16.  I'm sorry.  I think it must be Message

19  16.  There we go.

20  BY MR. REED:

21  Q.  Next day here, March 21st?

22  A.  Yes.

23  Q.  What time does this conversation start?

24  A.  It starts at 9:39 a.m.

25  Q.  All right.  And this is the scammer saying "Hi"

HOYLAND - DIRECT/REED                    Vol. 3 - 644

1    again?

2    A.  Correct.

3              MR. REED:  So if we could go down to page

4    19; although, it might be -- stop right there.

5    BY MR. REED:

6    Q.  What is Ms. Bryan sending him here?

7    A.  This would be a bank slip from Busey Bank.

8              MR. REED:  Okay.  Next page.

9    BY MR. REED:

10   Q.  Back to Farm Fresh?

11   A.  Correct.

12             MR. REED:  Page 24.  It's down four more

13   pages.

14   BY MR. REED:

15   Q.  Okay.  What's this?

16   A.  That is a message from Coinhub letting

17   Ms. Bryan know that her Coinhub registration is

18   complete and she can now purchase up to $50,000

19   worth of cryptocurrency per day.

20   Q.  Okay.  This is March 21st?

21   A.  That is correct.

22             MR. REED:  Down to page 30.

23   BY MR. REED:

24   Q.  Okay.  What is this here on page 30?

25   A.  That would be a receipt from Coinhub that was

HOYLAND - DIRECT/REED                    Vol. 3 - 645

1   sent to Ms. Bryan documenting a transaction in the

2   amount of $14,900 --

3   Q.  Was this --

4   A.  -- for Bitcoin.

5   Q.  I apologize.

6        When was this transaction completed?

7   A.  It occurred on March 21, 2023 --

8   Q.  Okay.

9   A.  -- at 1:14 p.m.

10  Q.  Is there a series of these Coinhub Bitcoin ATM

11  receipts in these messages?

12  A.  Yes, there is.

13  Q.  Okay.  Do they correspond to the five

14  transactions that you sent to Detective Allison to

15  look at to do a Bitcoin analysis?

16  A.  They do.

17        MR. REED:  Now I can jump all way down to

18  page 43.

19  BY MR. REED:

20  Q.  Okay.  What is the scammer telling Ms. Bryan

21  here?

22  A.  Chase Bank.

23        MR. REED:  And if we could go up one page

24  from here.

25  BY MR. REED:

HOYLAND - DIRECT/REED                    Vol. 3 - 646

1    Q.  Is there an address that goes with that?

2    A.  Yes, 248 Harvard Drive, Edwardsville,

3    Illinois.

4    Q.  When does the scammer send Ms. Bryan to Chase

5    Bank?

6    A.  March 23, 2023, at 12:32 p.m.

7              MR. REED:  Page 55.

8    BY MR. REED:

9    Q.  All right.  Still March 24th?

10   A.  Correct.

11   Q.  What does Virginia send in this message?

12   A.  That is a bank slip from Chase Bank.

13             MR. REED:  Page 58.

14   BY MR. REED:

15   Q.  All right.  What is the scammer asking for

16   here?

17   A.  Send more paperworks from Chase.

18   Q.  Still March 24th?

19   A.  Yes.

20   Q.  So we've been jumping around here; but big

21   picture, this exhibit, 365 pages?

22   A.  Yes.

23   Q.  And it starts on March 20th and ends on April

24   20th?

25   A.  That is correct.

HOYLAND - DIRECT/REED                        Vol. 3 - 647

1    Q.  Were there over 200 phone calls during those 30

2    days?

3    A.  Yes, there are.

4    Q.  At least one phone call every single day if you

5    include WhatsApp calls?

6    A.  That is correct.

7    Q.  Regular text messages in addition to that?

8    A.  Yes.

9    Q.  Does that level of communication kind of

10   increase as time goes on?

11   A.  Yes, it does.

12           MR. REED:  Can we go back to page 95,

13   please.

14   BY MR. REED:

15   Q.  All right.  It says message not sent, but what

16   is Virginia trying to send here?

17   A.  It appears to be bank statements.

18   Q.  All right.  And what time is this message?

19   A.  April 6, 2023, at 3:33 p.m.

20           MR. REED:  If we can go down to page 98.

21   BY MR. REED:

22   Q.  What does he say here?

23   A.  I have not received the pictures, ma'am.

24   Q.  Same day?

25   A.  Yes.

HOYLAND - DIRECT/REED                    Vol. 3 - 648

1    Q.  Next page, what does he say here?

2    A.  Or if you can type it on the text you can do

3    that.

4    Q.  Next page, what does he say here?

5    A.  First two pictures.

6    Q.  What does she say on the next page?

7    A.  Talk later.

8    Q.  And then on the next page?

9    A.  Okay, question mark.

10   Q.  And 103, how does he respond?

11   A.  Ma'am, I have not received the pictures.

12   Q.  And 104, what does he say here?

13   A.  Please try sending me the pictures again.

14   Q.  Page 114 -- 114, I'm sorry.  Are we still on

15   the same day?

16   A.  Yes.

17   Q.  All right.  And what does he say here?

18   A.  I will register this on your case papers.

19   Q.  All right.  Page 129, same day still here?

20   A.  Yes.

21   Q.  Many pages later?

22   A.  Yes.

23   Q.  What does he say here?

24   A.  Do you have any more pictures left?

25   Q.  What time is it at this point?

HOYLAND - DIRECT/REED                    Vol. 3 - 649

1   A.  8:08 p.m.

2   Q.  About five hours after this request for

3   information first came through?

4   A.  Yes.

5   Q.  And page 130, what does she say here?

6   A.  Not now.

7   Q.  And the next page, how does he respond?

8   A.  Okay.

9   Q.  And the next page, how does he respond here?

10  A.  So you can take rest now.

11  Q.  What time is it when he allows Virginia to

12  rest?

13  A.  Eleven -- or 8:10 p.m.

14          MR. REED:  Let's jump down to page 152.

15  BY MR. REED:

16  Q.  Okay.  In the bottom box, when is this first

17  call and what day is it?

18  A.  It occurs on April 9, 2023, at 8:48 a.m.

19  Q.  And lasts an hour -- or a minute and 31

20  seconds?

21  A.  That's correct.

22          MR. REED:  Next page, please.

23  BY MR. REED:

24  Q.  All right.  And 186, this is another call on

25  the same day?

HOYLAND - DIRECT/REED                    Vol. 3 - 650

1    A.  Yes.

2    Q.  How long does this call last and when does it

3    start?

4    A.  It starts at 8:50 a.m., and it lasts two hours

5    and one second.

6    Q.  And then page 154, another two-hour call that

7    starts at 10:51 and ends at about 12:51?

8    A.  Yes.

9    Q.  And 155, there's a handful of missed calls,

10   right?

11   A.  Correct.

12   Q.  And 156, there's a four-hour call that starts

13   at 1:11 and ends at 5:11?

14   A.  That is correct.

15   Q.  And 157, there is a two-hour call that starts

16   at 5:12 and ends at 7:12?

17   A.  That is correct.

18   Q.  And the next page, finally, a two-hour call

19   that starts at 8:15 and ends at 10:15?

20   A.  That is correct.

21   Q.  So 12 hours on the phone that day?

22   A.  That is correct.

23   Q.  And that brings us to April 10.  What happened

24   to Virginia on April 10?

25   A.  On April 10th a subject came to her house to

HOYLAND - DIRECT/REED                    Vol. 3 - 651

1   pick up money in reference to this scam.

2   Q. So page 160 here, we're on April 10th.  When's

3   the first contact -- whoops.  Right here.  I

4   apologize.

5           When is the first contact in Box 197?

6   A. It occurs at 8:04 a.m.

7           MR. REED:  And the next page, please.

8   BY MR. REED:

9   Q. And at 8:09, there is an hour-and-54-minute

10  call?

11  A. Correct.

12  Q. And after that the scammer sends her an address

13  in Wood River?

14  A. Yes.

15  Q. Is that a bank?

16  A. Yes, it is.

17  Q. All right.  Next page, sends her another

18  address?

19  A. Yes.

20  Q. Another bank branch?

21  A. That is correct.

22  Q. All right.  Next page, third bank branch?

23  A. Yes.

24  Q. And 163, what does he say here?

25  A. Once you have written down all three addresses,

HOYLAND - DIRECT/REED                    Vol. 3 - 652

1    just call me back.

2    Q.  And then there is an eight-minute call?

3    A.  Yes.

4    Q.  Next page, he sent the address again?

5    A.  Yes.

6            MR. REED:  Keep going.

7    BY MR. REED:

8    Q.  And another address again?

9    A.  Yes.

10            MR. REED:  Keep going.

11    BY MR. REED:

12    Q.  After he resends the addresses there is a

13    45-minute call starting at 10:58 a.m.?

14    A.  Yes.

15            MR. REED:  Jump down to page 174.

16    BY MR. REED:

17    Q.  All right.  We're still on April 10th at 1:45

18    p.m.?

19    A.  That's correct.

20    Q.  What does he say here?

21    A.  You can send me the pictures here.

22            MR. REED:  Okay.  Next page -- actually,

23    we can go all the way down to 179.

24    BY MR. REED:

25    Q.  All right.  What does Virginia send here?

HOYLAND - DIRECT/REED                    Vol. 3 - 653

1    A.  She sends him a photo of bundles of cash.

2    Q.  And then 181, another picture of cash?

3    A.  Yes.

4    Q.  What looks like a bank slip?

5    A.  That is correct.

6    Q.  187, more money pictures?

7    A.  That is correct.

8    Q.  All right.  188, what does she say here?

9    A.  Almost $30,000.

10   Q.  And the next page, 189, what does she say

11   here?

12   A.  All the cash I have.

13   Q.  Page 190, it's followed by a two-hour phone

14   call at 3:06 p.m.?

15   A.  Correction, that would be a two-minute phone

16   call.

17   Q.  I apologize.  A two-minute-and-seven-second

18   phone call?

19   A.  That's correct.

20   Q.  All right.  Next page, what is Ms. Bryan

21   sending here?

22   A.  That is a photo of the bundles of cash in a

23   shoebox.

24   Q.  All right.  Next page, what does she say here?

25   A.  All the bundays (as read) in a blue box.

HOYLAND - DIRECT/REED                    Vol. 3 - 654

1   Q.  Probably bundles?

2   A.  Probably bundles.

3   Q.  Page 204, what is she sending here on page

4   204?

5   A.  That is a photo of the front of her residence

6   on Hollyhock Lane.

7   Q.  205, what does she say here?

8   A.  Front yard from the street.

9   Q.  206, what is this?

10  A.  That is Ms. Bryan taking a photo of herself in

11  the mirror.

12  Q.  Did she also have to do this on April 20th?

13  A.  Yes, she did.

14  Q.  Page 208, did the scammer ask her to send a

15  photo of herself on April 20th?

16  A.  Yes, he did.

17  Q.  In your experience and training, why would he

18  be asking her to send a photo?

19  A.  Two main reasons.  One, to see who he is

20  supposed to meet -- or the courier who is picking

21  up the money is supposed to be meeting with.  The

22  other reason is it might give her -- him -- whoever

23  is on the other end of the conversation an idea of

24  whether or not anybody else is with her.

25  Q.  So page 208 here, are we still on April the

HOYLAND - DIRECT/REED                        Vol. 3 - 655

1    10th?

2    A.  Yes.

3    Q.  It's a two-hour call at 4:18 p.m.?

4    A.  That is correct.

5    Q.  And page 211, then there is a 50-minute call at

6    6:22?

7    A.  Yes.

8    Q.  And a two-hour call at 7:13 p.m.?

9    A.  Yes.

10   Q.  Is this the night that she handed over that

11   first box?

12   A.  Yes, it is.

13   Q.  So between April 9 and April 10, something like

14   20, 22 hours on the phone?

15   A.  That is correct.

16   Q.  In your experience, why would the scammer want

17   her on the phone for 22 hours leading up to this

18   drop?

19   A.  From the scammer's standpoint, it's about

20   maintaining control, making sure she's not

21   communicating with anybody else who might interfere

22   with his ability to carry out the scam.

23          MR. REED:  Okay.  Let's jump down to page

24   299.

25   BY MR. REED:

HOYLAND - DIRECT/REED                          Vol. 3 - 656

1    Q.  What day is it here?

2    A.  April 18, 2023.

3    Q.  Okay.  What does Virginia say to the scammer

4    here?

5    A.  Taxes should be finished this afternoon.

6    Q.  And then page 311, what is she sending him

7    here?

8    A.  I believe that's a photo of bank statements.

9    Q.  Maybe some mail?

10   A.  Yes.

11   Q.  All right.  Page 314, what does she ask here?

12   A.  Did you receive both?

13   Q.  Page 317, what does she say here?

14   A.  $4,000 to state and 25,000 to federal.

15   Q.  And the next page, what does she say here?

16   A.  Both are in the mail.

17   Q.  Okay.  From your investigation, was Virginia

18   under the impression she was talking to a federal

19   agent?

20   A.  Yes, she was.

21   Q.  With the Treasury Department?

22   A.  Yes.

23   Q.  So she's sending -- telling the agent from the

24   Treasury Department that she's sending her taxes

25   in?

1    A.  That is correct.

2              MR. REED:  Okay.  Could we jump down to

3    page 321?

4    BY MR. REED:

5    Q.  All right.  What day is this at this point?

6    A.  April 19th.

7    Q.  When does contact with the scammer start on

8    April 19th?

9    A.  There is a missed call at 8:18 a.m. and then a

10   completed call at 8:18 a.m. as well.

11   Q.  Okay.  Two hours long at 8:18 to 10:18?

12   A.  That's correct.

13             MR. REED:  All right.  Let's see here.

14   Page 323.

15   BY MR. REED:

16   Q.  All right.  In Box 432 what is Virginia asking

17   the scammer here?

18   A.  Can I do both money grabs tomorrow?

19   Q.  Next page, what does she say here?

20   A.  I need a day to settle down and buy

21   groceries.

22   Q.  325?

23   A.  I would be better off behind bars.

24   Q.  This is Virginia to the scammer?

25   A.  Yes.

HOYLAND - DIRECT/REED                      Vol. 3 - 658

1    Q. The day before the sting on April 20th?

2    A. That is correct.

3    Q. I would be better off behind bars?

4    A. Yes.

5    Q. Page 326, how does he respond?

6    A. Yes, ma'am.

7    Q. And 327, no problem?

8    A. No problem.

9    Q. 329, what does Ms. Bryan say here?

10   A. Home and not looking forward to anything.

11   Q. Page 330.  What does she say here?

12   A. Paid cash for groceries.

13   Q. So this brings us to April 20th.

14         MR. REED:  If we could go to page 333.

15   BY MR. REED:

16   Q. When is this message sent?

17   A. It's sent at 8:37 a.m.

18   Q. And what does Ms. Bryan say here?

19   A. I asked my daughter to drive.  I almost crushed

20   my garage and car yesterday.

21         MR. REED:  Down to 336.

22   BY MR. REED:

23   Q. All right.  Some missed calls?

24   A. Yes.

25   Q. And then 338, what does she say here?

1    A.  Talk later on.

2    Q.  Okay.  This is sent at 9:52?

3    A.  Yes.

4    Q.  Is this about when Beth Surmeier reported she

5    had arrived at Virginia's house?

6    A.  Yes.

7    Q.  And page 340, how does he respond here?

8    A.  First send me pictures of the bundles.

9    Q.  341, does she send photos?

10   A.  Yes, she does.

11   Q.  And then 345, what is this here?

12   A.  That is a U.S. Bank slip.

13   Q.  Okay.  346, what does he say here?

14   A.  Now take a shoebox and place all the bundles

15   inside and take a photo of it.

16   Q.  348, does she do it?

17   A.  Yes, she does.

18   Q.  352, is there a 2-minute-26-second call here?

19   A.  Yes, there is.

20   Q.  When did that 2-minute call happen?

21   A.  11:22 a.m.

22   Q.  Is this about when Virginia and Beth were at

23   the police station that morning?

24   A.  Yes, it is.

25   Q.  356, two-hour call that afternoon starting at

HOYLAND - DIRECT/REED                    Vol. 3 - 660

1    3:27?

2    A.  Yes.

3    Q.  357, followed by an hour-and-44 minute call at

4    5:30 p.m.?

5    A.  Yes.

6    Q.  And 358, this is the picture you referenced

7    earlier?

8    A.  Yes.

9    Q.  And at this point, you're in the house too,

10   right?

11   A.  Yes, I am.

12   Q.  And Sergeant Towell?

13   A.  Yes.

14   Q.  Did you hear why she was supposed to send a

15   picture of herself?

16   A.  For the person who was coming to pick up the

17   money.

18   Q.  Page 359, is there a 26-minute-and-32-second

19   call at 7:20?

20   A.  Yes, there is.

21   Q.  Twenty-six minutes takes us to 7:46?

22   A.  Yes.

23   Q.  Based on the time stamp, is Virginia on the

24   call, on this call, when she walks out and puts the

25   box in Nirav Patel's vehicle in front of her

HOYLAND - DIRECT/REED                    Vol. 3 - 661

1   house?

2   A. Yes, she is.

3   Q. All right.  360, then there is some missed

4   calls?

5   A. Yes.

6           MR. REED:  Go all the way down to 365.

7   BY MR. REED:

8   Q. All right.  It's a 2-minute-and-4-second call

9   at 7:54 p.m.?

10  A. Yes.

11  Q. This is after Patel is arrested?

12  A. Yes, it is.

13  Q. When he speaks with Sergeant Towell?

14  A. Yes, it is.

15          MR. REED:  We can take that down.

16  BY MR. REED:

17  Q. So that wraps up Ms. Bryan's phone.

18          Were you also involved with that operation

19  on April 20th?

20  A. Yes, I was.

21  Q. How did you come to be involved?

22  A. I was advised of the case by Sergeant Towell

23  when he took the initial report from Ms. Bryan and

24  Ms. Surmeier.

25  Q. And you went to her house that afternoon?

HOYLAND - DIRECT/REED                    Vol. 3 - 662

1    A. Yes, I did.

2    Q. Once you got to the house, where were you

3    stationed?

4    A. I went up to the second floor to keep

5    surveillance on the street from an upstairs

6    bedroom.

7    Q. How long did you wait?

8    A. Several hours.

9    Q. Someone eventually show up?

10   A. Yes, they did.

11   Q. Okay.  What kind of vehicle was the courier

12   driving?

13   A. They were driving a maroon Nissan Altima.

14   Q. And where did it park?

15   A. It drove initially past the house, turned

16   around at the end of the cul-de-sac, came back and

17   stopped at the end of the driveway.

18   Q. So if you were expecting a legitimate

19   ride-share service like Lyft or Uber, what would

20   you expect to see on the vehicle?

21   A. I would expect some kind of markings, the Uber

22   light that they sometimes have in the front window

23   or the Lyft light, something like that.

24   Q. Did you see any of that?

25   A. No.

1    Q.  And if you are expecting a legitimate package

2    service like UPS or FedEx, what would you expect to

3    see?

4    A.  I would also expect to see markings for Amazon,

5    USPS, UPS, whatever service it was.

6    Q.  Did the driver come to the door to retrieve the

7    box?

8    A.  No, he did not.

9    Q.  Did he get out of the car at all?

10   A.  No, he did not.

11   Q.  Did the driver provide Ms. Bryan with a receipt

12   for the money he was picking up?

13   A.  Not in this instance.

14   Q.  Did you see Ms. Bryan come out of the house?

15   A.  Yes, I did.

16   Q.  How far was it from the house to where the car

17   was parked?

18   A.  Approximately 50 feet.

19   Q.  And from a law enforcement perspective, are

20   there any safety concerns that you have at this

21   point?

22   A.  Several.  At that time we don't know who's in

23   the car, we don't know how many people are in the

24   vehicle, whether or not they're armed.  We have

25   Ms. Bryan approaching the vehicle that we don't

HOYLAND - DIRECT/REED                    Vol. 3 - 664

1  know what's in it or who's in it.  It was a lot of
2  moving parts.
3  Q. So what did Ms. Bryan do when she reached the
4  vehicle?
5  A. She approached the vehicle, and she ended up
6  setting the shoebox which contained the money in
7  the rear passenger side window on the seat.
8  Q. As far as you could tell from where you were,
9  did the driver say anything to her?
10  A. Not that I saw.
11  Q. What happened after she put the box in the
12  car?
13  A. At that time the vehicle began to pull away
14  from the house.
15  Q. Why did law enforcement let the vehicle drive
16  away?
17  A. We wanted to create distance between the
18  vehicle and Ms. Bryan before we attempted to stop
19  it just for her safety.
20  Q. So he starts driving away.  What happens
21  next?
22  A. At that time members of the Metropolitan
23  Enforcement Group of Southwestern Illinois,
24  commonly called MEGSI, they stopped the vehicle.
25  Q. Once he's stopped, where do you go?

HOYLAND - DIRECT/REED                    Vol. 3 - 665

1   A.  At that time I exited the residence and

2   approached the vehicle.  By that time MEGSI had

3   already taken Mr. Patel into custody.

4   Q.  And by "the vehicle," you mean the Nissan

5   Altima?

6   A.  That is correct.

7   Q.  Did you see the driver of the vehicle that

8   night?

9   A.  Yes, I did.

10  Q.  And you attempted to interview him later that

11  day?

12  A.  Yes I did.

13  Q.  Would you recognize him if you saw him again?

14  A.  Yes, I would.

15  Q.  Is he in the courtroom today?

16  A.  Yes, he is.

17  Q.  Could you please describe where he's seated and

18  what's he wearing.

19  A.  It's the gentleman seated at this table back

20  here with his hand in the air wearing the blue

21  sport coat.

22          MR. REED:  Judge, let the record reflect

23  that the witness has identified the defendant.

24          THE COURT:  So noted.

25  BY MR. REED:

HOYLAND - DIRECT/REED                    Vol. 3 - 666

1    Q. So back to the scene, did you take photos of

2    the vehicle and what you found?

3    A. Yes, I did.

4         MR. REED:  Put up Exhibit 67 for the

5    witness, please.  All right.  If we can flip

6    through those.

7    BY MR. REED:

8    Q. Do these photos truly and accurately reflect

9    what you saw on April 20 of 2023?

10   A. Yes, they do.

11        MR. REED:  Move to admit 67 and publish to

12   the jury.

13        MS. FRETER:  No objection.

14        THE COURT:  It's admitted.

15        (Government's Exhibit No. 67 was received

16   in evidence.)

17        MR. REED:  We can start on page 9.  Slow

18   down here.

19   BY MR. REED:

20   Q. Is this Nirav Patel's vehicle?

21   A. Yes, it is.

22   Q. What are we looking at here?

23   A. That is a photo taken through the rear

24   passenger's side window of the vehicle to the back

25   seat.

HOYLAND - DIRECT/REED                    Vol. 3 - 667

1    Q.  Why is this window down?

2    A.  That is the window that Ms. Bryan placed the

3    shoebox full of money into.

4    Q.  Page 10, is that the box there?

5    A.  Yes, it is.

6    Q.  Is this where you found it when you approached

7    the vehicle?

8    A.  Yes, it is.

9    Q.  Page 11, what does this photo capture?

10   A.  That is a photo in the driver's side door of

11   Mr. Patel's Nissan Altima.

12           MR. REED:  Jump up to page 3.

13   BY MR. REED:

14   Q.  Are we in the same spot here?

15   A.  Yes.

16   Q.  Why are you taking this picture?

17   A.  In the center console is a cell phone that has

18   a GPS map application open to the address 118

19   Hollyhock Lane.

20   Q.  Did you seize this cell phone?

21   A.  Yes, I did.

22   Q.  And what was on the screen at the time of the

23   spot?

24   A.  A GPS application showing the address 118

25   Hollyhock Lane.

HOYLAND - DIRECT/REED                    Vol. 3 - 668

1    Q.  I apologize.  It's been a long day.

2             MR. REED:  Page 2.  Go up to page 2.

3    BY MR. REED:

4    Q.  Why did you take this picture?

5    A.  That is a photo of one of the cell phones from

6    Mr. Patel which shows the location of Hoffman

7    Estates.

8    Q.  Okay.  This is the weather that -- the preset

9    location for the weather on this phone?

10   A.  Yes.

11   Q.  Okay.  Where is Hoffman Estates?

12   A.  It's in the Chicago area.

13   Q.  And is this a different cell phone at this

14   point -- a second cell phone?

15   A.  Yes.

16            MR. REED:  Page 17.  All right.  Could you

17   go up one page from here.  Go back down.  There we

18   go.

19   BY MR. REED:

20   Q.  Is this another picture of the center

21   console?

22   A.  Yes, it is.

23   Q.  Why are you taking this picture?

24   A.  There is a second cell phone located in the

25   center console of the vehicle.

1           MR. REED:  Okay.  And then if we could go

2    back up one page, please.

3    BY MR. REED:

4    Q.  What was Mr. Patel's license plate number on

5    this vehicle?

6    A.  It's an Illinois license plate:  D, as in

7    David; Q, as in queen; 99741.

8    Q.  So what happened to the money in the box?

9    A.  After it was photographed in the vehicle, we

10   secured it as evidence until it could later be

11   returned to Ms. Bryan.

12   Q.  And has it since been returned to Ms. Bryan?

13   A.  Yes, it has.

14   Q.  What about Patel's cell phones located in that

15   vehicle?

16   A.  Those were also seized as evidence.

17   Q.  Where was the driver, Nirav Patel, taken after

18   he was arrested at the scene in front of

19   Ms. Bryan's house?

20   A.  He was transported back to the Edwardsville

21   Police Department.

22   Q.  What happened once he got there?

23   A.  He was placed in one of our interview rooms,

24   and shortly after, Detective Mark Lask from our

25   agency and I attempted to interview him.

1    Q. Okay.  You said "attempted."  What happened

2    during that interview?

3    A. When we were trying to explain to him his

4    *Miranda* rights, we encountered a language barrier

5    and we had difficulty knowing whether or not he

6    understood his rights, so we elected not to ask him

7    any questions about the investigation; however, he

8    made several spontaneous statements while we were

9    trying to get through *Miranda*.

10   Q. Okay.  So you said you were trying to Mirandize

11   him, and just to be clear, you weren't asking him

12   substantive questions?

13   A. No.

14   Q. You were reading him his rights?

15   A. Yes.

16   Q. I think you said he made several spontaneous

17   responses?

18   A. Yes.

19   Q. Okay.  What did he say that stood out to you?

20   A. He made mention of 5,000 or $10,000.  He said

21   that this was his first time and he made statements

22   saying that he had nothing to do with this.

23   Q. Once you weren't sure whether he understood his

24   *Miranda*, did you stop the interview?

25   A. We did.

Vol. 3 - 671

1          MR. REED:  Okay.  Judge, at this time we

2     could move into the cell phone extractions or I can

3     start a new topic.

4          THE COURT:  Well, it's 25 after, so now is

5     a good time to break.

6          MR. REED:  Okay.

7          THE COURT:  And we'll come back at 9:00

8     a.m.

9          MR. REED:  Thank you, Judge.

10          THE COURT:  All right.  Ladies and

11     gentlemen, you're not supposed to talk about this

12     case with anybody, don't do any independent

13     research, you can't even talk amongst yourselves

14     about it; and if anybody approaches you and tries

15     to talk to you about this case, bring that to my

16     attention.

17          All right.  Have a good evening and a safe

18     trip home.  See you tomorrow.

19          (Jury out at 4:26 p.m.)

20          (Off the record.)

21          (Proceedings held on the record outside

22     the presence of the jury at 4:30 p.m.)

23          THE COURT:  We're on the record outside

24     the presence of the jury.  At this point it may be

25     the intention of the defendant to testify.  It's my

Vol. 3 - 672

1     belief that we -- it's not necessary to shackle his

2     feet, and it's the request of the defendant that he

3     not be shackled during his testimony; is that

4     correct?

5              MS. FRETER:  Yes, Your Honor.

6              THE COURT:  What is the Government's

7     position?

8              MR. WEINHOEFT:  The Government agrees.  We

9     don't think it's wise to take any chance whatsoever

10    for a jury to see the defendant shackled.  So with

11    respectful apology to the Marshals Service, who has

12    a different opinion, we do not wish for him to be

13    shackled.

14             THE COURT:  So Mr. Patel, if you do

15    testify tomorrow, I will not -- when you come up to

16    the stand, you will not have anything on your feet.

17    There won't be any chains on you, okay?

18             THE DEFENDANT:  I promise on my life.

19             THE COURT:  I understand.  I just want to

20    tell you if for some reason you were to panic or

21    you were to decide that you're going to --

22             THE DEFENDANT:   No.

23             THE COURT:  -- make a quick move, nowhere

24    to go.  It would only be a demonstration in front

25    of the jury that couldn't possibly help your case.

Vol. 3 - 673

1  All right?  So I anticipate you're going to be

2  cooperative, and there's not going to be a problem,

3  right?

4          All right.  Anybody -- does the Government

5  want to put anything else on the record?

6          MR. REED:  Not on the record, Judge.

7          THE COURT:  Defense, want to put anything

8  else on the record?

9          MS. FRETER:  No, Your Honor.  Thank you.

10          THE COURT:  All right.  See you tomorrow.

11          (Proceedings recessed at 4:33 p.m. until

12  9:00 a.m. February 6, 2025.)

13

14              *  *  *  *  *  *  *  *  *  *  *  *

15              CERTIFICATE OF COURT REPORTER

16

17      I, Erin M. Materkowski, hereby certify that

18  the foregoing is a true and correct transcript from

19  reported proceedings in the above-entitled matter.

20

21  /s/ Erin M. Materkowski          Date: 06/30/2025
    ERIN M. MATERKOWSKI, RPR, CRR
22  Official Court Reporter
    Southern District of Illinois
23  East St. Louis Division

24

25