UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,    )
                             )
        Plaintiff,           )
                             ) Cause No.
   vs.                       ) 3:23-cr-30076-SPM-1
                             ) East St. Louis, IL
NIRAV B. PATEL,              ) February 7, 2025
                             ) 9:02 a.m.
        Defendant.           )

Before the
HONORABLE JUDGE STEPHEN P. MCGYLNN

**TRANSCRIPT OF JURY TRIAL**
**VOLUME 5**

FOR PLAINTIFF:    Mr. Peter T. Reed
                  Mr. Steven D. Weinhoeft
                  United States Attorney's Office
                  9 Executive Drive
                  Fairview Heights, Illinois  62208
                  peter.reed@usdoj.gov
                  steven.weinhoeft@usdoj.gov


FOR DEFENDANT:    Ms. Kim C. Freter
                  Federal Public Defender's Office
                  650 Missouri Avenue, Suite G10A
                  East St. Louis, Illinois  62201
                  kim_freter@fd.org


INTERPRETERS:     Nita Shah and Chetan Vyas


COURT REPORTER:   Erin M. Materkowski, RPR, CRR
                  erin_materkowski@ilsd.uscourts.gov
                  750 Missouri Avenue
                  East St. Louis, IL  62201


(Proceedings taken by machine shorthand; transcript
produced by computer-aided transcription)

1                                **INDEX**

2                           **WITNESSES INDEX**

3      **DEFENDANT'S WITNESSES**                              **PAGE**

4      NIRAV PATEL

5          Continued Cross By Mr. Reed........................ 3

6          Redirect By Ms. Freter............................. 77

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PATEL - CONTINUED CROSS/REED                Vol. 5 - 872

1           (In open court.)

2           (Jury present at 9:02 a.m.)

3           THE COURT:  Good morning.  You are still

4    under oath.  You may proceed.

5                **CONTINUED CROSS-EXAMINATION**

6    BY MR. REED:

7    Q.  Good morning, sir.

8    A.  Good morning.

9           MR. REED:  Put Exhibit 93 on the screen,

10   please.

11   BY MR. REED:

12   Q.  Sir, this is November 23 of 2022 in Merrill,

13   Wisconsin?

14   A.  Yes.

15   Q.  You took this picture?

16   A.  Yes.

17   Q.  Okay.  It was dark outside?

18   A.  Yes.

19   Q.  There was snow on the ground?

20   A.  Yes.

21   Q.  Ice on the street?

22   A.  Yes.

23   Q.  Sir, you have family back in India?

24   A.  Yes.

25   Q.  And your own parents, are they still alive?

PATEL - CONTINUED CROSS/REED                 Vol. 5 - 873

1    A.  I do not know about my mother because for last

2    four or five months, I have not talked to her.  She

3    was in a lot of trouble when I last talked to her.

4    There's no other breadwinner, I am the only one,

5    and there is no money in the family.

6    Q.  Sir, I'm sorry to hear that your mother is not

7    doing well.  You mentioned that yesterday and to

8    the agents?

9    A.  I have faith in God.

10   Q.  We all worry about our parents.

11   A.  I am a responsible child.

12   Q.  How old is your mother?

13   A.  Around 77 years.

14   Q.  Does she live on her own?

15   A.  Sir, in Indian culture, everybody stays

16   together.  It's a joined family.

17   Q.  Okay.  Now, you've seen these three older

18   ladies testify this week, right?

19   A.  What lady?

20   Q.  Vonda Lutz, Karen Endres, Virginia Bryan?

21   A.  Yes.

22   Q.  They're about your mother's age?

23   A.  Yes.

24   Q.  And I ask this respectfully --

25   A.  I respect them by my heart.

PATEL - CONTINUED CROSS/REED          Vol. 5 - 874

1    Q. -- but if your mother called you and told you

2    that she had put 1 million rupees in a box and

3    dropped it in the back of the car after dark, what

4    would you tell her?

5          MS. FRETER:  Your Honor, I object as this

6    is an improper hypothetical.

7          THE COURT:  Yeah.

8          MR. REED:  Judge, if I may, defense

9    counsel has suggested there's some kind of cultural

10   barrier here.  I think it's appropriate to ask

11   whether in India, like here, this looks wrong.

12         THE COURT:  I sustain the objection.

13   BY MR. REED:

14   Q. So back to this picture, sir.  You went to a

15   specific address in Merrill, Wisconsin, and parked

16   on the street?

17   A. Yes.

18   Q. You did not get out of the car?

19   A. No.

20   Q. You waited for Karen Endres to walk to your

21   car?

22   A. Yes.

23   Q. She was carrying a box?

24   A. I did not pay attention to that.

25   Q. She put a box in your car?

PATEL - CONTINUED CROSS/REED                Vol. 5 - 875

1    A. Yes.

2    Q. Did you say hello and tell her your name?

3    A. She did not ask me anything, and I did not

4    reply to her anything.

5    Q. And you actually -- when she reached your car,

6    you slouched down and turned your head away from

7    her, right?

8    A. I don't remember anything like that.

9    Q. Okay.  So when she testified that that's what

10   you did, do you dispute that?

11          MS. FRETER:  Your Honor, this is --

12   Mr. Patel -- I'm objecting is that this is an

13   improper question asking him to comment on the

14   testimony of another witness.

15          THE COURT:  I think he asked if he

16   remembered her testimony.  So the question -- I

17   mean, the objection is overruled.

18   BY MR. REED:

19   Q. You heard her say that, that you slouched down

20   the other way?

21   A. At this time I don't remember anything like

22   that.

23   Q. Okay.  I'll move on.

24          Did you give her a receipt?

25   A. No, no.

PATEL - CONTINUED CROSS/REED                Vol. 5 - 876

1    Q.  Did you make sure she made it back to her house

2    safely?

3    A.  Yes, I was watching.

4    Q.  Did you hear -- do you remember her testifying

5    earlier this week that you took off before she made

6    it back across the street?

7    A.  At this time I don't know those details.

8    Q.  You took a video of the box that she gave

9    you?

10   A.  I don't remember that, but I think I took.

11   Q.  You took videos of each box you picked up from

12   these ladies, right?

13   A.  Yes.

14   Q.  And then you sent that video to Danny and these

15   other people, right?

16   A.  Yes.

17   Q.  And they told you where to take the money,

18   right?

19   A.  I don't know about any money, but it was a

20   courier matter, and I had to give it to.

21   Q.  So you took it to somebody else, and when you

22   got there, you counted the money with the other

23   person?

24   A.  Yes.

25   Q.  So you knew it was money?

PATEL - CONTINUED CROSS/REED                Vol. 5 - 877

1   A.  I knew that there were money, but how much, the

2   amount, I did not know.

3   Q.  And I think when you spoke with agents, you

4   recalled counting a box that had about $28,000 in

5   it; is that right?

6   A.  I would clarify that right now here.  Because

7   that person also doesn't know me, because that

8   person may have a feeling like that I may be

9   stealing this money from this, and that he was

10  verifying that he was honest or not.

11          MS. FRETER:  And I'm sorry.  I missed the

12  word that the interpreter said.  I couldn't

13  understand it.  Can you repeat that?

14          THE INTERPRETER:  Can you repeat the

15  question because --

16          MS. FRETER:  No.  Can you repeat your

17  answer -- what his answer was.  Can you repeat what

18  you said.

19          THE INTERPRETER:  Because that person did

20  not knew me, and that's the reason I was taking the

21  pictures.  That's what he meant to say.  I was

22  honest.

23  BY MR. REED:

24  Q.  You counted the money in the box?

25  A.  I did not count.

PATEL - CONTINUED CROSS/REED                Vol. 5 - 878

1    Q.  You were there when it was counted?  I think

2    you said that just two questions ago.

3    A.  That individual has counted there.

4    Q.  You saw him count?

5    A.  Yes.

6    Q.  So you knew it was a lot of bills?  A lot of

7    money?

8    A.  I was observing.

9    Q.  Okay.  So when Karen Endres told us earlier it

10   was $29,000, that sounds right to you?

11   A.  At that time that individual was talking to

12   some other party, and he was talking very loud.

13   Q.  Okay.  But you saw all the bills, right?

14   A.  It appeared that he was very angry.

15   Q.  After he counted?

16   A.  Yes.

17   Q.  He thought there wasn't enough?

18   A.  No, I had no communication with that.

19          MR. REED:  Okay.  Let's put up

20   Government's Exhibit 113.

21   BY MR. REED:

22   Q.  After the other guy counted the money, he made

23   these notes on the bill?

24   A.  That dollar was given by that individual only,

25   and when I hand over -- when they give me this

1    bill, that individual, I hand over the box, and

2    then I take this -- I send this image to --

3    Q.  That wasn't my question, sir.  I asked, Did the

4    other guy write this 27120 on the bill?  Yes or

5    no?

6    A.  No, that individual gave me this bill.

7    Q.  Did he write what's written on the bill?

8    A.  I did not write.

9    Q.  Did the other guy write it?

10   A.  I did not observe it.

11            MR. REED:  Well, if we could go back to

12   112.

13            I'm sorry.  It must be 111 and 110.

14   BY MR. REED:

15   Q.  The bill starts blank, right?

16   A.  Yes.

17   Q.  And then something is written on it?

18   A.  No.

19            MR. REED:  Back to 111.

20   BY MR. REED:

21   Q.  Something is written on it now?

22   A.  Yes.

23   Q.  And you took both of these pictures?

24   A.  Yes.

25   Q.  While meeting with the guy and counting the

PATEL - CONTINUED CROSS/REED                    Vol. 5 - 880

1   money?

2   A.  No, I don't know anything about it.

3   Q.  Okay.  I'll move on.

4            When you handed off these ladies' money to

5   other people, did you meet at a bank?

6   A.  No.

7   Q.  Police station?

8   A.  No.

9   Q.  Parking lot?

10  A.  I don't remember that part.

11  Q.  Well, yesterday you said it was a shopping

12  mall, right?

13  A.  Yes, something like that.

14  Q.  And it was in the car?

15  A.  What was in the car?

16  Q.  You and the guy who you counted the money with

17  did it in the car?

18  A.  No.

19  Q.  You got out of the car?

20  A.  No.

21  Q.  Were you parked in a parking lot when you

22  handed over the money?

23  A.  I parked, yes.

24  Q.  At a shopping mall?

25  A.  Yes.

PATEL - CONTINUED CROSS/REED                Vol. 5 - 881

1    Q.  Okay.  And the guy you met and handed over the

2    money to, you said he was a stranger to you; is

3    that right?

4    A.  Yes.

5    Q.  Do you hand over tens of thousands of dollars

6    of your money in a parking lot?

7    A.  If I don't know, I won't hand over.

8    Q.  You don't hand over money in parking lot if

9    it's your money?

10   A.  If I had to give it to somebody and if it's

11   like that, then I may give.

12   Q.  A parking lot is not a normal place to hand

13   over tens of thousands of dollars?  Yes or no?

14   A.  No.  If I had to do the payment to somebody and

15   if it is a legal money, what would I have to fear

16   about anything.

17   Q.  We'll get to that.

18           This time in Merrill, Wisconsin, where you

19   parked by the railroad tracks, that's the first

20   time you did one of these money pickups, right?

21   A.  It was either second or third time.

22   Q.  Did -- you knew from the very first time you

23   did this package work that the packages had money

24   in them?  Yes or no?

25   A.  No.

PATEL - CONTINUED CROSS/REED                Vol. 5 - 882

1    Q.  You just testified that you saw the guy count

2    the money?  Yes or no?

3    A.  It is true, but I don't know that you are

4    considering it the first time or the second time or

5    the third time.

6    Q.  By this time, the first time you're in

7    Wisconsin, you knew the packages had money in

8    them?

9    A.  About money, I have no information.  My phone

10   has messages, you can view it.

11   Q.  Sir, my question, sir --

12           MS. FRETER:  Well --

13   BY MR. REED:

14   Q.  The packages had a lot of money in them,

15   right?

16           MS. FRETER:  -- Judge, I ask that he be

17   allowed to finish his answer.

18           MR. REED:  It's a yes-or-no question,

19   Judge.

20           THE COURT:  Whatever he was saying, he

21   responded to the question.  We heard his answer.

22   Next question.

23   BY MR. REED:

24   Q.  You knew from this first Wisconsin stop that

25   there was a lot of money in those packages?  Yes or

PATEL - CONTINUED CROSS/REED                Vol. 5 - 883

1    no?  Yes or no, sir?

2    A.  I -- that much in the witness of the Lord God

3    about money, I had no information.  I only know

4    that I am a courier driver; and if I were this much

5    partner of that individual, why would I be sitting

6    here?

7    Q.  Stop.  You saw the money, right?

8    A.  Yes.

9    Q.  Okay.  So you knew there was a lot of money in

10   the packages, right?

11   A.  Only one time.

12   Q.  Okay.  We'll get back to that.

13          Let me ask you about the people you worked

14   with.

15   A.  Yes.

16   Q.  Danny is your cousin who lives in Atlanta,

17   right?

18   A.  Yes.

19   Q.  You said yesterday you were only in Atlanta for

20   a week, right?

21   A.  In that case I was two times in Atlanta.  First

22   time I had traveled from Savannah to Atlanta.  At

23   that time I did not have any vehicle or anything.

24   At that time later on, I was in Chicago, and I

25   obtain my license and car and everything, and after

PATEL - CONTINUED CROSS/REED                Vol. 5 - 884

1    that, six, seven months, I was.

2    Q. Right.  So after you went back to Chicago and

3    you did this pickup -- these pickups in Wisconsin,

4    you went back to Atlanta, right?

5    A. Yes.

6    Q. Okay.  You didn't tell us about that yesterday,

7    did you?

8    A. I don't remember that much.

9    Q. Okay.  You were stopped by the police in

10   Wisconsin on December 2nd of 2022, right?

11   A. Yes.

12   Q. You stayed in a hotel in Wisconsin after you

13   got stopped, right?

14   A. Okay.  They stopped me, and then after I was

15   released, I -- I had to stay in a hotel because I

16   did not want to do night driving.

17   Q. And after that, you went back to Clarksville,

18   Tennessee?

19   A. No, I had gone to Chicago.

20   Q. For a couple days, right?

21   A. Yes.

22   Q. We'll get back to this in a minute.

23           Abhishek, that's someone you met back in

24   India, right?

25               THE INTERPRETER:  Sir, can you repeat your

PATEL - CONTINUED CROSS/REED                Vol. 5 - 885

1    question.

2    BY MR. REED:

3    Q.  Abhishek is someone you met back in India,

4    right?

5    A.  Yes.

6    Q.  Danny knows Abhishek too, right?

7    A.  Yes.

8    Q.  And when you met with agents, you told them

9    Abhishek is the one who sent you to Indiana,

10   right?

11   A.  Abhishek didn't tell me.  Danny told me.

12   Q.  You told the agents, though, that Abhishek was

13   also involved in the Indiana pickups, right?

14   A.  I'm clarifying again right now here that I was

15   not -- I was not connected with anybody except

16   Danny.

17          MR. REED:  Could we play Clip No. 4,

18   please, from Government's Exhibit 5.

19          (The video was played at this time.)

20   BY MR. REED:

21   Q.  Do you agree that you told them Abhishek was

22   involved in the Indiana pickups, right?  Yes or

23   no?

24          THE COURT:  Slow down.

25          THE INTERPRETER:  Hold on.

PATEL - CONTINUED CROSS/REED                Vol. 5 - 886

1            THE DEFENDANT:  Okay.  I swear on the name

2    of my God that when this interrogation was going

3    on, my mind was upset.  I was more worried about my

4    mother who was sick and my child.

5    BY MR. REED:

6    Q.  I'll move on.

7            You knew Danny and Abhishek before you

8    even left India, right?

9    A.  I only know Danny more.  Abhishek is a good

10   friend of Danny, and I had no personal relationship

11   with Danny that way.

12   Q.  And a third name you gave the agents was

13   someone named Bharat; is that right?

14   A.  Yes, the pickup name which comes -- his name is

15   Bharat.

16   Q.  You also said you lived in Tennessee, right?

17   A.  Who lived in Tennessee?

18   Q.  You lived in Tennessee?  Yes?

19   A.  I had gone to.

20   Q.  And in Tennessee there was someone named

21   Bharat, right?  Well, just yes or no, sir.

22           THE INTERPRETER:  He clarified there is a

23   total misunderstanding.

24   BY MR. REED:

25   Q.  Same Bharat or different Bharat?

PATEL - CONTINUED CROSS/REED            Vol. 5 - 887

1   A.  Because I don't know what you are referring to

2   that in Indiana.  Now, my cousin's sister is there,

3   so I had gone there, and I don't remember all these

4   things.  It is like how these women got defrauded,

5   I got defrauded by these individuals.

6   Q.  The question I asked, sir:  There was someone

7   named Bharat in Tennessee, yes?

8   A.  No.

9   Q.  You don't know anybody named Bharat in

10  Tennessee?

11  A.  I don't know anybody, yes.

12  Q.  Okay.  After you were stopped in Wisconsin, you

13  went back to Chicago, right, but only for a couple

14  days, right?

15  A.  About seven to ten days.

16  Q.  Then you went to Clarksville, Tennessee,

17  right?

18  A.  Yes.

19  Q.  And then you went back to Atlanta, right?

20  A.  Yes.

21  Q.  And you were in Atlanta for December and

22  January and February, right?

23  A.  Yes.

24  Q.  And that's because the address on the license

25  that you gave the police officers in Wisconsin said

1    Illinois, right?

2    A.  Yes.

3    Q.  You didn't want them to be able to find you,

4    right?

5    A.  No, and I did not have job at that time, and I

6    did not have any money then.  That's why I had to

7    go to my cousin.

8    Q.  Yesterday you were asked when you lived in

9    Atlanta, right?

10   A.  Yes.

11   Q.  You said one week, right?

12   A.  That's when I had come in starting at that

13   time.

14   Q.  But, in fact, you lived in Atlanta for three

15   months, right?

16   A.  That is the next incidence.

17   Q.  Okay.  And you lived in Atlanta after you were

18   stopped in Wisconsin?

19   A.  Yes.

20   Q.  Then in March, you moved back to Chicago,

21   right?

22   A.  Yes.

23   Q.  You hadn't been --

24   A.  Now I am trying to tell my facts here.

25   Q.  Sir, answer my questions.

1            That's when you moved back to Chicago, in

2    March?

3    A.  Yes.

4    Q.  And then April 10 is when you went down to

5    Madison County for the first time, right?

6    A.  Yes.

7    Q.  It had been four months.  You hadn't been

8    charged.  It seemed safe to do it again, right?

9    A.  I swear on my life that there is nothing -- a

10   claim like that, like I am innocent.  I did not

11   know what was going on and I am getting accused of

12   anything.

13   Q.  Okay.  During your interview with agents, you

14   said the people you were working with were

15   dangerous people.  You said that, right?

16   A.  No, I didn't tell that.

17            MR. REED:  Can we play Clip No. 5, please,

18   from Exhibit 5.

19            (The video was played at this time.)

20            MR. REED:  Can you pause it there at the

21   end of the clip.

22   BY MR. REED:

23   Q.  I apologize.  You said they were very

24   dangerous, right?

25            MS. FRETER:  Objection, Your Honor, as to

PATEL - CONTINUED CROSS/REED                 Vol. 5 - 890

1   argumentative.

2           THE COURT:  Overruled.  It's

3   cross-examination.

4   BY MR. REED:

5   Q.  You said they can do anything if someone says

6   something, right?

7   A.  I want to clear it right now that my intention

8   to communicate to the officer was that they are

9   very smart people.

10  Q.  You knew you were working with very dangerous

11  people, didn't you?

12  A.  No.

13  Q.  You said it though.  Dangerous people?  Yes or

14  no?

15  A.  Can we replay that one time?

16  Q.  Yes.

17          (The video was played at this time.)

18          THE DEFENDANT:  Very smart, smart.

19          MR. REED:  Pause it.

20          THE DEFENDANT:  Not dangerous.

21          MR. REED:  Okay.  Pause it, please.

22  BY MR. REED:

23  Q.  You knew these were very dangerous people who

24  can do anything if someone says something or taking

25  money from these old ladies?  Yes or no?

1    A.  Sir, I did not use the word "dangerous."

2    Q.  But you did say they can do anything if someone

3    says something, right?

4    A.  I don't understand anything, and Hindi is not

5    my native language.

6    Q.  So the people you're talking about in this

7    clip, you knew that those people were the ones

8    taking the money from these older ladies, right?

9    A.  I can't say that they were taking the money

10    from the ladies or not.  I can't say what -- and

11    I'm not a God who can find out what is going on in

12    anybody's mind, whether it is you, the counsel, or

13    the jury, what they are thinking in their mind.  I

14    am not God.  Because everybody has different all

15    opinions and thoughts.

16    Q.  I'll move on.

17            Let's talk a little bit more about this

18    interview.  You said at the beginning of this

19    interview, quote, "It has nothing to do with me.  I

20    didn't get anything"?

21    A.  Yes.

22    Q.  And you said, They had not paid the money even

23    once to me?  You said that, right?

24    A.  Yes.

25    Q.  In fact, it was your own cousin Danny who got

1    you involved?

2    A.  Yes.

3    Q.  And when you went to Atlanta, Danny paid you,

4    didn't he?

5    A.  Yes, he gave me money and the phone also.

6    Q.  And you testified yesterday that you also got

7    paid by Zelle, right?

8    A.  I have not say that I have received money

9    through Zelle.  I had insisted to him that you have

10   to pay me by Zelle only.

11   Q.  Danny paid you, right?

12   A.  He had not paid me by Zelle.  When I went to

13   his house, he paid me.

14   Q.  So when you told agents that Danny had not paid

15   the money even once to me, that was a lie?  Yes?

16   A.  I had -- I have stated, in fact, that when I

17   went to Danny's place, he paid me.

18   Q.  Okay.  Danny paid you?  Yes?

19   A.  Yes.

20   Q.  You told the agents he had not paid the money

21   even once to you, right?

22   A.  Sir, one time was paid when I went to his

23   home.

24   Q.  Okay.  So when you told the agents you had not

25   been paid even once, that was a lie, right?

PATEL - CONTINUED CROSS/REED                    Vol. 5 - 893

1    A.  At that time my mind was involved with my son

2    and my mother's matters.

3    Q.  All right.

4    A.  Sir, if your mom is terminally ill and your son

5    is also going through hassles and you do not have

6    money in your hand, what would be your situation,

7    sir?

8    Q.  Sir, sir, I ask questions.

9    A.  And in 20 months happened, I have not talked to

10   my family members for the last 20 months in jail,

11   and I have not seen my son after that.

12         THE COURT:  All right.  You've gone beyond

13   answering the question he asked.

14         THE DEFENDANT:  I apologize, sir.

15         THE COURT:  So listen to his question and

16   answer the question that's asked.  Your lawyer will

17   have the opportunity to ask you more questions to

18   allow you to further explain your answers or to

19   tell the jury things that you want them to know.

20         THE DEFENDANT:  Sorry, sir.

21   BY MR. REED:

22   Q.  Danny told you that you could take money out of

23   these boxes, right?

24   A.  Yes.

25   Q.  And you testified yesterday that you did not

1   take money out of the boxes; is that right?

2   A.  Yes, it is fact.

3   Q.  But you told the agents that you did take money

4   out of the boxes, right?  Yes or no?  Yes or no?

5   A.  Sir, they were constantly interrogating me the

6   same questions, same questions and bombarding me,

7   so, oh, I just replied.  That's it.

8   Q.  Agents repeatedly told you to tell them the

9   truth, right?  Yes or no?

10  A.  Yes.

11  Q.  Because you had not been telling them the

12  truth?  Yes or no?

13  A.  No, what there was -- they were the facts in

14  mind and that's only I said.

15  Q.  You testified you flew from India to Canada in

16  December 2022, right?

17  A.  Yes.

18          MR. REED:  Pull out Government's Exhibit

19  79 -- oh, I'm sorry, Government's Exhibit 78.

20  BY MR. REED:

21  Q.  You had this visa application prepared for you?

22  Yes or no?

23  A.  Yes.

24  Q.  You paid someone to prepare it for you?  Yes or

25  no?

PATEL - CONTINUED CROSS/REED                Vol. 5 - 895

1   A.  Yes.

2           MR. REED:  Go down to page 11.

3   BY MR. REED:

4   Q.  Is this actually your passport?  Yes or no?

5   A.  Yes.

6   Q.  Okay.

7           MR. REED:  And if we could, go down two

8   pages.  Just scroll down.

9   BY MR. REED:

10  Q.  This is the other part of your passport, yes?

11  A.  Yes.

12  Q.  And is this your actual address, like

13  residency?

14  A.  Yes.

15  Q.  You provided the person who prepared this

16  application with your passport or pictures of it?

17  A.  Yes.

18  Q.  Okay.

19          MR. REED:  Go to the next page.  The page

20  after that.  Next page.

21  BY MR. REED:

22  Q.  And this is your old passport, right?  Yes?

23  A.  Yes.

24  Q.  So in fact, you know a visa is required to

25  enter another country, right?

PATEL - CONTINUED CROSS/REED                Vol. 5 - 896

1   A.  Yes.

2   Q.  And you've traveled to a number of countries

3   around the world?

4   A.  Yes.

5           THE INTERPRETER:  Don't say (inaudible)

6   Either say yes or no, please.

7   BY MR. REED:

8   Q.  You obtained lawful status to enter those

9   countries when you did that?  Yes or no?

10          THE INTERPRETER:  Sir, please repeat the

11  question.

12  BY MR. REED:

13  Q.  Sir, you obtained lawful status when you

14  entered those countries?  Yes?

15  A.  Yes.

16  Q.  You went to Australia?

17  A.  No.

18  Q.  Okay.

19          MR. REED:  Can we go down a page.  I

20  believe it's page 20.

21  BY MR. REED:

22  Q.  Your passport is stamped Australia?  Yes or

23  no?

24  A.  I want to say my statement here.

25  Q.  Is the passport stamped Australia?  Yes or no?

PATEL - CONTINUED CROSS/REED                    Vol. 5 - 897

1    Is this, in fact, your passport?

2    A.  Yes.

3    Q.  Okay.  You also went to South Africa?

4    A.  Yes.

5    Q.  Singapore?

6    A.  Yes.

7    Q.  So when you came across the border into the

8    United States, you knew you were breaking the law,

9    right?

10   A.  When I enter, I did not know because I did not

11   know I was in U.S.

12   Q.  You testified yesterday that someone named Jack

13   carried you across the border, right?

14   A.  Yes.

15   Q.  And you know people pay a lot of money for help

16   crossing the border like that, right?

17   A.  I don't know.

18   Q.  Are you claiming this guy Jack took you across

19   the border for free?

20   A.  Yes.

21   Q.  So after you broke the law by entering the

22   United States illegally, did you go to a police

23   station and turn yourself in?

24   A.  No.

25   Q.  Because you came to the United States to make

PATEL - CONTINUED CROSS/REED                Vol. 5 - 898

1    money, right?

2    A.  No, I had no intention to money.

3    Q.  Well, you testified yesterday that the reason

4    you came over to Canada and then the United States

5    was because you wanted to make money, right?

6    A.  No.

7    Q.  All right.  I'll move on.

8              MR. REED:  Could we go to page 27.  Could

9    we look at the top left corner of this, please.

10   BY MR. REED:

11   Q.  You told us that you do, in fact, live in the

12   Aalok Residency, right?

13   A.  Yes.

14   Q.  So this is your bank statement, right?

15   A.  Yes.

16   Q.  Okay.  And on the bank statement, it says it's

17   your statement from -- and it's flipped, right, so

18   it's going to be June 1st of 2019 to December 9 of

19   2019, right?  Yes?

20   A.  Yes.

21             MR. REED:  Let's go to the end of this

22   bank statement.  It's page 33, and if we could look

23   at the bottom part in the bottom right where it

24   says debts, credits, closing balance.

25   BY MR. REED:

PATEL - CONTINUED CROSS/REED          Vol. 5 - 899

1    Q.  Do you see that?

2    A.  Yes.

3    Q.  Total deposits in these six months are

4    8,228,227.91 rupees?  Yes or no?

5    A.  Can I give the actual details about this?  Can

6    I say my situation here?

7            THE COURT:  First answer his question.

8    BY MR. REED:

9    Q.  Yes or no?

10   A.  This I have not seen.

11           THE COURT:  Okay.

12   BY MR. REED:

13   Q.  You just told us this was your bank statement,

14   right?

15   A.  I'm trying to tell you the facts, what are

16   they.

17   Q.  Okay.  Eight million rupees, this 8,228,227.91,

18   that that's about 95,000 U.S. dollars, right?

19   A.  I do not know the counting because I'm poor in

20   mathematics.

21   Q.  Okay.

22           MR. REED:  Can we put up Government's

23   Exhibit 130 for the witness, please.

24   BY MR. REED:

25   Q.  Okay.  8,228,227.91 U.S. dollars --

PATEL - CONTINUED CROSS/REED                Vol. 5 - 900

1          MS. FRETER:  Wait, wait, wait.  Can we

2     approach?

3              (Sidebar proceedings on the record.)

4          MS. FRETER:  Judge, it appears that the

5     Government has a screenshot from Google that has an

6     exchange rate that when I look at it, it's undated.

7     This witness can testify as to what he believes

8     that the exchange rate or what it was worth in

9     2019, which is what the bank statement is, not from

10    an undated screenshot from Google.  It's unfair to

11    show him a picture of Google and say this is what

12    the exchange rate is now without any further

13    information.

14         MR. REED:  I did say roughly, Judge.

15         THE COURT:  I don't know what the exchange

16    rate -- how significant a swing it was from then to

17    now.  Does the Google thing have a date on it?

18         MR. REED:  I don't recall if there is a

19    date, but I can provide one.

20         MS. FRETER:  There's articles, Judge,

21    about how the Indian government has depreciated the

22    -- I mean, there is all kinds of stuff.  He's

23    asking --

24         THE COURT:  Okay.  Where are we going with

25    this?

1           MR. REED:  It's appropriate for redirect.

2      There's a lot of money in his bank account, Judge.

3           MS. FRETER:  Well, Judge, he's testified

4      that after COVID happened, he had financial

5      problems and that's why he left, so this is

6      preCOVID.  So, I mean, the Government can get into,

7      obviously, whatever it wants, but I think it's

8      unfair to show him an undated Google screenshot and

9      say this is what it was back in 2019 especially --

10          MR. REED:  I'll move on, Judge.

11          MS. FRETER:  -- especially considering the

12     language problems we've been having.

13          THE COURT:  I'm trying to think of -- if

14     on direct, if you asked him why he came here.

15          MR. REED:  He testified he was very poor,

16     Judge, and he --

17          MS. FRETER:  And so, Judge --

18          THE COURT:  Okay.

19          MS. FRETER:  -- I'm just going to say

20     this, right -- and I know Mr. Patel is a very

21     rigid, literal thinker.  If people recall, he

22     testified that he wasn't intending to go to Canada,

23     he was intending to go to somewhere else, and he

24     accidentally ended up here, which, whatever you

25     think about it, when the Government asked him, So

PATEL - CONTINUED CROSS/REED            Vol. 5 - 902

1   you came to Canada and the United States to make

2   money, I know, because I've spent time with him, in

3   his mind, his answer is going to be I didn't mean

4   to come to Canada, and I know it seems -- it's just

5   how he thinks.

6            MR. WEINHOEFT:  I think really the

7   questioning for Mr. Reed, I think, is quite

8   limited.  It is essentially this is a defendant's

9   own bank statement.  He's suggesting that he was

10  poor and doesn't have any money, but he's got close

11  to --

12           THE COURT:  Where did we get this?

13           MR. WEINHOEFT:  -- he's got a whole lot of

14  money in his account.

15           MR. REED:  It's attached to his visa

16  application on his phone, Judge.  He's already

17  testified it's his bank statement.

18           MR. WEINHOEFT:  It's his bank statement --

19           MS. FRETER:  And --

20           MR. WEINHOEFT:  -- on his phone --

21           MS. FRETER:  And --

22           MR. WEINHOEFT:  -- I think you should be

23  able to ask --

24           MS. FRETER:  -- but Judge, he's --

25           MR. WEINHOEFT:  -- him some questions

PATEL - CONTINUED CROSS/REED          Vol. 5 - 903

1   about his bank statement.

2          MS. FRETER:  Judge, if I could or just --

3   I can deal with Mr. Reed or I can deal with

4   Mr. Weinhoeft, but I'm having a hard time

5   responding to both sets of arguments.

6          THE COURT:  Well, why don't you wait until

7   they finish talking, whoever is talking.

8          Now your turn.

9          MS. FRETER:  Judge, Mr. Patel testified on

10  direct that he never turned in this visa statement,

11  it was on his phone, and we've established it was

12  from 2019.  He also testified on direct that after

13  COVID happened in 2020, he ran into financial

14  troubles; and so if the Government wants to ask him

15  about the 8 million rupees that he had in his

16  account in 2019 and what the value of it was in

17  2019, he can give whatever answer he wants, and if

18  they want to prove up how he's lying about the

19  value of the rupee to the U.S. dollar in 2019,

20  fine; but my objection, while we're up here, is

21  they're showing him a screenshot, I'm going to bet,

22  from the last 12 months of the value of the U.S.

23  dollar compared to the rupee in 2024, which he

24  wouldn't know about because he's been confined.

25          THE COURT:  Well, I'm trying to think if

1    the materiality -- how material is it that in 2019,

2    when he lived in India, there was $95,000 that

3    passed through his checking account over a period

4    of -- six months?

5                MR. REED:  Six months.

6                THE COURT:  How is that material?

7                MR. REED:  Judge, it's material because

8    the whole defense is he's poor.  He didn't know

9    what was going on.  In fact, as I've been asking

10   him, he knew all these people.  He had a lot of

11   money.  It was his turn to be in the U.S.  I won't

12   ask it that way, but that's what's going on.

13               THE COURT:  You want the jury to draw an

14   inference that this sophisticated scheme he was

15   making money on while in India or Australia or

16   Singapore?

17               MR. REED:  I don't know where he was

18   getting the money, but it's a lot, Judge.

19               MS. FRETER:  Years, Judge, before the

20   charge in this offense.  I mean, I have made my

21   objection, but --

22               THE COURT:  One more chance at how is it

23   material?

24               MR. REED:  It's material, Judge, because

25   he's testified that his family was poor, and the

PATEL - CONTINUED CROSS/REED                Vol. 5 - 905

1    reason he did this is because he didn't have money.

2    He tells the agents, Go look at my bank statements.

3    So he has his bank statement in his phone, and

4    we're showing it to him.

5            THE COURT:  All right.  With respect to

6    the specific objection about what the value of the

7    rupee is, it's going to have to be -- if he doesn't

8    know what the exchange rate was --

9            MR. WEINHOEFT:  You can ask him what the

10   value of a hundred thousand rupees is.  That's

11   another way to go about it.

12           THE COURT:  I just don't know, so --

13           MR. REED:  I'll keep going, Judge.

14           THE COURT:  Okay.  So you have to live

15   with his answer unless you have -- now, if I rely

16   on a Google search, am I going to say that's

17   admissible, that that's proper foundation?  There

18   are documents, there are records that I could rely

19   upon, take judicial notice of, what the value of

20   the rupee was as opposed to the U.S. dollar on

21   certain dates, but I don't know that a Google

22   search is one of them.

23           MR. REED:  Okay.

24           THE COURT:  All right.

25           (End of proceedings at side bar.)

PATEL - CONTINUED CROSS/REED                    Vol. 5 - 906

1          THE INTERPRETER:  He wants to say

2     something.  I need to -- that's what --

3          THE COURT:  No.  Let's -- I don't know

4     what it is you're going to say, so let's just --

5     let's go through the questioning from the

6     Government and your attorney; and if necessary, I

7     can talk to you outside the presence of the jury on

8     a particular matter, but right now the formal

9     process is he gets to ask the questions and you

10    answer.

11         MS. FRETER:  Your Honor, I would only ask

12    if the thing that Mr. Patel needs to say is if he

13    needed to use the restroom or if somehow we can

14    inquire that way.  I don't know if that's what

15    that's about.

16         THE COURT:  Were you needing a restroom

17    break?

18         THE WITNESS:  No.

19         MS. FRETER:  Thank you, Your Honor.

20         THE COURT:  Go ahead.

21         MR. REED:  78, page 33 back up again,

22    please.

23    BY MR. REED:

24    Q.  Sir, what can 100,000 rupees buy in India?

25         THE COURT:  You're going to have to be

PATEL - CONTINUED CROSS/REED                Vol. 5 - 907

1    specific as to time.

2    BY MR. REED:

3    Q.  In 2019?

4    A.  For my three generations, there will not be any

5    problem.  Then why I should be sitting here?

6    Q.  Sir, my question was a hundred thousand rupees,

7    is that a lot or a little?

8    A.  A lot.

9    Q.  Okay.  And this is 8 million rupees, right?

10   A.  Yes.

11   Q.  All right.  You testified yesterday that you

12   worked as a handyman in 2019; is that right?

13   A.  Yes.

14   Q.  How much money does -- how many rupees did a

15   handyman make in 2019 per year?

16   A.  I don't know much idea.

17   Q.  Okay.

18   A.  A family can run.

19   Q.  Was it more than a hundred thousand rupees or

20   less than a hundred thousand rupees annually?

21   A.  That is too much.

22   Q.  Okay.  So less than that?

23   A.  Very less.

24           MR. REED:  Okay.  Can we put Government's

25   Exhibit 78, page 1, back up again.

PATEL - CONTINUED CROSS/REED          Vol. 5 - 908

1  BY MR. REED:

2  Q. You testified yesterday that this visa

3  application was not submitted to the Canadian

4  government.  Is that what you said?

5  A. I have not work on it because I do not know how

6  to apply for it.

7  Q. My question was, Was this visa application

8  submitted to the Canadian government?  Yes or no?

9  A. Yes.

10 Q. And so yesterday when you testified that you do

11 not have an MBA and have not worked at

12 PricewaterhouseCoopers and have not worked for

13 Accenture, Inc., all that information was submitted

14 to the Canadian government too, right?

15 A. That's that agent assigned, they do that

16 thing.

17 Q. But it's your visa application, right?

18 A. Yes.

19 Q. You provided all the paperwork, yes?

20 A. Not all but a few.

21 Q. Your passport and your bank statement?

22 A. Whatever was my facts or label, I provided.

23 Q. And you reviewed it because it was on your

24 phone, yes?

25 A. It was on my phone, but I don't know that much

PATEL - CONTINUED CROSS/REED                Vol. 5 - 909

1    English.  I have not seen those in great detail.

2         MR. REED:  Could we go back to page 27,

3    please.  Zoom in on the top of that.

4    BY MR. REED:

5    Q.  Your bank statement was in English, right?

6    A.  Yes.

7         MR. REED:  Okay.  We can take that down.

8    We'll move on.

9    BY MR. REED:

10   Q.  Let's talk about the first Indiana pickup.

11        MR. REED:  If we could look at

12   Government's Exhibit 98, page 2.

13   BY MR. REED:

14   Q.  So it's the middle of the night after you've

15   driven all the way to Merrill and back to Chicago,

16   right?

17   A.  Yes.

18   Q.  That's when you got the address for Indiana, at

19   about two o'clock in the morning?

20   A.  Yes.

21   Q.  Okay.

22        MR. REED:  Exhibit 103.

23   BY MR. REED:

24   Q.  You drove to Indiana that very night, right --

25   that very day?

PATEL - CONTINUED CROSS/REED                Vol. 5 - 910

1   A. Early morning, yes.

2   Q. And when you got there, you took this

3   picture?

4   A. Yes.

5   Q. And you sent the picture to Danny or to KKT,

6   right?

7   A. Yes.

8   Q. KKT's number, it starts with a 9-1, right?

9   A. It is an India number.  That much I can tell

10  you.

11  Q. That's all I'm asking.  So it's an India

12  number, right?

13  A. (No response.)

14  Q. So it's light outside in this picture, yes?

15  A. Yes.

16  Q. So you can see the lady walking to your car,

17  yes?

18  A. Yes.

19  Q. But when the agents interviewed you, you told

20  them that you couldn't see her, right?

21  A. Because my attention was not to watch that

22  because I don't know anything about this matter.

23  Q. So you didn't look towards her when she's

24  coming to your car?

25  A. She was there, and some -- another gentleman

PATEL - CONTINUED CROSS/REED                Vol. 5 - 911

1    was also there.

2    Q. You saw that she was elderly, right?

3    A. Yes.  There was walker -- or there was one

4    crutch, crutch with her, and one gentleman was

5    entering her residence.

6    Q. Okay.  She had a walker, right?

7    A. She had crutches.  A stick.

8    Q. And an oxygen mask?

9    A. That I did not know.

10   Q. Okay.  But she had the walker or something --

11   she was supporting herself with something?

12   A. Yes.

13   Q. Okay.  So you did see the lady in Indiana,

14   right?

15   A. Yeah, because I was there.  It is a clear

16   matter.

17   Q. So when you told agents you had not seen her,

18   that was not true, right?

19   A. I'm not telling in that intention, but my

20   attention is not to watch that.  I don't know what

21   this was going on all.

22   Q. Okay.

23   A. I realize when I got inside the jail.

24   Q. Okay.  When she approached your car, did you

25   introduce yourself or make eye contact?

1    A.  She did not ask and I did not talk.

2    Q.  You just looked straight ahead?  Didn't look at

3    her?

4    A.  I did look at her.

5    Q.  You heard her testify that aside from when you

6    pointed "the back," you looked straight ahead?

7    A.  Those details I do not remember at this time.

8    When you are going in a car, there is nothing to

9    say that I'm intentionally looking this or that

10   way.

11   Q.  This is the box with all the gold, right?

12   A.  I didn't know anything.

13   Q.  You opened the boxes and had to count them,

14   yes?

15   A.  No.

16   Q.  So now you're saying you did not open the

17   boxes?

18   A.  No.

19   Q.  You said earlier, though, that you did,

20   right?

21   A.  Only once.

22   Q.  Only once?

23   A.  When they did not have my trust during that

24   money time.

25   Q.  Could you repeat that?

PATEL - CONTINUED CROSS/REED                Vol. 5 - 913

1    A.  When that money matter, when they did not have

2    trust in me.

3    Q.  They entrusted you with a lot of money, didn't

4    they?

5    A.  How many -- how much currency was there, I had

6    no information about that.

7    Q.  Okay.

8    A.  You can look into my messages.

9    Q.  I'll move on.  When Danny wanted you to go to

10   Wisconsin that first time, you told Danny, I will

11   not do any package-related work, right?

12   A.  Yes, package pertaining matter won't do.

13   Q.  You told him, I will not do any package-related

14   work even though you were out of a job and needed

15   money, yes?

16   A.  I don't remember those things.

17          THE COURT:  I'm sorry?  What was the time

18   frame you asked him about?

19   BY MR. REED:

20   Q.  The first time you went to Wisconsin, before

21   that, you told Danny, I will not do any

22   package-related work?

23   A.  That package means not something which is

24   illegal work.  I won't do that because I don't know

25   anything -- anything here.

PATEL - CONTINUED CROSS/REED                Vol. 5 - 914

1    Q.  Okay.  My question was, Did you tell him that?

2    A.  I am a courier driver.

3    Q.  My question is:  Did you tell Danny, I will not

4    do any package-related work?

5    A.  Yes.

6    Q.  Okay.  But eventually, you changed your mind

7    and agreed to do it because you wanted the money,

8    right?

9    A.  Package, I don't know.  Only courier to be

10   picked up and handing over.

11   Q.  That wasn't my question.  After you told him at

12   the very beginning, I will not do any

13   package-related work, you changed your mind and, in

14   fact, did do package work, yes?

15   A.  No.

16   Q.  Okay.  After these first two pickups, one in

17   Wisconsin and one in Indiana, you learned some

18   things about how this works, right?  Some things?

19   A.  It's courier work.

20   Q.  Did you ask Danny why you're taking so much

21   money from older ladies?

22   A.  No, I don't know anything.

23   Q.  Did you ask Danny why these pickup requests

24   were coming in in the middle of the night from

25   India?

PATEL - CONTINUED CROSS/REED                Vol. 5 - 915

1    A.  Not -- I don't know.

2    Q.  Did you ask Danny why there wasn't someone

3    closer than 240 miles away who could pick up a

4    box?

5    A.  I don't know anything about that.

6    Q.  Did you ask Danny why there were no receipts

7    for so much money?

8    A.  In my life, I never thought about this.  My

9    mind is not -- in there in this type of part.

10   My -- in my 44 years' life, nothing like that.

11   This is the first time I go this type of

12   experience, and I gave all this information to the

13   Indian government and the Indian consulate.

14   Q.  Sir, sir, you will have a chance to talk when

15   your attorney comes back up.

16          Once you realized how much money these

17   women were handing you, did you ask them if they

18   were okay?

19   A.  No, I had no intention and no -- I'm just a

20   courier driver.  I had no intention to ask them

21   about anything.

22   Q.  You didn't ask any of these questions, right?

23   A.  No, I did not discuss those matters.

24   Q.  So let's talk about what you did do.  After you

25   went to Wisconsin and Indiana, you deleted the

PATEL - CONTINUED CROSS/REED                Vol. 5 - 916

1    pictures you took, right?

2    A.  Yes.

3    Q.  You deleted the videos you took, right?

4    A.  I have deleted so many messages like that.

5    Q.  You deleted the pictures of the dollar bills

6    from when you dropped off their money, right?

7    A.  Yes.

8    Q.  Did you decide on your own to delete all those

9    messages, or did Danny tell you to delete them?

10   A.  Danny instructed.

11   Q.  So you knew that Danny wanted those messages

12   deleted too, right?  You knew Danny wanted to hide

13   what was going on too, right?

14   A.  I do not know in this whole matter what is

15   going on, those people.  My work is a courier

16   driver and I conducted that.

17   Q.  Okay.  But my question was:  Danny told you to

18   delete the messages, so you knew Danny didn't want

19   those photos on your phone?

20   A.  No.  Those type of things he had not told me.

21   He just told it is not related to us, to delete

22   it.

23   Q.  Could you repeat that?

24   A.  It was not pertaining to our work, so delete

25   it.

PATEL - CONTINUED CROSS/REED                Vol. 5 - 917

1    Q.  He told you to delete it?

2            THE COURT:  Counsel, do you have a while

3    to go still?

4            MR. REED:  Yes.

5            THE COURT:  Why don't we take a -- we'll

6    give the court reporter a break, and let's take a

7    ten-minute recess, and we'll come back at 10:35.

8            (Recess at 10:24 a.m. until 10:36 a.m.)

9            COURTROOM DEPUTY:  All rise.

10           THE COURT:  Be seated.

11   BY MR. REED:

12   Q.  Sir, before you did any of these pickups, you

13   told Danny, I will not do any package-related work,

14   right?

15   A.  Won't do anything illegal.

16           MR. REED:  Okay.  Could we play Clip

17   No. 14 from Government's Exhibit 5.

18           (The video was played at this time.)

19   BY MR. REED:

20   Q.  So you told him before that first pickup, I

21   will not do any package-related work, yes?

22   A.  I don't remember all this.  All I remember is

23   that I said, I'm not going to do anything

24   illegal.

25   Q.  You said package-related work when you talked

PATEL - CONTINUED CROSS/REED                    Vol. 5 - 918

1    to the agents, right?

2    A.  I don't know about package but courier work.

3    Q.  And you told him, I will not do that kind of

4    work -- package-related work, yes?

5    A.  This work, I wouldn't know that.  All I said is

6    I'm not going to do anything illegal, and he

7    assured me that it wouldn't be illegal.

8    Q.  Okay.  I'll ask you one more time, sir.  You

9    said before you went to Wisconsin the very first

10   time, I will not do any package-related work?  Yes

11   or no?

12   A.  I don't remember that.

13   Q.  Okay.  You changed your mind though, right?

14   A.  It's been three years now.  I wouldn't remember

15   what was and what wasn't.

16   Q.  You did, in fact, go and do package-related

17   work, right?

18   A.  I didn't do any package-related work but

19   courier work.

20   Q.  You went and saw that lady in Wisconsin, and

21   she gave you a package, right?

22   A.  Not a package.  That was courier.

23   Q.  It was a box?

24   A.  Courier.

25   Q.  A box full of money, right?

PATEL - CONTINUED CROSS/REED                Vol. 5 - 919

1    A.  Courier.

2    Q.  Okay.  And then when you got back, you deleted

3    all the photos and videos connecting you to

4    Merrill, Wisconsin, right?

5    A.  Yes.

6    Q.  And you deleted all the photos and videos

7    connecting you to Indiana -- to Franklin, Indiana,

8    right?

9    A.  Yes, he told me that.

10   Q.  And after all that, you still went back to

11   Franklin, Indiana, a second time, didn't you?

12   A.  Yes.

13   Q.  You watched Vonda Lutz come out of that

14   building a second time?

15   A.  Yes.

16   Q.  By this time, you've opened at least one of the

17   boxes, right?

18   A.  Now, I don't remember what was and what wasn't,

19   but yes, there was one box that he did not trust,

20   and he made me open that box.

21   Q.  So by the time you went to Indiana the second

22   time, you knew there was money in the box?

23   A.  Yes.

24   Q.  So when that lady came to your car, the one

25   with the walker, right --

PATEL - CONTINUED CROSS/REED          Vol. 5 - 920

1   A.  Yes.

2   Q.  -- you didn't ask if she was okay, did you?

3   A.  But I don't even know her.  What will I talk to

4   her?

5   Q.  You didn't ask her why she was handing over so

6   much money?

7   A.  It's not my job to find out who's paying what

8   and for what reason and why that money is being

9   paid.  I do not know.  I had nothing to do with

10   this.  I was only a courier driver.  It may be for

11   some business or something like that.  I also told

12   the lady.

13   Q.  Sir, you keep going off and not answering my

14   question.

15          THE COURT:  I think he responded.

16          MR. REED:  Okay.

17          THE COURT:  Move to your next question.

18   BY MR. REED:

19   Q.  You drove off with her money that second time,

20   right?

21   A.  Yes.

22   Q.  Then you drove to Wisconsin a second time,

23   right?

24   A.  Yes.

25   Q.  You went to the very same house, right?

PATEL - CONTINUED CROSS/REED                 Vol. 5 - 921

1    A.  I didn't go inside the house.  I stood

2    outside.

3    Q.  Yes, you parked on the street in front of the

4    same house, right?

5    A.  Yes.

6    Q.  And the reason you drove all the way up to

7    Merrill, Wisconsin, and parked outside the house

8    was to pick up another box of money?

9    A.  Yes.  Not box.  Courier.

10   Q.  So you park in front of the same house for more

11   money?  Yes or no?

12   A.  I don't know about money.  Just courier.

13   Q.  Okay.  You knew there was money in the boxes,

14   right?  Because you counted one?

15   A.  I'm just a courier driver.  I have nothing to

16   do with money.

17   Q.  Okay.

18   A.  And if that was the reason, why wouldn't I run

19   away with so much money?  Why would I be working

20   honestly?

21   Q.  They trusted you with a lot of money, didn't

22   they?

23   A.  Yes, they trusted me.  That's why they used to

24   give me the jobs.

25   Q.  They trusted you to do their Wisconsin work?

PATEL - CONTINUED CROSS/REED              Vol. 5 - 922

1   A.  Yes.  Danny knows me and he trusts me, and he

2   knows that he, meaning me, have never done anything

3   wrong.

4   Q.  You were the one they trusted in all these

5   three states:  Wisconsin, Indiana, Illinois,

6   right?

7   A.  Yes.

8   Q.  And they trusted you with tens and hundreds and

9   thousands of dollars, right?

10  A.  Yes.

11  Q.  Okay.  So let's go back to Wisconsin the second

12  time.

13  A.  Okay.

14  Q.  You went and parked outside of the same house a

15  second time, right?

16  A.  Yes.

17  Q.  You went there to get another package from the

18  same woman, right?

19  A.  Sir, may I say this once more.  Don't keep

20  saying parcel.  I am just a courier driver.

21  Q.  Same woman, right?

22  A.  Yes.

23  Q.  And you knew that the boxes contained money,

24  right?

25  A.  All I know is that I'm a courier driver and

PATEL - CONTINUED CROSS/REED                Vol. 5 - 923

1    that's it.

2    Q.  Okay.

3    A.  Don't keep saying the same things in a

4    roundabout way.

5    Q.  This is when you were stopped by the police,

6    right, in Wisconsin?

7    A.  Yes.

8    Q.  And you were on the phone with these guys when

9    you were stopped by the police, weren't you?

10   A.  Yes, everyone seen that on video.

11   Q.  Okay.  And you turned on disappearing messages

12   in the group chat, didn't you?

13   A.  I didn't do the group messaging thing.  They

14   did.

15   Q.  Okay.

16          MR. REED:  Could we look at 86, please,

17   page 2, the second box from the top.

18   BY MR. REED:

19   Q.  It says here, Nirav Patel turned on

20   disappearing messages, yes?

21   A.  I don't know anything about that at this moment

22   because they continuously monitored me because they

23   did not trust me because they don't know me.

24   Q.  You just said that they do trust you, right,

25   because they know you?

PATEL - CONTINUED CROSS/REED                Vol. 5 - 924

1    A.  Danny trusts me, but the other guys, I don't

2    know them, and they're not going to trust me, and

3    they're going to keep monitoring me; and let me

4    tell you one thing, sir, that if it's your money

5    and you tell somebody to do this for me, your

6    friend, so obviously you would be taking care of

7    that and monitoring that.

8    Q.  It says here you turned on disappearing

9    messages, yes?

10   A.  Yes.

11   Q.  Okay.  You never did pick up the money, the

12   box, from the woman in Wisconsin this second time,

13   did you?

14   A.  When the police stopped me, I don't know why I

15   was stopped.

16   Q.  But you didn't get the money from Karen Endres

17   that second time, did you?

18   A.  No.

19   Q.  Because the police stopped you from picking up

20   the money that day, right?

21   A.  Yes.

22   Q.  So after the police stopped you, you knew you

23   were not supposed to pick up the box from that

24   lady, right?

25   A.  The police knew that the lady was supposed to

PATEL - CONTINUED CROSS/REED                Vol. 5 - 925

1    give some money, but I don't know what they know.

2    Q.  You went there to get a box with money,

3    right?

4    A.  I went to get a courier.

5    Q.  Okay.  And you said the police knew she was

6    supposed to get -- that there was going to be a box

7    with money, right?

8    A.  I don't know what they knew or they didn't

9    know.

10   Q.  You just told us the police told you that this

11   lady -- that there was going to be a box?

12   A.  I didn't -- I wasn't told anything about the

13   lady.

14   Q.  You didn't get the money from her that day,

15   right?

16   A.  I didn't take any money from her, but I did go

17   there for a courier.

18   Q.  You went there to get a box, and you did not

19   get a box?  Yes or no?

20   A.  Yes.

21   Q.  Okay.  And the reason you did not get the box

22   is because the police stopped you from getting the

23   box, right?

24   A.  Yes.

25   Q.  And by then, you knew that that lady who lived

1    there did not want you to take her box, right?

2    A.  No, I don't know that.

3    Q.  Well, you went there to get a box, right?

4    A.  I went to get a courier.

5    Q.  You didn't get a box, and the police stopped

6    you from getting it?

7    A.  I like to repeat this again, that I'm just a

8    courier driver.  I have nothing to do with them or

9    anyone; and just as this lady was cheated, I too

10   have been cheated.

11   Q.  It's not what I asked you.  I asked you --

12           THE COURT:  He answered the question that

13   he went there to get a box and he didn't get it and

14   the police stopped him.  So don't ask that again.

15   MR. REED:  Okay.

16           THE COURT:  What's your next question?

17   BY MR. REED:

18   Q.  The police knew you were there to get a box,

19   right?

20   A.  Don't talk about the box.  I'm just a courier

21   driver.

22   Q.  Okay.

23   A.  It's as simple as that.  I'm just a courier

24   driver.

25   Q.  Once the police stopped you, you knew she

PATEL - CONTINUED CROSS/REED                Vol. 5 - 927

1    didn't want you to take the box of money?  Yes or

2    no?

3    A.  I don't know what was going in the mind of the

4    police, and I had no knowledge of the fact that

5    this woman was giving me money for something.

6    Q.  Did you tell police you had been to the same

7    house before and taken a box of money from the same

8    woman?

9    A.  At that time no police personnel asked me this

10   question.

11   Q.  But did you tell them that you had been to the

12   same place a week earlier and taken a box of money

13   from the same woman?

14   A.  When I was stopped by the police, there was no

15   such conversation at all; and if there is a

16   recording, show me.

17   Q.  So the answer is no, you did not tell them

18   that?

19   A.  Correct.

20   Q.  And you went back to Chicago without the box

21   you had gone for, right?

22   A.  I did not go --

23            INTERPRETER:  Excuse me.

24            THE DEFENDANT:  I didn't go there that

25   day. I stayed in a hotel that day because I didn't

1    have any phone on me; and if I wanted to get home,

2    I needed directions.

3    BY MR. REED:

4    Q.  You didn't get the box and you knew you were

5    not supposed to get the box?  Yes or no?

6    A.  Yes, I went to get a courier.

7    Q.  This is when you go to Atlanta for three

8    months, right?

9    A.  Yes, I didn't have a job at that time, and I

10   had no other way out.  I had to pay rent and all

11   that.

12   Q.  Danny lives in Atlanta?

13   A.  Yes.

14   Q.  Did you ask Danny why this woman had given you

15   a box of money?

16   A.  I did have a complete discussion with him, and

17   I asked him what exactly is going on, tell me the

18   truth, and he said everything is legal, money is

19   legal, and we need not worry about anything, and he

20   told me that you need not be afraid.

21   Q.  So when you were stopped by the police, that

22   made you think maybe something is not legal here,

23   right?

24   A.  At that time I had no idea that they were

25   checking me for this reason.

PATEL - CONTINUED CROSS/REED                    Vol. 5 - 929

1    Q.  Okay.  When you had that conversation with

2    Danny, you talked about that yesterday, right?

3    A.  Yes.

4    Q.  What you said Danny told you was, No one is

5    going to catch you, yes?

6    A.  He told me very clearly that there's nothing to

7    be afraid of.  This is legal money.

8    Q.  That's not what I asked.  I said he told you,

9    No one is going to catch you, right?

10   A.  What was that?

11   Q.  He said, No one is going to catch you?

12   A.  Do you mean touch?

13   Q.  No, I mean catch.  That's what you said

14   yesterday.  You said Danny told me no one is going

15   to catch you?

16   A.  I don't understand what you mean by "test."

17   Q.  Catch.  Catch you like arrest or stop you,

18   catch you?

19   A.  Yes.

20   Q.  He told you that?

21   A.  He said, Nobody can catch us in this.  Nobody

22   will catch you in this.

23   Q.  Because you were concerned after the police

24   stopped you that they might catch you, right?

25   A.  No.

PATEL - CONTINUED CROSS/REED                Vol. 5 - 930

1    Q.  Okay.  This is when you left and went to

2    Atlanta for three months, right?

3    A.  I didn't go out of fear to Atlanta because I

4    hadn't done anything wrong, so what should I fear?

5    The only reason was that at that time I had no

6    money and I had to pay rent, and I needed money.

7    Besides Chicago was very cold and I wasn't feeling

8    well, and you can have a look at my bank statement

9    at that time.

10   Q.  And the address you gave to the police officers

11   in Wisconsin was your Illinois address, right?

12   A.  They didn't ask me.  I just showed my license,

13   and that was the address on the license because I'm

14   not able to verbally give out the address.  I don't

15   really know which is Aurora or Chicago.  I know

16   what Chicago but not the other things.

17   Q.  Okay.  Talk about a new topic.  So before you

18   started doing -- picking up these boxes for Danny,

19   you testified you were delivering pizza; is that

20   right?

21   A.  Yes, I was working in a pizza store.

22   Q.  Were you delivering it?

23   A.  Yes.

24   Q.  Okay.  So you're taking a pizza; you drive it

25   to a house; you give it to a customer?  Right?

PATEL - CONTINUED CROSS/REED                Vol. 5 - 931

1   A. Yes.  The pizza place would give me a pizza

2   with the address on it, and then I would type that

3   into my phone, and then reach that address and

4   deliver the pizza to customer.

5   Q. There's a record of the order?  You know they

6   want pizza?

7   A. Yes.  They would give a box that would have

8   pizza in it.

9   Q. So you know what the customer wanted, right?

10  A. I don't know what kind of pizza the customer

11  wants, but I do know the customer wants a pizza,

12  and sometimes there were other things besides the

13  pizza, and I was also working with Door Dash.

14  Q. Okay.  Same deal with Door Dash, you're taking

15  food, and you're taking it to the customer who

16  wants the food, yes?

17  A. Door Dash would give me the address of the

18  store, I would go to the store, show them the

19  paper, then they would give me the food with the

20  address on it of the customer.  I will go there and

21  deliver it, and it's just the same thing, courier

22  delivery.  It's the same with Amazon.

23  Q. Did you ever drive 240 miles to deliver food

24  for Door Dash or the pizza company?

25  A. No.  Obviously, that's not possible.

1    Q.  You drive 10 or 15 miles?  It's only a couple

2    of minutes?

3    A.  Yes, but I used to do Door Dash all day.

4    Q.  And when you're doing that or you're delivering

5    a pizza, you walk up and you give them the food,

6    right?  The customer?

7    A.  No.  We had to take a picture of the customer's

8    door, and then submit that to Door Dash, and that

9    would indicate that our job was done, and then Door

10   Dash and the customer would have some conversation

11   showing that the food was delivered at the door and

12   that would be the end of the job, and I would be

13   paid for it.

14   Q.  Okay.  Let me ask it this way:  You get out of

15   the car when you do Door Dash or pizza delivery,

16   right?

17            THE INTERPRETER:  Excuse me.  What was the

18   first part of the sentence?

19   BY MR. REED:

20   Q.  You get out of the car and go up to their

21   house?

22   A.  Yes.

23   Q.  You walk up to the door?

24   A.  Yes.

25   Q.  You give them what they want, right?

PATEL - CONTINUED CROSS/REED                Vol. 5 - 933

1    A.  I would just give them the parcel, the food.  I

2    do not know what they ordered.

3    Q.  It's about serving the customer, getting them

4    their food, yes?

5    A.  Yes, yes.

6    Q.  And if you don't serve a customer well, the

7    customer can provide feedback on your job, right?

8    A.  Let me clarify one thing out here.  There have

9    been occasions when you have delivered the food and

10   I have delivered the food and yet the customer

11   complains that the food has not delivered.  This

12   has happened to me with Door Dash.

13   Q.  Right.  So you can get good ratings from the

14   customer, right?

15   A.  Yes.

16   Q.  And you can get bad ratings, right?

17   A.  Even if you do a good job, you can get a bad

18   rating.  Same as I'm sitting here right now.  I'm a

19   hundred percent honest when I'm sitting here now.

20   Q.  So when you did these jobs for Danny, your

21   instructions came from India, right?

22   A.  Yes.

23   Q.  Never happened with Door Dash or pizza, yes?

24   A.  Obviously not.

25   Q.  And with these women, the request would come in

PATEL - CONTINUED CROSS/REED                Vol. 5 - 934

1    the middle of the night?  It could be two or three
2    in the morning, yes?
3    A.  Yes.  I worked for Door Dash until 1 a.m.  One,
4    two, and sometimes in the morning I've started at
5    4:00 a.m.
6    Q.  Okay.  So you get orders at night for both is
7    what you're telling me?
8    A.  Yes.
9    Q.  Fair enough.  But with these ladies, you drove
10   hundreds of miles to get to their house, right?
11   A.  I didn't get what you said.
12   Q.  With these ladies, you drove hundreds of miles
13   to get to their house?
14   A.  But let me make this clear:  I don't know if
15   they were old ladies or whoever they were, but yes,
16   I was doing a courier job, and my job was to do the
17   pickups.
18   Q.  You drove a really long way?
19   A.  Yes, but I've driven 900,000 miles in India
20   too.
21   Q.  Okay.  And when you're doing Door Dash or
22   pizza, you're giving them food, right?
23   A.  Yes.
24   Q.  But here the old ladies are giving you boxes of
25   money, right?

1   A. Sir, let me tell you this, that I haven't asked

2   for anything.  I am just a courier driver.  What

3   they give me is their concern.  I just being honest

4   about this whole thing.  It's not like I asked them

5   for money.

6           THE COURT:  He's a courier driver.

7           THE DEFENDANT:  You're asking the same

8   questions, and my only answer is that I'm a courier

9   driver.

10          THE COURT:  I'm sorry.  I'm speaking right

11  now.

12          THE INTERPRETER:  I'm sorry.  I'm sorry.

13          THE COURT:  I think that you've gone about

14  as far as you can go with that.  If you are wanting

15  to go to the next step, that would be greatly

16  appreciated by the jury and myself.

17          MR. REED:  Okay.  I can move on, Judge.

18  BY MR. REED:

19  Q. The only way these ladies left feedback was by

20  calling the police, right?

21  A. What does that mean?  I didn't get that.

22  Q. The question was:  The only way they left

23  feedback --

24          MS. FRETER:  I'm sorry.  What was the next

25  word?

PATEL - CONTINUED CROSS/REED                Vol. 5 - 936

1    BY MR. REED:

2    Q.  The only way the old ladies could leave

3    feedback was by calling the police?

4    A.  By calling the police, what exactly is that?

5    Q.  Let's move ahead to Edwardsville.

6            You keep working with Danny even after the

7    police stopped you in Wisconsin?  Yes or no?

8    A.  Not at that time, no, but a long time later

9    when he came to Chicago, he talked about this,

10   yes.

11   Q.  Okay.  April of 2023 you keep working for Danny

12   and go get another package, yes?

13   A.  I don't remember the dates and all that right

14   now, but yes.

15   Q.  So Danny and this Bharat, right, they send you

16   to Edwardsville, yes?

17   A.  Yes, but at that time I had made it clear to

18   them, I told them that I've had a bad experience

19   once, so just let me know that this is absolutely

20   fine, nothing illegal is going on with this.

21   Q.  So you drive down to Edwardsville and park in

22   front of a house on the street, yes?

23   A.  Yes.

24   Q.  An older lady comes out of the house with a

25   box?  Yes or no?

PATEL - CONTINUED CROSS/REED                    Vol. 5 - 937

1    A.  Yes.

2    Q.  She comes down to your car and puts it in your

3    car through the window?  Yes or no?

4    A.  Yes.

5    Q.  It's the same as in Wisconsin, yes?

6    A.  Yes.

7    Q.  Same as in Indiana, yes?

8    A.  Yes, everywhere.

9    Q.  And by this point, the police have stopped you

10   in Wisconsin when you were doing this exact same

11   thing, right?

12   A.  Yes.

13   Q.  But you did it anyway, right?

14   A.  But I trusted them, and I thought there was

15   nothing wrong in this.

16   Q.  Well, that's not true.  You told the agents

17   that you thought the people giving you jobs were

18   doing something wrong, right?

19   A.  I would like to swear on God one more time and

20   tell you that I had no idea about this.  I had no

21   idea what the lady was giving, why she was

22   giving --

23            MR. REED:  Can replay --

24            THE WITNESS:  -- because I am just a

25   courier driver.

PATEL - CONTINUED CROSS/REED               Vol. 5 - 938

1          MR. REED:  Can we play Clip No. 15,

2     please, from Exhibit 5.

3               (The video was played at this time.)

4     BY MR. REED:

5     Q.  That's what you said, yes?  You knew they were

6     doing something wrong?

7     A.  Yes, I just let you know that.

8     Q.  Okay.  But you wanted to get paid, right?

9     A.  Yes.

10    Q.  You didn't want to know the details, right?

11    A.  The reason is that because the lady herself is

12    giving the money.

13    Q.  And in fact, you didn't ask any of those

14    questions of Danny about how this thing worked, why

15    they were giving you money, all those questions I

16    asked you earlier?

17    A.  No.

18    Q.  Because you did not want to know?

19    A.  Sir, this -- I never knew anything about this.

20    I came to know all these things and all these

21    details more because I came to this court.  I had

22    no idea about this, and I've never done anything

23    illegal in my life.

24          MR. REED:  Could we play Clip 16 from

25    Exhibit 5.

PATEL - CONTINUED CROSS/REED                Vol. 5 - 939

1            MS. FRETER:  Wait.

2                 (The video was played at this time.)

3            MR. REED:  Can you pause it there.

4    BY MR. REED:

5    Q.  Okay.  So here you said, I did not keep contact

6    with anyone, right?

7    A.  When was I arrested?

8    Q.  I asked, you did not keep contact with anyone,

9    right?

10   A.  Yes, that's what I'm trying to tell you, but

11   when is this about?

12   Q.  Okay.  I'm talking about when you went to

13   Edwardsville April of 2023.

14   A.  This questioning is Edwardsville or Chicago?

15   Q.  This questioning was in Schaumberg.

16            MS. FRETER:  But Judge, if we could -- I'm

17   not sure if this is an impeachment.  I don't -- if

18   we can restate the question that Mr. Reed is trying

19   to ask.

20            THE COURT:  Let's do a sidebar.

21                 (Side bar proceedings on the record.)

22            THE COURT:  So how many more areas are you

23   going to get into?

24            MR. REED:  I'm just about done, Judge.  I

25   want to establish with this line of questioning

PATEL - CONTINUED CROSS/REED                Vol. 5 - 940

1    that there were specific things he chose not to do

2    because he thought they were doing something wrong.

3              THE COURT:  He was obviously confused what

4    you were talking about.  You showed a video of him

5    talking to the police in Schaumberg but then talked

6    to him about -- talked to the police in

7    Edwardsville.  So I think the -- you're going to

8    have to clear up -- because there's a gap of, what,

9    three months or whatever.  How big is the gap

10   between Edwardsville and Chicago?

11             MR. REED:  About two months.

12             THE COURT:  I would clean up --

13             MR. REED:  I can do that.

14             MR. WEINHOEFT:  April to June.

15             THE COURT:  Because one could say that his

16   statements in June are, I don't do business with

17   them anymore because after that last time, I knew

18   they were up to no good.  So if you're trying to

19   impeach him with these statements from June, let's

20   be fair to the guy; otherwise, we're going to hear

21   God, country and courier in the answer.

22             (End of proceedings at sidebar.)

23   BY MR. REED:

24   Q.  Okay.  In June of 2023 when you're talking to

25   the agents, you said, I did not want to give my

PATEL - CONTINUED CROSS/REED                Vol. 5 - 941

1    number to them anymore, yes?

2    A.  After I was released 21 days later from jail, I

3    went to Chicago, I got a new number; and since

4    then, I did not give out my contact number to

5    anyone.

6    Q.  Okay.  So let's go back to April 10th, the

7    first time you went to Edwardsville, right?  It

8    looks the same as in Wisconsin and Indiana,

9    right?

10   A.  Yes, everything is the same.

11   Q.  And this is when you took the victim's money to

12   the guy who lives by the wheel in Chicago, yes?

13   A.  I was given.

14   Q.  Yes, you went up to Chicago and gave him the

15   money, yes?

16   A.  Yes.

17   Q.  Okay.  Then two days later, you deleted the

18   evidence from your phone connecting you to

19   Edwardsville and the money, yes?

20         MS. FRETER:  Objection, Your Honor, as to

21   the word "evidence".  Just deleted the pictures

22   or deleted, I mean --

23         MR. REED:  I'll rephrase.

24   BY MR. REED:

25   Q.  On April 12 you deleted the photos and the maps

PATEL - CONTINUED CROSS/REED                Vol. 5 - 942

1     and the video of the box connecting you back to

2     Edwardsville, yes?

3     A.  I don't know because I had other messages, too,

4     that I deleted.  I did delete, yes.  That's true.

5     Q.  Okay.  Then ten days later on April 20th, you

6     drove all the way back down to Edwardsville, yes?

7     A.  Yes, let me clarify this.  I did go, but I did

8     not get a call from Danny, I got a call from the

9     other person, and then I immediately call Danny,

10    and I asked him, Why is this thing occurring so

11    frequently?  What exactly is going on?  And I

12    explicitly told him that day, Tell me what exactly

13    is going on.  Is something wrong?  Let me know.  So

14    I asked for this clarification, and I went only

15    after that.

16    Q.  When you met with these agents in June, you

17    told them you went down to Edwardsville to get an

18    estimate on some work projects at a woman's house,

19    yes?

20    A.  Yes, and I was also told by him that apart from

21    this, there are some other projects, too, in the

22    house; and since I could not speak in English, he

23    said he first talk with them and let me know.

24    Q.  You told them that, but you knew you were there

25    to pick up a package of money because you had gone

PATEL - CONTINUED CROSS/REED                Vol. 5 - 943

1    to the same house ten days before, right?

2    A.  Let me clarify this as well.  I don't know

3    anything without a map.  So when I reached halfway,

4    I said, Why am I going on the same route as

5    earlier?  So I'm not able to tell that it's the

6    same address by looking at the address; and when I

7    reach there, I saw that a police car had gone there

8    just before me.  I saw that.

9    Q.  You did not get out of the car when you got

10   there, right?

11   A.  Right.

12   Q.  And you didn't talk to the lady who came down

13   to your car, right?

14   A.  No.

15   Q.  So you didn't ask her about estimates for work

16   on her house?

17   A.  Sir, the thing is, because of my English

18   problem, that person would talk to her and then let

19   me know what to do, and then I would talk to the

20   lady, and I'm not lying at all about this.

21   Q.  This is when the police stopped you, right, in

22   Edwardsville?

23   A.  Yes, I was arrested.

24   Q.  And you're put in the back of the police car

25   for a while, yes?

PATEL - CONTINUED CROSS/REED                Vol. 5 - 944

1    A.  Yes.  Because the incidence occurred so

2    quickly, I had no idea what was going on.

3    Q.  But those were your words, right, "first

4    time"?

5    A.  I wasn't able to express myself properly in

6    English.  It doesn't mean that this is the first

7    time, but this was the first time of an arrest, and

8    anyway, things were going on so quickly, I really

9    didn't know, and I was confused, and I was trying

10   in my own way to ask, Why?  Why I was being

11   arrested?  What's going on?  So I had so many

12   questions in my mind at that time because all these

13   things happened so quickly, like, What's going on?

14   What's happening?

15   Q.  You testified yesterday that by "first time,"

16   you meant first arrest?  Yes or no?

17   A.  It was my first arrest.

18   Q.  But you also told the police this was an odd

19   job one time?  Yes or no?

20   A.  Sir, I don't know English very well at all.

21   How would I express myself properly and say what

22   exactly I want to say and convey to them my

23   thoughts?

24   Q.  That wasn't my question.  I asked, Did you say:

25   This was an odd job one time?  Yes or no?  Did you

PATEL - CONTINUED CROSS/REED                Vol. 5 - 945

1    say that?

2    A.  It wasn't that I meant to say that, but I said

3    it.

4    Q.  It was not one time?  It was at least six

5    times?  Yes or no?

6    A.  At that time I didn't even think about that.

7                MR. REED:  I have one more question,

8    Judge.

9                THE COURT:  Actually, the lunches are

10   here, so we are going to break for lunch, and we'll

11   come back at 12:30.  We'll do a 55-minute lunch,

12   all right?

13               Remember, you're not to talk about the

14   case, wait until you begin your deliberations, and

15   don't do any research or contact anybody outside

16   the courthouse.  Enjoy your lunch.

17               (Lunch Recess at 11:35 a.m. until

18   12:37 p.m.)

19               (Jury present.)

20               THE COURT:  Please be seated.  We broke

21   for lunch.  We were in the middle of

22   cross-examination of Mr. Patel.

23               Counsel?

24               MR. REED:  Judge, we're satisfied.  No

25   more questions from the Government.  Pass the

PATEL - REDIRECT/FRETER                Vol. 5 - 946

1    witness.

2            THE COURT:  Redirect?

3            THE INTERPRETER:  He said can he clarify

4    something related to the bank currencies?

5            MS. FRETER:  And this is Government's

6    Exhibit 78 if we could show it to the group.

7                    **REDIRECT EXAMINATION**

8    BY MS. FRETER:

9    Q.  Mr. Patel, this is Government's Exhibit 78.

10   You remember talking to the Government about it; is

11   that right?

12   A.  Yes.

13   Q.  And are these amounts in rupees?

14   A.  Yes, in rupee currency.

15   Q.  Okay.

16   A.  No dollar.

17   Q.  And this is your bank statement from 2019; is

18   that right?

19   A.  Yes.

20   Q.  And were you working in 2019?

21   A.  Yes.

22   Q.  And what happened to your job and your work

23   after COVID in 2020?

24   A.  At that time my work was going on because my

25   cars were with the Government, and there was a big

PATEL - REDIRECT/FRETER                    Vol. 5 - 947

1    hospital.  I was taking the hospitalists, picking

2    up and dropping.

3    Q.  Okay.  When you left India in 2022, did you

4    have this much money in your bank account?

5    A.  Yes.

6    Q.  Okay.  Between 2019 and 2022, did you have more

7    expenses?

8    A.  Yes.

9    Q.  Okay.  And would those expenses be reflected on

10   this 2019 bank account?

11   A.  Yes.

12   Q.  2022 expenses, they're not on your 2019 bank

13   account, are they?

14   A.  No, no, no.

15   Q.  Okay.  That would be on your -- you would have

16   bank records from later than 2019?

17   A.  Yes, yes.

18   Q.  Okay.  In India were you -- how would you

19   describe -- compared to other people where were you

20   living, were you rich?  Were you poor?  Were you

21   medium?  How would you describe it?

22   A.  Middle class.

23   Q.  Okay.  That's fine.

24          Do you remember talking to the Government

25   about Australia?

1    A.  Yes.

2    Q.  Why is there an Australian stamp on your

3    passport?

4    A.  I had gone there, and I wanted to clarify

5    that.

6    Q.  Okay.  And what do you want to clarify?

7    A.  Yeah, when he was discussing about --

8    the counsel was discussing about the amount, he was

9    talking about dollars, and how in India had

10   dollars, I had no dollars because India has rupee

11   currency.

12   Q.  Okay.  So --

13   A.  That's what I wanted to clarify.

14   Q.  Mr. Patel, this question-answer format is

15   frustrating to you.  Is that fair to say?

16   A.  Yes.

17   Q.  Okay.  But you understand that that's the

18   rules, and they're there for good reason, right?

19   A.  Yes.

20   Q.  Okay.  So let's try to answer -- my question is

21   about Australia.  Are you with me?

22   A.  Yes.

23   Q.  Why was the Australian stamp on your

24   passport?

25   A.  Because I had gone there.  That's why.

1   Q.  Okay.  When did you go to Australia?

2   A.  That much I don't remember that, but I had

3   music-related work so I had gone there.

4   Q.  I'm sorry.  I don't understand.

5   A.  That much I don't have much in remembering, but

6   I had music-related business, so I had gone

7   there.

8   Q.  Okay.  When you left India, were you trying to

9   go to Canada or the United States or somewhere else

10   in 2022?

11   A.  No, I had only gone to Canada, and then I did

12   not go to any other place.

13        MS. FRETER:  Okay.  And Jackie, we can

14   take this down.

15   BY MS. FRETER:

16   Q.  Can you tell me in your mind what the

17   difference is between if you knew something or

18   you -- let's do it this way.

19        If I say do you suspect something, do you

20   know what that means?

21   A.  No.

22   Q.  If I ask you if you're pretty sure about

23   something, what does that mean?

24   A.  What?  I did not understand.

25   Q.  If I ask you do you know something, what do you

PATEL - REDIRECT/FRETER                    Vol. 5 - 950

1    mean -- when I say, "Do you know something," what

2    does that mean to you?

3    A.  I would say yes.

4    Q.  Okay.  Can you describe what it means to know

5    something.  What does that mean?

6    A.  Yes.

7    Q.  Okay.  What the Government was -- not to speak

8    for Mr. Reed.  What he was trying to get at is that

9    when you're picking up these -- when you're picking

10   up items from these elderly ladies that you should

11   have known by all the circumstances that it was

12   wrong and that the Government is saying because

13   they were elderly and because it was somebody

14   sticking stuff in the back of your car and that you

15   were driving so far away, that that should have let

16   you know that what you were doing was wrong.  So

17   what do you have to say about that?

18   A.  I want you know that I don't have any facts

19   about any ladies.  I don't know whether they are

20   lady or a gent.  I don't know.  I thought that they

21   maybe their husband or son must have called that,

22   Okay, if somebody comes, hand it -- this over to

23   them.  I did not have any details pertaining to

24   whether that person had money or any other items.

25   In any of the calls, I had not that type of

Vol. 5 - 951

1   discussion over the phone.

2   Q.  When you start to think something is wrong and

3   you ask Danny about it and he tells you it's fine,

4   why do you believe him even though all this other

5   weird stuff is going on?

6   A.  That's the reason that there are so many

7   Indians do business here, and they may have so many

8   friends over there here, so there may be some

9   contradiction of the activities, and there are so

10  many held partnership businesses.  They may have

11  several stores, grocery stores, and they may have

12  done some partners in business and they have

13  something to do with that.

14  Q.  And I'm going to stop you because you're not

15  understanding my question.

16          Why do you believe Danny's explanation to

17  you?

18  A.  Because I knew that he would not -- he would

19  not do this type of work and that.

20          MS. FRETER:  Okay.  I don't have anything

21  else.

22          MR. REED:  Nothing else, Judge.

23          THE COURT:  All right.  Do you have any

24  other witness or evidence you're going to present?

25          MS. FRETER:  No, Your Honor.  Defense

1      rests.

2                          **DEFENSE RESTS**

3              THE COURT:  Any rebuttal?

4              MR. REED:  No, Judge.

5              THE COURT:  All right.  Ladies and

6      gentlemen, we are going to move to closing

7      arguments but will take a little bit to get things

8      set up.  So instead of having you here and watch us

9      get all the equipment set up, why don't we take

10     a -- we'll take a recess.  We'll come back at one

11     o'clock, and we'll start closing arguments, all

12     right?

13             COURTROOM DEPUTY:  All rise.

14             (Jury out at 12:51 p.m.)

15             THE COURT:  All right.  Counsel, you want

16     to get some objections on the record.

17             MS. FRETER:  I do, Judge.  I don't know if

18     the marshals want to move Mr. Patel or --

19             THE COURT:  They can do that now.

20             MS. FRETER:  So Judge, while they're doing

21     that, at this time I would like to move for a

22     judgment of acquittal at the close of all the

23     evidence in that the Government has failed to make

24     a submissible case on each and every element of the

25     offense charged and incorporate all of my previous

1    arguments.

2         THE COURT:  Well, he admitted that he's

3    here illegally, so do you want to respond?

4         MR. REED:  Judge, I just rest on what I

5    said earlier.  I think the evidence is more than

6    sufficient to submit it.

7         THE COURT:  Motion is denied.

8         MS. FRETER:  Judge, for the record, the

9    Southern District of Illinois uses a system called

10   JERS in order to electronically transmit exhibits

11   to the jury during deliberations.  Accompanying the

12   JERS is an Excel spreadsheet that contains

13   descriptions of what the exhibits are to assist the

14   jury in finding those exhibits.  The Government

15   provided me and the Court with the JERS Excel

16   spreadsheet and has updated it throughout the week.

17        I have objections to the language of some

18   of the lines of the JERS sheet that I have not been

19   able to resolve with the Government.  They stand on

20   what they've written.  I'd like to read into the

21   record to the objections that I have to the

22   particular lines along with what I believe a more

23   neutral explanation would be, particularly as it

24   relates to descriptions that include elements that

25   the Government needs to prove in their case.

1          And so at Line 2, the Government's
2    description is, "V.B. check at Busey Bank sending
3    electronic signal from Illinois across state
4    lines."  I would request that it delete "from
5    Illinois across state lines."
6          At Line 3, the description is "V.B.
7    withdrawal at U.S. Bank sending electronic signal
8    from Illinois across state lines."  I would request
9    that "across state lines" be deleted.
10          Line 4 says, "Immigration search return
11    showing no record of legal entry."  I would request
12    that it say "immigration search return".
13          THE COURT:  Are those your only four?
14          MS. FRETER:  No, Your Honor.  I'm
15    scrolling down.
16          On the JERS I received today, it still
17    shows Item 44, which are the handwritten notes of
18    K.E.  I don't believe those came into evidence.
19          THE COURT:  Handwritten notes of K.E.?
20          MS. FRETER:  Yes, that's Line 44.
21          THE COURT:  What do you have, Jackie?
22          MR. REED:  We sent you the whole list.
23          THE COURT:  All right.  So --
24          COURTROOM DEPUTY:  They have not come into
25    evidence, so it's not going to go back -- well,

1    it's not going to say that.

2            MS. FRETER:  So then I request it be

3    removed from the JERS.

4            THE COURT:  So if it didn't come in, then

5    you would -- at Line 44 just put reserved because

6    that's what you have with the -- I thought they

7    were offered as a group, like 41 through --

8            COURTROOM DEPUTY:  But when it gets

9    released, that's not a released exhibit.

10           MS. FRETER:  They have other numbers, I

11   think, like 75 or 76 that were reserved on the

12   Excel sheet.  I think that we're just asking that

13   they edit the sheet so that 41 says "Reserved"

14   instead of "handwritten letters."

15           THE COURT:  And that's what I just said.

16           MS. FRETER:  Yeah.

17           On Line 73, it says, "Victim V.B.'s phone

18   calls with messages with scammers and with

19   Coinhub."  I would request it just say, "Victim

20   V.B.'s phone calls and messages."

21           THE COURT:  What's your response,

22   Government?

23           MR. WEINHOEFT:  As to point by point or

24   the last point that was made, Your Honor?

25           THE COURT:  Describing Exhibit 73 as

Vol. 5 - 956

1    Victim phone calls and messages with scammers and

2    with Coinhub?

3               MR. WEINHOEFT:  I think it's, first of

4    all, not in any way prejudicial to the defendant

5    because there's no question he was not a

6    participant in either of those.  If the jury wants

7    to find, you know, the phone records that shows --

8    you know, what the substance was as it relates to

9    the Coinhub evidence, that is the only way for them

10   to be able to find it, and that's -- that's who

11   she's communicating with.  Some of the messages

12   come from Coinhub; some of the messages come from

13   whoever the overseas scammer is.  It's accurate.

14   It helps the jury find relevant evidence if they

15   need it, and it doesn't prejudice the defendant.

16              THE COURT:  Overruled.

17              COURTROOM DEPUTY:  I have a question,

18   though.  Are we changing these, because I thought

19   she was just making her objections for the record?

20   I have not changed anything except that reserved

21   one.

22              THE COURT:  I'll get to the first four in

23   a little bit.

24              COURTROOM DEPUTY:  Okay.

25              THE COURT:  I'm denying the objection as

1    to 73.

2            Next one, please.

3            MS. FRETER:  Line 130, I believe, based on

4    the description, I think that that is the Google

5    sheet that did not come into evidence.

6            THE COURT:  I don't have any --

7            COURTROOM DEPUTY:  That was added last

8    night as a possible exhibit today.

9            THE COURT:  130 is what?

10           MS. FRETER:  It says, "8,228,227.91 rupees

11    to U.S. dollars" is the description.

12           THE COURT:  Oh.  They didn't offer it.

13    "Reserved."

14           Any other ones?

15           MS. FRETER:  Line 131 says, "Photo Re:

16    Patel possession of firearm."

17           THE COURT:  I don't see that on mine.

18           COURTROOM DEPUTY:  130, 131, 132 were

19    added today in case they wanted to use them.  None

20    of them came in, so I have them all as reserved.

21           THE COURT:  All right.  So it will still

22    say, "Reserved."

23           MS. FRETER:  And then the same for 132.

24           THE COURT:  Same ruling.

25           MS. FRETER:  Line 152, "Patel's Illinois

Vol. 5 - 958

1    iPhone April 10 photo showing Patel on his way to

2    Edwardsville."  I request that it just say,

3    "Patel's IL phone April 10th photo."

4            THE COURT:  Overruled.

5            MS. FRETER:  On Line 153, it says "Patel's

6    Illinois phone April 10th Photo No. 1 of Bryan's

7    box in Patel's vehicle."  I would request that it

8    say, "Patel's Illinois iPhone April 10 Photo No. 1

9    of Bryan's box."

10           THE COURT:  Granted.  Take out, "in

11   Patel's vehicle" -- wait, wait, wait.

12           No.  Because aren't there other photos of

13   Bryan's box?

14           MR. WEINHOEFT:  There are.

15           THE COURT:  And some of the photos are not

16   in the vehicle or in Bryan's home or table?

17           MR. WEINHOEFT:  That's correct.

18           THE COURT:  So objection is overruled.

19           Next one.

20           MS. FRETER:  Okay.  So Your Honor, that

21   same objection would be for Lines 154, 155, 156 in

22   that it was a -- it was testimony of the officer

23   that the boxes appeared to be the same or they

24   believed that they were the same -- or no, this is

25   Bryan's box.  Anyway, same objection.

Vol. 5 - 959

1          THE COURT:  Overruled.

2          Do you have more?

3          MS. FRETER:  Sorry, Your Honor.

4          THE COURT:  You have more?

5          MS. FRETER:  160, this is April 20th

6     picture showing Patel on his way to Edwardsville.

7     Again, I would request --

8          THE COURT:  I just ruled on that one.  Did

9     you say 160?

10          MS. FRETER:  160.

11          THE COURT:  I ruled on that.  Overruled.

12          MS. FRETER:  You ruled on 152.

13          THE COURT:  Okay.  The same ruling as to

14     152 to 160.  That objection is overruled.

15          MS. FRETER:  I have nothing further.

16          THE COURT:  With respect to the objection

17     for 1 -- I'm sorry, objection to 2 and 3, I'll

18     grant that.  Just delete "across state lines."

19          Objection No. 4 is a fair representation

20     of description of the exhibit, so I'll overrule the

21     objection.

22          MS. FRETER:  Thank you, Your Honor.

23          THE COURT:  All right.  How long do you

24     intend to take for closing?

25          MR. WEINHOEFT:  It's going to be a little

Vol. 5 - 960

1    lengthy.  I can't tell you specifically.

2            THE COURT:  All right.  Who is closing?

3            MR. WEINHOEFT:  What's that?

4            THE COURT:  Who is giving the closing

5    argument?

6            MR. WEINHOEFT:  I'm going to do the open

7    close.  Mr. Reed is going to be rebuttal.  I'm

8    going to try to be around an hour.  I'm going to do

9    my best.  There's a lot to get through.

10           THE COURT:  Anything else before we bring

11   the jury in?

12           MR. WEINHOEFT:  If I can get my computer

13   set up, I have a PowerPoint.

14           THE COURT:  All right.

15           (Jury present at 1:09 p.m.)

16           THE COURT:  All right.  Ladies and

17   gentlemen, all the evidence and testimony is in,

18   been presented, and we are at that point where the

19   parties get to make their closing arguments to you.

20   Because the Government has the burden of proof, it

21   goes first.  The defense then gets the opportunity

22   to argue its side, and the Government then gets

23   what's known as rebuttal to respond to the

24   arguments of the defendant.

25           This is the opportunity of the lawyers to

1    tell you what they believe the evidence has shown

2    and -- but their arguments are not evidence.  The

3    statements they make are not evidence, and

4    ultimately, you are to rely on the evidence, so

5    listen intentively.

6            And with that, Counsel.

7            MR. WEINHOEFT:  Thank you, Your Honor.

8            May it please the Court, counsel, ladies

9    and gentlemen, as you noticed, each time Judge

10   McGlynn walks into the courtroom, we stand for him,

11   and we do that because we're paying respect to the

12   Judge for his position as the judge in this case.

13   He rules on evidentiary objections.  He's going to

14   instruct you as to the law to be applied in the

15   case, and so we stand to respect that position; but

16   you've also noticed that each time you walked in

17   and out of this courtroom, we also stand for you,

18   and we do that because we're showing respect to

19   your position as judges also.  Because as Judge

20   McGlynn is the judge of the law, you, and you

21   alone, are the judges of the facts.  It is your job

22   to determine what happened, to determine what's

23   true, to assess the evidence and to weigh the

24   credibility of the witnesses, and that means all

25   the witnesses.

1    A defendant has an absolute right not to

2  take the witness stand, not to testify and not to

3  make a statement; but if he chooses to do so, you

4  can assess his mannerisms, the manner in which he

5  testified, the believability and credibility of

6  what he said, the sincerity, his evasiveness just

7  like you would any other witness; and if you

8  believe that the witness was untruthful, it's

9  additional evidence of their guilt.  So it's your

10  job to determine what's true and what the facts

11  are, and that's a critically important job.

12    This case is important.  We have to get it

13  right, and we can't have a just verdict unless it's

14  based on the truth and it is based on the facts.

15  So how do we do that?  How do we find out?  How do

16  we determine what's true?  Well, during jury

17  selection, we talked about that a little bit.  Each

18  of you were told and asked if you would apply your

19  common sense to the case, and, folks, that is the

20  beauty of the American jury system.  It relies on

21  the collective common sense of 12 people who bring

22  their life experiences to bear, to look at the

23  totality of the case and the totality of the

24  evidence and to decide what's true, and so I'm

25  going to break my closing argument up kind of

1    really into two parts.

2            One, I need to go through the charges with

3    you.  At this point it's time to talk about the

4    law, so we've got to spend a pretty healthy amount

5    of time in the first half talking about what the

6    law is, and then we're going to move a little bit

7    more into the details, into the facts.  So that's

8    where we're going.

9            The defendant has been charged with five

10   offenses.  He's been charged with five counts.

11   He's been charged with conspiracy to commit wire or

12   mail fraud, he's been charged in Counts 2, 3 and 4

13   with what we call substantive wire fraud --

14            (Interruption by court reporter.)

15            MR. WEINHOEFT:  Counts 2, 3 and 4; and

16   Count 5 being illegal entry into the United States.

17   Each crime, each charge is to be considered

18   separate, and each charge has certain things that

19   the Government is required to prove.  We call those

20   elements, and I anticipate how the Judge is going

21   to instruct you, and we're going to go through what

22   those elements are.

23            I expect that the Judge is going to

24   instruct you that to prove conspiracy to commit

25   wire fraud that there are two things that the

1    Government has to prove.  Everyone here has
2    probably heard the term "conspiracy" before and
3    things like that, and we all have our own ideas of
4    what that means, but the Court is going to tell you
5    legally what a conspiracy is, and it means two
6    things.  The first thing is that the conspiracy as
7    described in the indictment existed, that the
8    conspiracy existed; and second, that the defendant
9    became a member of that conspiracy with an intent
10   to further it.  The conspiracy existed; defendant
11   became a member of it to further it.  Those two
12   things.  That's what a conspiracy means as charged
13   in this particular case.
14           So we're going to take those two elements
15   one at a time, all right?  We're going to start
16   first with the conspiracy.  What is a conspiracy?
17   The essence of any conspiracy is an agreement.  Law
18   school 101 stuff, a conspiracy, the essence of it,
19   is an agreement.  It's an understanding between
20   people -- it's kind of a meeting of the minds if
21   you will, and it's an understanding, or an
22   agreement, to do something unlawful.  Now, as you
23   might expect, the law doesn't require the
24   defendants to be legal scholars.  They don't have
25   to know to agree to violate the particular

1    statutes, they don't have to agree like that; and

2    as you might also expect, an agreement doesn't have

3    to be expressed.

4         It would be a very rare crime if Mr. Reed

5    and I decided to go knock off a bank -- I'm going

6    to make you a bank robber -- forgive me, Mr. Reed;

7    but if we're going to commit a robbery together, we

8    probably wouldn't say, We hereby agree on this

9    particular date that we are going to engage in this

10   particular robbery at this particular date and

11   time, and that's just not how things work in the

12   real world, right?  We have a conversation, say,

13   Hey, you want to get some money?  You know, he

14   looks at me.  We look at each other.  We've got an

15   understanding between ourselves, and that's a

16   factual question for a jury to always resolve.  Is

17   there an understanding between multiple people to

18   engage in something that's illegal?  That's what a

19   conspiracy is.

20        In determining whether an agreement and a

21   conspiracy exists, you can look at all of the facts

22   and all of the circumstances involved in the case

23   to determine whether or not that agreement existed.

24        So let's start with a really easy one

25   here.  There is no doubt whatsoever that there is a

1    conspiracy in this case.  We have an international

2    conspiracy, quite frankly.  We have multiple

3    callers, and we start from the fact that we have

4    Noah is a caller, we had Timothy is a caller, and

5    we had -- forgive me, I'm blanking on the names --

6    there is a third caller as well.  I just can't

7    remember it as I stand here right now.  We had at

8    least three callers.  We had multiple people

9    involved in the picking up of the money and sending

10   money back and forth in places.  You've got folks

11   overseas.  We have people involved moving money

12   over bitcoin.  There is just no doubt this is an

13   international fraud scheme, period.  That part is

14   easy.  We know that a conspiracy exists.

15         We also know in this case that it's a

16   conspiracy -- the next charge you've got to find it

17   was either mail fraud or wire fraud.  In this case,

18   it was both.  It's super easy.  There is wires all

19   over the place in this case.  We've got bitcoin

20   itself going back across the world.  We have phone

21   calls from Illinois, Indiana, Wisconsin.  We've got

22   bank transfers going back and forth.  There are all

23   sorts of wires involved in this agreement.

24         And in mail fraud, mail fraud applies not

25   only to something you put a stamp on and put in

1    U.S. mail, but mail fraud also applies to

2    interstate commercial carriers.  Well, that's UPS.

3    That's FedEx.  That's things like that.  There were

4    at least three packages that were shipped UPS that

5    you heard about.

6         So clearly, we have a conspiracy in this

7    case.  Clearly, it's a conspiracy for mail and wire

8    fraud, so really that first element, the conspiracy

9    to commit mail and wire fraud existed, can be

10   disposed of in about 30 seconds.  It's not even a

11   question.

12        Here the is second element.  What does it

13   mean to become a member of a conspiracy?  And I

14   anticipate that the Court is going to instruct you

15   that a conspiracy may exist even if a conspirator

16   does not agree to commit or facilitate each and

17   every part of the substantive offense.

18        What's that mean in the real world?  Let's

19   go back to my bank robber example.  Let's say the

20   only evidence we have is a few people decide to get

21   involved in the bank robbery, right?  One stakes

22   the place out, lets his buddies know when security

23   is around.  They show up at the bank together.  One

24   is the getaway driver, one stands security at the

25   door, another one controls customers inside the

1    bank while the fifth one pulls out a gun, puts it

2    to the teller's face, takes money from the bank.

3            Well, guess who's guilty?  All of them.

4    All of them.  Because they each had a different

5    role.  There's an agreement, there's an

6    understanding that we're involved in something

7    illegal, we each had our role.  The getaway driver

8    doesn't have to have the gun in his hand; but under

9    the law he may as well have because under the law

10   if you're in for a penny, you're in for a pound.

11           Joint criminal conduct means that

12   accomplices are responsible for one another.  It's,

13   quite frankly, just that simple, and the

14   highlighted portion is really important, and I

15   expect that the Court will instruct you as such.

16   If coconspirators have a plan, if there is an

17   agreement and an understanding that certain people

18   will perpetrate the crime -- kind of like our gun

19   in the bank robber situation -- and other people

20   provide support, those supporters are just as

21   guilty as the perpetrators, okay; and that's what's

22   meant by accomplice liability, and you've probably

23   heard all kind of different words about it, but it

24   simply means when you're involved in a conspiracy

25   and you agree to participate in something that you

1    know to be illegal, in for a penny, in for a pound.

2         And in this particular conspiracy, there

3    is no question whatsoever that this defendant

4    performed an invaluable service to the conspiracy.

5    All of the calls, all of the emails purportedly

6    coming from the Federal Trade Commission or

7    Treasury Department, all of the phone calls from

8    the scammers pretending to be federal agents

9    hustling victims, all of those efforts are

10   worthless unless you can get the money from the

11   victim to the bad guys, and that's this guy's role.

12        He said -- if he said it once, he had to

13   have said it a hundred times.  "I was a courier.  I

14   was a courier," to which we say, "Yes, you're darn

15   right.  He was the courier."  That's his role in

16   this scheme.  He's the pickup guy.  He is the guy

17   going and collecting the money that is the proceeds

18   of this conspiracy and this fraud scheme.  He is

19   one of the supporters.  Yes, that's his role.  No

20   one has ever alleged he was the guy on the phone.

21   No one ever alleged that he was sending Bitcoins

22   somewhere.  Different people have different roles

23   in this particular enterprise.  His role in this

24   enterprise was to pick up money, period.  It's just

25   that simple.

1          So quite literally, the only question we're

2     down to is this question of, Did the defendant know

3     he's involved in something shady?  Does he know --

4     has he signed up for participating in something

5     that's illegal, and we'll talk a lot more about his

6     knowledge when we get into the facts of the case,

7     but I do want to talk about the remaining charges

8     and finish our discussion on the law before we get

9     in and spend all of my time on his knowledge.

10          Let's talk about Counts 2, 3 and 4.  They

11    are substantive wire fraud counts.  I bring notes

12    up here and walk around and wind up four or five

13    pages away from where I started.  I apologize.

14          Counts 2, 3 and 4, substantive wire fraud,

15    okay?  There are four things the Government is

16    required to prove.  The conspiracy, we had to prove

17    two things.  For Counts 2, 3, and 4, there is four

18    things that the Government is required to prove,

19    and I anticipate the Judge will instruct you

20    accordingly.

21          One, the defendant knowingly participated

22    in a scheme to defraud as described in the

23    indictment.  In this case, the scheme to defraud is

24    really synonymous with the conspiracy.  It's the

25    same -- it's the same fraud scheme.  It's just a

1    little bit different language under little bit

2    different laws, but it's the same idea.  There is

3    an organized scheme, a collection of people working

4    together, and, in this case, to use interstate

5    wires.

6            So first, the defendant knowingly

7    participated in the scheme, that he did so with the

8    intent to defraud.  The scheme to defraud involved

9    materially false representations or pretenses;

10   meaning, the victims were tricked; and fourth, for

11   the purposes of carrying out that scheme, the

12   defendants caused interstate wire communication to

13   take place as charged in the indictment.

14           So we're really back to the same issue

15   again when we start assessing these wire fraud

16   counts.  I'll go through the substantive wires and

17   make sure we're clear on that, but we're back to

18   what did the defendant know and what did the

19   defendant intend.  That's really the essence here

20   on the elements in Count 1 and the elements in 2

21   because there is no question that there is

22   materially false representations that exploit these

23   victims.  They departed with money because they had

24   materially false representations made to them; but

25   again, I expect you to receive an instruction, and

Vol. 5 - 972

1    I highlighted it because it's important; and in the
2    same way that in an accomplice liability, you're in
3    for a penny, you're in for a pound, that same
4    principle applies to Counts 2, 3 and 4.  The
5    defendant doesn't have to be the one to personally
6    send the wire transfer.  Of course, he could, but
7    it doesn't have to be him.  It has to be someone
8    who is legally responsible for, that he's working
9    in conjunction with that caused it within the
10   meaning of the statute, and we'll get to the
11   causation here in a second as well.
12            This is really important, that a person --
13   and again, knowingly -- we talk a lot about what it
14   means to be knowing.  The person knowingly aids in
15   the commission of an offense -- so if you're aiding
16   a wire fraud, you're assisting a wire fraud, you
17   are participating in that offense, can be guilty of
18   that offense if you knowingly participate in the
19   criminal activity to try to help make it succeed.
20            So, again, it's this idea that different
21   people have different roles.  As long as you are
22   trying to -- not accidentally, but trying to help
23   make the criminal conduct succeed, then you are
24   responsible for the other accomplices in the case.
25            So let's talk about what these interstate

1    wire communications are.  I don't want to get hung

2    up on anything that might be confusing about that.

3    The Government has to show interstate wire

4    facilities were used.  Essentially -- and you can

5    read that language, you'll be instructed, and the

6    Court will send it back with you; but the important

7    thing to recall is that the defendant need not

8    actually intend for a wire to happen.  It's

9    sufficient that the defendant knew facts from where

10    it's reasonably foreseeable that wires would

11    happen.  And this should come as no surprise to

12    anyone that when large financial transactions are

13    happening that interstate banking channels are

14    going to be involved.  That is what's meant by

15    foreseeable and a foreseeable use of the wires.

16            The wires themselves don't have to be

17    fraudulent.  A bank -- a wire transfer, we've

18    charged Counts -- Count 2 charges a substantive

19    wire between -- was a wire of transfer of money for

20    the purchase of gold.  That wire is not misleading

21    itself.  It's just a wire.  It's just the purchase

22    of gold, $188,000 of gold; but what matters is does

23    that wire facilitate the crime?  Does it further

24    the scheme to defraud?  And of course, it did,

25    because that's what generated the gold, the

1    proceeds that the bad guys were able to steal, and

2    the defendant.  So that is how use of interstate

3    wire communications works; and if everybody is

4    comfortable with that, we will move to the

5    substantive wires that were charged in this case.

6           Count 2 is the count for Vonda Lutz, and

7    that's what I just mentioned, the $188,000 worth of

8    gold that was involved.  Detective Kody Martin

9    established a wire transfer from her bank in

10   Indiana to purchase that gold from Oklahoma.

11   That's it.

12           Count 3, Virginia Bryan, that's our

13   Edwardsville victim.  A representative of Busey

14   Bank came in and established that interstate wire

15   communications were a necessary part of her April

16   10th bank withdrawal.  That's the day the defendant

17   picked up $51,900 from her.  A portion of that

18   money was a $15,000 check that she cashed, that she

19   put together with other funds, but that $15,000 and

20   the check that was cashed, that's the wire that's

21   charged in Count 3, and the bank official came in

22   and said that, of course, when a check is cashed,

23   that creates a wire communication to servers in

24   different states including interstate banking

25   channels, so that's the wire that's charged in

1    Count 3.

2         Count 4 is also a wire pertaining to

3    Virginia.  In this case, it was U.S. Bank.  He

4    established that the $35,000 bank withdrawal she

5    made on April 20th -- and if you remember, that

6    April 20th is the sting date.  She had taken that

7    money out before, the police knew about it, and she

8    was going to deliver that money.  So when she

9    withdrew that money, as part of the scheme to try

10   to pay off the bad guys, that caused the -- caused

11   a wire communication inside of the bank, which,

12   again, is not surprising.  A bank is not simply

13   going to have a calculator and a ledger and a

14   pencil where they cancel $31,000 without processing

15   that transaction.  So that's the wire communication

16   that furthered this scheme in Count 4.

17        Again, the defendant himself need not

18   personally use those wires.  A person who aids and

19   abets in the commission of the offense -- in this

20   case, the courier that's picking up the fraud

21   proceeds -- much like the getaway driver in the

22   bank robbery may as well have had the gun in his

23   hand, our courier driving may as well been the one

24   sending the wire because it's been caused in

25   furtherance of this particular crime.

Vol. 5 - 976

1        Count 5, the immigration count.  This -- at

2   this point I probably don't have to spend much time

3   on this at all.  You can't sneak into the country

4   without going -- you can't walk through the woods

5   and floods and cross the border to get into a car

6   on this side of the border to drive away.  This is

7   easy.

8        There is two elements to it.  The

9   defendant is not a U.S. citizen, he's an alien, and

10  he knowingly eluded examination and inspection by

11  immigration officers.  The idea that he's not

12  responsible for getting himself to Canada because

13  his agent who was supposed to be sending him to

14  Australia put him on an airplane and put him in the

15  wrong country and somehow he can get to Canada

16  through no fault of his own is about as credible as

17  this idea that he's being smuggled into the United

18  States, he described it, as piggybacked on somebody

19  else's back without his knowledge.  It's all just

20  absurd on its face.  It's obvious that -- I mean,

21  the man has traveled -- if you look at his passport

22  records and visa application, I think, 10 or 12

23  international destinations the man traveled to, so

24  all over the world.  He knows he can't enter the

25  country that way; and when you come into the United

1    States, you have to go through a port of entry.

2         So those are the charges, and that's the

3    law.  It's really fairly straightforward.  And the

4    wire that we talked about before, the causation

5    issue is that you just have to find that the wire

6    was foreseeable during the execution of this fraud

7    scheme.  It's really just that simple.

8         So let's talk a little bit more here,

9    focus the issue on what really matters.  There is

10   absolutely no doubt that Karen, that Vonda, and

11   that Virginia were defrauded of hundreds of

12   thousands of dollars.  There is no question of that

13   in the case.

14        There is no question that there was a

15   fraud scheme involving numerous, numerous people.

16   Danny, KKT, all of our various callers, this

17   Abhishek, person labeled "pick up" in the phone, I

18   mean, there is all sort of folks involved in this.

19   There's clearly a fraud scheme.  There's clearly a

20   conspiracy.

21        As I mentioned before, the defendant is a

22   critical part of making this venture succeed for

23   the parts that he participated in.  All the false

24   letters and scams in the world are immaterial if

25   you can't get the money from your victims and get

1    it into the hands of the people who are trying to
2    steal it; and so we have three different victims in
3    three different states who were all victimized by
4    the same scheme and had six pickups conducted by
5    the same defendant.

6         Well, that's pretty straightforward.
7    There's really one question.  Was this defendant
8    somehow duped into something and not realize that
9    he was participating in something unlawful; is he,
10   as he said, a victim of this; or did he know what
11   he was involved with?  That's really what we get
12   to.  It's a question of whether or not he knew he
13   was involved with criminal conduct, and there's a
14   million ways that show that he was.

15        So how do we decide that?  First of all,
16   what's knowledge mean, right?  Counsel, I think,
17   asked some questions of the defendant on direct --
18   redirect what it meant for him to know something
19   and not know something; and fortunately, I expect
20   you're going to get an instruction on that matter.
21   We're going to get a nice legal definition of what
22   knowledge means; and I expect the Court is going to
23   instruct you that knowledge means -- and a person
24   acts knowingly when he realizes what he's doing and
25   is aware of the nature of his conduct.  I love that

1    word, "awareness."  Awareness and knowledge makes a
2    lot of sense.  They go together really well.
3          And this next part is so critically
4    important because you are aware that your conduct
5    and you're not acting through ignorance, mistake or
6    accident; and let's understand when we have a
7    knowledge requirement what the law is trying to
8    protect against and what we're doing here.
9    Why does -- why do they call it mens rea?  Why does
10   mens rea -- why does a knowledge requirement exist?
11         Sometimes it's easier to go back to what
12   we know, being a parent, right?  If a child makes a
13   mistake, does something wrong, but they didn't
14   really know what they were doing, that's a chance
15   to teach them, educate them and tell them, you
16   know, Hey, honey, you know, you really shouldn't do
17   that, and let me tell you why.  But if that child
18   knows that they're trying to get one over on you,
19   that child knows that they're doing something
20   wrong, well, now we are into punishment, aren't we?
21         The law is set up exactly the same way.
22   We would never want to punish someone who was
23   acting by a simple, good faith mistake, right?
24   Nobody wants that.  You can't have criminal
25   consequences for a good faith accident.

1         So this knowing requirement is set up to

2    make sure that the net that's cast is a cast too

3    wide.  This knowledge requirement that's set up is

4    to make sure that the person is aware that they're

5    up to no good as opposed to simply being mistaken

6    and in good faith.  That's the essence of what

7    we're talking about, and it makes a lot of sense,

8    and the law says -- and I expect the Court will

9    instruct you -- that in deciding if the defendant

10   acted knowingly, you can consider all of the

11   evidence, including what he did and including what

12   he said, both what he admitted to and what he lied

13   about repeatedly.  That's a critically important

14   element of the law here that I got to make sure

15   everyone understands.

16         But knowledge has another way that can be

17   shown under the law.  We call it the "ostrich

18   instruction" in the law, and I'm going to guess

19   that if you don't remember anything else I say

20   for -- after your jury service is up here in a

21   month, you're going to remember the image of an

22   ostrich sticking their head in the sand.  We call

23   it the ostrich instruction because everybody is

24   familiar with that metaphor, right?

25         The Court is going to instruct that you

1  may find that the defendant acted knowingly if you

2  find beyond a reasonable doubt that he believed it

3  was highly probable that the victims were being

4  defrauded and that he took deliberate action to

5  avoid learning that fact.  You may not find the

6  fact that the defendant acted knowingly if he was

7  merely mistaken or careless in discovering the

8  truth or if he just failed to kind of make an

9  effort.

10         We're back to this good faith idea of

11  honest, innocent mistakes versus somebody that had

12  awareness.  Now, he had conscious awareness of what

13  was going on, there is no doubt whatsoever about

14  that, but the way he testified when confronted with

15  -- today with questions -- Mr. Reed put one

16  question to him about lying, and the specific

17  misstatement evades me right now.  But when he was

18  asked, You lied to the officer about that, you

19  know, it's almost back to the -- imagine a kid kind

20  of going, "I don't hear you.  I don't hear you.  I

21  don't hear you."  "Just a courier."  "Just a

22  courier."  Well, not what I asked you about.

23  "Well, just a courier."  "Just a courier."  He

24  doesn't want to answer the question.

25         This is kind of that whole idea you can't

1    bury your head in the sand, be confronted with

2    facts and circumstances under which you know what's

3    going on and pretend that you don't know because

4    you buried your head in the sand.  That's

5    "knowledge to" in the federal system -- that's

6    "knowledge to" in the federal system, and it sure

7    applies in this case just by the way he described

8    it.

9          You take the way he described it, the

10    knowledge instruction, it's still met under this.

11    He clearly, clearly understood that it was highly

12    probable that there was criminal activity going on

13    around him, and he clearly took steps not to -- not

14    to try to minimize his own role, but you don't get

15    to pretend that you're not aware of things that

16    you're aware of.  You don't get to just bury your

17    head in the sand and act like you don't know things

18    that you are plainly aware of.

19          All right.  So let's talk about all the

20    different ways we can show that the defendant had

21    knowledge.  He made six different pickups, and we

22    don't need to talk about red and brown cars and

23    beige cars any more, fortunately.  I think we're

24    way past that.  We don't have to worry about

25    somebody else using his phone at this point.  I

1    think we're way past that.  There is no doubt

2    whatsoever that the defendant made each one of

3    these six pickups.  His -- the GPS, his phone puts

4    him at the scene, he's taking pictures of the

5    evidence at the scene, he's caught red-handed

6    twice, and, oh, he admitted it.  I mean, we're -- I

7    mean, he did these things.  I mean, there is

8    absolutely no way around that.

9         So just the amount of money that we can

10   put in his hand from these six pickups is over

11   $400,000, and we're dealing with an international

12   fraud scheme of some level of sophistication.  Is

13   there any way in the world the criminal enterprise

14   is going to gamble with -- that $400,000 is not

15   going to get away from them, that they're going to

16   ensure that the person who picks it up is someone

17   they can count on.  The sheer amount of money by

18   itself belies common sense to think that the man

19   entrusted to pick it up would be anyone other than

20   a trusted confidant.  Just not how things could

21   possibly work in the real world.

22        Think of the amount of time these scammers

23   invested with each of the victims.  Virginia talked

24   about -- poor Virginia, she is the 86-year-old from

25   Edwardsville who struggled.  He kept her on the

1    phone -- and Mr. Reed introduced evidence from the

2    phone extractions and that.  They kept that poor

3    lady on the phone, kept her isolated, the amount of

4    hours they burned communicating with victims and,

5    you know, writing letters and everything else that

6    they've done here, there's just no way the criminal

7    enterprise of this magnitude is going to -- once

8    you -- and imagine how many of these emails and

9    texts and scams they have to send out before they

10    get a live one on the line, right?

11         I mean, people -- all the time your phone

12    is blowing up with, hey, work-from-home

13    opportunity, hey -- I mean, we all get those kind

14    of calls and texts, and I can't even imagine the

15    number of them that this enterprise has sent out,

16    but for that tiny percentage that fall for it,

17    that's a golden commodity with a criminal

18    enterprise like this; and once you get them on the

19    hook, you don't want to let them off the hook, and

20    especially once you've gotten them to the point

21    where you can separate them from their money; boy,

22    it gets real now; and they are not going to take

23    any chance that that money is going to get away.

24         What kind of person can they trust to pick

25    up?  Oh, I don't know, a friend, maybe a cousin.

1    He mentioned Abhishek being a person he knew when

2    he lived in India, a person that you had history

3    with.  Maybe the kind of person that you can trust

4    that when they get pulled over and stopped by the

5    police is going to lie to the police.  Maybe

6    they're going to trust that guy that when it comes

7    right down to it is going to say, "Oh, I have no

8    idea what's going on.  No idea what's going on,"

9    not cooperate, not say anything, and that's what

10   happened up in Wisconsin.

11          His first pickup in Wisconsin, he comes to

12   Indiana, back to Wisconsin, got stopped by the

13   police, and the first time he gets stopped by the

14   police, you know, it was -- I mean, you heard the

15   testimony from the detectives -- now you're lying

16   to say you were up there as a musician.  Finally,

17   Detective Sir, with him alone in the back of the

18   car and the videotape from that stop was asking him

19   these questions; and, you know, he wasn't candid

20   with them, but they talked with him.  What was the

21   sum and substance of the interview from Merrill,

22   Wisconsin?  You know, he's up there to pick up a

23   package.  Finally, he says that.  Originally he

24   says he's up there to be a musician.  He finally

25   admits to that he was going to get a package for

1    $250 but claims not to have any idea what was in

2    the package.  You know, that is just the kind of

3    person you trust to be involved if you're sending

4    out a courier who is picking up $400,000.

5            I'm having a little technical difficulty

6    here.  The clicker won't work.

7            (Off the record.)

8            MR. WEINHOEFT:  So our first wave where we

9    can show and know for certain that the defendant

10   was participating is just the sheer amount of money

11   that's involved and the magnitude of the

12   responsibility.  It's just unreasonable to think

13   that a criminal enterprise like this would be

14   involved with someone who wasn't trustworthy, but

15   let's talk about his conduct during the crimes.

16           First of all, he's being sent out by KT

17   and Danny to do a lot of these pickups, right?

18   What is one thing that he said over and over and

19   over and over again that he was?  A courier, right?

20   Well, it might make sense that he thought he was

21   working as a legal courier if we had "Danny's

22   Courier Service" or if we had "KKT Deliveries," but

23   that's not what we're dealing with in any way,

24   shape.

25           It's a very, very different situation.

Vol. 5 - 987

1    KKT and Danny have no relationship to any of these
2    victims.  He had no idea who any of these people
3    were.  All he knew is that from India there'd be a
4    message to go make a pickup at somebody's house 250
5    miles away a few hours later when you're not
6    working for an actual courier service.  It just --
7    there is nothing about it that sounds like it's an
8    honest, legitimate situation.  He's not going to
9    businesses.  He's not picking up things from anyone
10   other than elderly women.

11           And the one, for heaven sakes, going to
12   Indiana -- you saw the pictures of that yellow
13   building, Christina's House/Christina's Place -- it
14   was referred to both ways, you are literally
15   driving into an assisted living facility, passed a
16   sign that says Christina's Place, Assisted Living
17   Facility, and he pulls up -- it was a little point,
18   but you pull up kind of right in front of that
19   front door, jump out, kind of go in to help an
20   elderly lady if you think you're making a delivery.

21           This is the first delivery -- pickup
22   service in history where they sit and wait in the
23   car for you apparently.  Where did he park?  You
24   saw that one picture.  He parked on the farthest
25   right parking place away from the door.  That makes

1    a little sense because if I was coming to make an

2    illegal pickup, I wouldn't want to drive up by the

3    front door.  I'd be afraid of cameras.  Wouldn't

4    want to walk in that front door because assisted

5    living facilities very -- oftentimes have those

6    kinds of setups around them or there might be

7    someone meeting you at the front desk in the light;

8    but instead he stayed all the way to the edge of

9    the parking lot, and he made this poor woman on

10   oxygen and with a walker walk all the way out to

11   him.

12           Is that how regular delivery courier

13   services work?  That's what he'd have you believe.

14   Is that reasonable?  Does that pass that common

15   sense test?  It's ridiculous.  It's absolutely

16   ridiculous.

17           Look at how he got paid.  He got paid cash

18   or through Zelle, which is an app on the phone, to

19   transfer money or he did acknowledge at one point

20   he took some money -- some cash out of the box.  So

21   you pick up a box of money from an elderly woman,

22   pull a chunk of her cash out for yourself and think

23   that you're involved in honest business?  Is that

24   good faith?  Is that awareness that this isn't

25   right?

1          His body language, boy, oh, boy.  Not

2     getting out of a car is troubling just on a human

3     level, but it's also indicative of, you know,

4     someone who is trying to conceal themselves; and I

5     found it really interesting that the two witnesses

6     who could describe having gone up to him and making

7     those deliveries both said he hid his face, and,

8     you know, there was some questions about, well, it

9     was cold out or this and that.  He doesn't get the

10    benefit of it being cold outside for having, you

11    know, something up over his mouth and his nose and

12    a beanie cap over the top of his head, because,

13    remember, he has just driven 250 miles.  I think

14    the car is warm.  He sure as heck didn't get out of

15    it.  What's the only inference that's reasonable

16    from that fact?  He's hiding his face because he

17    knows he's doing something wrong.

18          The one victim described him as kind of

19    reclining his chair and turning away from him -- or

20    turning away from her when she walked up; and in

21    fact, his body language was so off with her, she

22    had done -- Vonda had done a couple of pickups with

23    who she called the "burger boys," that we haven't

24    been able to identify yet -- you know, she was --

25    she was scammed and kind of comfortable with the

1   situation.  What did she say was the first thing

2   that made her start to wonder if all of this was

3   legitimate?  It was this guy's body language.  It

4   was the defendant's body language.  It was off.  It

5   was off.  She could sense something wasn't right,

6   and now, Vonda was the person who herself was

7   pretty easily fooled, and even she was able to see

8   and perceive that the way he was looking straight

9   ahead, wouldn't make eye contact, just did the

10  thumbs-up, throw-it-in-the-back kind of motion,

11  like, this isn't right, doesn't feel right, and

12  it's because she's sensing the way he's acting at

13  the scene and because he knows he's doing something

14  wrong.  It's why he's hiding himself.  It's why

15  he's covering his face.

16          And look at his constant communications --

17  and I know we had one really long day where we went

18  through those cell phone extractions, and we jumped

19  back and forth between a thousand exhibits it felt

20  like throughout the course of that day, but it was

21  emphasized and reinforced just the nonstop

22  communication between this defendant, Danny and KKT

23  and all of those calls back and forth.

24          I think it was December 1st and December

25  2nd, if memory serves, and I believe in a 24-hour

1   period of time, I think there were 37 or 38 calls

2   and messages exchanged between the two.  What does

3   that sheer volume of communication tell you about

4   what's going on with this guy?  This is -- I mean,

5   this is back-and-forth, nonstop discussion and

6   communication.  This is -- that's a lot more than

7   somebody who superficially just has no idea, and

8   that's his default setting.  Every time he gets

9   posed with a hard question, it's, "No idea.  No

10  idea.  Courier, courier, courier."  It's just a

11  default defense mechanism and a way to try to hide

12  behind answering a difficult question.

13          Boy, let's talk about those dollar bills.

14  How weird is that, right?  How weird is that?

15  Fortunately, Detective Hoyland has seen this

16  before.  Conor Hoyland was able to describe how

17  these India-based scams, that these scammers will

18  use a dollar bill and serial number essentially

19  like a tracking number, and it's a way that they

20  communicate and they track money as it goes back to

21  the pipeline.

22          Counsel's opening statement said he was a

23  courier just like any other, you know, just like

24  Uber, just like Amazon.  So I guess our

25  secret-coded dollar bill communication is just like

1    Uber and just like Amazon.  It's weird.  It's not

2    right.  It's every reason in the world that this

3    defendant knew that he was involved in something

4    wrong, and he's the one taking pictures of the

5    bills.  Take picture of the bill.  There would be a

6    note and an amount scribbled on it.  Two to three

7    minutes later he's taking a picture of the same

8    bill, and that was going on -- it was his testimony

9    earlier how that was going on during the count of

10   the money, and that's knowledge.  It just is.

11   There is no other way to explain it.

12          And that Wisconsin arrest, the Wisconsin

13   stop, is absolutely devastating evidence.  It's

14   absolutely devastating evidence.  Put it in

15   context.  He's going up there to make a second

16   pickup, and the police are there, the lights come

17   on, and they say, "What are you doing in Merrill?"

18   That's the first question.  "What are you doing in

19   Merrill, Wisconsin?"  "What are you doing?"  And

20   about the -- at first he starts out with the

21   business about he's there as a musician, and

22   Detective Sir is like, I don't see instruments, I

23   don't music, I don't see amps, I don't see wires,

24   you know, none of this makes sense; and he said it

25   wasn't a miscommunication.  If it would have been a

Vol. 5 - 993

1    miscommunication, he would have kept asking

2    questions, but after several minutes of it, he used

3    the word "confronted" him.

4            You saw the demeanor of those Wisconsin

5    officers.  All of the police in this case are a

6    credit to law enforcement and how professional and

7    appropriate and how much dignity that they treated

8    this defendant with.  Detective Sir was really

9    respectful and patient and polite and careful when

10   he testified.  I mean careful.  If he wasn't

11   certain about something that was said or something

12   that was done, he would stop, look up, he paused,

13   he didn't reach.  He didn't -- he was cautious in

14   the manner in which he testified to make sure

15   everything he said was spot on precisely the truth.

16           And he said the defendant said that he was

17   here as a musician, and they looked and said, Well,

18   where are your instruments?  Well, where are you

19   playing?  What venue are you at?  He said it was

20   after a few minutes of this that they confronted

21   him and said, You are not telling us the truth; and

22   of course, it's a sting, and they say, We know

23   you're here to pick up a package.  And he's like,

24   Okay, I was here to pick up a package.  I don't

25   know what was in it.  I don't know was in it.  I

1    was just getting $250 to pick up a package.  Some

2    random guy named KKT contacted me two days ago.

3    That's all I know, and he kept saying it over and

4    over and over again, and that's literally all the

5    Wisconsin police got out of him.  None of it is

6    true.  KKT didn't just randomly contact him as an

7    unknown person two days before that.

8            And look at what he didn't mention while

9    he was talking with them.  When he made that

10   stop -- when he got stopped by the police in

11   Wisconsin, it was hours after he had just made

12   another pickup in Indiana.  You remember he went on

13   Thanksgiving morning to Indiana, and it was the day

14   after that he was up making this stop the next day,

15   and it was -- it's remarkable that he pretends to

16   have absolutely no idea, no idea what's in the box

17   during the -- during this time.

18           So understanding the impact of this

19   Wisconsin evidence, at this point they don't let

20   him take the package.  He doesn't get to make his

21   pickup.  He has to report back to Danny and KKT

22   that the police intercepted the package, and

23   remember, he couldn't get home because they also

24   seized his phone as evidence.  So he knows the

25   package was not a lawful pickup, and he knows he's

Vol. 5 - 995

1    under criminal investigation because the police

2    still have his phone to search it.

3            I mean, to the extent there's any, any way

4    to conceive of him not knowing, it's all gone after

5    Wisconsin.  It's gone.  He knows at that point --

6    at that point in time this is not a lawful pickup,

7    and what's he do?  He goes back to Chicago for a

8    few days, and then he goes straight down to -- this

9    is in December -- spends the next three months down

10   in Atlanta with Danny, with Danny.  That's where he

11   went after he got stopped by the Wisconsin police.

12           And out of his own mouth he said that

13   Danny told him that the police would not catch him

14   there, and he said he had concerns about the fact

15   that the police were there, and this is, I guess,

16   where Danny brainwashes him.  Do you remember that

17   testimony?  It's ludicrous as well.

18           But he's down in Atlanta, and Danny is

19   there, and if he's got a question about what was

20   happening in Wisconsin, guess what, it's a pretty

21   easy Google search to get in touch with the Merrill

22   Police Department to say, Hey, I got some concerns

23   about what happened.  Can we talk this thing

24   through?  Can I ask you some questions?  Can I

25   learn about this?  But instead, supposedly he goes

1    back, and he is just going to rely on Danny who

2    sent him there to make all of these pickups, so

3    somehow that exonerates.  Somehow that means he

4    doesn't know.  No, he got of dodge and went down to

5    Atlanta with the guy that's dispatching him all

6    over the Midwest to do pickups.  That's what's

7    happening in the real world.

8         Let's talk about this Edwardsville PD stop.

9    The first words out of his mouth when he gets

10   stopped is "first time" and "no idea."  He also

11   says he's a musician again.  He's basically

12   rehashing all the same lines he pulled out in

13   Wisconsin, and he's trying to get out of, now,

14   Edwardsville.  When he says, "first time"

15   there's -- I mean, that's the second time he's been

16   to Virginia's house.  There is no set of

17   circumstances under which him saying "first time"

18   is anything remotely truthful.  It's just an

19   attempt to make a false statement to escape

20   responsibility for what he knows that he's doing.

21         The false statements that he made in that

22   recorded interview, I'm not going to go through

23   each and every one of them.  I'll highlight a few

24   of them, but that recorded interview that he did

25   with Agent Kaur is just remarkable examples of him

1    just talking in circles and circles and making

2    false statement after false statement after false

3    statement.

4            He lied about why he was in Edwardsville.

5    He said the location was just given to him, and he

6    made reference to Door Dash, and he claimed he was

7    there as a handyman.  He claimed he was in

8    Edwardsville as a handyman -- at least he tried

9    that.  When they asked -- when he first started

10   that interview, he said, some woman is claiming

11   that she put money in the back of my car, but I

12   don't know what she put in my car.  That's not

13   true.  He's lying.  He just is.  And if he's lying,

14   you got to ask yourself the next question:  Why is

15   he lying?

16           In the law, we call that consciousness of

17   guilt.  He's hiding because he's covering something

18   up.  He claimed he got sent to Virginia's house by

19   someone who he didn't know their name.  His only

20   mistake in this whole thing was not getting the --

21   he said the only -- his only mistake he made was he

22   didn't get the name of the person that sent him to

23   Virginia's house.  That's just not true.

24           He said that he was going there for

25   handy -- to do handyman work.  He said he is going

1    there.  There is some repair work to be done.  Some

2    color work.  I assume that means painting.  One or

3    two household jobs.  This is what he told me.

4    That's his explanation in that recorded

5    interview -- his first explanation.  He goes

6    through many, but that's his first explanation.

7    Repair work to be done, some color work, one or two

8    household jobs, this is what he told me, and he

9    said he went there without knowing how much he was

10   going to be get paid, and he said in the same

11   breath, "I swear 100 percent on my child I didn't

12   know anything about this."  Just bald-face lie

13   after bald-face lie with the -- whether it's

14   swearing to -- on children, swearing on family,

15   swearing on religion, it's just what he does when

16   he's trying to give completely false statements the

17   patina of credibility when there is none.

18          This story evolved from going to Virginia's

19   house for a lawful purpose of handyman work to

20   picking up a package but no idea what I was picking

21   up, but then it went to okay, I picked it up, but

22   they made me to do it.  He was forced to do it.

23   Then he finally says, My cousin sent me.  Then he

24   finally says, I did it for my family because I

25   needed the money.  He says over and over again he

1    didn't know he was picking up money, and then he

2    finally gets around to saying, Well, I thought it

3    was only $10,000 or $15,000.  The story just

4    continues to evolve.  He lied about getting paid.

5    He finally did admit to counting out that 28- or

6    $29,000 and -- from an aged woman that he

7    described.

8          So his interviews and false statements are

9    just like his false testimony.  His testimony was

10   ridiculous, and it's as incriminating as the

11   statements you watched on the recording, but don't

12   forget.  We've even got more.  We've got acts of

13   concealment.  Not only do we have false statements,

14   we have actual acts of concealment.  We have

15   photographs and videos of criminal proceeds that

16   are evidence that are deleted off of his phone.  He

17   made a choice to do that for a reason.  Just like

18   nothing else in this case is his fault, according

19   to him, he claims somebody else made him do it, but

20   he wiped that evidence off of his phone for a

21   reason.  It's incriminating evidence, and he's

22   covering his tracks.

23         He turned on disappearing messages on

24   those chats back and forth with KKT.  Remember

25   that?  That was a great catch in cross-examination

1    today because he said point-blank on the witness

2    stand, "I didn't turn on disappearing messages.

3    One of the other guys did."  Mr. Reed, unh-unh,

4    pulled up the image from the cell phone extraction,

5    and guess what, plain as day, it was this defendant

6    who was the one who turned on disappearing

7    messages, and he lied about it right in front of

8    all of us.  Why did he turn on disappearing

9    messages?  What were they talking about that he

10    didn't want recorded while he's on the way to pick

11    up criminal proceeds?

12            THE COURT:  Counsel?

13            (Sidebar proceedings on the record.)

14            MR. WEINHOEFT:  I've got about five or ten

15    more minutes.

16            THE COURT:  At the most.

17            MR. WEINHOEFT:  Okay.

18            THE COURT:  Okay.  This is a Friday

19    afternoon.  You have been going an hour and ten

20    minutes.

21            MR. WEINHOEFT:  Have I?  Okay.

22            THE COURT:  And I still have 36 pages of

23    instructions to read.

24            MR. WEINHOEFT:  Okay.

25            THE COURT:  This jury -- we're lucky if

Vol. 5 - 1001

1   the jury gets this case at three o'clock, and I'm

2   not going to let you go any longer than --

3          MR. WEINHOEFT:  All right.

4          THE COURT:  All right.

5          MR. WEINHOEFT:  I've got some slides, and

6   I'll blow through them.

7          THE COURT:  All right.

8          (End of proceedings at sidebar.)

9          MR. WEINHOEFT:  I will go through these a

10  little bit more quickly, but there are a couple of

11  statements made during his recorded interview that

12  just have to be -- have to be pointed out.

13  Cross-examination about the term "money laundering"

14  being used, but it's at the end of that

15  conversation that there is something pretty

16  significant.

17          (The video was played at this time.)

18          MR. WEINHOEFT:  We'll watch it one more

19  time.  He's talking about at that time -- and

20  they're like they're not worried about -- the agent

21  from Schaumberg touches his heart, What did you

22  think was going on then in here?  And watch

23  Mr. Patel back.  He goes, In here I thought they

24  were doing something wrong.  It's one of the rare

25  truths that he told in this case.  Watch this

1    again.

2              (The video was played at this time.)

3              MR. WEINHOEFT:  When discussing the second

4    pickup from Vonda, how much money did you count

5    inside?  And this is number one.  This is before

6    he's down here in Southern Illinois.  He said 30,

7    30,000 something.

8              (The video was played at this time.)

9              MR. WEINHOEFT:  Another way to describe

10   that, that's knowledge.  He knew what was going on.

11             (The video was played at this time.)

12             MS. FRETER:  Judge, do we have to play

13   each one of these twice?

14             MR. WEINHOEFT:  I'll move through these.

15             When discussing how he delivered the

16   money -- and I'll just make this point and save --

17   having seen this.  These people were doing

18   something wrong, but this is the second point

19   that's important.  They were all in coordination

20   with each other.  That's another way of describing

21   he knew there were multiple people involved in this

22   scheme to defraud -- of this conspiracy.

23             Discussing the Madison County pickup, it

24   would not be more than 10- or $15,000 that he

25   admitted.  That's knowledge.  It just is.  He knows

1    what's going on.

2         This one is really good.  When he's

3    picking up -- when he thinks he's picking up from

4    Virginia Bryan and it's a sting, he was asked, Why

5    did you only lower the window a little bit?  And he

6    said I only -- I was a little scared and I also

7    felt something wrong was happening.

8         (The video was played at this time.)

9         MR. WEINHOEFT:  There's more, but I've

10   made the point.  This jury understands what's going

11   on here.

12         Folks, you're the judges of the facts.  It

13   is up to you and you alone to determine the truth.

14   Justice does not exist without verdicts that are

15   based on the truth.  We have to get it right, and

16   we only get it right when we get to the truth, and

17   the truth here is that these different victims in

18   different states who were targeted by the same scam

19   from the same courier were all victimized because

20   the defendant was knowingly participating in a

21   larger scheme.  It's just that simple.  He knew

22   what he was participating in.

23         So now it's your job to return to

24   deliberate; and when I sit down, defense will

25   address you; and then Mr. Reed will have an

Vol. 5 - 1004

1    opportunity to speak in rebuttal; and it's that
2    time that you have to sit back and judge the facts
3    to determine what was true.  Was this man blameless
4    and acting in good faith, or did he know what he
5    was doing?
6         And when you consider his behavior during
7    the crimes, his countless lies to law enforcement
8    and even in this courtroom, the fact that he
9    continued making pickups after stopped by the
10   police, his acts of concealment and his admissions,
11   that you'll come to the conclusion that there is no
12   reasonable doubt about this man's guilt.  This
13   defendant did more than just steal their money.
14        THE COURT:  One minute.
15        MR. WEINHOEFT:  He's been emotional and
16   he's been desperate, but he is not the victim here.
17   He sits in that chair because of countless
18   decisions that he's made, that these victims --
19   he's stolen their life savings, he's destroyed
20   their trust, their independence, and now every time
21   the phone rings, they have to flinch.  There is
22   nothing worse than crimes that pray upon vulnerable
23   victims, and it is simply wrong to drive all over
24   the Midwest stealing money from elderly victims in
25   any culture and in any language.

Vol. 5 - 1005

1          At the conclusion of this case, we will

2     ask you to return the only verdict supported by the

3     facts and the law, and that is a verdict of guilty

4     on all counts.  Thank you for your time.

5               THE COURT:  Erin, do you need a break?

6               (Off the record.)

7               THE COURT:  We have more closing

8     arguments, and then you get to hear my dramatic

9     reading of 37 pages of jury instructions, so why

10    don't we take a five-minute break, and we'll come

11    back for that.

12              (Recess at 2:24 p.m. until 2:32 p.m.)

13              THE COURT:  Counsel, you may proceed.

14              MS. FRETER:  Thank you, Your Honor.

15          Thank you all for your time and attention

16    this week.  I know it's been a long week.  A

17    hard -- it's been a lot of information crammed into

18    a short period of time, and it's been difficult to

19    receive it.  We very much appreciate you taking

20    time out of your lives to perform this very

21    essential function, so thank you very much.

22          When you have new lawyers, law students or

23    new lawyers, you do an exercise with them, and you

24    have everybody imagine a bear.  You have them think

25    about a bear, imagine the bear, what it looks like,

1    what color it is, what it's doing.  You have them

2    all think about their bear; and then you go through

3    which -- each of the students, and you have them

4    describe their bear, and inevitably, some of the

5    bears are polar bears, some are koala bears, some

6    are brown, grizzly bears.  All of the bears are

7    doing different things.  They all look different.

8         The purpose of the exercise is to try to

9    demonstrate to law stents how, when you saw bear,

10   just the word "bear," for different people it means

11   different things, and a lawyer's job is an attempt

12   to explain and fill out and describe the bear.

13   What color is your bear?  And what kind of bear you

14   think about might be influenced by where you came.

15   If you're from Australia, koala bears.  If you're

16   from Alaska, maybe you think of grizzlies.

17        It's difficult to explain or demonstrate

18   how different people really are from each other.  I

19   mean, we're the same, but we're also really

20   different, shaped by our own life experiences, our

21   own situations, how we view the world, and in

22   compressed time and shortened relationships, it's

23   unbelievably hard to do that.

24        So maybe it's cheesy, but I had a lot of

25   witnesses talk about what color the car was, what

Vol. 5 - 1007

1    color is the car, and I did a whole song and dance

2    about brown or maroon or pick this out, and you saw

3    professional law enforcement officers struggle to

4    describe this car, and these would be people who

5    would call in a car if they had to stop somebody

6    for speeding, and they would call in the color of

7    the car, and it was difficult for them to pick a

8    color.  We've seen pictures of the car.  You can

9    make up your own mind about what color it was.

10   Maybe some of the officers have color blindness.

11   Maybe the lighting was bad.  I don't know what the

12   answer to those things are and you don't either.

13   Their perception of the color of the car or what

14   color is your bear, right, is really important in a

15   case where what we're dealing with is language and

16   actions.

17          While there are moving pieces and

18   financial records and people that were affected, it

19   comes down to this, the bottom line for the case,

20   has the Government proven to you beyond a

21   reasonable doubt that Nirav Patel knew -- you could

22   use the phrase "should have known," right?  Were

23   the circumstances such that you should have known

24   that -- that what he was doing was participating in

25   an illegal scheme to defraud?  Did he know it or

1    not?

2              Are you convinced, after listening to all

3    the evidence, beyond a reasonable doubt, not just

4    "ah."  Beyond a reasonable doubt that he knew that

5    he was participating in a scheme to defraud?

6              It's hard looking back to see what was in

7    someone's heart, what was in their mind.  It's

8    almost impossible to do backward looking that way.

9    So you have to look at what somebody said and what

10   somebody did, right; and Mr. Patel got up and

11   testified for you; but the way you interpret

12   that -- again, lawyers like to slice up little

13   words.  That's what we do.  We go to law school to

14   learn how to do that.  You said this then and this

15   now.  It's why people don't like lawyers.  It's why

16   we have complicated relationships with our spouses,

17   because you get into minutia of words and language.

18   It's fun for lawyers.  Regular people don't care

19   for it too much.  They don't like testifying.  They

20   don't like lawyers.  "You're always picking on me

21   about that.  Why are you picking with my words?

22   You know what I mean."

23              When you just saw little pieces of the

24   transcripts and what Mr. Patel said or you think

25   back about his testimony, we all were looking at

1   the words on the screen in English sitting there

2   saying when the Government says and you said this,

3   and Mr. Patel wouldn't remember, wouldn't agree

4   with it, and it seemed ridiculous, right, it's the

5   word the Government used because you're looking at

6   the words, and you're like, well, he said it there,

7   there's the transcript, but Mr. Patel doesn't read

8   English.  They would have had to replay the audio

9   for him again enough that he could hear.  So while

10  you're all looking at the screen saying this is

11  what the words say, why doesn't he just say yes, he

12  doesn't -- he doesn't read English.  He would have

13  had to listen to it again on top of the layer of

14  the conversation was in Hindi, not Gujarati, which

15  Special Agent Kaur testified is a totally different

16  language, and even she doesn't read Gujarati.

17          How confident are you after listening to

18  two different interpreters talk and see all the

19  different issues we've had here in this courtroom

20  with interpretation that in the clips that the

21  Government just saw (sic) you, when Mr. Patel,

22  according to the transcript, said "I felt," that

23  that translation shouldn't be "I feel."  I feel

24  they were doing something wrong.  I feel in my

25  heart that wasn't good, because that statement in

Vol. 5 - 1010

1   the police statement in Schaumberg is in June of

2   '23 after Mr. Patel has been arrested in Madison

3   County, released, gone back home and then been

4   rearrested.  So he's had interaction with the U.S.

5   criminal justice system that has told him what you

6   did in Madison County was wrong, and so are you

7   certain beyond a reasonable doubt that in that

8   transcript, in that -- when you say "I felt" that

9   it's not -- that it's not "I feel."  "I feel in my

10  heart now that it was wrong."  "I feel now."   How

11  certain are you?  It's not proof beyond a

12  reasonable doubt.  You're not certain about it

13  because you can't be.  It's inexact.

14          It would be nice if it was clean and

15  simple and easy and not messy, and you could say,

16  You said this before, you're saying this now,

17  you're lying, you're guilty, be done; but that's

18  not what we have here because you're trying to

19  figure out did he know; and these statements, you

20  have to remember when he's in the police station in

21  Schaumberg, they say to him, You've been arrested

22  more than once, you were arrested in Wisconsin, and

23  he says, No, I wasn't, and they said, Yes, you

24  were.  You are lying.  You were arrested in

25  Wisconsin.  Stop lying to us.  They said it over

1    and over again.  You heard that happen when he

2    testified on the stand.  You're lying.

3            But we know, because we've seen the text

4    message where the officer in Wisconsin said you are

5    100 percent not under arrest, that that's what he

6    was told in a text message in Hindi.  Go sit --

7    twice, you are not under arrest, go sit in the car,

8    and he was let loose, right?  He was freed.  But

9    they told him in the interview room when they

10   talked to him in Schaumberg, you're wrong, you're

11   lying, you have been arrested more than once.  How

12   is he supposed to convince them or you that he's --

13   I mean, how is he supposed to convince -- he

14   knew he -- I mean, he knew they told him he wasn't

15   arrested.  It doesn't get any more basic than that.

16   They told him he wasn't arrested, and now these

17   other people are telling him that he's a liar and

18   that he absolutely was.

19           The three ladies in this case, Ms. Lutz,

20   Ms. Endres, Ms. Bryan, have been affected horribly.

21   This is terrible.  There's no doubt that they were

22   defrauded.  There's no question about that, but I

23   want you to hear what I'm saying without -- I'm not

24   disparaging them.  I'm not criticizing them.  I'm

25   not saying anything at all badly or derogatory to

Vol. 5 - 1012

1    them.  Those ladies were just trying to do the best

2    that they can, right?

3              But the window into human behavior and

4    human interaction can be seen through their action.

5    Ms. Bryan was a chemistry professor and the chair

6    of the physics department, right?  Ms. Lutz was a

7    registered nurse.  Ms. Endres had worked outside

8    the home, and she's -- maybe she didn't have a

9    bunch of fancy letters after her name, she was the

10   one that said "no more" the soonest of these other

11   two ladies, right?  These were all smart, capable

12   women who had careers and lives and children and

13   bank accounts and smartphones.  Somehow through

14   either loneliness or manipulation or, for whatever

15   reason, all three of them fell victim to this, and

16   they all did things that when you look at it, you

17   just think that's crazy.  How could you take 35- or

18   $50,000 in cash to a Bitcoin machine in a gas

19   station?  I mean, it seems just crazy to think

20   about, and that the girl working at the gas station

21   said, Ma'am, I don't think you want to do this, and

22   she did it anyway, even though the -- objectively

23   it doesn't make any sense.  She's -- they're all

24   communicating with these people who don't have

25   accents, who are texting and talking in complete

Vol. 5 - 1013

1    sentences for hours on the phone, and then they're

2    deleting the messages.  Is that deleting evidence?

3    I mean, why -- they were all asked, Why did you

4    delete the messages?  Because these people told me

5    to.  These are small ladies, but in whatever the

6    context it is, they're deleting the messages.

7    They're doing more packages.

8            Ms. Bryan, after the Bitcoin was -- I

9    mean, it just disappeared, she lost all that money,

10   she went to the police station to report the prior

11   fraud and already had money packaged up for the

12   next one.  When you look at it, you think, well, it

13   just doesn't make any sense.  How can they do that?

14   But you also hear and believe that they're telling

15   the truth about that, that they weren't a

16   participant in this fraud, they're not trying to

17   send Bitcoin in some money laundering scam.  I

18   mean, we all believe them 100 percent, right?  Some

19   of it may be based on how they testified.  It can

20   be their interaction.  For whatever reason, we all

21   believe them.  Nobody thinks, oh, no, they were

22   doing a crime.  Nobody thinks that, right?

23           The Government, though, and the police or

24   whatever, don't give the same benefit to Mr. Patel

25   when he says they told me to delete the pictures so

Vol. 5 - 1014

1    I did.  They told me to go to these places so I did

2    even though it objectively seems crazy, right?  It

3    seems just as bizarre.

4          Why doesn't Mr. Patel get the same benefit

5    of the doubt as the ladies do?  Why is that?  Is it

6    because they're victims of a crime?  Is it because

7    they're able to articulate their situation better?

8    Is it because we identify with them more?

9          Mr. Patel has been insistent through all

10   of this that he's a courier, that's moving -- he's

11   just there to pick up packages, and he doesn't

12   investigate any further as to why, and he doesn't

13   look into it; and you're being asked to

14   extrapolate, to surmise, from his behavior and from

15   what he did in some ways based on your own

16   experiences about what you would do, and what's

17   reasonable to you based on your life, which is very

18   different than Mr. Patel's.  People act differently

19   in different situations.

20         In this room, I'm cross-examining police

21   and making objections and taking up a lot of space,

22   but out in the world, maybe if I get pulled over in

23   a car, something else, I'm going to try to make

24   myself small because I'm a woman, because I'm

25   short, because I don't have any agency or power out

Vol. 5 - 1015

1    there in the world in the same way that I do in the

2    courtroom.

3              The agent thought Mr. Patel was lying

4    because he wouldn't look at her, because of his eye

5    contact, but he was looking at the guys.  She said

6    that that's a cultural thing.  Maybe, maybe he

7    didn't understand her role and thought she was just

8    an interpreter.  Maybe he just thought that they

9    had the power in the room.  She testified she would

10   have dealt with the interview differently had she

11   known, for example, that he had a text message from

12   before telling him he wasn't a hundred percent

13   under arrest.  How did that color everything else

14   that got said?  All the questions, all the

15   parsing -- when he says the word "money laundering"

16   in the interview -- and you can ask for all the

17   exhibits.  You can rewatch the stuff if you want.

18   It's very long, but you're going to take time and

19   think about this and consider it carefully.  If you

20   want to look at stuff, you can.  The Judge is going

21   to read you the instructions of law.  The

22   Government has put some of those on slides, but the

23   Judge's instructions are the ones, right?  That's

24   what the law is.  Not what the Government or I say.

25             Read through all the pages of instructions

Vol. 5 - 1016

1    on your own, right?  Really look at them because

2    that's what the law is.  Wire fraud, when you go

3    into a bank and it's saved on a -- what did he say?

4    It was like saved as a document thing in wherever

5    Minnesota, whether that's wire fraud or not, you

6    will get instructions so you all can figure that

7    out.

8           But our experiences are -- they're just

9    different, right?  Yellow cab, dollar cab, gypsy

10   cab, when I say that, those are lyrics from a song,

11   right?  You all may know what the song is and you

12   may not, but a dollar cab and a gypsy cab is a cab

13   in New York City that you can still get that's just

14   like a neighborhood cab.  You're just paying

15   somebody from the neighborhood to drive you a

16   place; and so when I say yellow cab, dollar cab,

17   gypsy cab, you may not know the song and you may

18   not know what I'm talking about or you might.  Just

19   like when I say "play cousin," what that means, and

20   that's based on your experience and whether you

21   have ever taken a dollar cab; and when you talk

22   about your cousin within the context of Indian

23   relationships from Gujarati, what that means, and

24   the agents -- not Agent Kaur, the other two agents,

25   right, took that to mean -- and the Government is

Vol. 5 - 1017

1    taking it to mean -- that he's being evasive about

2    the relationships.  He's just trying to explain

3    from his perspective and point of view.  He's just

4    a courier, and he said it a million times.  What

5    does that mean to you, and what did it mean to him

6    then?  Not now.  Then.

7            To find him guilty, you have to believe

8    beyond a reasonable doubt that he knew or

9    essentially should have known that he was

10   defrauding people and that he was a participant in

11   that.  The instructions will tell you the

12   agreement -- you have to have agreement in a

13   conspiracy.  The Government gave you an example

14   about a bank robbery with a head nod or something.

15   No, you got to say, Hey, let's go rob a bank.

16   That's agreement.  If you're sitting in the car and

17   nobody told you you guys were going to go do a bank

18   robbery, that's not an agreement.  That's not a

19   meeting of the minds.  He had to know that he was

20   defrauding somebody.

21           I'm not going to belabor this.  We've been

22   here a long time, but like how you just see things,

23   the Government's perspective of, like, well, he

24   didn't get out of the car and he didn't help these

25   ladies, and he didn't do this, and he didn't talk

1    to them, I mean, from that perspective, it's really

2    rude, right?  I mean, you've got this old --

3    elderly, sorry, lady whose -- it's fantastical that

4    she has $188,000 in gold bars that by herself she

5    lifts, puts on a walker, and rolls it out to the

6    car.  I mean, if you told somebody that, you would

7    say, Nah, nobody is really going to do that, but

8    she did, right?

9          And so the criticism is Mr. Patel is rude

10   because he doesn't get out and help her, he doesn't

11   do this and he doesn't do that; but if you are a

12   big scammer like these guys are who are on the

13   phone for hours and hours and hours trying to sweet

14   talk these ladies, wouldn't you go help her?

15   Because you got to keep her on the hook for the

16   next package, right?  Mr. Patel just sits there

17   waiting for his delivery, isn't friendly to them,

18   doesn't try to facilitate more packages or scams or

19   introduce himself.  He just sits there, gets

20   whatever they put in the car and then leaves.

21         The Government has talked about, Well, you

22   will trust somebody related to you or it's just a

23   lot of trust.  They didn't trust Mr. Patel any more

24   than these ladies.  They made him take all these

25   pictures all the time.  He had to send them stuff.

Vol. 5 - 1019

1   When you look at the videos, he is not unwrapping

2   any boxes.  They've got to stay wrapped, right,

3   because that's what they wanted him to do to send

4   the pictures of them.  It's not that you're

5   trusting your relative, you're trusting the

6   slowest, not as smart, wife's cousin, right?

7   Because you can just cut him loose because you

8   don't care about him.  So what if he gets arrested?

9   So what if he gets picked up, right?  What

10  difference does it make?  Who cares?  You don't

11  care about him.  They're moving so much money if he

12  loses a package, so what?  They're just going to

13  cut him loose, which is what they did.

14          The Government has to -- is required to --

15  prove to you beyond a reasonable doubt that he

16  knew.  If you have a doubt, they didn't prove it.

17  He got up there.  He admitted he came to the United

18  States illegally.  He admitted to that.  Why

19  wouldn't he admit to the other stuff?  Why would he

20  just keep screaming about courier?  Because that's

21  his truth he's been trying to tell for a long time.

22  Thank you very much for your attention.

23          THE COURT:  You're going to have to keep

24  it short, Peter.

25          MR. REED:  Three points, three minutes.

1    Hang with me.  This is not a case about parsing

2    words or car colors or misunderstanding.  This is a

3    case about common sense, about a trusted

4    coconspirator and a guilty conscience.  It's about

5    common sense.  Driving hundreds of miles to take

6    tens of thousands of dollars from older women in

7    shoeboxes in the dark, that's wrong in any culture,

8    in any language.  He saw those victims.  He saw the

9    money.  He is the one who did the driving.  Highly

10   probable they're being defrauded.  He took

11   deliberate action to avoid learning anything that

12   he could.  That's the ostrich instruction.  Common

13   sense.

14         Second, trusted coconspirator and not a

15   dupe.  Defense counsel compared him to these

16   victims.  It's not even close, not even close.

17   He's clearly not a dupe.  One, he's entrusted with

18   hundreds of thousands of dollars by these folks.

19   Hundreds of thousands of dollars.  He said that,

20   They trust me.  Who is the guy?  This guy.  And who

21   is their guy in Indiana?  The defendant.  Who is

22   their guy in Wisconsin?  The defendant.  Who is

23   their guy in Illinois?  The defendant.  All the

24   people in those three states, there is one guy they

25   trust to take this money and bring it back home.

1    It's this guy.  Close communication, trusted

2    coconspirator, yes, this is going back to India,

3    but these are his people, right?

4            Remember when the victim in Wisconsin

5    said, I couldn't see the car?  I said I couldn't

6    see the car to the guy on the phone, to the

7    scammer, and then the car's lights flashed.  That's

8    close communication.  It's a small crew.  Knows

9    what they're doing.  The friends and family

10   network, right?  It's his family.  These are the

11   people he runs home to when the police stop him.

12   It's a close network.  It's his family.  He is a

13   trusted member of what's going on, and he said

14   they're dangerous people, right?  Dangerous people.

15   They can do anything they want to people.  That is

16   a trusted coconspirator who knows that he's doing

17   something dangerous, that dangerous people are

18   taking money from these women, and he is part of

19   it, right?

20           Guilty conscious.  You heard the victims

21   talk repeatedly about how he tried to hide from

22   them.  Doesn't want to be seen.  You saw how he

23   deleted everything, and you heard that he got

24   stopped in Wisconsin, and this is just -- it's

25   fundamental.  You get stopped doing something, and

Vol. 5 - 1022

1    it, it -- you did not pick up that package.  He

2    knew she did not want him to take her money, but he

3    doesn't tell the police, Oh, I took her money a

4    week ago too.  That's not what happened, right?  He

5    knew that he had been stopped and what he was doing

6    was wrong, and he kept doing it.  He ran away to

7    Atlanta, he came back, and he kept doing it over

8    and over.

9         Guilty conscious, dishonesty, right?  Over

10   and over dishonesty.  Wisconsin, I don't know who

11   these people are.  I don't know -- I've been

12   talking to KKT for two days.  No.  He knew Abhishek

13   back in India.

14         Dishonest in Edwardsville.  He said one

15   time, first time, odd job.  All indications he was

16   trying to communicate I'm not involved in this, but

17   that was a lie.  We know he was involved in this.

18   He wanted the police to believe something different

19   than what he knew was true.  That's a guilty

20   conscious.

21         And, again, in the interview, he says, I

22   didn't get any money from this.  Well, he did get

23   money from this.  He admitted that.  You lie

24   because you have a guilty conscious, and you are

25   trying to hide something.  You're trying to lie

Vol. 5 - 1023

1    that you are a trusted member of the conspiracy,

2    that you knew what you were doing was wrong, and

3    that's what it comes down to the end in that

4    interview.  He says not once, not twice, but four

5    or five, six times he uses the word "wrong," right?

6    "I knew what they were doing was wrong."  To tell

7    you the truth.  Well, what they were doing was

8    wrong, and we all know that.  Knew what they were

9    doing is wrong.

10           I urge all of you to carefully consider

11   the evidence and the law.  I trust that if you do

12   that, use your common sense, you will return a

13   verdict of guilty on all five counts.  Thank you.

14           THE COURT:  Thank you.

15           Members of the jury, I will now instruct

16   you on the law that you must follow in deciding

17   this case.  I will also give you a copy of these

18   instructions to use in the jury room.  You must

19   follow all of my instructions about the law even if

20   you disagree with them.  This includes the

21   instruction I gave you before the trial, any

22   instructions I gave you during the trial and

23   instructions I am giving you now.

24           As jurors, you have two duties.  Your

25   first duty is to decide the facts from the evidence

Vol. 5 - 1024

1    that you saw and heard here in court.  This is your

2    job.  It's not my job or anyone else's job.  Your

3    second duty is to take the law as I give it to you,

4    apply it to the facts and decide if the Government

5    has proved the defendant guilty beyond a reasonable

6    doubt.

7         You must perform these duties fairly and

8    impartially.  Do not let sympathy, prejudice, fear

9    or public opinion influence you.  In addition, do

10   not let anyone's race, color, religion, national

11   ancestry or gender influence you.

12        You must not take anything I said or did

13   during the trial as indicating I have an opinion

14   about the evidence or about what I think your

15   verdict should be.

16        The charges against the defendant are in a

17   document called an indictment.  You will have a

18   copy of the indictment during your deliberations.

19   The superseding indictment in this case charges the

20   defendant committed the crime of conspiracy to

21   commit wire fraud and mail fraud in Count 1; wire

22   fraud, Count 2, 3 and 4; and illegal entry, Count

23   5.  The defendant has pled not guilty to these

24   charges.

25        The indictment is simply the formal way of

1    telling a defendant what crime he is accused of

2    committing.  It is not evidence that the defendant

3    is guilty.  It does not even raise a suspicion of

4    guilt.  The defendant is presumed innocent on each

5    and every one of the charges.  This presumption

6    continues throughout the case including during your

7    deliberations.  It is not overcome unless from all

8    the evidence in the case you are convinced beyond a

9    reasonable doubt that the defendant is guilty as

10   charged.

11        The Government has the burden of proving

12   each defendant guilty beyond a reasonable doubt.

13   This burden of proof stays with the Government

14   throughout the case.  A defendant is never required

15   to prove his innocence.  He is not required to

16   produce any evidence at all.

17        You must make your decision based only on

18   the evidence that you saw and heard here in court.

19   Do not consider anything you may have seen or heard

20   outside of the Court, including anything from the

21   newspaper, television, radio, the Internet or any

22   other source.  The evidence includes only what the

23   witness said -- I'm sorry, only what the witnesses

24   said when they were testifying under oath and the

25   exhibits that I have allowed into evidence and the

1   stipulation that the lawyers agreed to.

2        A stipulation is an agreement that certain

3   facts are true.  In addition, you may recall that I

4   took judicial notice of certain facts that may be

5   considered as matters of common knowledge.  I don't

6   think we did any judicial notice in this, but it's

7   in the rules, so I'm going to read it to you

8   anyway.  You may accept those facts as proven, but

9   you are not required to do so.

10       Nothing else is evidence.  Lawyers'

11  statements and arguments are not evidence.  If what

12  a lawyer is said is different from the evidence as

13  you remember it, it's the evidence that counts.

14  The lawyers' questions and objections, likewise,

15  are not evidence.  A lawyer has a duty to object if

16  he thinks a question is improper.  If I sustain the

17  objection to questions a lawyer asked, you must not

18  speculate on what the answers might have been.  If

19  during a trial I struck testimony or exhibits from

20  the record or told you to disregard something, you

21  must not consider it.

22       Give the evidence whatever weight you

23  decide it deserves.  Use your common sense in

24  weighing the evidence and consider the evidence in

25  light of your own everyday experience.

Vol. 5 - 1027

1    People sometimes look at one fact and
2    conclude from it that another fact exists.  This is
3    called an inference.  You are allowed to make
4    reasonable inferences so long as they are based on
5    the evidence.

6    You may have terms -- you may have heard
7    terms like direct evidence and circumstantial
8    evidence.  Direct evidence is evidence that
9    directly proves a fact.  Circumstantial evidence is
10   evidence that indirectly proves a fact.  You are to
11   consider both direct and circumstantial evidence.
12   The law does not say that one is better than the
13   other.  It is up to you to decide how much weight
14   to give any evidence whether direct or
15   circumstantial.

16   Do not make any decisions simply by
17   counting the number of witnesses who testified
18   about a certain point.  What is important is how
19   truthful and accurate the witnesses were and how
20   much weight you think their testimony deserves.
21   Part of your job as jurors is to decide how
22   believable each witness was and how much weight to
23   give each witness.  You may accept all of what a
24   witness says or part of it or none of it.  Some
25   factors you may consider include the intelligence

1    of the witness; the witness' ability and

2    opportunity to see, hear or know the things the

3    witness testified about; the witness' memory; the

4    witness' demeanor; whether the witness has any

5    bias, prejudice or other reason to lie or slant the

6    testimony; the truthfulness and accuracy of the

7    witness' testimony in light of the other evidence

8    presented; and inconsistent or consistent

9    statements or conduct by the witnesses.

10            You have heard evidence that before the

11    trial, a witness made statements that may be

12    inconsistent with their testimony here in court.

13    You may consider an inconsistent statement made

14    before a trial only to help you decide how

15    believable a witness' testimony was here in court.

16            You have heard evidence that before the

17    trial, the defendant made statements that may be

18    inconsistent with his testimony here in court.  You

19    may consider an inconsistent statement by the

20    defendant made before the trial to help you decide

21    how believable the defendant's testimony was here

22    in court and also as evidence of the truth of

23    whatever the defendant said in the earlier

24    statement.

25            You have heard that the defendant made

1    statements to law enforcement.  You must decide

2    whether the defendant actually made the statements

3    and, if so, how much weight to give to those

4    statements.  In making these decisions, you should

5    consider all of the evidence, including the

6    defendant's personal characteristics and

7    circumstances under which the statement may have

8    been made.

9         During the trial, Hindi and Gujarati

10   language recordings were admitted into evidence.

11   You were also given English transcripts of those

12   recordings, so you could consider the contents of

13   the recording.  It is up to you to decide whether a

14   transcript is accurate, in whole or in part.  You

15   may consider the translator's knowledge, training

16   and experience, the nature of the conversation and

17   the reasonableness of the translation in light of

18   all the evidence in the case.  You may not rely on

19   any knowledge you may have of the Hindi or Gujarati

20   language.  Rather, your consideration of the

21   transcript should be based on the evidence

22   introduced at trial.

23         Certain summaries and charts were admitted

24   in evidence.  You may use those summaries and

25   charts as evidence.

Vol. 5 - 1030

1         If you've taken notes during the trial,

2    you may use them during deliberations to help you

3    remember what happened during the trial.  You

4    should use your notes only as an side to your --

5    I'm sorry, only as aids to your memory.  The notes

6    are not evidence.  All of you should rely on your

7    independent recollection of the events, and you

8    should not be unduly influenced by notes of other

9    jurors.  Notes are not entitled to any more weight

10   than the memory or impression of each juror.

11        The superseding indictment charges that

12   crimes happened "on or about" certain dates.  The

13   Government must prove that the crimes happened

14   reasonably close to those dates.  The Government is

15   not required to prove the crimes happened on those

16   exact dates.

17        The defendant has been accused of more

18   than one crime.  The number of charges is not

19   evidence of guilt and should not influence your

20   decision.  You must consider each charge

21   separately.  Your decision on one charge, whether

22   it's guilty or not guilty, should not influence

23   your decision on any other charge.

24        In deciding your verdict, you should not

25   consider the possible punishment for the defendant.

Vol. 5 - 1031

1    If you decide that the Government has proved the

2    defendant guilty beyond a reasonable doubt, then it

3    will be my job to decide on the appropriate

4    punishment.

5            Count 1 of the indictment charges the

6    defendant with conspiracy to commit wire fraud and

7    mail fraud.  In order for you to find a defendant

8    guilty of this charge, the Government must prove

9    each of the following elements beyond a reasonable

10   doubt:

11           One, the conspiracy to commit wire fraud

12   or mail fraud existed; and two, the defendant

13   became a member of the conspiracy with an intention

14   to further that conspiracy.

15           If you find from your consideration of all

16   the evidence the Government has proved each of

17   these elements beyond a reasonable doubt as to the

18   defendant, then you should find the defendant

19   guilty of that charge.  If, on the other hand, you

20   find from your consideration of all the evidence

21   that the Government has failed to prove any one of

22   these elements beyond a reasonable doubt as to the

23   defendant, then you should find the defendant not

24   guilty of that charge.

25           A "conspiracy" is an express or implied

Vol. 5 - 1032

1    agreement between two or more persons to commit a

2    crime.  A conspiracy may be proven even if its

3    goals were not accomplished.  In deciding whether

4    the charged conspiracy existed, you may consider

5    all of the circumstances, including the words and

6    acts of each of the alleged participants.

7            A conspiracy may exist even if a

8    conspirator does not agree to commit or facilitate

9    each and every part of the substantive offense.  If

10   a -- if conspirators have a plan that calls for

11   some conspirators to perpetrate the crime and

12   others to provide support, the supporters are as

13   guilty as the perpetrators.

14           Counts 2, 3 and 4 of the superseding

15   indictment charges the defendant with wire fraud.

16   In order for you to find the defendant guilty of

17   these charges, the Government must prove each of

18   the following elements beyond a reasonable doubt as

19   to each charge:

20           One, that the defendant knowingly devised

21   or participated in a scheme to defraud as described

22   in Count 1; two, the defendant did so with the

23   intent to defraud; and three, that the scheme to

24   defraud involved a materially false or fraudulent

25   pretense, representation or promise; and four, that

Vol. 5 - 1033

1    the purpose of carrying out this scheme or

2    attempting to do so, the defendant caused

3    interstate wire communications to take place in the

4    manner charged in the particular count.

5         If you find from your consideration of all

6    the evidence that the Government has proved each of

7    these elements beyond a reasonable doubt as to the

8    charge you're considering, then you should find the

9    defendant guilty of that charge.

10        If, on the other hand, you find from your

11   consideration of the evidence that the Government

12   has failed to prove any one of these elements

13   beyond a reasonable doubt, then you should find the

14   defendant not guilty.

15        A scheme is a plan or course of action

16   formed with the intent to accomplish some purpose.

17   A scheme to defraud is a scheme that intends to

18   deceive or cheat another and to obtain money or

19   property or cause the potential loss of money or

20   property to another by means of materially false or

21   fraudulent pretenses, representations or promises.

22   A materially false or fraudulent pretense,

23   representation or promise may be accomplished by an

24   omission or the concealment of material

25   information.

1    In considering whether the Government has

2    proven a scheme to defraud, the Government must

3    prove that one or more of the false or fraudulent

4    pretenses, representations or promises charged in

5    the portion of the indictment describing the scheme

6    be proven -- be proved beyond a reasonable doubt.

7    The Government, however, is not required to prove

8    all of them.

9    A false pretense, representation, promise,

10    omission or concealment is "material" if it is

11    capable of influencing the decision of the person

12    or entity to whom it was addressed.  It is not

13    necessary that the false or fraudulent pretense,

14    representation, promise, omission or concealment

15    actually have that influence -- or actually have

16    that influence or be relied on by the alleged

17    victim as long as it is capable of doing so.

18    A person acts with intent to defraud if he

19    acts knowingly with the intent to deceive or cheat

20    in order to cause a gain of money or property to

21    the defendant or another or the potential loss of

22    money or property of another.

23    A person acts knowingly if he realizes

24    what he is doing and is aware of the nature of his

25    conduct and does not act through ignorance, mistake

Vol. 5 - 1035

1    or accident.  If you decide whether -- I'm sorry.

2    In deciding whether the defendant acted knowingly,

3    you may consider all of the evidence, including

4    what the defendant did or said.

5         You may find that the defendant acted

6    knowingly if you find beyond a reasonable doubt

7    that he believed it was highly probable that the

8    victims were being defrauded and that he took

9    deliberate action to avoid learning that fact.  You

10   may not find the defendant acted knowingly if he

11   were merely mistaken or careless in not discovering

12   the truth or if he failed to make an effort to

13   discover the truth.

14        An offense may be committed by more than

15   one person.  A defendant's guilt may be established

16   without proof that the defendant personally

17   performed every act constituting the crime charged.

18   Any person who knowingly aids the commission of an

19   offense may be found guilty of that offense if he

20   knowingly participated in the criminal activity and

21   tried to make it succeed.

22        The wire fraud statute can be violated

23   whether or not there is any loss or damage to the

24   victim of the crime or gain to the defendant.  The

25   Government need not prove that the scheme to

Vol. 5 - 1036

1  defraud actually succeeded.

2       Telephone calls, mobile or cellular

3  telephone calls, facsimiles, emails, instant

4  messages, wire transfers of funds, text messages

5  and electronic filing of documents constitutes

6  transmission by a means of wire communication.

7       The Government must prove that a private

8  or commercial interstate carrier or interstate

9  communication facilities were used to carry out the

10  scheme, or were incidental to an essential part of

11  the scheme.

12       In order to cause the use of a private or

13  commercial interstate carrier or cause interstate

14  wire communication to take place, the defendant

15  need not actually intend that use to take place.

16  You must find the defendant knew this would

17  actually occur, or that the defendant knew that it

18  would occur in the ordinary course of business, or

19  that the defendant knew facts from which that use

20  could reasonably have been foreseen.  However, the

21  Government does not have to prove that the

22  defendant knew that the wire communication was of

23  an interstate nature or that the carrier was an

24  interstate carrier.

25       The defendant need not actually or

Vol. 5 - 1037

1    personally use an interstate carrier or interstate

2    communications facility.  Although an item

3    communicated interstate need not itself contain a

4    fraudulent representation or promise or a request

5    for money, it must carry out or attempt to carry

6    out the scheme.

7         Count 4 charges the defendant caused an

8    interstate wire communication between the states of

9    Indiana and Oklahoma.  To convict on the wire fraud

10   counts, you are not required to find that the wire

11   communication alleged in that particular count

12   passed through the Southern District of Illinois.

13   Instead, you must find that the wire communication

14   alleged in the indictment traveled between two

15   different states and that the defendant intended to

16   defraud individuals residing in the Southern

17   District of Illinois.

18        Count 5 of the indictment charges the

19   defendant with eluding examination and inspection

20   by immigration officers.  In order for you to find

21   the defendant guilty of this charge, the Government

22   must prove both of the following elements beyond a

23   reasonable doubt:

24        One, the defendant was an alien; and two,

25   the defendant knowingly eluded examination and

1    inspection by immigration officers.

2            If you find from your consideration of all

3    the evidence that the Government has proved each of

4    these elements beyond a reasonable doubt, then you

5    should find the defendant guilty.  If, on the other

6    hand, you find from your consideration of all the

7    evidence that the Government has failed to prove

8    any one of these elements beyond a reasonable

9    doubt, then you should find the defendant not

10   guilty.

11           Once you are all in the jury room, the

12   first thing you should do is choose a foreperson.

13   The foreperson should see to it that your

14   discussions are carried on in an organized way and

15   that everyone has a fair chance to be heard.  You

16   may discuss the case only when all jurors are

17   present.  Once you start deliberating, do not

18   communicate about the case or your deliberations

19   with anyone except other members of the jury.

20           You may not communicate with others about

21   the case or your deliberations by any means.  This

22   includes oral or written communications as well as

23   any electronic method of communication, such as a

24   smartphone, text messaging, instant messaging or

25   services like Facebook, Twitter, or any other

1    method of communication.

2          If you need to communicate with me while

3    you're deliberating, send a note to the court

4    security officer.  The note should be signed by the

5    foreperson or by one or more members of the jury.

6    To have a complete record of this trial, it is

7    important that you do not communicate with me

8    except by written note.  I may have to talk to the

9    lawyers about your message, so it may take me some

10   time to get back to you.  You may continue your

11   deliberations while you wait for my answer.

12         Please be advised that transcripts of

13   trial testimony are not available to you.  You must

14   rely on your collective memory of the testimony.

15   If you send a message, do not include the breakdown

16   of any votes you may have conducted.  In other

17   words, do not tell me you are split 6 to 6 or 8 to

18   4 or whatever your vote happens to be.

19         The verdict forms have been prepared for

20   you.  You will take these forms with you to the

21   jury room.  The verdict form is very simple.  It

22   says, We, the jury, find the following with respect

23   to Defendant Nirav Patel.  You have a column, Count

24   1, 2, 3, 4, 5.  If you find guilty, check the box

25   under or -- the line under "Guilty."  If not

Vol. 5 - 1040

1   guilty, check the line under "Not Guilty."  Then it

2   has a place for the foreperson to sign and then a

3   sign -- a place for each of the rest of the jurors

4   to sign.

5          When you have reached a unanimous

6   agreement, the foreperson will fill in, date and

7   sign the verdict forms.  Each of you will sign the

8   form.  Advise the court security officer once you

9   have reached a verdict.  When you come back to the

10   courtroom, I will read the verdict aloud.

11          Your verdict must represent the considered

12   judgment of each juror.  Your verdict, whether it

13   is guilty or not guilty, must be unanimous.

14          You should make every effort -- you should

15   make every reasonable effort to reach a verdict.

16   In doing so, you should consult with each other,

17   express your own views, and listen to your fellow

18   jurors' opinions.  Discuss your differences with an

19   open mind.  Do not hesitate to reexamine your own

20   views and change your opinion if you come to

21   believe it is wrong, but you should not surrender

22   your honest beliefs about the weight or effect of

23   evidence just because of the opinions of your

24   fellow jurors or just so there can be a unanimous

25   verdict.

Vol. 5 - 1041

1            The twelve of you should give fair and

2      equal consideration to all the evidence.  You

3      should deliberate with the goal of reaching an

4      agreement that is consistent with the individual

5      judgments of each juror.  You are impartial judges

6      of the facts.  Your sole interest is determined

7      whether the Government has proven its case beyond a

8      reasonable doubt.

9            All right.  Swear in the court security

10     officer.

11           (Court security officer sworn.)

12           THE COURT:  The joys of being the

13     alternate jurors:  In a civil case, you get to

14     deliberate with the whole group, but in a criminal

15     case, because the specifics are the judgment of 12

16     jurors, the alternates will not deliberate with the

17     jury unless I discharge one of the jurors for

18     whatever reason.  So we will keep you separately,

19     and we'll keep you advised of things, but it's kind

20     of the gip that we spring on you at 3:25 on a

21     Friday afternoon.  All right.

22           COURTROOM DEPUTY:  All rise.

23           (Jury retires to began deliberations at

24     3:27 p.m.)

25           MS. FRETER:  Judge, this is in support of

Vol. 5 - 1042

1    my objection to Jury Instruction No. 26, which was

2    the non-pattern Pinkerton-like instruction that the

3    Government submitted.  I wanted the record to

4    reflect for any issues concerning possible

5    prejudice that during the first part of the

6    Government's closing argument, this instruction,

7    portions of it, were displayed on a PowerPoint

8    screen.  They were left in front of the jury.  The

9    slide was left up from approximately 1:22 to 1:27,

10   so for about five minutes.  The words were

11   highlighted in yellow and underlined.  Thank you.

12            THE COURT:  Any response?

13            MR. WEINHOEFT:  No.

14            THE COURT:  Anything else?

15            MS. FRETER:  No, Your Honor.

16            THE COURT:  All right.  Well, we will

17   await the jury's verdict.  It was my hope that the

18   cross-examination would have gone much faster

19   today.  My understanding -- and I did not want to

20   give the jury this case late in the day; however,

21   impacting my determination was we're required to

22   have two out-of-state translators, interpreters,

23   present.  If I were to continue this to Monday --

24   and my understanding is the inclement weather, at

25   least yesterday, there was the belief that we may

Vol. 5 - 1043

1    have weather issues on Monday, and I didn't want to

2    force translators to try to travel Monday or

3    Tuesday if there were going to be inclement issues

4    with weather.  We still may -- we may still carry

5    on until Monday for deliberations.  Generally

6    speaking, the -- they want people out of this

7    courthouse by 4:30, but we will keep the jury for a

8    while after that.  I'll just have to see how things

9    are being paced and what they have to say.

10                All right.  Anything else on the record

11   before we close for the Government?

12                MR. REED:  No, Judge.

13                THE COURT:  Anything else for defense?

14                MS. FRETER:  No, Your Honor.

15                (Recess from 3:30 p.m. to 4:04 p.m.)

16                (On the record outside the presence of the

17   jury.)

18                THE COURT:  Very quick, we got a note from

19   the jury that reads as follows:  We need two copy

20   (sic) of the indictment.  We do not know what the

21   exact charges are for Counts 2, 3 and 4.

22                MR. WEINHOEFT:  That seems like a very

23   reasonable request on their end.

24                MS. FRETER:  There was a copy of the

25   indictment that went back, though, right?

Vol. 5 - 1044

1          THE COURT:  There was supposed to be a
2     copy of the superseding indictment.  I told them
3     that they would get it.
4          COURTROOM DEPUTY:  They did not get it.
5          THE COURT:  They did not get it?
6          COURTROOM DEPUTY:  No.
7          THE COURT:  So we send them two copies of
8     the superseding indictment.  Do you want me to put
9     anything else?
10          MS. FRETER:  No, Your Honor.
11          THE COURT:  All right.  So I won't even --
12     I will keep this writing, as I'm required to, but I
13     will just have the court security officer go in
14     there with two copies of the superseding
15     indictment.
16          Any objection?
17          MR. WEINHOEFT:  No, sir.
18          MR. REED:  No.
19          MS. FRETER:  No, Your Honor.
20          THE COURT:  All right.
21          (Recess at 4:06 p.m. to 4:27 p.m.)
22          (Jury present.)
23          THE COURT:  All right.  Mr. Foreman, do
24     you have a verdict?
25          MR. FOREMAN:  Yes, Your Honor.

Vol. 5 - 1045

1          THE COURT:  Would you hand it to the court
2    security officer?
3          All right.  I've been handed a verdict in
4    the *United States of America v. Nirav Patel*.  We,
5    the jury, find the following with respect to
6    Defendant Nirav Patel:  As to Count 1, guilty; as
7    to Count 2, guilty; as to Count 3, guilty; as to
8    Count 4, guilty; as to Count 5, guilty.
9          Signed as Foreman, Demari Williams.
10          Sir, is this your signature?
11          MR. FOREMAN:  Yes, Your Honor.
12          THE COURT:  All right.  Juror No. 1, is
13    this your verdict, and did you sign the form?
14          JUROR NO. 1:  Yes, Your Honor.
15          THE COURT:  All right.  Juror No. 2, is
16    this your verdict?
17          JUROR NO. 2:  It is, Your Honor.
18          THE COURT:  And as to all counts?
19          JUROR NO. 2:  (No response.)
20          THE COURT:  As to all counts?
21          JUROR NO. 2:  Yes, sir.
22          THE COURT:  And is that your signature?
23          JUROR NO. 2:  Yes.
24          THE COURT:  All right.  Juror No. 1, is
25    this, to all counts, your verdict?

Vol. 5 - 1046

1          JUROR NO. 1:  Yes.

2          THE COURT:  Juror No. 3, is this your

3    verdict as to each count?

4          JUROR NO. 3:  Yes.

5          THE COURT:  All right.  And is this your

6    signature?

7          JUROR NO. 3:  Yes.

8          THE COURT:  All right.  Juror No. 4, is

9    this your verdict?

10          JUROR NO. 4:  Yes.

11          THE COURT:  And as to all counts?

12          JUROR NO. 4:  Yes.

13          THE COURT:  And this is your signature?

14          JUROR NO. 4:  Yes.

15          THE COURT:  All right.  Next, is this your

16    verdict, ma'am -- I already read yours.

17          Demari, is this your verdict?

18          MR. FOREMAN:  Yes, Your Honor.

19          THE COURT:  As to each count?

20          MR. FOREMAN:  Yes, Your Honor.

21          THE COURT:  All right.  And did you sign

22    this?

23          FOREMAN:  Yes, Your Honor.

24          THE COURT:  Next juror, is this your

25    verdict?

Vol. 5 - 1047

1          JUROR NO. 6:  Yes, sir.

2          THE COURT:  And is that to all counts?

3          JUROR NO. 6:  Yes.

4          THE COURT:  Is this your signature?

5          JUROR NO. 6:  Yes.

6          THE COURT:  Ma'am, is this your verdict?

7          JUROR NO. 7:  Yes.

8          THE COURT:  And as to each count?

9          JUROR NO. 7:  Yes.

10         THE COURT:  And is this your signature?

11         JUROR NO. 7:  Yes.

12         THE COURT:  All right.  Sir, is this your

13    verdict?

14         JUROR NO. 8:  Yes.

15         THE COURT:  As to each count?

16         JUROR NO. 8:  Yes.

17         THE COURT:  And is this your signature?

18         JUROR NO. 8:  Yes.

19         THE COURT:  Juror, is this your verdict?

20         JUROR NO. 9:  Yes, sir.

21         THE COURT:  As to each count?

22         JUROR NO. 9:  Yes, sir.

23         THE COURT:  And is this your signature?

24         JUROR NO. 9:  Yes.

25         THE COURT:  Sir, is this your verdict?

Vol. 5 - 1048

1              JUROR NO. 10:  Yes.

2              THE COURT:  As to each count?

3              JUROR NO. 10:  Yes.

4              THE COURT:  Is this your signature?

5              JUROR NO. 10:  Yes.

6              THE COURT:  Is this your verdict?

7              JUROR NO. 11:  Yes.

8              THE COURT:  As to each count?

9              JUROR NO. 11:  Yes.

10             THE COURT:  And is this your signature?

11             JUROR NO. 11:  Yes.

12             THE COURT:  And finally, sir, is this your

13    verdict?

14             JUROR NO. 12:  Yes, Your Honor.

15             THE COURT:  As to each count?

16             JUROR NO. 112:  Yes, Your Honor.

17             THE COURT:  And is this your signature?

18             JUROR NO. 12:  Yes, Your Honor.

19             THE COURT:  I'll enter a judgment on the

20    jury's verdict.

21             Ladies and gentlemen, I appreciate very

22    much your service this week.  Any time we are -- we

23    have cases where you have language barriers, that

24    sort of thing, it makes it more difficult, but I'm

25    very impressed in the way you conducted yourself,

Vol. 5 - 1049

1    and it's important not only that, you know, when

2    people participate in hearings that they think that

3    it's fair and they see that people are trying to be

4    fair, and I commend you because you guys conducted

5    yourself appropriately, and we thank you for your

6    service.

7         Most cases that go to trial go to trial

8    because they're not easy cases.  Easy cases tend to

9    get resolved.  It's the tough cases that tend to go

10   to trial, and so we appreciate your efforts in

11   helping us in this case.

12        My admonitions about you not being able to

13   talk to people about this case, that's done.  You

14   can talk to your family.  You can talk to your

15   alternates about your thoughts.  You can talk to

16   them.  We do have some stuff for you so that you'll

17   have to go back to the jury room before we

18   discharge you, and not only are you free to talk to

19   your family and friends about it, but you can talk

20   to the lawyers if you wish.

21        Sometimes the lawyers stick around,

22   they'll be available out in the hall or here.  If

23   you want to talk to the lawyers, you're welcome to

24   do so.  If you want to talk to me about it, you're

25   welcome to do so, if you want me to give you a tour

Vol. 5 - 1050

1    of what else is back there.

2           As you probably figured out, the -- our

3    little dinky jury room with our indifferent coffee

4    is probably the least impressive room of this

5    complex.  So if you want to do that, you can.  If

6    you want to leave from here and -- you're free to

7    do that as well.  You're not obligated to talk to

8    anybody.

9           Now, Mr. Patel, the -- as I explained in

10   the instructions, we will set this matter for a

11   sentencing hearing.  The sentencing hearing will be

12   on May 29, 2025, in this courtroom at 10:30 a.m.

13   It will be open to the public if anybody wishes to

14   watch the proceedings.

15          At a sentencing hearing, it's not just the

16   day you find out what sentence will be imposed.

17   You can call witnesses.  You can testify.  Victims

18   can testify.  The -- I'm not sure what the

19   sentencing guidelines are in this case.  You will

20   be asked to meet with probation, and you can have

21   your lawyer present if you wish when you talk to

22   them, and the probation will prepare a detailed

23   review of the facts of your background.  We'll talk

24   about your family, your employment history, and

25   that's called a presentence investigative report.

Vol. 5 - 1051

1    You and your lawyer can object to anything that is

2    in that report, and I will rule on those objections

3    before we get to the sentencing phase of the

4    hearing.

5            The -- we generally -- there's two things.

6    There's statutes that say here under the law are

7    the potential penalties that can be imposed:  A

8    term of imprisonment, a term of supervised release

9    or probation, but it's usually a pretty big swing,

10   many years apart.  The sentencing guidelines give

11   us a narrower range of what the sentencing

12   guidelines would recommend in your case.  I'm not

13   obligated to them; but if I impose a sentence

14   that's above or below those guidelines, I have to

15   give my reasons why I'm doing that.

16           So you are able to talk to me at the

17   sentencing hearing about all the things you want me

18   to know about you before I impose a sentence.  What

19   the law directs me to do is to impose a sentence

20   that is sufficient, but not greater than necessary,

21   to fulfill the interests of justice, and so -- and

22   I'll listen to whatever you have to say.  If you

23   have witnesses that will come in and testify about

24   you, we'll listen to them as well.  You don't have

25   to talk to me, but if you do, I'll listen.  Your

Vol. 5 - 1052

1    lawyer will get to argue on your behalf, but I want

2    to let you know that those are rights that you

3    have.

4            All right.  Anything else from the

5    Government?

6            MR. REED:  No, Judge.  Thank you.

7            THE COURT:  Anything else on behalf of the

8    defendant?

9            MS. FRETER:  No, Your Honor.

10           THE COURT:  All right.  We are adjourned.

11   Thank you very, very much.

12           (Proceedings adjourned at 4:36 p.m.)

13

14                * * * * * * * * * * * *

15

16              CERTIFICATE OF COURT REPORTER

17

18       I, Erin M. Materkowski, hereby certify that

19   the foregoing is a true and correct transcript from

20   reported proceedings in the above-entitled matter.

21

22   /s/ Erin M. Materkowski          Date: 06/30/2025
     ERIN M. MATERKOWSKI, RPR, CRR
23   Official Court Reporter
     Southern District of Illinois
24   East St. Louis Division

25